UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         ) Case No:  4:13-cr-25/RH
                                   )
vs.                                ) Tallahassee, Florida
                                   ) June 10, 2013
JAMIE LEE WAMBLES,                 ) 8:18 A.M.
                                   )
                Defendant.         )
_____)


VOLUME I
(Pages 1 through 201)

TRANSCRIPT OF ATTORNEY CONFERENCE AND FIRST DAY OF TRIAL
BEFORE THE HONORABLE ROBERT L. HINKLE,
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:


  For the Plaintiff:        Pamela C. Marsh
                            United States Attorney
                            By:  JAMES M. USTYNOSKI
                                 Assistant U.S. Attorney
                                 james.ustynoski@usdoj.gov
                            111 North Adams Street
                            4th Floor
                            Tallahassee, Florida   32301


  For the Defendant:        Randolph P. Murrell
                            Federal Public Defender
                            By:  RANDOLPH P. MURRELL
                                 Federal Public Defender
                                 randolph_murrell@fd.org
                            227 North Bronough Street
                            Suite 4200
                            Tallahassee, Florida   32301




JUDY A. GAGNON, RMR, FCRR
Official United States Court Reporter
111 North Adams Street * Tallahassee, Florida  32301-7717
(850) 561-6822

1              P R O C E E D I N G S

2         (Call to Order of the Court.)

3         (Defendant present.)

4              THE COURT:  Good morning.  Please be seated.

5              MR. USTYNOSKI:  Good morning.

6              THE COURT:  Is the government ready for trial?

7              MR. USTYNOSKI:  Yes, Your Honor.  Good morning.

8              THE COURT:  Defense ready?

9              MR. MURRELL:  Well, yes, sir, except I think

10   Mr. Wambles would again like to ask the court for a new

11   lawyer.

12             THE COURT:  Mr. Wambles, tell me what the issue is.

13   Stand up for me and come to the lectern.

14             THE DEFENDANT:  Well, Mr. Murrell is a good lawyer,

15   but for me he's not.  Everything I ask him to do it's still

16   no.  I mean, my defense part is no, no, no.  I mean, I need

17   somebody who is going to defend me.  He's telling me you can

18   go to trial, but I can't defend you on the charges.  So he's

19   no good to me.  I might as well stand here by myself and

20   defend my own self.  I feel like I'm getting railroaded.  You

21   know what I mean?  I mean, allegedly one of the letters that I

22   allegedly sent was to the same building he works in.  So I

23   believe that's a conflict right there.  I sent you a letter.

24   I done it wrong.  I should have sent it to the clerk of court,

25   which I didn't know at the time.  I didn't find all of this

1    out --

2         THE COURT:  I couldn't tell from your letter you were

3    talking about Mr. Murrell.  I didn't know that until you

4    started talking about it.  It occurred to me it might have

5    been.  But you didn't say anything about your lawyer not

6    rendering good assistance.  What is it that you've asked him

7    to do that he won't do?

8         THE DEFENDANT:  My defense, my insanity defense.  I

9    mean, I wasn't who I am now -- you know what I mean? -- at the

10   time of the incidents.  I need me to be evaluated, and you get

11   evaluated after you are found guilty or you pled out, you use

12   that on your sentencing, that don't do me no good today.  I

13   need somebody that's going to -- he worked with me some on

14   other things, but on my defense, nothing.  I need somebody who

15   is going to be here and help me.  Other than that.  I'll just

16   do it by myself.  You know what I mean?

17        THE COURT:  What you want to do is insert an insanity

18   defense.

19        THE DEFENDANT:  Yes, sir.  Dementias, mental

20   capacity.  I mean, there's several things I can use for my

21   defense.  I wasn't in my right state of mind, you know.

22        THE COURT:  Have you talked to Mr. Murrell about what

23   the law is?  You understand that the law that applies to you

24   in the case is the law that applies to everybody.  We're not

25   going to make up the law just for you.

1          THE DEFENDANT:  Right.

2          THE COURT:  So there is law.  You're not the first

3    person charged with an offense who had mental health issues or

4    claimed to have mental health issues.  So the law that applies

5    is the law that applies generally to everybody.

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  So what you need really is a lawyer who

8    knows the law and can talk with you about that law.  And if

9    the answer is, your circumstances just don't match that law,

10   you need to know that.

11         THE DEFENDANT:  Right.

12         THE COURT:  Having a lawyer who says, "Sure,

13   Mr. Wambles, we'll assert a mental health defense," that

14   doesn't do you any good, if the law doesn't support it, and

15   there's no basis to assert such a defense.  And if the law

16   doesn't support it, and there's no basis to support such a

17   defense, then I can appoint a hundred lawyers in a row, and

18   every competent lawyer is going to tell you the same thing,

19   until I get one that is totally incompetent who may do what

20   you want.

21         THE DEFENDANT:  Right.

22         THE COURT:  We had this discussion before.  I talked

23   with Mr. Murrell about whether he consulted on this and looked

24   into it, and he had.  I don't hear you telling me anything

25   other than Mr. Murrell won't tell you what you want the law to

1    be, and won't assert the defense that he thinks in his best

2    professional judgment isn't supported by the facts or law.

3            THE DEFENDANT:  Okay.  Well, if you was in my shoes,

4    which you're not, and I appointed you a lawyer, and your

5    lawyer -- and you're going to trial and your lawyer is telling

6    you there's no defense, you're just plain guilty, I mean,

7    that's not a lawyer.  If I had $30,000 to pay on a lawyer, I

8    bet I can get him up here to defend me, but I don't have that

9    money.  If you want me to keep him, I'll keep him.  I just

10   want to get that on the record.

11           THE COURT:  Mr. Murrell, we're in the same situation

12   the last time we talked.  You consulted.

13           MR. MURRELL:  Yes, sir, I'd say we are.  Yes, I'd say

14   we are.

15           THE COURT:  If I appointed a different lawyer, and

16   the lawyer represented his client zealously within the bounds

17   of the law, do you have any reason to think that his lawyer

18   would do anything differently than you have done?

19           MR. MURRELL:  No, sir.

20           THE COURT:  Mr. Wambles, your choices are to go

21   forward with Mr. Murrell or defend yourself, if you want to do

22   that and meet the requirements of doing that, but I'm not

23   going to appoint you a new lawyer.

24           THE DEFENDANT:  Okay.

25           THE COURT:  All right.  I've gotten a government

1    witness list.  Is there a defense witness list?

2         MR. MURRELL:  No, sir.

3         MR. USTYNOSKI:  Your Honor, I filed an amended list

4    this morning.  There was one name that came up over the

5    weekend.  I have copies for Your Honor.

6         THE COURT:  Just tell me the new name.  That's good

7    enough.

8         MR. USTYNOSKI:  All we did was add to the end the one

9    you have, Your Honor, Jason McAlpin, M-c-A-l-p-i-n, an

10   investigator with the Jackson County Sheriff's Office.

11        THE COURT:  All right.

12        MR. USTYNOSKI:  That's all we added.

13        THE COURT:  All right.  I didn't ask you, I guess I

14   should have.  You are the one that writes the brief.  If you

15   get a conviction and defended it on appeal, do you want me to

16   do anything differently with Mr. Wambles' request?

17        MR. USTYNOSKI:  Yeah.  I was just going to suggest

18   one thing, and maybe it's not, you know, out of an abundance

19   of caution, because I could see a potential 2255.  Mr. Wambles

20   just said now that one of his issues was that his lawyer --

21   one of the reasons he didn't want his lawyer was because he

22   was in the same courthouse where allegedly the letter that he

23   sent came to.

24        THE COURT:  Same federal building.

25        MR. USTYNOSKI:  Right.  And I just want to make sure

1   that both sides originally agreed that there was no reason to

2   file anything so that Your Honor could sit here.  I just want

3   to make sure he's not claiming the same thing with the court.

4            THE COURT:  Oh, I invoked the remittal procedure.  So

5   I assume that both sides filed an affirmative waiver,

6   otherwise I wouldn't still be here.

7            MR. USTYNOSKI:  Right.  That's why I just want to

8   make sure, but what he said now, I just want to make sure he's

9   not changing his position on that, Your Honor, that's all.

10           THE COURT:  Mr. Murrell and Mr. Wambles, no changes

11  about me sitting in the case?

12           MR. MURRELL:  No, sir.

13           THE COURT:  Mr. Murrell, I guess I should have asked

14  you.  Do you think your having an office in this building

15  affects in any way your handling the case?

16           MR. MURRELL:  Well, no.  I mean, we're actually in

17  the City Center Building, of course; and the letter that he's

18  talking about was sent to Mr. Leon.  And, frankly, my argument

19  is going to be that was not even a threat.  But even if you

20  want to read it as a threat, as the government does, I think

21  it was a threat to blow up this building, not the City Center

22  Building.  It just happened to be mailed to Mr. Leon, who was

23  in the City Center Building, but it wasn't a threat to damage

24  that particular building.

25           THE COURT:  All right.  So it was a communication

1  that was delivered to that building, but it was a threat to

2  blow this building up.

3            MR. MURRELL:  That's the reading I think the

4  government has given.

5            THE COURT:  That's the government's theory.  But, in

6  any event, whatever it was, whether it was a threat or not, it

7  dealt with this building.

8            Okay.  Mr. Ustynoski, let me make sure I do

9  understand the theories.  Counts One and Two deal with a

10  biological agent.  The theory is that it was a false claim.

11  What was the biological agent?  Is it referred to in the

12  communication?

13            MR. USTYNOSKI:  That's true, a biological agent, Your

14  Honor.

15            THE COURT:  And what was it?

16            MR. USTYNOSKI:  Allegedly Anthrax.

17            THE COURT:  All right.  Maybe that's what the letter

18  refers to, is Anthrax.

19            Count Three refers to a destructive device.  Is that

20  the bomb?

21            MR. USTYNOSKI:  Yes.  Yes.  He mentions it.

22            THE COURT:  Count Three alleges false threats just

23  like Counts One and Two allege false threats.  Count Four

24  doesn't allege false.  That is the communication threatening

25  to harm --

1           MR. USTYNOSKI:  Harm another person.

2           THE COURT:  Mr. Leon?  Does it say who it was?

3           MR. USTYNOSKI:  No, just another person, Your Honor.

4           THE COURT:  That's what the indictment says.  What

5    does the communication say?

6           MR. USTYNOSKI:  Well, it basically is implied, Your

7    Honor, to blow up the building, the same thing he's been

8    implying in the other three letters.

9           THE COURT:  But Count Four is not the same letter as

10   Count Three.

11          MR. USTYNOSKI:  No.  There are four different

12   letters, each letter is separate.

13          THE COURT:  One and Two are Anthrax and --

14          MR. USTYNOSKI:  One and Two are Anthrax; Three would

15   be components of a bomb; and Four also components of a bomb.

16          THE COURT:  Mr. Murrell, I'm going to voir dire on

17   the defense right to remain silent, if that's okay with the

18   defense.

19          MR. MURRELL:  Yes, sir.

20          THE COURT:  There are no cooperating witnesses in the

21   case, are there -- or are there?

22          MR. USTYNOSKI:  No cooperating witnesses.

23          THE COURT:  No plea-bargained witness?

24          MR. USTYNOSKI:  No.

25          MR. MURRELL:  Well, there is a witness who is

1   incarcerated and not -- I don't think there is any written

2   agreement or anything.  Maybe he's looking for a break, I

3   don't know, but --

4          THE COURT:  You can certainly cross-examine about

5   that, but I'm not going to bring it up in jury selection.

6          I try to mention to the parties, Mr. Wambles,

7   everybody over here, you can't communicate with the jurors

8   during the jury-selection process.  They will be close to you,

9   but the only communication back and forth is as part of the

10  questioning.  Don't talk to them separately.

11         That's all I have that I need to talk with you about,

12  unless you have something you need to talk to me about.  Any

13  issues?

14         MR. MURRELL:  Nothing from the defense; no, sir.

15         MR. USTYNOSKI:  No, Your Honor.  I added the

16  stipulation to defense counsel, two stipulations, we're

17  discussing those, Your Honor.

18         MR. MURRELL:  Well, I mean, we can talk about it.  I

19  certainly would be happy to file these stipulations.  I think

20  they are fairly procedural.  I don't know if Mr. Wambles is

21  interested in signing them.

22         THE COURT:  What are they?

23         MR. MURRELL:  I don't think we actually need them.

24  One is Mr. Ustynoski wants to say -- I mean, I think he's

25  concerned about the chain of custody.  As I understand the

1    rule, I don't think you really need the testimony of every

2    person that handled the letter.  If he introduces the

3    testimony of the fellow that got the letter, and then somebody

4    who examined it later, I think that is perfectly fine.  So I

5    don't think we really need a stipulation about chain of

6    custody.

7            THE COURT:  In any event, you don't have to stipulate

8    to anything you don't want to stipulate to, and Mr. Wambles

9    doesn't have to stipulate to anything.  But ordinarily, it's

10   correct, to identify a letter, you don't need everybody who

11   handled the letter.  If somebody can say this is what it is,

12   then you --

13           MR. MURRELL:  Mr. Ustynoski was concerned about the

14   condition of the letter.  Again, I don't see where that really

15   enters into it.  As long as they can identify the letter, I

16   think that's enough.

17           THE COURT:  But they don't have to stipulate to

18   anything.  And if there is a stipulation, then the way the

19   jury can find out about it is you tell me there's a

20   stipulation, I'll explain to the jury what that is, and then

21   you can read it.  But, again, the defense doesn't have to

22   stipulate to anything.

23           MR. MURRELL:  We'll talk about it some more.

24           THE COURT:  We will recess in just a second.  We will

25   be in recess until the jurors all get in their seats.  That

1    will probably be a half hour.  It could be a little sooner.

2    It could be a little longer.  It depends on how long it takes

3    to check everybody in down there.  You don't have to stay

4    right here in the courtroom, but make sure you are very close.

5    I don't want there to be any delays.  When the last juror sits

6    down, I expect to walk right into the courtroom and go right

7    to work at that point.

8            Anything else we need to do before that?

9            MR. MURRELL:  No, sir.

10           MR. USTYNOSKI:  No.

11           THE COURT:  All right.  We'll be in recess.

12       (*A recess was taken at 8:32 a.m.*)

13       (*The proceedings resumed at 8:49 a.m.*)

14       (*Defendant present.*)

15           THE COURT:  Please be seated.  The courtroom deputy

16   tells me you wanted me back.

17           MR. MURRELL:  I'm sorry.  I didn't mention this

18   earlier.  While you were out, I was reviewing the file and

19   started adding up the days.  Mr. Wambles had initial

20   appearance on March 26th.  By my count that's 76 days from

21   now, or that's 76 days ago.  We did file a motion for an *in*

22   *camera* inquiry.  There's about a four-day lapse there.  But by

23   my count, this is the 73rd day, since his initial appearance,

24   and the indictment had already been filed at the time of his

25   initial appearance.

1          So, with my apologies to the court for bringing this

2     up so late; although, we just did cross it, it seems to me,

3     Friday and over the weekend, I would move to dismiss on the

4     basis of speedy trial.

5          THE COURT:  Mr. Wambles' letter was pending longer

6     than that.  So just the letter itself would exclude more than

7     three days.

8          MR. MURRELL:  Well, that may be the court's view, but

9     my position is that the case should be dismissed on the basis

10    of speedy trial.

11         THE COURT:  Mr. Ustynoski?

12         MR. USTYNOSKI:  In furtherance of what you just said,

13    Your Honor, they filed a motion, as far as the possible

14    conflict of the court and Mr. Murrell, and Your Honor in

15    response gave the defendant, I believe it was -- and the

16    government -- ten days to respond, to see if, you know, either

17    side objected to Your Honor sitting.  And I would argue that

18    the ten days should be excludable.  That was pursuant to the

19    defendant's motion, and Your Honor gave us ten days to respond

20    to that.  So I would argue those ten days would also be

21    excluded.

22         THE COURT:  There were at least four days excluded by

23    the -- and I guess you counted those -- by the motion for an

24    *in camera* inquiry.  That was when Mr. Wambles was complaining

25    about Mr. Murrell the first go around.  That motion got

1    docketed May the 3rd.  We had a hearing on May 7th.

2         I invoked the remittal procedure on May 7th.  The

3    waivers got filed on May 22nd.  Those dates -- that period

4    would properly be excluded.

5         The trial was set for June 3rd and got stacked for

6    June 10th.  We could have picked the jury on June 3rd and

7    started the trial.  Ordinarily would have.  I think we set it

8    for the 10th so that everybody would have notice of exactly

9    when the case was going to go to trial.  I don't remember the

10   details of why that was done.  The defense, of course, has no

11   obligation to bring the case to trial within the speedy trial

12   period.  But, for the record, let me give you this description

13   and tell you I would appreciate it if -- here's the way it

14   gets done.

15        We set trials for the beginning of the trial period.

16   In this instance June the 3rd.  That was within the 70 days,

17   even without any excluded days.  If all goes smoothly, the

18   trials start on June 3rd.  We pick the juries for any cases

19   that are going to trial, and then -- which takes care of the

20   speedy trial issue, and then the actual trials, the remainder

21   of the trials, after the jury selection get stacked as

22   convenient for the parties and the court.

23        It helps to know exactly when the witnesses need to

24   be there.  In this instance, I probably had, I don't know, a

25   substantial number of trials set for the 3rd, and so that

1    everybody here would know exactly where we stood, we set this

2    one for the 10th.  Actually, the reason this one didn't

3    actually start on the 3rd was that we had a trial that started

4    May 28th, or whatever the Wednesday was the week before.

5    Mr. Murrell was the defense lawyer in that case.  In that case

6    I think we got a verdict on June 4th.  So we had a trial

7    actually in process with Mr. Murrell as the lawyer that

8    wrapped around to the 4th.

9         We didn't know exactly how long that trial would

10   continue, and so for everyone's convenience, we said we would

11   actually call witnesses on the 10th and give everybody plenty

12   of notice.  Nobody had any objection to that.  We obviously

13   couldn't start on the 3rd, because Mr. Murrell was in the

14   other trial, as was I.

15        Had there been a speedy trial objection, I could have

16   had another judge try the case.  But we had already been

17   through the remittal process in this case, so that another

18   judge couldn't do it without again invoking the remittal

19   process and giving the time for response, because the other

20   judge, like me, had offices in the building.

21        So I understand, but I -- and I treat that as a

22   motion to dismiss on speedy trial grounds.  I deny the motion.

23        Anything else?

24        MR. MURRELL:  Not from the defense, no, sir.

25        THE COURT:  We are still waiting on the jurors.

1   We'll be in recess until they are here.

2       (*A recess was taken at 8:55 a.m.*)

3       (*Jury-selection proceedings filed separately under seal.*)

4                       *  *  *  *  *  *  *  *

5       (*The proceedings resumed at 11:04 a.m.*)

6       (*Defendant present; jury not present; Mr. Ustynoski not

7   present.*)

8               THE COURT:  Please be seated.

9       (*Mr. Ustynoski entered the courtroom at 11:06 a.m.* )

10              Mr. Ustynoski, we run on time.

11              MR. USTYNOSKI:  I apologize.

12              THE COURT:  When I say court is going to start at

13  11:00, court is going to start at 11:00.

14              Jury in, please.

15      (*The jury entered the courtroom at 11:08 a.m.*)

16              THE COURT:  All right.  You may be seated.

17              Members of the jury, we had an oath for you to take

18  at the beginning of the jury-selection process.  That was your

19  oath to answer truthfully the questions asked during that

20  process.  We now have another oath for you to take.  This is

21  your oath as the jury that will try the case.

22              The clerk will please administer the oath.

23              DEPUTY CLERK:  If y'all will please stand and raise

24  your right hand.

25      (*Jury duly sworn.*)

1          You may have a seat.

2          THE COURT:  You've now been sworn as the jury.  By

3    your verdict you will decide the disputed issues of fact.  You

4    will do that based on the evidence introduced during the

5    trial.

6          The evidence will consist of testimony of witnesses

7    and papers or things that are referred to as "exhibits."  You

8    should pay close attention to the testimony, because you'll

9    have to rely on your memory of it and any notes you choose to

10   take.  You will not receive typewritten transcripts.  On the

11   other hand, an exhibit that is admitted into evidence

12   ordinarily will be available to you during your deliberations.

13   So you'll have access to the exhibit later even if it's not

14   fully read to you or shown to you during the trial.

15         If you wish to take notes you may do so.  We provided

16   pads and pens for your use if you choose to take notes.  On

17   the other hand, of course, you're not required to take notes.

18   Whether to do that or not is left up to each of you

19   individually.  If you decide to take notes, please don't get

20   so involved in note-taking that you lose track of the ongoing

21   proceedings.  And whether or not you take your own notes, you

22   should not be unduly influenced by the notes of any other

23   juror.  Notes are not entitled to any greater weight than the

24   memory and impression of each juror.  When we take breaks or

25   overnight, please leave your notepad right there on your

1    chair.  Nobody will look at your notes, and the courtroom

2    deputy clerk will safeguard them for you, lock them up

3    overnight, and have them back out on your chair in the

4    morning.

5           During the trial you must keep an open mind.  Avoid

6    hasty impressions or conclusions.  Reserve your judgment until

7    you have heard all of the testimony and evidence, the closing

8    arguments, and my instructions on the law.

9           So you will keep an open mind during the trial, and

10   then you will decide the case based just on the evidence.  To

11   help make sure this happens, there is another rule.

12          You must not discuss the case during the trial in any

13   manner among yourselves or with anyone else, and you cannot

14   allow anyone to discuss the case with you or in your presence.

15   So you won't be talking about the case with anybody until the

16   trial is over, and you retire to deliberate with the other

17   jurors.

18          In addition, you must not have any conversations or

19   communications at all about the case or about anything else

20   with a lawyer or party or witness or anybody who has a

21   connection with one side of the case or the other.

22          The reason is to avoid even the appearance of

23   impropriety.  A lawyer or party or witness would not talk with

24   you about the case; but, if somebody saw you talking to one of

25   those people, for example, if you passed a lawyer coming or

1    going at the end of the trial day or the next morning before

2    trial, and somebody was down on the street corner and saw you

3    talking with that lawyer, that person would not know what you

4    were talking about, and so to avoid even any impression that

5    you could be talking about the case, the rules provide that a

6    lawyer or a party or a witness will not talk with you at all

7    even to say hello, except right here in the courtroom as part

8    of the formal proceeding where we all can hear.

9            So, if you pass a lawyer or a party or a witness and

10   the person does not speak to you, even to say hello, don't

11   think them rude, they are just following the rules.

12           As I discussed with you during the jury-selection

13   process, you must avoid reading any newspaper story about the

14   case.  You must avoid hearing or seeing any radio or

15   television coverage.  I don't expect there to be any media

16   coverage of this case, but I never know which cases are going

17   to be covered and which are not.  So, if there should be any

18   coverage, make sure you don't see or hear or read it.

19           You must not get any information over the internet or

20   send out any information over the internet or in any other

21   way.  You must not get or send emails or tweets.  You can't

22   blog about the trial.  You must not visit the scene of any

23   events that may be discussed during the case.

24           The reason for these rules, as I've now told you

25   several times, is that it will be your duty to decide the case

1   just based on the evidence presented here during the trial,

2   not on the basis of anything that you might hear or see in the

3   media, over the internet, or on your own.

4          From time to time during the trial, I may be called

5   on to make rulings on objections or motions.  You should not

6   infer from any ruling I make, or from anything I say or do,

7   that I have any opinion on the merits of the case favoring one

8   side or the other.  When there is an objection to a question

9   asked to a witness, I will sustain or overrule the objection.

10  If I overrule the objection, the witness will answer the

11  question.  You should just ignore the objection and treat the

12  question and answer just as if there had been no objection.

13  If I sustain an objection to a question, the witness will not

14  answer it.  You should not speculate on what answer -- what

15  the answer might have been, and you should not draw any

16  inference from the question itself.

17         The order of the trial's proceedings will be this:

18         In just a moment the lawyers will make opening

19  statements.  The government then will present evidence during

20  what is called its case-in-chief.  When the government

21  finishes by announcing that the government rests, the

22  defendant then will have an opportunity to present evidence.

23  The defendant never has to present any evidence at all.  But

24  if the defendant does choose to present evidence, then, when

25  the defendant finishes, by announcing that the defense rests,

1  the government has another opportunity to present evidence

2  within narrow limits just responding to the defense case.  The

3  government goes first and last because it has the burden of

4  proof.

5          When all of the evidence is in, the lawyers then will

6  make closing arguments, and then I will instruct you on the

7  law.  You then will retire to deliberate on your verdict.

8          I told you a little about the daily schedule during

9  the jury-selection process.  You'll always get a lunch break

10 of about an hour.  It generally will not come right at noon.

11 It might.  It just depends on when it's a convenient

12 breakpoint.  But sometimes we run beyond noon, don't expect to

13 run beyond 1:00.  But, if you're sitting there at 12:30 or

14 quarter of 1:00, and we haven't taken a lunch break, don't be

15 concerned, I haven't forgotten.  We will get the lunch break.

16 We generally take a midmorning, midafternoon break.  I try not

17 to keep you sitting in that chair for more than two hours at a

18 stretch.

19         Now, as I told you, we begin -- oh, one other thing

20 about breaks.

21         For the midmorning break and the midafternoon break,

22 you will be back in the jury room area just like you were for

23 the break we just took.  I sometimes get asked by smokers,

24 whether they can smoke at that break, and the answer is, no.

25 You will be in the jury area.  It's a nonsmoking building.

1    Lunch hour you are on your own.  You are welcome to leave the

2    building, you're welcome to eat with one or more jurors, if

3    you wish.  You also are welcome to go off on your own, however

4    you want to do it.  You will be out of the building; and, of

5    course, you can smoke there if you wish.

6            Now, as I told you, we begin with opening statements.

7    In an opening statement, a lawyer may explain the issues in

8    the case and summarize the facts that the lawyer expects the

9    evidence to show.  An opening statement is not evidence, but

10   it is important.  It's intended to help you understand the

11   issues and to help you understand the evidence as it comes in.

12   So I ask that you give the lawyers your close attention as I

13   recognize them for opening statements.

14           Mr. Ustynoski?

15           MR. USTYNOSKI:  "Sticks and stones may break my

16   bones, but names will never hurt me."  I'm sure we've all

17   heard that.  This case isn't about name calling, ladies and

18   gentlemen.  You're going to hear about Anthrax and bomb

19   threats.

20           Good morning, Mr. Murrell, Your Honor, and ladies and

21   gentlemen of the jury.

22           Let me briefly, just formerly, introduce myself.  My

23   name is James Ustynoski; and, as I said, I work for the

24   government.  I'm originally from Philadelphia, Pennsylvania.

25   I've been in Tallahassee for two years.

1           I want to thank you all for being here today.

2   Obviously, the pay isn't great, but this is, next to maybe

3   serving in a third world country, Afghanistan or Iraq, or

4   Iran, this is probably one of the most important civic

5   functions y'all can do.  And I'm sure I speak on behalf of

6   Mr. Murrell, but we really appreciate you taking the time.

7           As His Honor indicated, it's pretty easy to get out

8   of jury selection, and miraculously we got 12 of the first 16.

9   So I want to let you know, the government really appreciates

10  your willingness to serve today.

11          In that vein, I'm going to try to streamline the

12  government's case and call as few witnesses as possible; and,

13  hopefully, we will be done within 48 hours, and we shouldn't

14  have to go into Wednesday, but I'm going to do my best.

15          We hardly know each other today, and I'm not going to

16  know y'all, and you're not going to know me much better at the

17  end of the 48 hours.  It's always an interesting thing to do,

18  when you're picking a jury, because, basically, both lawyers,

19  we get your sheets basically saying where you lived, how old

20  you are, you know, what magazines you read, what shows you

21  watch, and a few other things.  But it's really -- it's really

22  hard to really know everything from one side of one piece of

23  paper.  So the only thing I'm going to ask you on behalf of

24  myself and the U.S. Government is two things, and I'm sure you

25  all can do that, which is why the government selected you all,

1    is:

2             First, be fair to both sides.  It sounds easy enough,

3    but the defendant sits there today presumed innocent unless

4    and until you all go back and come back and say otherwise.  He

5    sits there with an American flag of cloak of innocence.  And

6    it's incumbent upon me for the government to strip him of that

7    cloak of innocence and prove his guilt beyond a reasonable

8    doubt, which after you hear all of the evidence in this case,

9    I submit to you it's overwhelming, and we will prove the

10   defendant guilty beyond a reasonable doubt.

11            And I would just ask you that, you know, sometimes

12   it's hard to sit in judgment of others, but the government

13   would just ask you to be fair.  If we've proven the case, say

14   guilty; and, of course, if at the end of this I have not

15   proven the case, say not guilty.

16            And the second thing I would ask you all is just to

17   use your common sense.  That's all I, as an attorney, can ask,

18   other than being fair, is use your common sense.  It's always

19   great, when somebody has a lot more life experiences or higher

20   education than other people, but at the end of the day, when

21   you hear the facts and the judge instructs you on the law at

22   the end of this case, all you're going to need is your good

23   old fashion common sense and street smarts.  I mean, when you

24   see the language, and when you see the letters in this case,

25   and the judge instructs you on the law, it's really -- and I

1    don't want to shortchange the defense, but it's really a

2    strong case.  And I submit, if you use your common sense,

3    'cause this is not a search for doubt, it's a search for the

4    truth; and I submit, when you listen to all of the evidence

5    that I'm going to put forward, and I'll go over it briefly

6    next, there will be no doubt in your minds, if you use your

7    common sense.

8         Every trial that is performed or goes on in this

9    courtroom and the courtrooms across the country are basically

10   stories.  Some short.  Some longer.  This is going to be a

11   short story, because you're only going to hear it over the

12   next 48 hours.  And it's going to be a story of the defendant,

13   Jamie Lee Wambles, and basically four letters that the

14   government submits were threats.

15        They all take place, all four letters, you're going

16   to hear, take place within a pretty short time frame:  the

17   first one is December 17th, December 18th, and then around

18   December 20th, and the first week of January.  So they all

19   happened within a couple of weeks' period.

20        The first letter that you're going to hear about was

21   received -- the first letter that the defendant, we submit to

22   you, actually wrote, was received at this courthouse.  And in

23   that letter, which you're going to hear, some of it is going

24   to state, and I want to make sure I get it right, "I need you

25   to read this letter slow, because you are about to go.

1   Anthrax is all over this letter.  So I'm sorry for this day.

2   God bless you all.  Take it to the bank, because it's true."

3   That's the first letter that you're going to hear that the

4   government submits that this defendant wrote which was

5   received at this very courthouse.

6        And in putting on the testimony of that letter,

7   you're going to hear first from Sergeant Jason McAlpin of the

8   Jackson County Sheriff's Office.  He's an investigator.  He's

9   going to give you all light into how that first letter came to

10  be and how all four letters came to pass.  He's going to give

11  you insight into why Jamie Wambles wrote those letters.

12       You're going to hear Mr. Wambles -- during the course

13  of the trial, you're going to hear confessions by Mr. Wambles,

14  and you'll hear statements in the letter why he's upset, why

15  he's threatening the government.  But you're going to hear

16  from Sergeant McAlpin, he'll let you know his involvement with

17  the defendant prior to the letters and will you give some idea

18  of, the government submits, the defendant's motive for writing

19  the letters.

20       You're also going to hear from ATF Agent -- Special

21  Agent Jim Langley.  You're going to hear that he didn't seek

22  out Mr. Wambles.  Mr. Wambles sought out an ATF agent to speak

23  with him.  And you're going to hear from Mr. Langley that he

24  responded to the defendant, went and spoke with him, and the

25  defendant told him he actually wanted to be indicted federally

1    for a crime, and Mr. Langley said it's not going to happen,

2    sorry.  And he'll describe the conversation, and then the

3    letters start.

4            You're going to hear first from a court security

5    officer who works in this building, Glen Adcock, who found

6    that first letter that was written on December 17th.  You will

7    hear what he did with it, what he's instructed to do, the

8    policies and procedures when you have a threatening letter

9    such as this.

10           You'll hear from United States Marshal Service Andy

11   Kilgore, who is in charge of the Marshal's Service here, and

12   actions and policies and procedures that they took regarding

13   that first letter.

14           Then you'll hear from Scott Simmons, a Tallahassee

15   Fire Department hazmat team member, who came and was required

16   to do certain things with that letter because of the nature of

17   it.

18           Then you will hear from my case agent, Mark Leon, all

19   of the things that the FBI did once he was assigned the case,

20   involving possible Anthrax and a weapon of mass destruction.

21   He will describe to you everything he did.

22           And you're also going to hear from an FBI Special

23   Agent Bridgette Frost, who is out of Jacksonville, who's

24   specifically assigned to these type of cases, Anthrax or

25   weapons of mass destruction.  And the government is going to

1   put her on to pretty much show you that these people wouldn't

2   have gotten involved unless the government considered it a

3   serious threat.

4        Part of this case is, you all are going to have to

5   say, well -- I think it's going to be clear by the verbiage of

6   the letters -- it's a threat and is it serious.  The

7   government is going to show you all of the steps, procedures,

8   manpower, hours, money, everything spent that we didn't just

9   throw it into the waste can and say, "Oh, it's just Jamie Lee

10  Wambles.  He's disgruntled."  You're going to hear it from all

11  of these different people that were involved.

12       Next, December 18th is the second letter the

13  government submits that the defendant wrote.  This letter was

14  not -- did not make to it its intended place.  It was

15  addressed to the district courthouse here in Tallahassee,

16  again.  It was actually confiscated by -- at the Jackson

17  County Correctional Facility.  In part, you're going to hear

18  that this letter reads, "Please read slow.  You're about to

19  go.  This is Anthrax.  Merry Christmas to the feds.  Anthrax."

20       And the witnesses you're going to hear involving that

21  letter is Corporal Danny Morehead, who works at the Jackson

22  County Correctional Facility, who found the letter.

23       You'll hear from Sergeant Jamie Jeter who then took

24  over once the letter was found, and he then went and got

25  Mr. Wambles and, in part, got an informal statement as he was

1  walking him out to -- to get him out to put him into a more

2  secure location.

3         You will hear from Tommy Harkrider, who works with

4  the Florida Department of Health, explain why and how the

5  Florida Department of Health had to get involved in this.

6         You'll hear from Lieutenant Kevin Blackburn, who

7  works at the Jackson County Fire Department hazmat team in

8  Jacksonville, how he got involved in this and what procedures

9  and policies that the hazmat team has to take.

10         Phil Lee is an expert lab analysis.  You're going to

11  hear from the Department of Health in Jacksonville; that his

12  department -- he was involved in the analyzation of that first

13  letter on December 17th and also the second letter on

14  December 18th.

15         You're going to hear from Captain Bill Bryant from

16  the Marianna Police Department.  He recorded a statement with

17  an FDLE agent, Travis Lawson, present.  They sat down with

18  Mr. Wambles after that second letter was found at the

19  facility, and they recorded the statement after he was

20  mirandized.

21         You're going to hear Mr. Wambles in his own words

22  admit to writing that second letter that they just found, and

23  then he tells them that he also wrote a first letter, a letter

24  that he had written earlier, which actually got here to this

25  courthouse, which was the December 17th letter.  He wrote that

1    first, it was in the mail, and then he got caught with the

2    second letter, the December 18th letter, at the prison.  And

3    being interviewed, he said, "Listen, there is another letter I

4    wrote before.  It's in the mail."  And he basically told law

5    enforcement where it was going to be mailed to.  So this

6    courthouse was on alert, full alert.  And then, as I said,

7    Glen Adcock found that -- the court security officer

8    downstairs found that letter.

9         You're going to hear that in that second letter that

10   was found at the Jackson County Correctional Facility, where

11   he said, "Anthrax," there was crushed, finely crushed white

12   powder in the envelope.  You're going to hear the security

13   measures that they took at the prison when they saw that.  All

14   of the different people that it went to.  Obviously, then,

15   after the hazmat, it went to a lab analyst.  You're going to

16   hear from Phil Lee, who is the lab analyst in Jacksonville,

17   the analyzation that he did on both letters.

18        Happily, he's going to tell you that in the first

19   letter that was actually received at this courthouse, there

20   was no observable powder in that letter, and that was tested

21   and came back negative for anything.  Phil Lee will tell you

22   that the second letter also tested negative.

23        You're going to hear, when Captain Bill Bryant

24   testifies, that when he took this recorded statement and you

25   listen to it, you're going to hear Jamie Lee Wambles' own

1    words say that he would go to the infirmary at the prison and

2    ask for Tylenol or Advil, and he would crush up the white

3    pills into a fine powder, and that's what he put in the

4    envelope.

5            You're going to hear on that recording why

6    Mr. Wambles believes he is -- should be upset and tries to

7    legitimize why he can send letters threatening Anthrax to a

8    federal courthouse and federal officials.  You're going to

9    hear in his own words that he was upset; that when he was

10   arrested one day, that during the course of his arrest, his --

11   he had a pit bull dog, at least a half pit bull, that went

12   through the door when he was being arrested, and you're going

13   to hear him say that he believes his dog was improperly shot,

14   and he was very upset about that.  He considered it like a

15   family member, like most people would.  He was very upset that

16   the police department felt they had to shoot the dog, and

17   didn't let him -- didn't un-cuff him and let him handle the

18   dog himself.  So he was really, really upset about that, and

19   he wanted them investigated.  That's one of his two reasons

20   why he feels he can threaten the government.

21           The other thing you're going to hear on the tapes is

22   that he feels he was improperly arrested for a gun charge.

23   And, again, you're going to hear from Sergeant Jason McAlpin

24   at the beginning of this, the circumstances revolving that gun

25   charge.  And I submit to you the government is going to show

1    you that Mr. Wambles really has no reason to be upset about

2    that gun charge, whatsoever.  But you're going to hear on tape

3    that that's one of the two reasons:  his pit bull and being

4    arrested for a SKS assault rifle, for possession of that gun.

5         You're going to hear from Sergeant McAlpin that he

6    wasn't legally allowed to possess the firearm, and information

7    he got was that Mr. Wambles had the firearm, and you're going

8    to hear Mr. Wambles admitted to him that he had the firearm at

9    some point, and he was arrested for it.  But you're going hear

10   why he's upset about it, and that's one of the other two

11   reasons why he feels he can write these letters.

12        Lastly you're going to hear from Chief Wayne Lipford

13   from Jackson County Correctional Facility, who is the chief of

14   the facility.  And, again, the government is going to show

15   that, as chief, the policies and procedures they have for

16   screening material, letters, all of the security measures that

17   they have, why it's important that they took this letter

18   seriously, both letters.  And he's going to tell you, and as

19   I'm sure you all can imagine, but you will hear it from him,

20   you know, we've all seen it all over the place, but stuff gets

21   smuggled into prisons.  You're going to hear from the chief

22   and you'll hear it from the other officers that they took this

23   seriously, because inmates get drugs in jail, inmates get cell

24   phones in jail.  You're going to hear testimony that they get

25   all kind of things in jail.  Obviously, they do their best,

1   and you will hear from the chief that they have a lot of

2   measures in place, but, you know, every day, as we sit here,

3   things are being smuggled in from either people in the inside

4   or corrections officers that are dirty, but it happens.  It's

5   a reality, and you're going to hear from the chief about

6   things that happen in prison and why they took this serious.

7        And one of the things you're going to hear, ladies

8   and gentlemen, that's important is that all of these agents

9   and officers, you're going to hear when I ask them how well

10  they know Jamie Wambles, do they know who Jamie Wambles knows,

11  do they know who they know, do they know who they talk to on

12  the internet, who they communicate with, do they know who they

13  communicate with in what country, they're all going to tell

14  you that they don't know what Mr. Wambles is capable of doing

15  or obtaining, and they're going to tell you that's why they

16  took this seriously.

17       Next, ladies and gentlemen, the third letter was

18  written sometime between December 20th and December 24th.  It

19  was also confiscated at the prison, so it wasn't postmarked.

20  We don't know an exact date, but we know it was approximately

21  between December 20th and 24th.  Again, the Jackson County

22  Correctional Facility was on the lookout for letters, and this

23  letter was not involving Anthrax, but you're going to hear it

24  involved the threatened use of a bomb.  In part, the letter

25  that we will submit that we will prove that Mr. Wambles wrote,

1   states, "I got the boys on the outside to get ready to pay 111

2   North Adams Street -- "which is this courthouse of

3   course "-- a visit on the week after Christmas.  Ammonium

4   nitrate and fuel and a battery makes a big, big boom.  So get

5   ready, that building will go.  So I hope now I got your eyes

6   open, but it's too late now.  If I get moved out of this jail

7   and y'all look into my dog's death, it will not happen.  But

8   if I stay, you will see boom, boom, boom.  Jamie Wambles."

9   That's, in part, the third letter.

10         You're going to hear that he later admitted writing

11   that letter to my FBI agent.

12         You're going to hear from Corrections Officer Charles

13   Obert, who found that third letter at the Jackson County

14   Correctional Facility, what he did with it.  Then you'll hear

15   again from Sergeant Jamie Jeter, who again took over once the

16   Corrections Officer Obert found the letter.  Sergeant Jeter,

17   again, became involved and took over and called the Marianna

18   Police Department and that got the ball rolling.  And, again,

19   it has to go to the police department, then it has to go to a

20   hazmat team, and then it has, you know, eventually go into

21   evidence.

22         And you're going to see, ladies and gentlemen, on two

23   of the letters, although Mr. Wambles always signed the

24   letters, on two of the return addresses, which are clearly

25   from the prison, one time he writes the name William Ulmer,

1   who is a prisoner at that facility, at Jackson County

2   Correctional Facility.  And he references his name twice just

3   on the return address.  And you may or may not hear from

4   Mr. Ulmer that, of course, he is going -- he's going to tell

5   you that he didn't write those letters, he had nothing to do

6   with it.  He may know Mr. Wambles, he may know he was writing

7   them, and maybe he -- he didn't stop him from writing them,

8   but he certainly wasn't the author of those letters.

9          And then, lastly, it's a four-count indictment, as

10   His Honor explained.  The fourth letter was written on or

11   about January 7th of this year, 2013; and it was received by

12   FBI Special Agent Mark Leon at the FBI building.  Mr. Leon

13   will tell you that he went and he interviewed Mr. Wambles

14   about the prior three letters.  And after admitting to those

15   letters, he then wrote a letter to Mr. Leon.  In part, you're

16   going to hear that that letter states, "I'm still pissed about

17   my dog and these cops around here.  I've played around with

18   y'all today during the interview.  I do have ammonium nitrate.

19   Other than that, you won't get 110 gallons of it, nitrate.  It

20   don't take much of nitrate.  Hell, it takes 14 grams to blow a

21   mailbox up and two gallons to blow a car up.  P. S.  I'm going

22   to be truthful with you.  I got nitrate plus I can get

23   anything you want -- guns, ice, meth, or bombs."

24          And FBI Agent Leon is going to tell you, when he got

25   that letter, after knowing about the prior three letters and

1    all of the threats that Mr. Wambles made, threatening a prior

2    bomb and the Anthrax, and also you're going to hear on that

3    CD, when Mr. Wambles is giving his statement, that he says

4    that the person who shot his dog, Chief Burt McAlpin, that if

5    he can get out of jail, he would blow his house up right then

6    and there.

7           So you're going to hear that in the context of what

8    had happened in the prior three letters and then receiving

9    this letter, Mr. Leon called Andy Kilgore of the United States

10   Marshal's Service here in this courthouse to let him know that

11   he received that fourth letter; and, again, the defendant was

12   referencing that he could get 110 gallons of ammonium nitrate

13   and P.S. bombs, and he was still pissed.

14          You're also going to hear from explosives expert Greg

15   Armstrong from the Tallahassee Police Department, what are

16   some of the common things that could compose a bomb.  And

17   you'll hear that the three things that the defendant

18   references could very well be the main ingredients of a very

19   significant bomb.

20          And, lastly, ladies and gentlemen, the defendant

21   wrote another letter, a fifth letter.  It's not part of the

22   indictment, but the government is going to introduce it to you

23   because he writes a letter to FDLE, Florida Department of Law

24   Enforcement, Special Agent Travis Lawson, who had been earlier

25   at the interview when Mark Leon interviewed him, so he knew

1    Mr. Lawson.  So he not only wrote to Mr.  Leon at the FBI

2    building, he also wrote to Travis Lawson at his job, and the

3    government is going to let you hear what's written in that

4    letter.  And, essentially, Mr. Wambles admits to Mr. Lawson,

5    "I'm sorry.  I shouldn't wrote those letters.  It's not the

6    right way to go about doing things," to show you, ladies and

7    gentlemen, that he knows he's wrong, and whatever those two

8    grievances that he has don't justify him writing those

9    letters.

10          That's basically a thumbnail sketch of all of the

11   testimony.  Again, I just ask you to sit attentively, listen

12   to the exact words that the defendant uses in his recording,

13   look at the exact words on the letters, and ask yourselves if

14   the FBI, Jackson County Correctional Facility, Marianna Police

15   Department, the hazmat team, if everybody acted reasonably; or

16   if we should have all just said, no big deal, just throw them

17   in the garbage, and maybe gave him two days in the hole.  And

18   I submit at the end of the testimony, ladies and gentlemen,

19   you're going to find that there is no other verdict other than

20   guilty.

21          Thank you.

22          THE COURT:  Mr. Murrell?

23          MR. MURRELL:  Yes, Judge.

24          Good morning, ladies and gentlemen.  This is a case

25   about a fellow that did some things that were wrong and that

1   were foolish, and, objectively, really makes no sense

2   whatsoever.  I don't think there will be a great dispute over

3   the facts.

4         What's going to be an issue, though, is whether or

5   not what he did amounts to a crime.  As the judge has told

6   you, and Mr. Ustynoski, who did a fine job of outlining his

7   case, by the way, have already told you that there are these

8   four charges, and three are the same sort of charge.  I would

9   describe it as the charge of trying to -- trying to make a

10  false threat, perpetrating a hoax.  But it has to be one,

11  you're going to find out, that under the circumstances

12  reasonably could have been believed.

13        So those are the first three charges.  And that's

14  really what the question is going to be on these first three

15  charges, whether or not these threats or the threats could

16  have reasonably been believed.

17        Well, the first two letters, as you've heard, have to

18  do with the threat of Anthrax.  The claim is that there is

19  Anthrax in the letters.

20        Well, you're going to find out, though, that these

21  letters are postmarked from the Jackson County Jail.  So the

22  question is going to be:  Well, is there really Anthrax

23  available at the Jackson County Jail?  And if there is not

24  Anthrax available at the Jackson County Jail, are these the

25  kind of threats that can, under the circumstances, can

1    reasonably be believed.

2          Now, there is a distinction that I think you will see

3    that is important.  The question is not should people have

4    taken precautions, should people not have been careful, should

5    people not have had the envelope tested.  And, I mean, some of

6    those things make a lot of sense, and those sort of things

7    happened.  But the question is going to be, under the

8    circumstances, was it reasonable to believe that a prisoner at

9    the Jackson County Jail had gotten ahold of Anthrax and sent

10   it in a letter.  That's two of the counts.

11         The third count has to do with, again, perpetrating

12   this hoax, trying to threaten somebody; but, again, it has to

13   be reasonably believed.  And the allegation is that he had

14   some friends, and they were going to use this sodium nitrate

15   to make an explosive, and they were going to blow up the

16   courthouse.

17         Well, here, again, this is a fellow that's already

18   explained that the first two threats were a hoax, it's already

19   been discovered that there was no Anthrax.  And so the

20   question is, under those circumstances, was it reasonable to

21   believe that this was a legitimate threat?

22         Those are the first three charges.

23         The final charge is a little different.  The final

24   charge is that of mailing a threat through the mail.  And

25   here, again, it's described as a true threat, I think; one

1   that, under the circumstances, might reasonably be believed.

2   But -- and you'll get to see these letters, by the way,

3   because that's important, especially with regard to this

4   fourth claim.  This was sent to Mr. Leon, the FBI agent.

5           Well, look at that letter.  You'll get to read it.

6   And you'll see there is -- I suspect you'll see there is no

7   threat there.  What the letter says is, "Look, I'd like to

8   make a deal."  He uses that.  "I want to make a deal over my

9   dog and the charges."

10          As Mr. Ustynoski has told you, the genesis for all of

11  this, it seems to be, the fact that Mr. Wambles was upset

12  about the way the officers had shot and killed his dog, when,

13  in his view, there was no need to do so; and then he thought

14  he had been treated badly and unfairly by some officers in

15  Jackson County with regard to a gun charge, so --

16          But you'll see the letter says, "I want to make a

17  deal about my dog and about the charges."  And the letter goes

18  on to say -- and I'm paraphrasing, but you'll see it when you

19  read the letter.  It says, "If you'll make a deal, I'll tell

20  you where the ammonium nitrate is.  And, oh, by the way, I can

21  get you guns, bombs, drugs, whatever you need."  He's

22  negotiating.  He's trying to make a deal.  If you help me out

23  with the dog and the charges here, where I have been treated

24  so badly, I can help you.  I can tell you where the ammonium

25  nitrate is.  I can tell you where the bombs -- or I can find

1  bombs for you, whatever you want, I'll help get it for you.

2  He was negotiating.  He wasn't making a threat.

3          So, again, you will get to see the letter, but that's

4  what's really critical on the fourth charge.  What does the

5  letter say?  And you will get to read it for yourselves.

6          The first three charges, the question is going to be:

7  Could this sort of thing reasonably be believed under the

8  circumstances?  The fourth charge the question is going to be:

9  What did the letter say?

10          In the end, I suspect, if you use your common sense

11  and you listen to what the judge has to say, you'll be able to

12  make a decision, and I will be urging you at the end of the

13  trial to find Mr. Wambles not guilty of all four charges.  So

14  at this point, I invite your close attention to what you're

15  about to hear.

16          Thank you.

17          THE COURT:  All right.  Members of the jury, I told

18  you sometimes we'll go a little after noon.  Today we're going

19  to go a few minutes before noon.  At the end of openings, it's

20  a good time to take the lunch break.  So we'll take the break.

21          We will start back an hour from now, a quarter of

22  one, by that clock.  That clock was picked because it was very

23  attractive, not because it keeps time very well.  It may be a

24  minute or two slow.  I'm not sure.  But that's the clock we

25  will go by.  So if you will be back in one hour, we will try

1    to get you back in the courtroom and start right on time with

2    you.

3              Jury out, please.

4              Oh, let me tell you one thing before you walk out.

5              If you check in at home or at the office and say

6    you're on the jury, the first question you're going to get is,

7    what kind of case is it.  Please don't even respond to that.

8    As soon as you tell somebody what kind of case it is, they're

9    going to want to offer an opinion about this kind of case or

10   what they think they know.  We don't want you deciding the

11   case based on somebody else's experience.  We spent a good bit

12   of your time this morning asking about what -- experiences you

13   had and not had.  If you tell somebody else what kind of case

14   it is, they're going to want to offer you their experiences.

15   So you might respond to that kind of question by saying, "I'll

16   tell you about it when the case is over."  But don't get into

17   a discussion even about what kind of case it is.  Thank you.

18             Jury out, please.

19       (*The jury exited the courtroom at 11:46 a.m.*)

20             Either side need me before we break?

21             MR. MURRELL:  Nothing from the defense; no, sir.

22             MR. USTYNOSKI:  No, Your Honor.

23             THE COURT:  All right.  We'll be in recess until

24   quarter of one.

25       (*A luncheon recess was taken at 11:46 a.m.*)

1

**AFTERNOON SESSION**
(12:50 P.M.)

2

3     (*Defendant present; jury not present.*)

4          THE COURT:  Please be seated.  You may all be seated.

5     The jurors will be in in just a second.  The last one is

6     coming in the hallway.  So as soon as they are here, we'll

7     start.

8          MR. MURRELL:  Could I raise one issue while

9     we're waiting?

10          THE COURT:  Sure.

11          MR. MURRELL:  Mr. Ustynoski was kind enough to tell

12     me about some of his testimony.  As I understand it, he's

13     planning to introduce some testimony to show these grievances

14     of Mr. Wambles, the business about the dog and being treated

15     unfairly about the charges.  He intends to introduce evidence

16     to show that that's not the case.  And my objection is to

17     relevancy; and, if it's even somehow relevant, it would be a

18     403(b), that introduces misleading issues.  I mean, I'm

19     prepared to produce testimony that he did shoot the dog

20     improperly, and all that, but it seems to me that's not the

21     issue here, and it seems to be all irrelevant.

22          THE COURT:  Mr. Ustynoski?

23          MR. USTYNOSKI:  Well, I mean, I don't know, the jury

24     may or may not draw the conclusion whether it was justified or

25     not; but, Your Honor, in the letters he's complaining about

1    two basic things, and it's kind of the issue in the case.

2    It's what led to him, you know, to his motive, to his reasons

3    for writing these letters.  And I just want to give the jury

4    the precipitous how this came to be, the history of the case.

5         THE COURT:  You can prove that the dog was shot, and

6    he can prove that the dog was shot, if that's referred to in

7    the letters.  You really don't want to try the issue of

8    whether it was a good shooting or a bad shooting.  You

9    probably want to try the charges in this case.

10        So I'm not going to try the issue of whether it was a

11   good shooting or a bad shooting of the dog, but you can prove

12   the dog was shot.  And then you can tell the jury that, you

13   didn't get any evidence one side or the other, because that's

14   not the issue in front of them.  I'll tell the jury the same

15   thing, if I need to.

16        But I don't doubt Mr. Murrell for a minute that he

17   can present the other side of that.  Most instances like that

18   there are two sides of that, and we will not try the issue.  I

19   will go question by question when it comes up, but you should

20   move through quickly the fact that the dog was shot, and we're

21   not going to try the issue of whether it was good or bad.

22        Bring them in.

23        If I need to instruct the jury to make it clear what

24   the issue is and is not, I can do that.  I don't think there

25   is any great risk that a juror would think it is okay to

 1  threaten to blow up a federal building if your dog was shot

 2  improperly.  But if I need to, I will make it clear that

 3  that's not how one deals with that problem.

 4      (*The jury entered the courtroom at 12:54 p.m.*)

 5          All right.  You may be seated.

 6          Good afternoon, ladies and gentlemen.  Welcome back.

 7          Mr. Ustynoski, please call your first witness.

 8          MR. USTYNOSKI:  Thank you, Your Honor.  The

 9  government calls Sergeant Jason McAlpin.

10          DEPUTY CLERK:  Please raise your right hand.

11      ***WILLIAM JASON McALPIN, GOVERNMENT WITNESS, DULY SWORN***

12          DEPUTY CLERK:  Be seated.

13          Please, state your full name and spell your last

14  name for the record.

15          THE WITNESS:  William Jason McAlpin, M-c-A-l-p-i-n.

16                          DIRECT EXAMINATION

17  BY MR. USTYNOSKI:

18  Q.  Good afternoon, Sergeant McAlpin.

19  A.  Good afternoon.

20  Q.  I'm going to ask you some questions this afternoon; and,

21  if at any time I ask you something that you are confused on

22  and you don't understand the question, please let me know,

23  and I'll rephrase it for you.  And also I'd ask that you

24  please really speak in a loud, clear voice so that everybody

25  can hear you, the stenographer, the defendant, and the ladies

1    and gentlemen of the jury.  Can you do that for me?

2    A.   Sure.

3    Q.   Thank you.

4         Sergeant, by whom are you employed?

5    A.   By the Jackson County Sheriff's Office.

6    Q.   And how long have you been so employed, sir?

7    A.   Approximately 16 years.

8    Q.   And have you always served in the same capacity with the

9    Jackson County Sheriff's Office?

10   A.   No, sir.  For the first four years, I was a road deputy.

11   Then I was promoted to an investigator.  And after four

12   years, I was promoted to investigator.  Then after that, I

13   was promoted to a sergeant in investigations.

14   Q.   And are you currently a sergeant in investigations?

15   A.   Yes, sir.

16   Q.   And can you tell the members of the jury what kind of

17   training or education you've gotten to get to become where

18   you are now?

19   A.   Sure.  I went through the law enforcement academy at

20   Chipola College, you know, their criminal justice standards

21   and training.  I graduated that academy with the highest GPA

22   award and the top gun of the class award.

23        Then I took the Florida Law Enforcement State Board.  To

24   pass that, you have to pass that to be a law enforcement

25   officer.  And since my career began with the sheriff's

1    office, I've had numerous and multiple trainings and

2    specialized classes in investigations.

3    Q.  Okay.  Can you tell the members of the jury, do you know

4    an individual by the name of Jamie Lee Wambles?

5    A.  Yes, sir, I do.

6    Q.  And do you see him in the courtroom anywhere today?

7    A.  Yes, sir, I do.

8    Q.  Can you tell us where he's seated?

9    A.  He's seated by the defender, wearing a white shirt.

10   Q.  And how long have you known Mr. Wambles approximately,

11   roughly?

12   A.  Probably ten years.

13   Q.  Okay.  And can you tell the members of the jury at one

14   point were you part of a group of individuals that went to

15   arrest Mr. Wambles at his residence?

16   A.  Yes, sir, I was.

17   Q.  Who else was with you, if anybody?

18   A.  Myself, Chief McAlpin from Sneads Police Department, and

19   Sergeant Bolin from Sneads Police Department.

20   Q.  And without getting into any underlying reasons, did you

21   go there to arrest Mr. Wambles?

22   A.  Yes, sir.

23   Q.  And were yourself and the other law enforcement officers

24   able to effect the arrest of Mr. Wambles that day?

25   A.  Yes, sir, we were.

1   Q.  Can you tell the members of the jury what, if anything,

2   happened when you went -- if anything unusual or out of the

3   ordinary occurred when you went to arrest Mr. Wambles?

4   A.  When we went there, Mr. Wambles was located on the back

5   porch, and while questioning him --

6           MR. MURRELL:  I'm going to object to the relevancy.

7           THE COURT:  Overruled.

8           THE WITNESS:  While detaining Mr. Wambles, there was

9   an incident where a dog was -- got out of the house and

10  attacked the officers and had to be put down.

11          MR. MURRELL:  I object and move to strike.

12          THE COURT:  Overruled.

13  BY MR. USTYNOSKI:

14  Q.  I'm sorry.  Continue.

15  A.  Anyway, the animal was shot.  Mr. Wambles became very

16  upset, said that was his dog.  And that's the only thing that

17  was not normal about the procedure.

18  Q.  Okay.  And you were present for that?

19  A.  Yes, I was.

20  Q.  Okay.  And after that day, sir, did there come a time

21  where you yourself went to arrest Mr. Wambles?

22  A.  No, sir.  I filed further charges on him while he was

23  still incarcerated.

24  Q.  Okay.  And without getting into the charges, did it

25  involve any type of weapon?

1  A.   Yes, sir.  It involved a SKS rifle.

2  Q.   Okay.  And you filed those charges with who?

3  A.   I filed the complaint with the clerk of court in Jackson

4  County with the State Attorney's Office; and then they, you

5  know, sent it to the clerk's office to obtain a warrant.

6  Q.   And were you the investigator assigned to those charges?

7  A.   Yes, sir.

8  Q.   Okay.  Can you tell the members of the jury, as part of

9  your investigation, were you able to determine whether

10 Mr. Wambles was allowed to legally possess that gun?

11          MR. MURRELL:  I'm going to object to the relevancy.

12          THE COURT:  Overruled.

13          THE WITNESS:  No, sir.  After charging Mr. Wambles

14 with the firearm, it was determined that he was a --

15 BY MR. USTYNOSKI:

16 Q.   Without getting into the reason, I just want to know,

17 could he legally possess a firearm?

18 A.   No, he could not legally possess a weapon.

19 Q.   And after that, sir, did you have any occasion to -- I

20 don't know if you did or not, but -- can you tell the members

21 of the jury, did you have a chance to interview him, or did

22 you ever take any statement from Mr. Wambles?

23 A.   To the best of my knowledge, after that day, I did not;

24 no, sir.

25 Q.   And, lastly, if you can just give the ladies and

1   gentlemen a general time frame.  Can you tell us

2   approximately when the first incident happened, when you

3   arrested him and a pit bull ended up being shot?  Can you

4   give us a time frame on that, sir?

5   A.  Yes, sir.  That was on October 25, 2012, was the date he

6   was taken into custody.

7   Q.  And, approximately, can you tell the members of the jury,

8   sir, when it was that you filed the charges regarding the SKS

9   assault rifle?

10  A.  I filed the charges -- give me just one second so I

11  can --

12  Q.  Is it true that you need to refresh your recollection to

13  get the exact date?

14  A.  Yes.

15  Q.  So the record is complete, can you tell the members of

16  the jury what it is that you are looking at?

17  A.  I'm looking at the actual affidavit complaint that I

18  filed with the clerk's office in Jackson County.

19      And that was on December the 15th, 2012.

20  Q.  Okay.

21          MR. USTYNOSKI:  Thank you very much.

22          Your Honor, I pass the witness.

23          THE COURT:  Cross-examine?

24          MR. MURRELL:  I don't have any questions.

25          THE COURT:  Thank you, Mr. McAlpin.  You may step

 1   down.

 2          Please call your next witness.

 3          MR. USTYNOSKI:  Your Honor, the government would next

 4   call Special Agent Jim Langley.  Your Honor, I'm sorry.  Can

 5   this witness be excused?

 6          MR. MURRELL:  I won't recall him.

 7          THE COURT:  You can do that among yourselves, yes.

 8          DEPUTY CLERK:  Please raise your right hand.

 9          **JAMES W. LANGLEY, GOVERNMENT WITNESS, DULY SWORN**

10          DEPUTY CLERK:  Be seated.

11          Please, state your full name and spell your last

12   name for the record.

13          THE WITNESS:  My name is James W. Langley,

14   L-a-n-g-l-e-y.

15          MR. USTYNOSKI:  Proceed, Your Honor?

16          THE COURT:  Surely.

17          MR. USTYNOSKI:  Thank you.

18                      DIRECT EXAMINATION

19   BY MR. USTYNOSKI:

20   Q.  Agent Langley, good afternoon.  I'm going to ask you some

21   questions.  If I ask you anything that's confusing, let me

22   know and I'll rephrase it for you.  Okay, sir?

23   A.  Yes, sir.

24   Q.  And please speak in a loud and clear voice so everybody

25   can hear you.

1      By whom are you employed?

2    A.  United States Department of Justice, Bureau of Alcohol,

3    Tobacco, Firearms, and Explosives.

4    Q.  How long have you been so employed?

5    A.  Twenty-seven years.

6    Q.  And do you have a current title?

7    A.  Yes, sir.  I'm a senior special agent.

8    Q.  And do you have any type of specialized training?

9    A.  Throughout my career with ATF, I have been trained as an

10   undercover expert.  I have been trained as a firearms expert,

11   firearms instructor, interstate nexus.  I've testified as an

12   expert witness on interstate nexus, firearms identification,

13   firearms nomenclature, undercover operations, street-level

14   narcotics; yes, sir.

15   Q.  And what territory are you currently?

16   A.  I'm currently assigned to the Panama City office here in

17   the Northern District of Florida.

18   Q.  Okay.  Mr. Langley, at some point did you have occasion

19   to meet and speak with a person by the name of Jamie Lee

20   Wambles?

21   A.  Yes, I did.

22   Q.  Do you see him in the courtroom today?

23   A.  Yes, I do.

24   Q.  Can you point to him and describe an article of clothing

25   he's wearing?

1   A.  That's him sitting at the table over there in a white

2   shirt and close-cut hair.

3   Q.  At some point while you were working with ATF, were you

4   notified that somebody -- that Mr. Wambles wanted to speak

5   with somebody in the ATF?

6   A.  Yes, sir.  It was -- as a matter of fact, it was

7   November 29th of last year.  I received a telephone call from

8   an investigator with the Jackson County Sheriff's Office that

9   said they had someone in the Jackson County Jail that was

10  requesting to speak to an ATF agent specifically.

11  Q.  Okay.  And because you received the call, were you

12  assigned that, or were you just fielding the calls so you

13  took it?

14  A.  I fielded the call so I took it.  Like I said, that was

15  on the 29th, so I think it was December the 3rd, I drove to

16  Jackson County to the jail there and visited with

17  Mr. Wambles.

18  Q.  Okay.  So on December 3rd of last year, you drove to the

19  Jackson County Correctional Facility and met with

20  Mr. Wambles?

21  A.  Yes, sir.

22  Q.  And was anybody with you?

23  A.  No, sir.

24  Q.  Did you meet in person with Mr. Wambles at the facility?

25  A.  Yes, sir.  I signed in at the jail and went back into the

1  housing unit and met with Mr. Wambles.  I went by myself,

2  because there are just two of us in the office.  Myself and

3  my partner, we cover the five counties there, so a lot of

4  times we just do things by ourselves.  But I did go to

5  Jackson County there and meet with him back in the housing

6  unit.

7  Q.  Okay.  And when you met with Mr. Wambles, did you

8  mirandize him?

9  A.  Yes, sir, I did.

10  Q.  Can you tell the members of the jury the conversation

11  that Mr. Wambles had with you?

12       MR. MURRELL:  Object to relevancy.

13       THE COURT:  Overruled.  But, if we need to, we'll go

14  in smaller questions.

15       MR. USTYNOSKI:  Okay.

16       THE WITNESS:  Mr. Wambles explained to me that he was

17  in the jail there and wanted to talk to me about a firearm

18  that had been sold to an individual, give me the identity of

19  that individual.  It was a stolen firearm, and he wasn't

20  supposed to have guns.  So he wanted to talk to me about that

21  particular case.

22  BY MR. USTYNOSKI:

23  Q.  Okay.  And what did he tell you was his reason for

24  calling you?  What did he want to happen?

25  A.  He wanted to go to federal court instead of going --

```
 1              MR. MURRELL:  Object to the relevancy.

 2              MR. USTYNOSKI:  Goes to his motive, Your Honor.

 3              THE COURT:  Let me see the lawyers at the bench.

 4         (Conference held at the bench.)

 5              THE COURT:  I don't want a speaking objection, unless

 6    I ask for it.  So "goes to motive" is not something you are to

 7    say in front of the jury.

 8              What's the problem?

 9              MR. MURRELL:  This is -- all this happened before the

10    threats; and, in my view, it's just an effort to prove that

11    his grievances were unfounded.  I just don't see the

12    relevancy.

13              THE COURT:  You have to have a little bit of

14    background to know what he said and why he said it, and also

15    if part of the question is whether this can be taken as truth,

16    they have to know a little bit of the background.  I don't

17    know, for example, what Mr. Leon knew about this, but surely

18    Mr. Leon knew something of the background when he's evaluating

19    the threat.  So he has to prove some of it.  I think at the

20    very least, Mr. Leon can say everything he knew when he got

21    what was to be a threat.

22              MR. MURRELL:  That would be fine.  That was part of

23    the process of evaluating the threat, but I think he -- I

24    suppose if we're going to get into -- I don't know exactly

25    what this witness is going to say, but I suppose he's going to
```

1    say, yeah, we talked about a firearm, and he said he could get

2    the firearm for me, and I don't know what else, but --

3              THE COURT:  He's offering to cooperate, is that what

4    he's doing?

5              MR. USTYNOSKI:  He wanted -- basically, Your Honor,

6    the proffer would be that he wanted to actually go to -- he

7    wanted to get indicted federally.  He -- his grievance with

8    the gun, he was telling the agent, I want to be indicted

9    federally, I don't want to be in state custody, I want to go

10   to federal.  And that's also a reason why he wrote the

11   letters.  He wanted to commit a crime so he could be held

12   federally.  So he tells him, I want you to indict me for the

13   gun.

14             MR. MURRELL:  If that's the testimony, that's fine.

15             MR. USTYNOSKI:  That's what I believe.

16             THE COURT:  I will overrule the objection.  Item 12

17   on the complaint is the background, so the background is

18   relevant.

19             MR. USTYNOSKI:  I will touch on it very briefly.

20             THE COURT:  All right.

21        (*End of bench conference.*)

22   BY MR. USTYNOSKI:

23   Q.  Mr. Langley, I'm not exactly sure where we left off in

24   the question, but let me ask you.

25        When you met with Mr. Wambles, did he indicate to you --

1   what did he want you to do, if anything?  Did he indicate

2   that he wanted you to do something?

3   A.  Yes, sir, he did.  He indicated that he wanted to be

4   indicted federally; that he wanted not to go to state court,

5   but he wanted me to indict him for possessing the firearm

6   that he had discussed with me federally.

7   Q.  And was it your understanding that he was, when you went

8   to meet him, he was currently in state custody for that rifle

9   or at least partially?

10  A.  Actually, I wasn't sure exactly what he was in state

11  custody for, and he told me the story that he either bought

12  or traded, ended up with a SKS rifle at some point in time,

13  and then traded it to someone else.  And that rifle was

14  stolen.  So he was trying to tell me who had the gun; that,

15  you know, that ATF could go there; and that -- but that he

16  would confess to having the gun, even though he was, what we

17  call, a prohibited person.

18  Q.  Can you tell the members of the jury at any point in your

19  meeting with Mr. Wambles did he ever tell you he did not

20  possess the gun or he should not have been arrested?

21  A.  No, he did not.

22  Q.  And when Mr. Wambles indicated to you, as you said, that

23  he wanted you to indict him federally, what was your

24  response, if anything?

25  A.  I told him at that point in time that, even though we did

1   do firearm investigations on people that were prohibited from

2   possessing firearms, that he did not meet our criteria for

3   investigation and federal indictment.

4   Q.  And so did you ever do anything with that?  After that

5   conversation, did you ever file any charges on Mr. Wambles

6   regarding that firearm?

7   A.  No, sir.  I turned that information back over to the

8   county, the information he had told me, and that was the

9   extent of it.

10  Q.  So at that point in time did you determine whether --

11  that there was not a substantial government interest in

12  indicting Mr. Wambles for that gun?

13  A.  Yes, I did.

14  Q.  You said you have been an ATF agent for approximately 27

15  years?

16  A.  Twenty-seven years; yes, sir.

17  Q.  Can you tell the members of the jury, in your 27 years,

18  have you ever had an individual call ATF and then tell you

19  they want to be indicted federally?

20  A.  This is the first time in 27 years I've ever had this

21  happen.  It was kind of unique.

22          MR. USTYNOSKI:  Your Honor, that's all I have at this

23  time.  I pass the witness.

24          THE COURT:  Cross-examine?

25                      CROSS-EXAMINATION

BY MR. MURRELL:

Q.  Mr. Langley, so as I understand it, he wanted to talk to you because he thought maybe you could help him?

A.  I could indict him federally, is what I intercepted that he wanted.

Q.  Did he seem to think that you could maybe help him with his charges as they were?

A.  No, sir.  I explained that.  Anytime I go speak to somebody in jail, I tell them right off the bat that I'm not in the business of helping them; that I cannot help them with their state charges; that that can only be done by the state attorney.

Q.  Is that something that he was interested in, though, having you help him with the state charges?

A.  What I recall is that he wanted to be prosecuted federally.

Q.  And your memory is that he didn't want you to try to help his situation with the state charges?

A.  I'm not even sure what the state charges were at that time, sir.

Q.  Okay.  At that point in time, you don't know if he had been charged with a firearm offense?

A.  I do not, no.

Q.  But whatever he told you, you passed that on to the state agents --

```
 1    A.  Yes, sir.

 2    Q.  -- the state officers?

 3        And, to your knowledge, did they use that to prosecute

 4    him, that information you passed on?

 5    A.  I have no idea.

 6              MR. MURRELL:  Thank you.  That's all I have.

 7              THE COURT:  Redirect?

 8              MR. USTYNOSKI:  No redirect, Your Honor.

 9              THE COURT:  Thank you, Mr. Langley.  You may step

10    down.

11              THE WITNESS:  Thank you, sir.

12              THE COURT:  Mr. Ustynoski, please call your next

13    witness.

14              MR. USTYNOSKI:  The government next will call Glen

15    Adcock.

16              DEPUTY CLERK:  Please raise your right hand.

17              *GLEN ADCOCK, GOVERNMENT WITNESS, DULY SWORN*

18              DEPUTY CLERK:  Be seated.

19              Please, state your full name and spell your last

20    name for the record.

21              THE WITNESS:  Glen Adcock, A-d-c-o-c-k.

22              MR. USTYNOSKI:  May I proceed, Your Honor?

23              THE COURT:  Surely.

24              MR. USTYNOSKI:  Thank you.

25                         DIRECT EXAMINATION
```

1    BY MR. USTYNOSKI:

2    Q.  Mr. Adcock, good afternoon.  I'm going to ask you some

3    brief questions here.  Please let me know if I ask something

4    you don't understand, I'll rephrase the question for you.

5    A.  Yes, sir.

6    Q.  And also speak in a loud and clear voice, exaggerate, so

7    everybody can hear you this afternoon.

8        Mr. Adcock, who do you work for?

9    A.  Court Security, American Paragon.

10   Q.  And how long have you been employed in court security?

11   A.  Nine years.

12   Q.  And can you tell the members of the jury, in general,

13   what are your duties as a court security officer?

14   A.  We check people coming and going from the courthouse,

15   packages that come into the courthouse, screen, packages

16   coming into the courthouse.

17   Q.  You do that on a daily basis?

18   A.  Yes, sir.

19   Q.  And are you given training in screening?

20   A.  Yes, sir.

21   Q.  Is that an important part of your duties as a court

22   security officer?

23   A.  Yes, sir.

24   Q.  Can you tell the members of the jury what are some of the

25   things you are looking for?

1    A.   In this case, we received a memo from the Marshal's

2    Service to be on the lookout for any mail or packages with

3    the -- with Jackson County Corrections on it that was

4    directed to the clerk of court.

5        I happened to be the one that was at the loading dock the

6    day that the mail came in, and I actually found a letter

7    addressed to the clerk's office from the Jackson County

8    Corrections.

9    Q.   Mr. Adcock, before we get to that, let me back up a step.

10   Before you received this information to be on the lookout for

11   something else suspicious, on a daily basis, what are you

12   looking for?

13   A.   Anything such as an explosives, people bringing in

14   weapons into the courthouse.

15   Q.   And can you tell the members of the jury, do you do that

16   even without any type of notification to be on the lookout

17   for something specific?

18   A.   Yes, sir.

19   Q.   So every day, when people are coming through, do you

20   check their persons?

21   A.   Yes, sir.

22   Q.   Any type of luggage or bags they may have?

23   A.   Yes, sir.

24   Q.   Now, you testified a little bit about, you were notified

25   to be on the lookout.  Who notified you, if anybody?

*Glen Adcock - Direct*

63

1  A.  The Marshal's Service with a memo to the court security

2  officers.

3  Q.  And based on that memo, did you do anything out of the

4  ordinary, or is it something that you do every day?

5  A.  Personally searched through each piece of mail that came

6  into the courthouse or the loading dock by the U.S. mail, and

7  checked for that address on an envelope.

8  Q.  And is that something that you -- until that -- until you

9  were notified to be on the lookout for a certain letter, you

10  said it was from a certain place that you should be looking

11  for?

12  A.  Jackson County Correctional Facility; yes, sir.

13  Q.  Anything else you were told to look out for, or just from

14  that particular location?

15  A.  At that time it was just from that particular location;

16  yes, sir.

17  Q.  Now, is that something that you typically do, go through

18  the mail like that; or is that an extra measure that you --

19  A.  That was an extra measure.

20  Q.  -- were doing because of what you were notified of?

21  A.  Extra measure because we were notified of it.

22  Q.  And were you the first person to find a suspicious

23  letter?

24  A.  Yes, sir.

25          MR. USTYNOSKI:  May I approach, Your Honor?

```
 1              THE COURT:  You may.

 2   BY MR. USTYNOSKI:

 3   Q.  Mr. Adcock, I'm going to show you what is marked for

 4   identification at this point as Government's Exhibit 1.  Can

 5   you tell the members of the jury, after you look at that, do

 6   you recognize Government's Exhibit 1?

 7   A.  Yes, sir.

 8   Q.  And what is that, sir?

 9   A.  It's a letter addressed to the clerk of the court from

10   Jackson County Correctional Facility.

11   Q.  And does Exhibit 1 -- is Exhibit 1 the suspicious letter

12   that you had found?

13   A.  It appears to be so; yes, sir.

14              MR. USTYNOSKI:  Your Honor, at this time I would ask

15   that Government's Exhibit 1 be moved into evidence.

16              MR. MURRELL:  No objection.

17              THE COURT:  Government's 1 is admitted.

18        (GOVERNMENT EXHIBIT NO. 1:  Received in evidence.)

19              MR. USTYNOSKI:  May I publish, Your Honor?

20   BY MR. USTYNOSKI:

21   Q.  Mr. Adcock, looking at Government's Exhibit 1, do you see

22   the top-left-hand corner?  Can you tell the members of the

23   jury, you know, in looking at that envelope, what was --

24   what, if anything, was the flag to you to confiscate it?

25   A.  Well, Jackson County Correctional Facility.  It's got the
```

*Glen Adcock - Direct*

1  clerk of the court's office address on it.

2  Q.  And can you tell the members of the jury, Mr. Adcock,

3  once you received Government's Exhibit 1, when you

4  confiscated it, what actions did you take, if any?

5  A.  I contacted my supervisor, Don Porter, and he made

6  contact with the Marshal's Service, Andy Kilgore, to come

7  down and take a look at it.

8  Q.  Do you recall if Mr. Kilgore was actually working that

9  day or not, if you do?

10  A.  He was not working that day, but they called him and had

11  him come to the building.

12  Q.  So he was off duty, to your knowledge?

13  A.  Yes, sir, he was.

14  Q.  So how long did it take for Mr. Kilgore to arrive, if you

15  recall roughly, if you do?

16  A.  Maybe 30 minutes, if that.

17  Q.  And during that time who maintained custody of

18  Government's Exhibit 1?

19  A.  It was placed into a plastic bag, and it was held by Don

20  Porter until he arrived.

21  Q.  And was that in your presence as well?

22  A.  Yes, sir.

23  Q.  Okay.  And at some point did Mr. Kilgore show up?

24  A.  Yes, he did.

25  Q.  Did you see whether he took possession of Government's

1    Exhibit 1?

2    A.  He did.

3    Q.  And can you tell the members of the jury what did you do

4    next, if anything?

5    A.  I was sent to a room to be isolated away from the

6    package, because I'm the one that collected the package,

7    until someone was able to take a look at the envelope to see

8    if there was anything that could harm anyone.

9    Q.  And do you know why you were put in a separate room and

10   almost quarantined?  Do you know why?

11   A.  Because they weren't sure what was in the envelope, if it

12   could be anything of harm.

13   Q.  And when you confiscated the letter, sir, can you tell

14   the members of the jury, at that time did you know whether

15   there anything harmful in the envelope?

16   A.  I did not know, but it was a concern that it was.

17   Q.  And did you take that seriously?

18   A.  Very seriously.

19   Q.  And at some point later you were told that -- strike

20   that.

21       Were you told at some point later that there was nothing

22   harmful in the envelope?

23   A.  Right.  Approximately 45 minutes later, I was told that I

24   could come out of the isolation room that I was in at the

25   time.

*Glen Adcock - Cross*

1    Q.   So you were put into isolation for about 45 minutes?

2    A.   Yes, sir.

3    Q.   And where was that?  Was that in this courthouse?

4    A.   Yes, sir.  It was in the control room of the Marshal's

5    Office.

6          MR. USTYNOSKI:  Thank you, Your Honor.  The

7    government would pass the witness.

8          THE COURT:  Cross-examine?

9                        CROSS-EXAMINATION

10   BY MR. MURRELL:

11   Q.   Good afternoon, Mr. Adcock.

12   A.   Hi.

13   Q.   It sounds like you were following instructions?

14   A.   Yes, sir.

15   Q.   And you didn't make an independent decision about whether

16   this letter was dangerous or not?

17   A.   No, sir.

18   Q.   They told you to be on the lookout for the letter?

19   A.   Yes, sir.

20   Q.   And then you followed procedure and turned that over to

21   Mr. Porter?

22   A.   Yes, sir.

23   Q.   And then they told you to go to the isolation room, and

24   you followed that instruction?

25   A.   Yes, sir.

1          MR. MURRELL:  Thank you.  That's all I have.

2          THE COURT:  Redirect?

3          MR. USTYNOSKI:  Nothing, Your Honor.

4          THE COURT:  Thank you, Mr. Adcock.  You may step

5  down.

6          Mr. Ustynoski, please call your next witness.

7          MR. USTYNOSKI:  Your Honor, Andy Kilgore.

8          DEPUTY CLERK:  Please raise your right hand.

9          ***ANDREW KILGORE, GOVERNMENT WITNESS, DULY SWORN***

10          DEPUTY CLERK:  Be seated.

11          Please, state your full name and spell your last

12  name for the record.

13          THE WITNESS:  My name is Andrew Kilgore, spelling is

14  K-i-l-g-o-r-e.

15                    DIRECT EXAMINATION

16  BY MR. USTYNOSKI:

17  Q.  Mr. Kilgore, good afternoon.  Please let me know if I ask

18  you anything that you're confused of, and I will rephrase the

19  question for you, sir.  Okay?

20  A.  Yes.

21  Q.  By whom are you employed?

22  A.  I am an employee of the United States Marshal's Service,

23  the Department of Justice.

24  Q.  And how long have you been so employed, Mr. Kilgore?

25  A.  I've been employed with the Marshal's Service over 27

*Andrew Kilgore - Direct*

1   years now, sir.

2   Q.  And can you tell us -- give the members of the jury a

3   general background of your training and experience.

4   A.  I've had -- as I said, I've been employed with the

5   Marshal's Service for over 27 years here in the Northern

6   District.  For the last three and a half years, I've been the

7   judicial security inspector for the district, or more

8   specifically, the senior inspector responsible for the

9   security of the facilities as well as the judiciary and the

10  associated agencies within the Department of Justice and with

11  the courts.

12  Q.  And is that limited to one courthouse or is that?

13  A.  That's actually throughout the district.  It runs from

14  our Gainesville Division all the way to our Pensacola

15  Division, including Tallahassee and Panama City.

16  Q.  And what is your current official title?

17  A.  My title is senior inspector; yes, sir.

18  Q.  And you say you are responsible throughout the district

19  for those safety concerns.  Can you tell the members of the

20  jury what general policies and procedures do you have as far

21  as something -- when you receive a threat, what, if anything,

22  do you instruct your employees?

23  A.  Well, the biggest thing is, in dealing with a threat or

24  an issue as far as the security of the building, my job is

25  as -- I'm responsible to see that the court security officers

*Andrew Kilgore - Direct*

1    are trained in performing their jobs so that the personnel

2    entering into the facility are screened sufficiently to

3    minimize, mitigate any threat coming into the building.

4        For example -- or as well as in the event that something

5    is mailed in, their job, again being the screening of this

6    material, so that it's intercepted at the entry points

7    instead of coming into the building to the offices or any of

8    the tenants of the building.

9        So our job specifically is to try to keep the material at

10   the entry point of the building.

11   Q.  And in some cases you receive information of a threat

12   such as in this case, correct?

13   A.  Yes, sir; that is correct.

14   Q.  Even without any type of alert, on a daily basis, is

15   screening for such weapons or materials important?

16   A.  Oh, absolutely.  It does.  It goes on a daily basis, as

17   well as looking into the current threats that are going on

18   throughout the world, looking at them as trying to -- or

19   mitigate them so that such a threat isn't introduced into

20   this facility or into any of the buildings or facilities here

21   in the district.

22   Q.  Can you tell the members of the jury, you know, in this

23   case, how it was that you became involved and you were

24   notified to be on the lookout for anything suspicious?

25   A.  It was the latter part of December of 2012.  I had

*Andrew Kilgore - Direct*

1    received a phone call that there were letters that had been

2    mailed from the Jackson Correctional Facility in Marianna,

3    Florida.   The letters were stated to have contained an

4    unknown substance.   The letter purportedly -- or the author

5    or the drafter of letter basically said that the letter

6    itself contained Anthrax, and it was his intent to mail it to

7    the facilities.

8        At that point, once I had received the word, we ended up

9    notifying the parties, court security officers, as well as

10   the possible recipients so that, if -- to be looking,

11   mindful, watching.   And what we ended up doing was actually

12   going through the notification process, trying to ascertain

13   who the threat had -- what had originated from as well as

14   just notification of the parties, the resources necessary --

15   if the material did arrive here at the courthouse, the

16   notification of the personnel, hazardous material, the fire

17   department, so that they are able to respond, contain the

18   material so that there isn't the risk of contamination in the

19   building or even beyond the entry point into the building

20   itself.

21   Q.  And the original alert, who did it come from?

22   A.  As I recall, I got a --

23   Q.  If you recall?

24   A.  Sir?

25   Q.  If you recall, who did the information come from?

 1  A.  The information, I was notified by FDLE out of Marianna.

 2  I also received contact from Special Agent Leon with the FBI,

 3  who had also received the information from FDLE, that our

 4  courthouse -- there was a letter that was intercepted at the

 5  Jackson County Jail with a powdery substance that was

 6  intercepted by the correctional officers there.  It was

 7  unknown what the material was, other than the letter itself

 8  was addressed to the U.S. Courthouse in Tallahassee, Florida.

 9      At that point what we ended up -- once we were notified,

10  then basically the parties as well -- I mean, the parties

11  such as the senior managers within the Marshal's Service were

12  notified, our threat management division was notified because

13  of the possibility of a letter containing hazmat material.

14  Q.  What is threat management?

15  A.  Threat management in Washington in the Marshal's Service

16  headquarters.

17  Q.  And who notified them?

18  A.  I did.

19  Q.  And can you tell the members of the jury, at this

20  particular courthouse or within the district, did you

21  institute any additional procedures as opposed to if that

22  information had not come?

23  A.  Well, we ended up doing -- what I ended up doing was

24  notifying the court security officers to be looking for it,

25  to be alert to it.  At that point we opened a threat

*Andrew Kilgore - Direct*

 1    investigation with regard to it.  If it hadn't been for the

 2    contact by the FBI, I would have been contacting the FBI,

 3    notifying them of the threat itself against the facility,

 4    since our job was to mitigate or investigate the security

 5    aspect of the threat, to try to contain the threat while the

 6    actual criminal investigation was conducted by the bureau.

 7    Q.  And can you tell the members of the jury, at some point

 8    were you notified of a suspicious letter that was received at

 9    this courthouse?

10    A.  We were notified that there were two letters.  The first

11    letter -- or there was a letter that was intercepted by the

12    Jackson County Correctional Facility; and the second letter,

13    which was, we were told was in the mail, was either addressed

14    to the Panama City Courthouse or the Tallahassee Courthouse.

15    It wasn't sure -- it wasn't clear to us at that point which

16    courthouse it was going.

17        Since it was unclear, I notified our court security

18    officers in Panama City, as well as the Marshal's Office in

19    Panama City to be alert, looking for the letter.  And if the

20    letter did come, with the copy of the information that was

21    provided to me of the first letter that was intercepted,

22    copies were provided to Panama City as well as maintained

23    here in Tallahassee so that we had something to be looking

24    for so that in the time frame after Christmas before New

25    Year's, our personnel can be looking for the letter.  If the

*Andrew Kilgore - Direct*

1    letter went to Panama City or, as it was, here, the letter

2    could be intercepted, screened, packaged with the FBI being

3    notified, and then having the material turned over to

4    hazardous material for analysis and disposed of.

5    Q.  Were you at some point notified by Mr. Adcock or

6    Mr. Porter, somebody that works with the COs here --

7    A.  Yes, sir.

8    Q.  -- the court COs here at this courthouse that something

9    might have been received suspicious?

10   A.  Yes, sir.  I got a call -- it was after Christmas.  I

11   received a call.  I believe it was from Don Porter, the lead

12   court security officer here in the building or in this

13   facility, that the letter we had been looking for was

14   received here by the court security officers, having come in

15   through the postal service.

16       At that point, directing them to go ahead and to bag it,

17   to hold it.  I then notified Special Agent Leon with the FBI,

18   and then we both came down to the courthouse at that point.

19   Q.  Were you working at that point?  Do you know?

20   A.  I was an annual leave during that time frame.

21   Q.  Okay.  And if you could look in front of you,

22   Mr. Kilgore, or at your screen, look at Government's

23   Exhibit 1.  Can you tell the members of the jury if you

24   recognize that envelope?

25   A.  Yes, sir, I do.

*Andrew Kilgore - Direct*

```
 1   Q.  And what is that envelope?

 2   A.  Well, this is an envelope to -- it's addressed to the

 3   Clerk's Office, 111 North Adams Street, Tallahassee, Florida,

 4   32301.  It's from the Jackson County Correctional Facility

 5   from Inmate James Wambles.  And then it lists the address

 6   Penn Avenue, Marianna, Florida.  It's got a postmark on it,

 7   20 December 2012.

 8   Q.  At some point, although, you are off duty, did you arrive

 9   at this courthouse to take possession of the evidence that

10   was seized?

11   A.  Yes, sir, we did -- or yes, sir, I did.

12   Q.  And is Government's Exhibit 1 part of the evidence that

13   you received --

14   A.  Yes, sir, it is.

15   Q.  -- from CSO Porter?

16   A.  Yes, sir.

17           MR. USTYNOSKI:  May I approach, Your Honor?

18           THE COURT:  You may.

19   BY MR.  USTYNOSKI:

20   Q.  Mr. Kilgore, I'm going to show you what is marked for

21   identification only at this time as Government's Exhibit 2.

22   Please take a brief moment to look at that exhibit.

23   A.  Yes.

24   Q.  Do you recognize Government's Exhibit 2?

25   A.  Yes, sir, I do.
```

 1   Q.  Can you tell the members of the jury, is that something

 2   that you received along with Government's Exhibit 1?

 3   A.  It was within the envelope itself.  At the time the

 4   letter with the envelope, when it was received, both -- the

 5   letter was contained in the envelope.  When it was sealed, we

 6   took it to have it tested by Tallahassee Fire Department's

 7   hazmat team.  This is the letter, the contents of the

 8   envelope itself, sir.

 9           MR. USTYNOSKI:  Your Honor, at this time the

10   government would move Government's Exhibit 2.

11           MR. MURRELL:  No objection.

12           THE COURT:  Government's 2 is admitted.

13       (GOVERNMENT EXHIBIT NO. 2:  Received in evidence.)

14           MR. USTYNOSKI:  The government would ask to publish,

15   Your Honor.

16           THE COURT:  You may.

17           MR. USTYNOSKI:  Can you blow it up a little bit?

18   Thank you.

19   BY MR. USTYNOSKI:

20   Q.  Mr. Kilgore, can you please read for the members of the

21   jury the letter?

22   A.  "To whoever reads:  The court in Jackson County, Florida,

23   is giving out too much time for people that don't have money

24   and y'all are letting it happen.  L.T. at Jackson County Jail

25   is favoring other inmates that she had a sex relationship

*Andrew Kilgore - Direct*

1    with on outside.  State attorney needs to be locked into, but

2    I need you to read this letter slow because you are going to

3    go, Anthrax -- going to go.  Anthrax is all over this letter

4    so I'm sorry for this day.  God bless you.  Take it to the

5    bank, cuz it's true.  Thanks, Jamie Wambles."

6    Q.  If you can go to the middle of the letter where it says

7    "needs," do you see the word "needs," middle of the letter?

8    A.  Yes, sir, "State attorney needs."

9    Q.  Yes.  You had earlier said "needs to be locked into."  Is

10   that word "locked" or is it "looked"?

11   A.  Oh, "looked," it could be, yes, sir.

12   Q.  Now, what you -- strike that.

13           MR. USTYNOSKI:  May I approach, Your Honor?

14           THE COURT:  You may.

15   BY MR. USTYNOSKI:

16   Q.  I show you what is marked for identification as

17   Government's Exhibit 3.  Do you recognize that document?

18   A.  I do recognize it; yes, sir.

19   Q.  Can you tell -- without getting into what it is, can you

20   tell the members of the jury, was that document also

21   contained within Government's Exhibit 1, the letter -- or I'm

22   sorry -- the envelope and the letter, if you recall?

23   A.  I believe it was, but I'm not certain of that.  I just

24   don't recall.  The letter that was drafted was the one that

25   predominantly caught my mind.  But I want to say, yes, it

*Andrew Kilgore - Direct*

 1    was; yes, sir.

 2            MR. USTYNOSKI:  If there is no objection, marked

 3    Government's Exhibit 3 into evidence.

 4            MR. MURRELL:  No objection.

 5            THE COURT:  Government's 3 is admitted.

 6        (GOVERNMENT EXHIBIT NO. 3:  Received in evidence.)

 7            MR. USTYNOSKI:  May it be published, Your Honor?

 8            THE COURT:  It may.

 9    BY MR. USTYNOSKI:

10    Q.  I'm going to ask you two quick questions.  Looking at

11    Government's Exhibit 3 at the top, what does it read?

12    A.  "Criminal Punishment Code, Supplemental Score Sheet."

13    Q.  And just the name underneath that to the left, who would

14    that be for?

15    A.  Wambles, Jamie Lee.

16    Q.  Okay.  Now, once you -- Mr. Kilgore, once you got

17    Government's Exhibits 1, 2, and 3, can you tell the members

18    of the jury what you did next, all the steps that you took

19    once you received that?

20    A.  Well, once the letter was intercepted here at the

21    courthouse, as I said before, the letter was essentially

22    bagged up, because with the -- our intelligence or our

23    information was that it did contain or there was the risk

24    that it contained a hazardous material.  The letter was

25    bagged, so -- to keep it sealed up so that it wasn't spread

*Andrew Kilgore - Direct*

1    throughout the facility as it exited the building.

2       I notified Special Agent Leon.  We notified the hazmat

3    team here in Tallahassee.  The letter was taken by hazmat,

4    initially checked, and then taken down and screened for

5    hazardous material at a facility here in town by the

6    Tallahassee Fire Department, and I believe FDLE as well.  But

7    I know the Tallahassee Fire Department was the lead party on

8    that.

9            MR. USTYNOSKI:  May I approach, Your Honor?

10           THE COURT:  You may.

11   BY MR. USTYNOSKI:

12   Q.  Now, Government's Exhibit 2, the letter that you read a

13   loud to the jury, who is it signed by?

14   A.  Jamie Wambles.

15   Q.  Can you tell the members of the jury, Mr. Kilgore, have

16   you ever met an individual by the name of Jamie Wambles?

17   A.  I never met and -- I never met Jamie Wambles until I went

18   down to the Jackson County Jail with Special Agent Leon.  We

19   interviewed Mr. Wambles with regards to the letters that he

20   mailed out.

21   Q.  But at the time that you got -- you obtained Government's

22   Exhibits 1, 2, 3 at this courthouse, did you know who Jamie

23   Lee Wambles was?

24   A.  Other than through the source or through our efforts,

25   investigative efforts, to determine who the author of the

1    letter was, we were able to find out who he was in advance,

2    but I never had the opportunity to meet him until that day at

3    the jail.

4    Q.  Okay.  So on this date, did you have any idea what he may

5    or may not be capable of?

6    A.  At that time, no, sir.

7    Q.  Did you know anybody he knows personally?

8    A.  No, sir.

9    Q.  Did you know what they may be capable of?

10   A.  No, sir.

11   Q.  Did you take this threat seriously?

12   A.  Absolutely.

13         MR. USTYNOSKI:  At this time we have no further

14   questions, but I would ask to recall the witness

15   chronologically with the last letter.

16         THE COURT:  Cross-examine?

17         MR. MURRELL:  Yes, sir.

18                    CROSS-EXAMINATION

19   BY MR. MURRELL:

20   Q.  Good afternoon, Mr. Kilgore.

21   A.  How do you do, sir?

22   Q.  Just fine.  I wanted to ask you about the dates.  Do you

23   know what date it was this letter arrived at the courthouse?

24   You said it was after Christmas.

25   A.  It was after -- it was after Christmas but before New

1   Year's; yes, sir.  The exact date, I really don't recall.

2   Q.  Do you recall how much time past between the time you

3   learned that there might be a letter coming to the courthouse

4   and the time that you actually received the letter?

5   A.  The notification for the letters that had been -- there

6   was the letter that was intercepted at the Jackson County

7   Jail, that was prior -- I think it was three or four days

8   before Christmas itself that the first letter was

9   intercept -- or that there was a letter intercepted at the

10  Jackson County Jail.  And then this letter that actually got

11  through, we received after Christmas.

12  Q.  So there certainly could have been a week between the

13  time you were notified about the possibility of a letter and

14  the time you actually received the -- actually saw the

15  letter?

16  A.  It's possible.

17  Q.  Do you know whether, during that interim, they made any

18  determination as to whether there was a hazardous substance

19  in that letter they had there at the Jackson County Jail?

20  Did anybody tell you about that?

21  A.  I knew the letter was taken by the authorities at the

22  Jackson County Jail.  I knew it was turned over to FDLE.

23  FDLE turned it over to the FBI.  And from there it went to

24  their crime lab.  And I'm not sure if it was Jacksonville or

25  Washington.

*Andrew Kilgore - Cross*

1   Q.  So you knew there had been some effort to test it.  Did

2   you -- did anybody tell you what the outcome of that testing

3   was, prior to the time you actually received this letter

4   you've been talking about?

5   A.  I don't recall.  I knew the letter was sent off for

6   testing.  I don't recall if we had received or been notified

7   of the results of the letter itself.  I don't think we had,

8   sir.

9   Q.  Fair enough.

10      As far as the letter itself, when it was handed to you,

11  it was in a plastic bag?

12  A.  Yes, sir, I believe so.

13  Q.  And did you actually open the letter?

14  A.  No, sir.

15  Q.  So, when you sent this letter off to be tested, it went

16  unopened?

17  A.  Yes, sir.  It was sealed up in the Baggie.  And what we

18  ended up doing was, we escorted, with hazmat, escorted the

19  letter over; yes, sir.

20  Q.  And I assume that's standard procedure?

21  A.  Essentially, yes, sir, it is.

22  Q.  So at least at that point in time you didn't know what

23  was said in the letter?

24  A.  No, sir, not at that time, other than from the first

25  letter itself.

1   Q.  All you had was an envelope?

2   A.  A sealed envelope with something in it.

3   Q.  I'm assuming that there is some kind of standard protocol

4   in your office as to these sort of incidents when a

5   threatening letter comes to the courthouse?

6   A.  Yes, sir, there is.

7   Q.  Is it your job to independently evaluate the risk, or is

8   this something that you automatically bag up and send off for

9   testing?  How does that work?

10  A.  What will happen is, when we have knowledge of a threat

11  against the building itself, whether it's a letter that's

12  shipped in, the standard procedures are to take the material,

13  seal it so we eliminate the risk of contamination beyond the

14  entry point.  At that point it's turned over to the

15  authorities who had the ability -- turned it over to the FBI

16  in this case as part of a threat investigation, where the

17  testing and the evaluation is conducted on the letter, sir.

18  Q.  So it's not something that you want to take any chances

19  with?

20  A.  It's something that we can't afford to take the chance

21  with, sir.

22  Q.  So it certainly makes sense to follow that protocol?

23  A.  Yes, sir, it is.

24  Q.  And that's what you did here?

25  A.  We tried to do that as best we could; yes, sir.

*Scott Simmons - Direct*

```
 1              MR. MURRELL:  Thank you.

 2              THE COURT:  Redirect?

 3              MR. USTYNOSKI:  No redirect, Your Honor.

 4              THE COURT:  Thank you, Mr. Kilgore.  You may step

 5    down.

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  Mr. Ustynoski, please call your next

 8    witness.

 9              MR. USTYNOSKI:  I just ask for the ability to recall

10    this witness later.

11              THE COURT:  Okay.

12              MR. USTYNOSKI:  The government would next call Scott

13    Simmons.

14              DEPUTY CLERK:  Please raise your right hand.

15        SCOTT MICHAEL SIMMONS, GOVERNMENT WITNESS, DULY SWORN

16              DEPUTY CLERK:  Be seated.

17              Please, state your full name and spell your last

18    name for the record.

19              THE WITNESS:  Scott Michael Simmons, S-i-m-m-o-n-s.

20              MR. USTYNOSKI:  Proceed, Your Honor?

21                         DIRECT EXAMINATION

22    BY MR. USTYNOSKI:

23    Q.  Mr. Simmons, good afternoon.

24    A.  Good afternoon.

25    Q.  I'm going to ask you just some brief questions.  Please
```

1   let me know if I ask anything that you don't understand.

2   I'll rephrase it for you.

3   A.  Yes, sir.

4   Q.  And please speak nice and loud and clear for everybody

5   today.

6   A.  Yes, sir.  How is my volume here?  Is this good?

7   Q.  Yes.

8   A.  Okay.

9   Q.  Yeah, just exaggerate, because it's after lunch, and our

10  blood, you know --

11      Who are you employed by?

12  A.  The Tallahassee Fire Department.

13  Q.  How long have you been so employed?

14  A.  Twelve years.

15  Q.  And what is your title there?

16  A.  I'm currently a captain.

17  Q.  And, as a captain, can you briefly go through what your

18  training and experience or education is?

19  A.  With regard -- I've got a lot of training.  With regards

20  to hazardous material?

21  Q.  Specifically, yeah.  Well, do you have any experience in

22  hazardous materials?

23  A.  Yes.  I'm a Florida certified hazmat tox medic.  Before

24  that I was a hazmat technician, with additional hours in WMD

25  and clandestine labs.

1   Q.  And "WMD" stands for what?

2   A.  Weapons of mass destruction.

3   Q.  And what does that term mean to you, in your training and

4   experience?  What types of things could --

5   A.  You're looking at anything from radiological explosive,

6   chemical -- anything that has a big bang or ability to scare.

7   Q.  For instance, would a bomb qualify as a WMD?

8   A.  Yes.

9   Q.  And how about Anthrax?

10  A.  Yes.  That would be biological.

11  Q.  Well, what is -- do you know what Anthrax is, by the way?

12  A.  It's a biological agent.  I think it's found naturally in

13  sheep.  That kind of thing.  There's multiple types.  There's

14  cutaneous, respiratory.

15  Q.  Can you tell the members of the jury, do you have any

16  knowledge of the effects of that type of agent?

17  A.  Not exactly.  I mean, I do know that there's several

18  types; and respiratory, it generally shuts down the

19  respiratory system.

20  Q.  And in the Tallahassee Fire Department, how many people

21  are in the hazmat squad or team?

22  A.  We have about 103 certified hazmat techs.  We carry two

23  teams daily.  Generally, anytime we may have up to 16 techs

24  on duty at a time.

25  Q.  And can you tell the members of the jury, do you have any

 1    general procedures when you have a report of a suspicious

 2    letter that may contain a substance such as Anthrax?

 3    A.   Yes.

 4    Q.   Can you tell them what general procedures you apply when

 5    you get that type of threat?

 6    A.   Well, it's all depending on, first of all, how it was

 7    delivered, where it's delivered, that kind of thing.  We do a

 8    threat matrix on it, first of all.

 9    Q.   What's a "threat matrix"?

10    A.   We kind of run it through -- to boil it down and make it

11    simple, we look at, was there a -- the letter or the package,

12    did it have an implied threat or a threat to it.  Then we

13    look at the target.  Was the target high value or political,

14    that kind of nature.  And from there we decide our course of

15    action at that point. If we consider it a threat, then we

16    follow our standing operating procedures for dealing with it.

17    Q.   At some point did you become involved in the

18    investigation regarding an individual by the name of Jamie

19    Wambles?

20    A.   If you're talking about the December 26th, yes.

21    Q.   Well, let me show you something specifically.

22         Mr. Simmons, I'm showing you Government's Exhibit 1.

23    Tell the members of the jury, do you recognize that envelope?

24    A.   Honestly, no.

25    Q.   Okay.  Did you receive an envelope in December of last

1   year?

2   A.  Did I receive one?

3   Q.  Yeah.  What evidence, if any, did you receive that you

4   investigated?

5   A.  December -- I think it was the 26th, but you will have to

6   double-check that time.  But we got called I believe by my

7   special operation's chief to come up to the federal

8   courthouse here for a suspicious letter in the mailroom, I

9   believe.  It was already bagged in a clear bag when we got to

10  it.

11      At that point we went in, bleached the bag, re-bagged it.

12  Bleached that one.  Standard operating procedure for --

13  Q.  What does that mean?

14  A.  We'll bleach the outside of the bag.  The one hadn't

15  been -- the letter had not actually been opened yet, I

16  believe.  It was already in a bag.  So what we did was, we

17  take a bleach solution, a 1-to-10 bleach solution, and we'll

18  spray the outside of the bag, let it air dry a little bit,

19  and then re-bag it -- or put another bag on it, spray it, and

20  so on, until we get three layers of bags and bleach on it.

21  Q.  And why do you do that?

22  A.  To reduce or minimize or stop any secondary

23  contamination.

24  Q.  Okay.  And after you did that, what did you do next, if

25  anything?

1    A.  I believe I left it to the law enforcement agency on

2    scene to transport to the Lake Bradford mailroom so we could

3    go down there and test it.

4    Q.  And did you do so?

5    A.  Yes.

6    Q.  Who were you with, if anybody?  Do you recall?

7    A.  On my team?

8    Q.  Yes.

9    A.  I had my driver, my engineer, and two firefighters -- or

10   one firefighter.

11   Q.  Do you recall anybody that may have been there from the

12   courthouse, if you recall?

13   A.  FBI Agent Mark Leon I believe was there.  But other than

14   that, I don't believe -- I can't remember their names.

15   Q.  And what kind of testing or procedures did you do in

16   the -- what was it?  You said it was the mailroom?

17   A.  Yes.  There's a mailroom off of Lake Bradford.  The

18   reason we like to take it there is it has a power hood so we

19   can open the stuff up under there, and it keeps the stuff

20   safe, so --

21   Q.  And can you tell the members of the jury what you did

22   when you got to that mailroom, what procedures?

23   A.  We -- in order to send anything like that to the

24   Department of Health in Jacksonville, we've got a standard

25   procedure.  We have to test for radioactivity, chemical as

*Scott Simmons - Direct*

1    well as explosives.

2        We tested for radioactivity, first, using I believe a

3    Ludlum.  It came up negative.  At that point we opened it up

4    under the power hood and found no product inside.

5    Q.  Found no product inside?

6    A.  Yes, sir.

7    Q.  So is it fair to say that there was nothing radioactive,

8    chemical, or any type of explosives in that letter that

9    you -- well, at that point was it just the envelope?

10   A.  At that point -- I don't remember what was in it, other

11   than there was no product in there for me to test, further

12   than what I did, which was the radioactivity.

13   Q.  I know it was a little while, but do you remember what

14   was in the envelope, if you recall?

15   A.  (Shakes head.)

16   Q.  Do you remember at any point when you're testing it, did

17   you ever read any letter that may have been contained in

18   there?

19   A.  I don't remember.

20   Q.  Your main focus was on testing the product?

21   A.  What I was there for.

22   Q.  To you, it didn't matter really what was in there, what

23   was written on the letter?

24   A.  No.

25   Q.  What, if anything, did you do after you tested it for the

1    radioactive, chemical, explosives?  What procedures, if

2    anything, did you do?

3    A.  There was nothing left -- there was no product, so I had

4    nothing to test.  So I left it with law enforcement.

5    Q.  Do you recall who you left the envelope and its contents,

6    who you left it with?

7    A.  There were several people there, but I don't recall.  I

8    never had custody, so it was whoever had custody the whole

9    time.

10            MR. USTYNOSKI:  Court's indulgence?

11            May I approach, Your Honor?

12            THE COURT:  You may.

13            MR. USTYNOSKI:  Thank you.

14   BY MR. USTYNOSKI:

15   Q.  Mr. Simmons, I'm going to show you what has been marked

16   for identification as Government's Exhibit 4.

17   A.  Uh-huh.

18   Q.  Can you take a brief moment to look at that form?

19   A.  I'm familiar with it.

20   Q.  You're familiar with that?

21   A.  Yes, sir.

22   Q.  You've seen it before?

23   A.  I've seen that form, yes.

24   Q.  And is your signature on that form?

25   A.  Yes.

1    Q.  Can you tell the members of the jury what that form is?

2    A.  This is our standard form that we fill out prior to

3    sending the sample to Jacksonville to get tested at the lab.

4    And really my part of it is to make sure that we're not

5    sending any explosives, radiological, or chemical danger.  So

6    we figure that out on scene before we send it to the lab.

7          MR. USTYNOSKI:  At this time, Your Honor, I would ask

8    that Government's Exhibit 4 be moved into evidence.

9          MR. MURRELL:  No objection.

10         THE COURT:  Government's 4 is admitted?

11      (GOVERNMENT EXHIBIT NO. 4:  Received in evidence.)

12         MR. USTYNOSKI:  May I publish, Your Honor?

13         THE COURT:  You may.

14   BY MR. USTYNOSKI:

15   Q.  Mr. Simmons, if you look at your computer monitor

16   there --

17   A.  Yes, sir.

18   Q.  -- can you just point on the monitor where your signature

19   is or your initials?

20   A.  Where it says, "By whom, By whom, By whom," about half

21   way down, "Sample ruled out for explosive agent."  There is

22   No product, PID, and Ludlum, and my signature is next to all

23   three of those.

24   Q.  And that's your signature that's implying that --

25   A.  Yes, that we did that; that we ruled them out.

Scott Simmons - Direct

1    Q.  And do you know who that form is submitted to, if you

2    know?

3    A.  I thought it went with the Department of Health when they

4    took it to Jacksonville, but that would be beyond my scope.

5    Q.  Okay.  And if we scroll to the top of that document, can

6    you tell the members of the jury what is the title of that

7    document, sir?

8    A.  Florida State Emergency Response, the SERC, Response

9    Procedures, Appendix E.

10   Q.  The items that you just told the jury that you tested

11   before it was sent to Jackson County for lab analysis,

12   according to your Tallahassee Police Department hazmat, as

13   you called it, threat matrix, the evidence you tested, does

14   that fall within your matrix, your threat matrix?

15   A.  Yes.

16   Q.  And so, when you were testing it, did you consider it a

17   serious threat that needed to be tested?

18   A.  Well, we've got two options of that.  We're either not

19   going to test it, we don't consider it a threat; or we're

20   going to take it as a threat, and we're going to whole nine

21   yards.  So we went the whole nine yards on it.

22   Q.  And you don't know anybody by the name of Jamie Lee

23   Wambles, correct?

24   A.  No.

25   Q.  So you don't know what he may or may not be capable of

1   doing?

2   A.   No.

3              MR. USTYNOSKI:   I pass the witness, Your Honor.

4              THE COURT:   Cross-examine?

5                          CROSS-EXAMINATION

6   BY MR. MURRELL:

7   Q.   Captain Simmons, in looking at that form, I saw the date

8   of December 26th on that form.   That would have been the date

9   then that you tested it?

10  A.   Yes.

11  Q.   The fact that you considered it a threat, you had not

12  read the contents of the letter before you made that

13  determination as to whether it was a threat?

14  A.   No.

15  Q.   And nobody told you that there was any sort of

16  possibility that it was -- there was dangerous radiation

17  levels?

18  A.   No.

19  Q.   But that was just kind of standard procedure, you test

20  for radiation?

21  A.   Yes.

22  Q.   And is it safe to say that that's what you were doing

23  here, following standard procedure?

24  A.   Yes.

25              MR. MURRELL:   Thank you.

```
 1              THE COURT:  Redirect?

 2              MR. USTYNOSKI:  Nothing, Your Honor.

 3              THE COURT:  Thank you, Mr. Simpson, you may step

 4    down.

 5              Mr. Ustynoski, please call your next witness.

 6              MR. USTYNOSKI:  Your Honor, the government would next

 7    call Mark Leon.

 8              DEPUTY CLERK:  Please raise your right hand.

 9              *MARK LEON, GOVERNMENT WITNESS, DULY SWORN*

10              DEPUTY CLERK:  Be seated.

11              Please, state your full name and spell your last

12    name for the record.

13              THE WITNESS:  It is Mark Leon, L-e-o-n.

14                           DIRECT EXAMINATION

15    BY MR. USTYNOSKI:

16    Q.  Mr. Leon, good afternoon.  You've heard my general

17    instructions already.

18    A.  Yes, sir.

19    Q.  Which means you're going to talk really quietly, right?

20    A.  I usually don't have that problem.

21    Q.  You are employed by the FBI?

22    A.  Yes, I am.

23    Q.  How long have you been so employed?

24    A.  A little more than 24 years.

25    Q.  Do you have any specific education for your position?
```

1   A.  Yeah.  I've got a political science degree from the

2   University of Cincinnati, a law degree from the University of

3   Cincinnati.  I practiced law for about three years before

4   joining the bureau, and then I've been assigned to the

5   Tallahassee office for my entire career.

6   Q.  Being an agent is more fun than being a lawyer?

7   A.  Definitely.

8   Q.  Do you have a specific title with the FBI?

9   A.  Well, I'm a special agent.  I'm not a supervisor or

10  anything like that, just a special agent.  But one of my side

11  duties is, I'm also an assistant coordinator in the weapons

12  of mass destruction program.

13  Q.  And what are your responsibilities within the agency for

14  weapons of mass destruction, if any?

15  A.  In a small office like Tallahassee, we have six or seven

16  agents here, and we cover from Madison to Apalachicola, all

17  the way down to Perry.  So we work a variety of matters.

18  I've worked international terrorism matters, domestic

19  terrorism matters, civil rights investigations, fraud

20  matters, public corruption matters.  One of those duties are

21  weapons of mass destruction cases.

22      In the Tallahassee area when that occurs, generally, it

23  involves letters with white powder substances or threats

24  involving matters like that.  So I respond to cases like

25  that.  If there was a, you know, biological threat or a

1    nuclear threat or radiological threat, I would also respond

2    to those matters as well.

3    Q.  And at some point were you assigned to an investigation

4    that involved Jamie Lee Wambles?

5    A.  Yes, I was.

6    Q.  Can you tell the members of the jury how is it that you

7    ended up being assigned to this matter?

8    A.  In December, it would have been either on the 20th or the

9    21st, we received word that a letter containing a white

10   powdery substance had been intercepted at the Jackson County

11   Correctional Facility.  The letter claimed it was Anthrax.

12   There was a threat in there.  And it was a letter that was

13   destined for this courthouse.  It was intercepted before it

14   actually got in the mail.

15       An investigation that was conducted at the jail facility

16   at that time involved an interview of Mr. Wambles in which he

17   admitted to sending that letter as well as a prior letter

18   also destined for the federal courthouse here in Tallahassee.

19       As far as anyone was aware, the first letter that he sent

20   out had not been intercepted and was somewhere in the mails

21   and at the time -- I want to correct one thing.  It was

22   destined for either this courthouse or the courthouse in

23   Panama City.  The information that came to me was not

24   specific as to which courthouse, but it was one of the two.

25   Q.  And after receiving that information, did you at some

1    point respond to this courthouse?

2    A.  I did.  Following that information, I contacted Andy

3    Kilgore, who testified previously, and advised him of this.

4    I think he was already aware of the threat and a possible

5    letter coming to one of the two federal courthouses.  So the

6    court was on alert for this particular -- for a particular

7    envelope coming from the Jackson County Correctional

8    Facility.  And on -- it was the morning of December 26th,

9    after Christmas, we got word that the letter was located here

10   in the courthouse.

11   Q.  I'm just wondering.  Before it was received there, is

12   there any type of thing that can be done to check within the

13   postal service while it's en route to see if -- is there

14   anything that can be done, or you just basically -- it's not

15   feasible and you kind of have to wait?

16   A.  I don't think it's feasible.  I'm not well versed in the

17   whole postal system business, but knowing, you know, the

18   millions or billions of mail they process on a daily basis,

19   didn't believe that that was a feasible alternative at this

20   point.

21   Q.  Okay.  So at some point, you testified, that you notified

22   Mr. Kilgore.  And then at some point did you receive a

23   notification by Mr. Kilgore that something might have been

24   intercepted?

25   A.  Yes.  It was midmorning on December 26th.

*Mark Leon - Direct*

1  Q.  And were you working at that time?

2  A.  I was not.  I was using some leave I had saved.

3  Q.  So you were notified on December 26th of last year, 2012.

4  What, if anything, did you do -- what information did you

5  receive when you were notified?

6  A.  That there was an envelope that had been identified in

7  the mailroom here that was apparently sent from the Jackson

8  County Correctional Facility.  And given the information that

9  we had had previously, we assumed that, you know, likely be

10  tied into the letters that, you know, Mr. Wambles had

11  admitted to writing.

12  Q.  And tell the members of the jury what actions did you

13  take, if anything, next?

14  A.  Well, upon hearing that, I immediately contacted the

15  Tallahassee Fire Department hazmat team to let them know we

16  had a -- what was believed to be a suspicious letter, may

17  contain, you know, a substance believed or alleged to be

18  Anthrax, and we needed them to respond to the courthouse.

19  Following that, I got dressed and came down here myself.

20  Q.  And what occurred, if anything, once you got here?

21  A.  By the time I got here, the hazmat team had already

22  responded.  They had already double packaged the letter.

23  They had placed the letter in a paint can, which is standard

24  in this sort of matter.  Put the lid on the paint can.

25  Decided that we would go to the state mail sorting facility,

1    which is down near the stadium, because, as Mr. Simmons

2    testified before, that they have a hood that helps us keep

3    any material inside the hood.  So that's where all of the

4    hazmat work is done, if we can get the letter down there.

5        I took control of the paint can; and along with

6    Mr. Kilgore, myself, and some other hazmat guys, hazardous

7    material guys, we traveled down to the state facility where

8    the hazmat guys went ahead and did their testing.

9    Q.  And you were present for that?

10   A.  Yes, I was.

11   Q.  And after the testing was completed, what, if anything,

12   did you do next?

13   A.  Once the testing was completed, it was determined there

14   was no visible product in the letter.

15       During the time, prior to my arriving here at the

16   courthouse, and then the final testing, preliminary testing

17   being done, I also contacted my weapons of mass destruction

18   coordinator in Jacksonville, which is our main office here in

19   North Florida.  She oversees the entire the weapons of mass

20   destruction program for our division, and she is also my link

21   to our headquarters unit that deals with weapons of mass

22   destruction.

23       So I alerted her.  She alerted our headquarters unit.

24   And following the conclusion of the preliminary testing, we

25   had a conference call between myself, my WMD coordinator, and

1   our headquarters unit in order to come to a decision as to

2   how the material, the letter, the evidence needed to be

3   handled.

4       The decision was made that this needed to go to the

5   Department of Health lab in Jacksonville for further testing,

6   in order to rule out any possible evidence that we couldn't

7   see.

8   Q.  And was the evidence then shipped to Jacksonville to be

9   tested at the lab?

10  A.  Yes, it was.

11  Q.  Okay.  And do you know the results of the testing?

12  A.  The results that -- all of the tests the lab conducted

13  were negative for any sort of biological agent.

14  Q.  And once they are tested by the Department of Health's

15  lab in Jacksonville, what do -- do you know where

16  the evidence -- any evidence remained, where that would be

17  stored as evidence?

18  A.  Yes.  What happens then is that, being over in

19  Jacksonville, our weapons of mass destruction coordinator

20  would go pick up the evidence and take it in -- we would take

21  it into custody in our evidence room, and it would stay there

22  until we decided there was additional things that needed to

23  be done with it or we needed it for a court presentation.

24          MR. USTYNOSKI:  May I approach the witness, Your

25  Honor?

1          THE COURT:  You may.

2  BY MR. USTYNOSKI:

3  Q.  Agent Leon, I'm going to show you Government's

4  Exhibits 1, 2, 3, and 4.  Take a brief moment to take a look

5  at those exhibits.

6      Do you recognize those exhibits?

7  A.  Yes, I do.

8  Q.  Have you seen those before?

9  A.  Yes, I have.

10  Q.  And what are they?

11  A.  This is the letter -- or the envelope, the two pieces of

12  correspondence.

13  Q.  For the record, when you say "this," can you say

14  Exhibit 1, Exhibit 2 --

15  A.  Exhibit 1 is the envelope that was received at the

16  courthouse on December 26th.

17      Exhibits 2 and 3 are the items that were contained in the

18  envelope.

19      And Item 4 is the Department of Health form that I filled

20  out along with the assistance of Captain Simmons that

21  accompanied the evidence to the Department of Health lab.

22  Q.  Can you tell the members of the jury, looking at

23  Government's Exhibits 1, 2, and 3, are they in the same

24  condition as they were when you first received the evidence

25  in this case?

*Mark Leon - Direct*

1   A.  Yes, as far as I can tell.

2   Q.  Prior to getting involved in this investigation, did you

3   know Jamie Lee Wambles?

4   A.  No, sir.

5   Q.  And as part of your investigation, did you at some

6   point -- you earlier testified that the letter that you

7   received you believed was a second letter that was written --

8   I'm sorry -- was the first letter that was written?

9   A.  That is correct.

10  Q.  And the reason you were not alerted to that letter was

11  because of why?  Was something -- strike that.

12     Was a letter confiscated before that letter?

13  A.  Yes.  There was the letter that was confiscated at the

14  Jackson County Correctional Facility on December 20th.  That

15  was the letter that actually had some white powdery substance

16  in it.  Investigation determined that that was actually the

17  second letter that was written by Mr. Wambles.  This one at

18  the courthouse was the first letter that was written.

19  Q.  And was that why everybody was alerted to be on the

20  lookout for that letter --

21  A.  That's correct.

22  Q.  -- Government's Exhibits 1, 2, and 3 that are before you?

23  A.  Yes, sir.

24  Q.  And were you made aware during the investigation that

25  Mr. Wambles had given a statement that was recorded?

*Mark Leon - Direct*

1   A.   Yes.

2   Q.   And do you know who conducted the interview and who

3   recorded the interview with Mr. Wambles?

4   A.   Yes.   On the date, December 20th, when the letter was

5   intercepted -- actually, the letter may have been intercepted

6   the day before.   The interview was conducted on December 20th

7   by Captain Bill Bryant of the Marianna Police Department and

8   Special Agent Travis Lawson of the Florida Department of Law

9   Enforcement.

10  Q.   And did you at some point obtain -- as the case agent

11  during the investigation, did you obtain a copy of the

12  recorded statement that Mr. Wambles had given?

13  A.   Yes, I did.

14  Q.   I'm sorry?

15  A.   Yes, I did receive a copy of that CD.

16  Q.   And, as part of it, did you eventually turn that over to

17  myself and the U.S. Attorney's Office in this investigation?

18  A.   Yes, I did.

19       MR. USTYNOSKI:  May I approach, Your Honor?

20       THE COURT:   You may.

21  BY MR. USTYNOSKI:

22  Q.   Showing you what has been marked for identification as

23  Government's Exhibit 14(a), Agent Leon, do you recognize that

24  disc?

25  A.   Yes, I do.

1  Q.  Is that a disc that you forwarded to the U.S. Attorney's

2  Office?

3  A.  Yes, it is.

4  Q.  Is that the recording that you obtained from Marianna

5  Police Department?

6  A.  Yes, it is.

7  Q.  And does that CD contain the audiotape of Mr. Wambles'

8  statements to the Marianna Police Department?

9  A.  Yes.  There were two separate interviews that were

10  conducted on that day.

11  Q.  And were they by the same people?

12  A.  Yes, they were.

13  Q.  And when you say "two interviews," they both happened the

14  same day?

15  A.  Yes.  One within a short period of time of the -- the

16  second one occurred within a short period of time of the

17  first one ending.

18        MR. USTYNOSKI:  Your Honor, at this time I move

19  Government's Exhibit 14(a) into evidence.

20        MR. MURRELL:  No objection.

21        THE COURT:  Tell me the number again.  14(a)?

22        MR. USTYNOSKI:  14(a), Your Honor.

23        THE COURT:  Government 14(a) is admitted.

24    (GOVERNMENT EXHIBIT NO. 14(a):  Received in evidence.)

25  BY MR. USTYNOSKI:

1  Q.  Mr. Leon, once you received that audio recording, did you

2  do anything with the recording at your office?

3  A.  Well, I listened to it in the first place; and then, with

4  the assistance of one of our support people, I had a

5  transcription made -- a written transcription made of the two

6  interviews.

7           MR. USTYNOSKI:  May I approach, Your Honor?

8           THE COURT:  You may.

9  BY MR. USTYNOSKI:

10  Q.  I'm going to show you Government's Exhibit 14(b) for

11  identification.  Can you tell the members of the jury, do you

12  recognize the documents contained in Exhibit 14(b)?

13  A.  Yes, I do.

14  Q.  And what are those documents?

15  A.  These are the two transcripts that a lady that I worked

16  with in our office created off of listening to the CD.  And

17  I've gone through this a number of times to make sure that

18  the -- as best as I can, to make sure that the transcription

19  is an accurate representation of the CD.

20  Q.  And after listening to it several times and looking at

21  the transcript, can you tell the members of the jury, do you

22  believe it's a fair and accurate representation and

23  transcription of what is on the recordings?

24  A.  Yes, I do.

25           MR. USTYNOSKI:  At this time, Your Honor, the

1    government would move Exhibit 14(b) into evidence.

2             MR. MURRELL:  I have no objection.

3             THE COURT:  Government 14(b) is admitted.

4        (GOVERNMENT EXHIBIT NO. 14(b):  Received in evidence.)

5    BY MR. USTYNOSKI:

6    Q.  The last couple of questions relative to this letter,

7    Agent Leon.

8        Again, prior to this investigation, you hadn't had the

9    occasion to meet or know Mr. Wambles in any capacity?

10   A.  No, I have not.

11   Q.  So is it fair to say you didn't know what he may or may

12   not have been capable with as it relates to that letter?

13   A.  That is correct.

14   Q.  Can you tell the members of this jury, did yourself and

15   the members of the Federal Bureau of Investigation take that

16   letter as a possible --

17            MR. MURRELL:  I'm going to object as --

18            THE COURT:  Sustained.

19   BY MR. USTYNOSKI:

20   Q.  Did you consider this first letter something worthy of

21   investigation with the FBI as a possible weapon of mass

22   destruction?

23   A.  Well, I did.  As Captain Simmons said before, there is a

24   threat matrix, and he talked about low-value targets and

25   high-value targets; and when we have a letter threatening

1    Anthrax at a federal courthouse, a federal courthouse is

2    considered a high-value target.

3            MR. USTYNOSKI:  Your Honor, we would at this time,

4    with the ability to call later in the trial, the government

5    would pass the witness.

6            THE COURT:  Cross-examine?

7                        CROSS-EXAMINATION

8    BY MR. MURRELL:

9    Q.  Good afternoon, Mr. Leon.

10   A.  Good afternoon, Mr. Murrell.

11   Q.  So, if I have the chronology right, your understanding is

12   that they actually intercepted the letter on December 19th?

13   A.  Yes.  I misspoke earlier.  I think it's either the 18th

14   or the 19th that it was actually intercepted; yes, sir.

15   Q.  Is it clear to you, though, which letter was actually

16   sent first?

17   A.  Just based upon Mr. Wambles' testimony or his statement,

18   it was believed that the letter sent to this courthouse was

19   sent second -- or was sent first.  I'm sorry.

20   Q.  You or somebody had looked at his statement and

21   interpreted that to come up with some conclusion about the

22   order of the letters?

23   A.  Yes.

24   Q.  It wasn't anything other than what he said?

25   A.  That is correct.

*Mark Leon - Cross*

1  Q.  But, at any rate, the letter there was discovered there

2  at the detention center in Jackson County; and then by the

3  20th, your understanding is he had confessed to sending the

4  letters?

5  A.  That is correct.

6  Q.  And in that same time, when he made that statement, he

7  said that there was no Anthrax?

8  A.  That is correct.

9  Q.  He said it was Tylenol that had been crushed up?

10 A.  Yes, sir.

11 Q.  And that was on the 20th, which would have been about six

12 days before they got the letter here at the courthouse?

13 A.  That is correct.

14 Q.  And did you pass that information on to the people here

15 at the courthouse?

16 A.  I believe that Mr. Kilgore was aware of that; yes, sir.

17 Q.  Was there any testing of that substance in that letter

18 that was seized at the jail between the 20th and the 26th, to

19 your knowledge?

20 A.  Yes.

21 Q.  And what was the result of that testing?

22 A.  The results of that testing is that it was -- the

23 preliminary test -- that letter was sent to the lab in

24 Jacksonville.  They get preliminary test back within 48

25 hours, and the preliminary test on that is that the material

1  inside the letter was -- tested negative for being a

2  biological agent.

3  Q.  So by the 26th, by the time the letter got here,

4  Mr. Wambles had told the authorities that there was no

5  Anthrax?

6  A.  That is correct.

7  Q.  And by the time the letter got here on the 26th, the

8  substance in that letter that had been seized had been

9  tested?

10 A.  Correct.

11 Q.  And everybody knew it was not a biological agent?

12 A.  Yes, sir.

13 Q.  They knew, whatever the substance was, it was harmless?

14 A.  They knew it was not a biological agent.

15            MR. MURRELL:  Thank you.

16            THE COURT:  Redirect?

17            MR. USTYNOSKI:  Very briefly.  Thank you, Your Honor.

18                         REDIRECT EXAMINATION

19 BY MR. USTYNOSKI:

20 Q.  Agent Leon, defense counsel just asked you whether --

21 before that letter was received here at this courthouse,

22 whether there was information received that the powder tested

23 was negative, and that it was Tylenol or aspirin; is that

24 correct?

25 A.  Yes.

Mark Leon - Redirect                                        111

1    Q.  Would that have any bearing on how you take that letter

2    that was received to this courthouse and all of the steps

3    that you then took?

4    A.  Well, we take that into account in making a determination

5    as to a threat, but one thing I would point out about the

6    envelope that was received here is that, one, actually

7    Mr. Wambles' name is not on the return address of the

8    envelope.  It's a James Ulmer.  And when you look at the

9    envelope, while it has indications that it's from the Jackson

10   County Correctional Facility, that's strictly a stamp, like a

11   block stamp you can get.  And so from that standpoint at that

12   point in time, there is a distinct possibility that the

13   letter -- it could have been somebody that Mr. Wambles

14   associated with on the outside.  The letter may not have come

15   from the Jackson County Correctional Facility.  It was

16   postmarked Pensacola, Florida, for one.  So given all that --

17   the job of the FBI has changed a lot in the last 10 to 12

18   years, given what's gone on --

19            MR. MURRELL:  I object to the narrative.

20            THE COURT:  Sustained.

21            MR. USTYNOSKI:  Let me ask a different question.

22   BY MR. USTYNOSKI:

23   Q.  Regardless of what was found and tested, would you

24   assume, as the FBI case agent on this matter, that nothing

25   was going to be in the next letter?

1   A.   No, I could not make that assumption whatsoever, or even

2   there may be remnants of things that we could not see

3   visually from that.  So, you know, at that standpoint, we

4   have to take, you know, everything seriously, and that's why

5   we have protocols in place to deal with threats specifically

6   such as these.

7   Q.   And in this case, even with the information that the

8   first letter may have contained something other than Anthrax,

9   that powder, it's true, is it not, that in this case you

10  still had the hazmat come in, there was still a CSO person

11  quarantined, and you still had it sent to the lab for further

12  testing in Jacksonville?

13  A.   That is correct.  I, you know, it's not something that I

14  could just, you know, on my own make the determination, well,

15  this is, you know, obviously some sort of a hoax or whatever.

16  I have to take these things seriously, and we followed

17  through with our protocols and sent it to the lab.

18         MR. USTYNOSKI:  Thank you, Your Honor.  Nothing

19  further.

20         THE COURT:  Thank you, Mr. Leon.  You may step down

21  and return to counsel table.

22         Please call your next witness.

23         MR. USTYNOSKI:  Bridgette Frost.

24         DEPUTY CLERK:  Please raise your right hand.

25         *BRIDGETTE FROST, GOVERNMENT WITNESS, DULY SWORN*

1          DEPUTY CLERK:  Be seated.

2          Please, state your full name and spell your last

3    name for the record.

4          THE WITNESS:  Bridgette Frost, F-r-o-s-t.

5                         DIRECT EXAMINATION

6    BY MR. USTYNOSKI:

7    Q.  Good afternoon, Ms. Frost.

8    A.  Good afternoon.

9    Q.  I'm going to ask you just a few questions.  Please, if I

10   confuse you or ask something that you don't understand, let

11   me know, and I'll rephrase the question for you.  Okay,

12   ma'am?

13   A.  Yes.

14   Q.  By whom are you employed?

15   A.  I'm employed with the Federal Bureau of Investigation.

16   Q.  And how long, ma'am?

17   A.  I have been with the FBI for 15 years.

18   Q.  And what is your job title?

19   A.  I'm a special agent with the FBI assigned to the joint

20   terrorism task force.

21   Q.  And what is your -- do you have any specialized training

22   in that particular field?

23   A.  Yes.  I'm in charge of the weapons of mass destruction

24   program.  So my title is Weapons of Mass Destruction

25   Coordinator.

1  Q.  And did you have to get any specialized training to

2  become a coordinator in weapons of mass destruction?

3  A.  Yes.  The FBI has a weapons of mass destruction

4  certification program.  So you take courses in biological,

5  chemical, radiological, and nuclear threat issues.

6  Q.  And as a weapons of mass destruction coordinator, what --

7  are there various categories of WMDs that could qualify?

8  A.  Yes, sir.  The weapons of mass destruction cover the

9  chemical threats, biological threats, nuclear threats,

10  radiological threats, and also it includes explosive threats.

11  So we also have a special agent bomb program that mainly

12  deals with explosive threats.

13  Q.  Agent Frost, how long have you been the weapons of mass

14  destruction coordinator for the FBI?

15  A.  Two years.

16  Q.  And what does that cover, what area, geographically?

17  A.  I work in the Jacksonville FBI office.  We cover 40

18  counties in North Florida.  So that would be from

19  Jacksonville all the way across the state to Pensacola, all

20  the way down to Ocala, Gainesville, and Daytona.

21  Q.  And at some point, Ms. Frost, did you get involved in the

22  investigation of an individual by the name of Jamie Lee

23  Wambles?

24  A.  Yes.

25  Q.  Can you tell the members of the jury, how was it you

*Bridgette Frost - Direct*

1  ended up being notified and getting involved in some way in

2  this case?

3  A.   Yes.  I received notification from the Florida Department

4  of Health.  Her name is Sandy Corsin.  Her title is RERA,

5  Regional Emergency Response Advisor.  She notified me that

6  there had been a letter that had a threat of Anthrax

7  intercepted at a correctional institute and was being

8  transported across the state by the Department of Health and

9  being brought to the public health laboratory in

10 Jacksonville.

11     And since the FBI investigates threatened use of weapons

12 of mass destruction and actual weapons of mass destruction,

13 we often work with the Department of Health.  They look at it

14 from a public health standpoint, and we look at it from an

15 investigative standpoint.  So she notified me so we could

16 decide whether we wanted to open an investigation.

17 Q.   And did you ultimately determine to open an

18 investigation?

19 A.   Yes.

20 Q.   And can you tell the members of the jury, what was the

21 basis for that?

22 A.   The basis is a threatened use of a weapon of mass

23 destruction.  So since the letter threatened Anthrax, they

24 are threatening a biological agent, which is a weapon of mass

25 destruction.  Of course, Anthrax is a bacteria that is

*Bridgette Frost - Direct*

1   dangerous to humans and can -- it was weaponized by the

2   military as use of a bio-threat agent.  But Anthrax itself is

3   a bacteria that occurs naturally, but it can be used to harm

4   people.  So even the threatened use of it is a federal crime,

5   but we don't actually know it's Anthrax until we get it

6   tested at the public health lab.

7   Q.  Are you familiar with how it's tested, Anthrax in

8   particular?

9   A.  Yes.

10  Q.  Can you explain how that -- the process?

11  A.  It's actually a multistep process.  So, first, before a

12  sample -- in this case it was a white powder, but we would

13  just consider it an unknown substance.  You have an unknown

14  substance accompanied with a letter saying that it's Anthrax.

15  So, ultimately, you want to know, is this substance actually

16  Anthrax.

17      In order to do that, first, it has to be field-screened,

18  and the reason why it has to be field-screened is for public

19  safety of the laboratory biologist who ultimately is going to

20  test that substance.

21      So they look for, is it radioactive, is it a radiological

22  threat, and they use a radiation detector to do that.

23      Then they look to see, if it's a chemical threat, they're

24  looking at, is it off-gassing certain things that are

25  volatile or unstable or harmful to people.

1    Then they also try to do an explosives test.  Is this a

2    material that could ignite or explode and harm the laboratory

3    technician?

4        After we are able to -- and we usually work with a hazmat

5    team, usually with the fire department, to do those types of

6    field screening.

7        At that point, they package it in a way that is safe for

8    transport.  And once it's packaged, it's safe for transport,

9    then we bring it to a public health lab.  And the public

10   health lab will test for all of the bio-threat agents.  One

11   of them being Anthrax.  Other ones they will test for is

12   ricin, which is a toxin derived from the castor bean.  They

13   test for plague.  They test for the botulinum toxin.  And

14   they test for a couple of other bio-threat agents.  One of

15   them is called Glanders, and I think there is another one

16   that I'm not recalling the name.

17       But they actually have microbiologists that are going to

18   look for the -- they actually -- one of the tests, they are

19   actually looking for the DNA.  So is there the DNA of Anthrax

20   there?

21       And then we'll get the results of those tests to tell us

22   are those biological agents, whether they are viruses,

23   bacteria, or toxins, actually present in that substance.

24   Q.  And, Agent Frost, can you tell the members of the jury,

25   since you opened up the investigation, did you have the

1    opportunity to receive and look at any of the letters in this

2    case?

3    A.  No, I did not.

4    Q.  What did you -- what physical evidence, if any, did you

5    observe during the investigation?

6    A.  When I received notification from the public health,

7    RERA, Sandra Corcin, that the sample was being transported to

8    the public health lab, I coordinated with our Tallahassee FBI

9    office to see if they were going to open an investigation,

10   since there was a violation of federal law, threatened

11   weapons of mass destruction.  And they decided, yes, they

12   were going to open an investigation.

13       So at that point I wanted to -- the FBI wants to get

14   involved in the chain of custody of the evidence.  So I went

15   to the public health lab in Jacksonville to meet the public

16   health official.  And the field screening at that point

17   hadn't been done.  So I contacted the Jacksonville Fire

18   Department hazmat team to do the field screening that I

19   talked about earlier.

20       Then I took possession of the sample, but it was

21   packaged.  As I said, they package it for it to be safe so

22   it's double-sealed and usually it's in a paint can.  In this

23   case, I don't recall if it's in a paint can.  But it's sealed

24   in a manner that I can't see it.  So I walk it into the

25   public health lab and sign it over to them to do the

1  bio-threat screenings.

2      When they were done with all the bio-threat screenings,

3  and we found out they were negative for all of the substances

4  that I had mentioned, I went back to the public health lab to

5  pick up the evidence to bring it back to the Jacksonville FBI

6  office and to put it into our evidence storage for

7  safekeeping.

8  Q.  And did a similar procedure occur with a second letter,

9  if you know?

10 A.  Yes.  When the second letter -- we became aware that

11 there had been another Anthrax-threatening letter coming out

12 of the same correctional institute, but it had gotten into

13 the mail system.  We tried to intercept the letter in the

14 mail system so that it wasn't received -- I believe it was

15 addressed to the courthouse -- so it wasn't received there

16 and didn't cause panic with the person opening it.

17     So I got with the United States Postal Inspectors to try

18 to locate it in the mail service and pull it out of the mail.

19 And, actually, it was right before Christmastime, and the

20 mail was delayed and a lot of offices were closed.  So we

21 weren't able to intercept it in the mail system.  And then I

22 found out right after Christmas, I think on the 26th, that

23 the letter had been received at the courthouse.

24     I didn't physically respond to pick up the letter, but I

25 coordinated other FBI agents to physically get the letter and

*Bridgette Frost - Direct*

1  get it to the public lab.  And after they went through the

2  same process I already described, I picked up that piece of

3  evidence on the same day as the other letter and brought it

4  back to the FBI office and put it into your evidence vault.

5  Q.  And, again, in regards to that letter, at any point in

6  time did you ever read any of the letters, if you recall?

7  A.  Actually, I don't recall.  We receive a lot of these

8  letters, so I've done dozens and dozens of these types of

9  callouts a year.  So I don't recall specifically if I had

10 seen this letter or not.

11         MR. USTYNOSKI:  May I approach, Your Honor?

12         THE COURT:  You may.

13         MR. USTYNOSKI:  Thank you.

14 BY MR. USTYNOSKI:

15 Q.  Agent Frost, let me show you what has been marked as

16 Government's Exhibit 5.

17 A.  Okay.

18 Q.  Take a look at that document, briefly.  Do you recognize

19 that document, ma'am?

20 A.  Yes.

21 Q.  And what is Government's Exhibit 5?

22 A.  Government's Exhibit Number 5 is a Florida Bureau of

23 Public Health Laboratories Chain of Custody form, or it's a

24 copy of that form.

25 Q.  And is your signature anywhere on that form?

*Bridgette Frost - Direct*

1   A.  Yes, it is.

2   Q.  Okay.

3           MR. USTYNOSKI:  Your Honor, at this time I would ask

4   that Government's Exhibit 5 be moved into evidence.

5           MR. MURRELL:  No objection.

6           THE COURT:  Government's 5 is admitted.

7       (GOVERNMENT EXHIBIT NO. 5:  Received in evidence.)

8           MR. USTYNOSKI:  May I publish, Your Honor?

9           THE COURT:  You may.

10          MR. USTYNOSKI:  Thank you.

11          Five, please.  Blow it up a little bit, please.

12  BY MR. USTYNOSKI:

13  Q.  Agent Frost, looking at the top of the document, what is

14  the title of this document or what is the form called?

15  A.  The form is called, "Florida Bureau of Public Health

16  Laboratories Chain of Custody."

17  Q.  And, again, your signature is on that document?

18  A.  Yes, sir.

19  Q.  And under what number line is -- can you tell the members

20  of the jury where?

21  A.  Yes.  On the bottom portion of the document, Line Number

22  3.

23  Q.  And tell the members of the jury, why -- what does --

24  what does that mean -- what does that indicate when your

25  signature is on that line?  What are you doing?

*Bridgette Frost - Direct*

1   A.   I'm picking up the evidence so that the same evidence

2   transferred to law enforcement agencies, FBI, and to my name

3   and my signature.

4   Q.   And can you tell the members of the jury if that was the

5   first physical evidence that you received or the second piece

6   of evidence that you received, if you can?

7   A.   I picked up both of the letters on the same day, but I

8   believe this is the second letter, just from looking at the

9   top of the form where it says "Delivered to the laboratory by

10  Jim Barry."  That's my co-worker who I sent to deal with the

11  second letter on December 26th.  So he picked up the second

12  letter on December 26th, and then I picked it up when they

13  were done with it to bring it into FBI evidence on

14  January 14th.

15  Q.   And what happens?  What do you do with it when you get --

16  when you say you put into FBI evidence, where does it go?

17  A.   In our building we have a large storage place for

18  evidence that is secure and run by an evidence technician.

19  We have different parts of evidence.  Valuable evidence goes

20  in one place, like money or jewelry.  Drug evidence goes in

21  another place.  Grand jury evidence goes in another place.

22  And general evidence goes in yet another place.

23      So this was turned over to the custody of our evidence

24  custodian, and I start an FBI -- well, actually, I might have

25  already started -- I started an FBI chain of custody.  I

*Bridgette Frost - Cross*

1    continue the FBI chain of custody and fill out paperwork,

2    make sure it's sealed properly, and hand it over to our

3    evidence custodian for storage.

4    Q.  And, Ms. Frost, since you opened up the -- you are the

5    coordinator and you opened up a file case on this, and you

6    coordinated with your -- with the local branch of the FBI, is

7    it fair to say that you took this letter seriously, both

8    letters?

9    A.  Yes, absolutely.

10   Q.  And before you got involved in this investigation, did

11   you ever hear of a person named -- by the name of Jamie Lee

12   Wambles?

13   A.  No.

14   Q.  And can you tell the members of the jury, do you have any

15   idea what he may or may not be capable of doing?

16   A.  No.

17         MR. USTYNOSKI:  Pass the witness, Your Honor.

18         THE COURT:  Cross-examine?

19                     CROSS-EXAMINATION

20   BY MR. MURRELL:

21   Q.  Good afternoon, Ms. Frost.  I'm Randy Murrell.  I

22   represent Mr. Wambles.

23   A.  Good afternoon.

24   Q.  Do you have any expertise as far as Anthrax?  Do you know

25   much about it?

*Bridgette Frost - Cross*

1  A.  I have some training in different biological threats, but

2  I'm not a biologist.

3  Q.  I heard you mention that Anthrax, for example, is a

4  natural toxin?

5  A.  It's a natural-occurring bacteria.

6  Q.  Natural-occurring bacteria.

7      When you see it, does it come in the form of white

8  powder?

9  A.  It can appear to be a white powder, but it can also be

10  different colors.

11  Q.  So it's hard to tell from the appearance?

12  A.  Yes.  You would have to have a microbiologist tell you

13  it's Anthrax.

14  Q.  Is it lethal to handle the substance Anthrax?  Is it

15  lethal to handle it?

16  A.  Anthrax is lethal.  It has to get into your body.

17  Q.  You can inhale it?

18  A.  Yes.

19  Q.  I mean, it's in the air.  If it's in sufficient quantity,

20  I suppose, if it's in the air, that can be lethal?

21  A.  Yes.  There is also a type of Anthrax that's called

22  cutaneous Anthrax that can infect your skin, but you have to

23  have an open cut.

24  Q.  I gather you have to be pretty careful in handling it not

25  to be exposed yourself.

1    A.   Yes.

2    Q.   You wouldn't want anybody handling it who didn't have a

3    certain level of expertise?

4    A.   Yes.   They would have to be aware of how to protect

5    themselves.

6    Q.   And if somebody was handling it that didn't know about

7    that or didn't know how to protect themselves, the results

8    could be fatal?

9    A.   Yes, they could.

10   Q.   It doesn't seem likely that an average prisoner in the

11   county jail would know how to handle Anthrax?

12   A.   I would suppose not.

13           MR. MURRELL:   Thank you.

14           THE COURT:   Redirect?

15                         REDIRECT EXAMINATION

16   BY MR. USTYNOSKI:

17   Q.   Defense counsel asked you if a prisoner would know how to

18   handle Anthrax, and you said, no.   But do you have any idea

19   whether a prisoner would be able to obtain Anthrax?

20   A.   No, I would have no idea whether a prisoner could obtain

21   Anthrax.

22           MR. USTYNOSKI:   Thank you.   Nothing further.

23           THE COURT:   Thank you, Ms. Frost.   You may step down.

24           And, members of the jury, that makes this a good time

25   to take the afternoon break.   Recall my instructions.   Don't

1    talk about the case.  Leave your pad right there on your

2    chair.  We'll be back with you in a few minutes.

3              Jury out, please.

4         (*The jury exited the courtroom at 2:45 p.m.*)

5              You may be seated.

6              A couple of procedural notes.  You don't need to ask

7    me to excuse a witness.  If you're the only one that has a

8    witness under subpoena, you're free to tell the witness that

9    the witness is finished, just like you could have told the

10   witness Friday you don't need to come in response to that

11   subpoena.  What that means is, if the other side wants the

12   witness to remain available and does not have the witness

13   under subpoena, then the other side needs to speak up.

14             So, Mr. Ustynoski, if you're through with a witness,

15   you don't have to say anything.  You can tell the witness to

16   go whenever you wish.  And if Mr. Murrell wants the witness to

17   remain available, Mr. Murrell needs to speak up.

18             When we've sworn a witness and have gotten the name,

19   you don't have to ask to proceed.  You can just start asking

20   questions.

21             You don't have to ask me if it's okay to recall a

22   witness later.  I can't really rule at the time whether you

23   can recall the witness later, because I don't know what you're

24   going to ask later.  In general, you're free to call a witness

25   again.  I don't say one time is all you get.  Don't ask them

1   the same things again, but you wouldn't.  As long as it's a

2   new subject, if it's easier to break it up, as sometimes it

3   is, that's fine, so you don't need to ask.

4           Then, finally, no stage whispers.  Every word that is

5   said in the courtroom that I can hear, the court reporter is

6   going to take down.  So, if you just need to whisper to

7   somebody, that's fine.  But, if you say it kind of halfway,

8   she doesn't know whether I can hear it or whether to take it

9   down, and what that means is, if you turn around to tell

10  Ms. Dougherty who is next, just say it out loud, where we can

11  all hear, because the court reporter is doing take that down.

12  So, if it's kind of half and half, she can't hear very well.

13  So you've got to do what you tell your witnesses, if you're

14  going to say it, say it loud enough so we can all hear.

15          Those are my special rules.  By the way, they may be

16  different in the courtroom next door.  I understand that, but

17  that's for me.  Judge Walker has different rules.  You're on

18  your own over there.

19          Anybody need me before we break?

20          MR. MURRELL:  No, sir.

21          THE COURT:  Let's break until 3:00 by that clock.

22      (*A recess was taken at 2:48 p.m.*)

23      (*The proceedings resumed at 3:03 p.m.*)

24      (*Defendant present; jury not present.*)

25          THE COURT:  Please be seated.

1          Jury in, please.

2          MR. USTYNOSKI:  Your Honor, do you allow bottled

3  water in the courtroom or not?

4          THE COURT:  Yes.  And we have water up here.

5          MR. USTYNOSKI:  I just wanted to double check.  Thank

6  you.

7      (*The jury entered the courtroom at 3:04 p.m.*)

8          THE COURT:  All right.  You may be seated.

9          Mr. Ustynoski, please call your next witness.

10         MR. USTYNOSKI:  Thank you, Your Honor.

11         Danny Morehead.

12         DEPUTY CLERK:  Please raise your right hand.

13         ***DANNY MOREHEAD, GOVERNMENT WITNESS, DULY SWORN***

14         DEPUTY CLERK:  Be seated.

15         Please, state your full name and spell your last

16  name for the record.

17         THE WITNESS:  My name is Danny Morehead.  My last

18  name is M-o-r-e-h-e-a-d.  I'm a corporal at the Jackson County

19  Correctional Facility.

20                    DIRECT EXAMINATION

21  BY MR. USTYNOSKI:

22  Q.  Mr. Morehead, good afternoon.  Please speak in a loud and

23  clear voice into that microphone so everybody can hear you.

24  And if I say anything that you don't understand, let me know,

25  and I will rephrase the question for you.  Okay, sir?

*Danny Morehead - Direct*

1    A.  Yes, sir.

2    Q.  Mr. Morehead, by whom are you employed?

3    A.  I'm employed by Jackson County Correctional Facility,

4    which is the jail in Jackson County, Florida.

5    Q.  And how long have you been employed with the Jackson

6    County Correctional Facility?

7    A.  I've been at the jail for approximately three years and

8    four months.

9    Q.  And how did you become a corporal?

10   A.  A corporal is a step below a sergeant.  You have to make

11   rank.  So in the sergeant's absence, you are in charge of the

12   facility.

13   Q.  And, Corporal Morehead, do you have any type -- what are

14   your job duties at the facility?

15   A.  I do anything that a regular officer does.  And then

16   whenever the sergeant is absent, I actually take over his

17   duties, and I make sure that all of the staff is doing their

18   jobs correctly.  And if it's on a weekend and none of our

19   lieutenants are there, I'm actually in charge of the whole

20   facility.

21   Q.  Are you -- given your rank and possibly filling in as a

22   sergeant, are you familiar with the security measures for

23   screening of items going in or out of the prison?

24   A.  Yes, I am.

25   Q.  Can you tell the members of the jury what are those

*Danny Morehead - Direct*

1    procedures, in general?

2    A.  As far as any type of mail that goes out, we are allowed

3    to skim over it.  We try not to open any type of legal mail,

4    unless we feel that there's something contained within it

5    that may be considered contraband.

6         Now mind you, contraband is something as simple as, it

7    can be a sound that we hear in it that doesn't sound like

8    paper, or it can be something that we feel that feels like a

9    rock, or whatnot.  So anything contained inside the envelope

10   that doesn't belong there.

11   Q.  And what about in-going?  Is it just outgoing?

12   A.  As far as, incoming, our lieutenants and our office

13   manager actually check the incoming mail.  We actually, as

14   corporals and sergeants, we actually don't touch the incoming

15   mail until we are issuing it out.

16   Q.  Now, you said specifically -- you made a reference to

17   legal mail.  How would you know whether it's legal mail or

18   not?

19   A.  The only way we really know if it's legal mail is we'll

20   look at the address to double check and verify, but most of

21   the time the inmate that's incarcerated there will post

22   "legal mail" across the top in pen or some form.  And that's

23   generally how we can tell it's legal mail.

24   Q.  So, if it's legal mail, unless there is something

25   unusual, is it the policy of the facility not to open it up

1  or read it or check for the contents therein?

2  A.  That's correct.

3  Q.  And what does it take to -- what do you mean -- what does

4  it take to become suspicious?  You said something of a --

5  maybe it sounds different.

6  A.  If it has a distinct sound to it, if it sounds like

7  something more than paper, or it feels like something more

8  than paper, we're within our security to check and make sure

9  that there is nothing harmful in it.  Or anything that may be

10  trying to get out that the inmate may be trying to get money

11  for or send money to.  Anything that don't belong in that

12  facility is considered contraband.

13  Q.  Can you tell the members of the jury what are some of the

14  things that routinely, unfortunately, get -- make their way

15  into your prison system?

16  A.  We have found drugs.  We have found weapons.  We have

17  found stuff as simple as people's social security numbers

18  that don't belong in there.  Just about anything that can be

19  snuck in does get snuck it, and it is our job to try to stop

20  as much of it as we can.

21  Q.  What are some of the ways that the stuff gets smuggling

22  into the prison successfully, unfortunately, sometimes?

23  A.  It can be a lack of an officer doing his job.  It can be

24  them hiding it in their rectal cavity.  They can hide it in

25  their mouth.  I mean, it's -- if you think of a place on your

*Danny Morehead - Direct*

1    body that you can hide something, they've already figured it

2    out.

3            MR. USTYNOSKI:  May I approach, Your Honor?

4            THE COURT:  You may.

5    BY MR. USTYNOSKI:

6    Q.  Sir, I'm going to show you what's marked for

7    identification as Government's Exhibit 7.  Do you recognize

8    Government's Exhibit Number 7, sir?

9    A.  Yes, sir, I do.

10   Q.  And what is that?

11   A.  That is the letter that I confiscated on the evening of

12   12/18 at approximately 10:45.  It was signed by Jamie

13   Wambles, and it was addressed to this courthouse.

14           MR. USTYNOSKI:  May I approach again, Your Honor?

15           THE COURT:  You may.

16   BY MR. USTYNOSKI:

17   Q.  Let me show you what is marked for identification as

18   Government's Exhibit Number 8.  Do you recognize that

19   document, sir?

20   A.  That was the document that was contained within the

21   envelope that I have in front of me.

22   Q.  Okay.  Again, that was on, is it your testimony,

23   December 18th?

24   A.  Yes, sir, December 18th.

25   Q.  Okay.

*Danny Morehead - Direct*

133

1     MR. USTYNOSKI:  I'd move Government's Exhibits 7 and

2  8 into evidence, if there is no objection.

3     MR. MURRELL:  No objection.

4     THE COURT:  The exhibit is admitted.

5     (GOVERNMENT EXHIBIT NOS. 7 AND 8:  Received in evidence.)

6     MR. USTYNOSKI:  May I publish Exhibit Numbers 7 and

7  8, Your Honor?

8     THE COURT:  You may.  7 and 8?  Those are admitted,

9  and you may publish them.

10    MR. USTYNOSKI:  Thank you.

11  BY MR. USTYNOSKI:

12  Q.  Corporal Morehead, looking at the upper-left-hand corner,

13  the return address, it appears that there's a portion that's

14  handwritten and a part that's a stamp.  How does that work?

15  Who stamps it?

16  A.  We actually have a stamp within out facility.  Whenever

17  an inmate orders commissary that we stamp, that has the

18  address and the name of the facility on it.

19  Q.  So do you give inmates letters with the stamp already on

20  there?

21  A.  Yes, sir.  Whenever they order their commissary, we do

22  give them the envelopes and we stamp them.

23  Q.  And whose name is in the upper-left-hand corner as the

24  sender?

25  A.  That is Jamie Wambles.

*Danny Morehead - Direct*

1   Q.   And, for the record, can you read who the envelope is

2   addressed to?

3   A.   The envelope is addressed to the U.S. District Court,

4   Northern District Clerk's Office, at 111 North Adams Street,

5   Tallahassee, Florida, 32301-7730.

6   Q.   And what is handwritten in the bottom-left-hand corner?

7   A.   The bottom-left-hand corner, it's handwritten "legal

8   mail."

9   Q.   And Government's Exhibit 8, please.  The letter you said

10  that was contained within Government's Exhibit 7, can you

11  read to the jury a loud what is contained in that letter?

12  A.   The letter states:  "To who's reading this.  Please read

13  slow.  You're about to go.  This is Anthrax.  Merry Christmas

14  to the feds."  And then in bold letters, he wrote "Anthrax."

15  Q.   Corporal Morehead, can you explain to the members of the

16  jury how it is that you ended up finding or confiscating

17  Government's Exhibits 7 and 8?

18  A.   Yes, sir, I can.  On the evening of 12/18, I was skimming

19  through all of the main housing mail, which is your general

20  population pods.  All the mail goes in together.  We don't

21  have separate boxes for legal or just personal mail.  What we

22  do is, we actually sort it up whenever we get it up there,

23  and then we have to skim over the mail to make sure there's

24  nothing in it that's threatening or anything that can sway

25  somebody, as far as a witness in a case.

*Danny Morehead - Direct*

1    I come across the piece of legal mail, and I noticed that

2  it had a funny feeling to it.  So I shook it.  And upon

3  shaking it, I could hear something moving inside there that

4  was not paper.  You could tell it wasn't paper.  It sounded

5  like you put sand in a bottle almost.  And I felt it a little

6  bit closer, and then I made the decision to open the legal

7  mail.

8  Q.  And when you did, what did you find, if anything?

9  A.  Upon opening the legal mail, I found a white powdery

10  substance, unknown at the time what it was, what it could be.

11  I wasn't aware of what it possibly was until I actually read

12  the letter.

13  Q.  And once you read the letter, did you know at that point

14  really what it was?

15  A.  No, sir, I did not.

16  Q.  Do you have any type of testing kits at your facility,

17  the prison, for Anthrax?

18  A.  No, sir, we do not.

19  Q.  Do you have any type of background or degree or

20  certification in weapons of mass destruction or biochemical

21  agents?

22  A.  No, sir.

23  Q.  What actions -- tell the members of the jury, when you

24  saw the letter and you saw the powder -- can you describe

25  what the powder looked like?

*Danny Morehead - Direct*

1   A.   It was a real fine consistent gritty white powder.   It

2   looked almost as, if you was to find it on the street, you

3   would automatically assume it was cocaine.   That's what I

4   initially thought it was.

5   Q.   Once you saw the powder and then you read the letter,

6   what actions did you take, if any?

7   A.   I immediately notified my supervisor of what the letter

8   contained and asked him if he would step to main housing

9   where I was located and make a decision based on the letter

10  we had and the substance contained therein.

11  Q.   And what was that individual's name that you spoke with?

12  A.   Sergeant Jeter.

13  Q.   Now let me just back up for one a quick second.

14      You said at first, when you opened up the envelope and

15  saw the powder, you thought it was cocaine; is that correct?

16  A.   No, sir.   I said it was -- when I said that I was talking

17  about, if I was to see it on the street it would've looked

18  like cocaine-type substance.

19  Q.   Okay.   I just want to be clear then.

20      When you opened the letter and you saw the powder and

21  then you read the letter, did you know what it was at that

22  point?

23  A.   No, sir, I did not.

24  Q.   Okay.   And then you said you contacted Sergeant Jeter?

25  A.   Yes, sir.

1    Q.   And what did y'all do with Government's Exhibits 7 and 8,

2    the letter and the powder that was contained there?  What did

3    you do next?

4    A.   Sergeant Jeter come down, and he looked at the letter and

5    read the letter and seen the address.  And from there he made

6    a decision to put it in one of our plastic evidence bags.

7    And after that, I really can't tell you anymore, because he's

8    my officer in charge, so anything he done after that is --

9    it's over my head.

10   Q.   Now, when you saw the letter and the powder in there and

11   you didn't know what it was, at that point is there any

12   reason you didn't just throw it in the waste can and --

13   A.   I have to treat everything that comes in and out of that

14   jail as a legitimate and serious threat.  And I honestly did

15   not know what the substance was; therefore, I could not

16   justify throwing something in the garbage that could've

17   possibly injured or killed people.

18   Q.   Is it fair to say that you took the letter and the powder

19   in there seriously?

20   A.   Yes, sir, it is.

21   Q.   Can you tell the members of the jury, although you all do

22   your best, I mean, how often are drugs and paraphernalia

23   smuggled into your prison?

24   A.   They're smuggled in a lot more than we catch.  We do our

25   best to catch it every time.  And I'm being completely honest

*Danny Morehead - Cross*

1    with you, it does get by us sometimes.  There's been several

2    attempts just recently for people to sneak something as

3    simple as cigarettes or drugs in.

4    Q.  And when you opened the letter and saw what was in there

5    and read the letter, can you tell the members of the jury at

6    that point in time did you know who Jamie Wambles, what he

7    was capable of, if anything?

8    A.  I had no idea who Jamie Wambles was, other than the fact

9    that he was incarcerated at our facility.

10          MR. USTYNOSKI:  Thank you, Your Honor.  The

11   government has nothing further.  We pass the witness.

12          THE COURT:  Cross-examine?

13                      CROSS-EXAMINATION

14   BY MR. MURRELL:

15   Q.  So sometimes drugs get smuggled into the jail?

16   A.  Yes, sir, it does happen.

17   Q.  In the last six months, how many instances would you say

18   that it's been detected?

19   A.  In the last six months, from my shift -- because we have

20   four different shifts up there -- I cannot recall one time on

21   my shift.  I do know of instances on other shifts, sir.

22   Q.  But at least on your shift, it hasn't happened in the

23   last six months?

24   A.  No, sir.

25   Q.  Do you get weapons of mass destruction smuggled into the

*Danny Morehead - Cross*

1   jail very often?

2   A.  Sir, I don't know what anybody is capable of.

3   Q.  But the questions was:  Have you ever heard of a weapon

4   of mass destruction being smuggled into the jail?

5   A.  No, sir, I have not.

6   Q.  Once this substance was found, did they shut down the

7   jail?

8   A.  No, we did not.

9   Q.  Did they evacuate the jail?

10  A.  No, sir, we did not.

11  Q.  Did they call in a hazmat team?

12  A.  No.  As far as that goes, I'm not aware of that.  That

13  would've been when my sergeant come down.

14  Q.  Did anybody do any testing of the surfaces of the jail or

15  test any prisoners?

16  A.  Not to my knowledge, sir; no, sir.

17  Q.  So you put this in a plastic bag, but, as far as you

18  know, that was about the end of it?

19  A.  Yes, sir.

20          MR. MURRELL:  Thank you.

21          THE COURT:  Redirect?

22          MR. USTYNOSKI:  Nothing, Your Honor.

23          THE COURT:  Thank you, Mr. Morehead, you may step

24  down.

25          THE WITNESS:  Yes.

1          THE COURT:  Please call your next witness.

2          MR. USTYNOSKI:  The government next calls Jamie

3     Jeter.

4          DEPUTY CLERK:  Please raise your right hand.

5          **JAMIE JETER, GOVERNMENT WITNESS, DULY SWORN**

6          DEPUTY CLERK:  Be seated.

7          Please, state your full name and spell your last

8     name for the record.

9          THE WITNESS:  Jamie Jeter, J-e-t-e-r.

10                         DIRECT EXAMINATION

11    BY MR. USTYNOSKI:

12    Q.  Good afternoon, sergeant.  Please speak in a loud and

13    clear voice so everybody can hear you today.

14    A.  Yes, sir.

15    Q.  By whom are you employed, sir?

16    A.  Jackson County Correctional Facility.

17    Q.  And for how long have you been so employed?

18    A.  About 13 years.

19    Q.  And what is your -- as a sergeant, what are your duties

20    at the facility?

21    A.  I'm the shift supervisor.  I oversee all of the officers

22    at the facility.

23    Q.  You oversee other officers?

24    A.  Right.

25    Q.  And does any of that overseeing function have to do with

1  any -- with security measures?

2  A.  Yes, sir.

3  Q.  In general, can you describe what are the policies and

4  procedures regarding security?

5  A.  Care, custody, and control of the whole facility.

6  Q.  And, specifically, would that include outgoing mail?

7  A.  Yes, Your Honor.  Yes, sir.

8       MR. USTYNOSKI:  May I approach, Your Honor?

9       THE COURT:  You may.

10      MR. USTYNOSKI:  Thank you.

11 BY MR. USTYNOSKI:

12 Q.  Sergeant, looking at Government's Exhibits 7 and 8, would

13 you take a look at those two items?

14      Do you recognize Government's Exhibits 7 and 8?

15 A.  Yes, sir.

16 Q.  Are what are those, sir?

17 A.  These are the letter that -- the letter that Corporal

18 Morehead had called me to the main housing to observe that he

19 had pulled out of the mailbox that Mr. Wambles was sending

20 over to the federal courthouse over here in Tallahassee.

21 Q.  And at some point -- how did you become aware of those

22 items?

23 A.  Corporal Morehead called me and made me aware of them.

24 Q.  And we'll get into those in a moment.

25      MR. USTYNOSKI:  May I approach, Your Honor?

1          THE COURT:  You may.

2   BY MR. USTYNOSKI:

3   Q.  I show you Government's Exhibit 9 for identification.

4       Do you recognize Government's Exhibit 9, what that is?

5   A.  Yes, sir, I do.

6   Q.  What is it?

7   A.  It's an inmate property bag where we put property in, is

8   what I sealed the letter up in before turning it over to the

9   Marianna Police Department.

10  Q.  Is your signature on that?

11  A.  Yes, sir, it is.

12  Q.  And that's the bag that you put the letter in front of

13  you -- the envelope and the letter into?

14  A.  Yes, sir, it is.

15          MR. USTYNOSKI:  At this time, if there is no

16  objection, the government would move Government's Exhibit 9

17  into evidence.

18          MR. MURRELL:  No objection.

19          THE COURT:  Government 9 is admitted.

20      (GOVERNMENT EXHIBIT NO. 9:  Received in evidence.)

21          MR. USTYNOSKI:  May I approach, Your Honor?

22          THE COURT:  You may.

23  BY MR. USTYNOSKI:

24  Q.  After you put the contents in Government's Exhibit 9,

25  sergeant, I'm going to ask you to look at Government's

1   Exhibit 10 for identification.  Can you tell the members of

2   the jury what that document represents?

3   A.  It's a property receipt for Marianna Police Department

4   where they retained custody of the letter.

5   Q.  And is that a property receipt that was used by the

6   Marianna Police Department when you turned it over to them,

7   Government's Exhibits 7, 8, and 9?

8   A.  Yes, sir.

9           MR. USTYNOSKI:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. USTYNOSKI:

12  Q.  And, again, along the same lines of questioning,

13  Government's Exhibit 11 for identification, do you recognize

14  that bag that contains stickers with biohazard on them?

15  A.  Yes, sir.  It's a bag that the evidence was collected

16  into.

17  Q.  By whom?

18  A.  Marianna Police Department.

19  Q.  And does it appear to be the same evidence that you

20  turned over to the Marianna Police Department?

21  A.  Yes, sir, it is.

22          MR. USTYNOSKI:  Your Honor, at this time the

23  government would move Exhibits 10 and 11.

24          MR. MURRELL:  No objection.

25          THE COURT:  Government's Exhibits 10 and 11 are

*Jamie Jeter - Direct*

1    admitted.

2        (GOVERNMENT EXHIBIT NOS. 10 AND 11:  Received in

3    evidence.)

4    BY MR. USTYNOSKI:

5    Q.  Lastly, sergeant, are you aware of what a property

6    receipt is?

7    A.  Sir?

8    Q.  Are you aware of what a property receipt is?

9    A.  Yes, sir.

10   Q.  What is that generally used for in law enforcement

11   purposes?

12   A.  To show the chain of command when property is being

13   confiscated or taken from an individual.

14   Q.  Chain of command or chain of custody?

15   A.  Chain of custody.  I'm sorry.

16           MR. USTYNOSKI:  May I approach, Your Honor.

17           THE COURT:  You may.

18   BY MR. USTYNOSKI:

19   Q.  Again, you turned over Government's Exhibits 7, 8, and 9

20   over to the Marianna Police Department, correct?

21   A.  Yes, sir.

22   Q.  And can you tell us, looking at Government's Exhibit 12,

23   if you recognize what that document is?

24   A.  Yes, sir.  It's also a property receipt for the letter

25   from Mr. Wambles that I turned over to the Marianna Police

1    Department.

2    Q.  So that's a paper receipt that the physical bag --

3    A.  Right, the property bag from our facility was in.

4         MR. USTYNOSKI:  If there is no objection, Your Honor,

5    we move Government's Exhibit 12 into evidence.

6         THE COURT:  Government 12 is admitted.

7         (GOVERNMENT EXHIBIT NO. 12:  Received in evidence.)

8    BY MR. USTYNOSKI:

9    Q.  Sergeant, you said you were alerted by Corporal Morehead

10   about a suspicious letter; is that correct?

11   A.  Yes, sir.

12   Q.  What did you do once you were notified?

13   A.  I came from the booking area and went to main housing,

14   observed the letter.  By the time we got down there, we read

15   what the letter had said and saw the white --

16   Q.  When you say "we," who?

17   A.  Me and Corporal Morehead.  And he had already opened the

18   letter, I believe, and read what the letter said, and I went

19   and pulled Mr. Wambles out and --

20   Q.  Now let me ask you.  Before you went to pull Mr. Wambles

21   out, at the prison, you saw that the letter -- what was the

22   threat contained in the letter, basically?  What was the

23   material that it was alleged to be?

24   A.  Anthrax.

25   Q.  Okay.  And did you actually see some sort of powder in

Jamie Jeter - Direct

1  the envelope?

2  A.  Yes, sir.  It was a white powdery substance.

3  Q.  Now, do you have any type of background or certification

4  in biological weapons or --

5  A.  No, sir, I don't.

6  Q.  As a sergeant of the facility, do you have any type of

7  equipment, a testing kit that would even be able to test

8  for --

9  A.  No, sir, I don't.

10  Q.  -- for a substance like Anthrax?

11  A.  No, sir.

12  Q.  So when you first looked in the letter and saw it and

13  read what it said, did you know a hundred percent either way

14  what it was?

15  A.  No, sir, I didn't.

16  Q.  Okay.  And had you ever dealt with something like that

17  before?

18  A.  No, sir.  This was the first time.

19  Q.  What steps did you do once you saw what was in there?

20  What did you do next?

21  A.  Moved Mr. Wambles to a women's cell booking area up in

22  82.  We sealed up the letter with the container system --

23  substance in a gray plastic property bag.  I contacted my

24  lieutenant, which instructed me to contact the chief of

25  corrections, which I contacted them.  And he told me to

1  contact the Marianna Police Department and turn it over to

2  them.  And I had all of my -- well, me and Corporal Morehead

3  did reports on it and turned them over to the Marianna Police

4  Department, also.

5  Q.  Do you recall who you turned the evidence over to at the

6  Marianna Police Department, if you recall?

7  A.  Sergeant Todder and Officer Herndon came out to the

8  facility and took custody of it.

9  Q.  Now, you said that you went to move Mr. Wambles at that

10  point.

11  A.  Right.

12  Q.  Where was he and why did you --

13  A.  He was in general population out at main housing, a

14  separate housing unit, and we moved him up to the booking

15  area where we have administrative cells, and we placed him in

16  there under observation.

17  Q.  And why was that?  Why did you move him?

18  A.  Due to the threat, that he made a threat towards other

19  individuals.

20  Q.  And while you were transporting Mr. Wambles, did you --

21  at some point did Mr. Wambles say anything to you?

22  A.  I asked him what the substance was, which he then told me

23  it was crushed up Tylenol.  He also stated to me that --

24  about the officers had -- the sheriff's officers and feds had

25  killed his dog, and he was trying to get back at them.

*Jamie Jeter - Direct*

1  Q.  Told you he was trying to get back at certain officers?

2  A.  Right, for killing his dog.

3  Q.  And when you got the letter, can you tell the members of

4  the jury, you -- do you know who Mr. Wambles communicates

5  with on the outside?

6  A.  No, sir.

7  Q.  Do you have any idea whether he's capable of obtaining

8  something like --

9          MR. MURRELL:  I --

10  Q.  -- what was in the letter?

11  A.  No, sir.

12  Q.  Can you tell the members of the jury how often things are

13  smuggled into your prison?

14  A.  It happens on occasions.  They're able to smuggle in

15  drugs, pills, cigarettes, lighters -- stuff of that nature.

16  Q.  How about cell phones?  Are they ever smuggled in?

17  A.  I've never caught anyone with a cell phone, but they had

18  them before, but we caught them before they left the booking

19  area.

20          MR. USTYNOSKI:  Your Honor, I have no further

21  questions as it pertains to this letter.  The government

22  passes the witness.

23          THE COURT:  Cross-examine?

24                  CROSS-EXAMINATION

25  BY MR. MURRELL:

1  Q.  We've had some discussion about this.  But you said

2  sometimes people do smuggle drugs into the jail?

3  A.  Yes, sir.

4  Q.  And can you give us some idea how often that happens?

5  A.  You probably have one or two a month, someone trying to

6  smuggle something in.

7  Q.  Any weapons of mass destruction smuggled into the jail?

8  A.  No, sir.

9  Q.  So this letter was discovered on the 18th of December; is

10 that correct?

11 A.  Yes, sir.

12 Q.  In the evening?

13 A.  At night.  We collect mail probably after 11:00 at night.

14 So sometime after that.

15 Q.  And was it that same evening that you moved Mr. Wambles?

16 A.  Yes, sir.

17 Q.  And on the very same evening of the 18th, that's when he

18 told you it was Tylenol?

19 A.  Yes, sir.

20 Q.  And he told you he was mad because an officer killed his

21 dog?

22 A.  Yes, sir.

23 Q.  Now, he has an Aunt Gloria Jeter.  Are you related to

24 Mr. Wambles in some way?

25 A.  Not that I know of.

*Jamie Jeter - Cross*

1   Q.  Have you known Mr. Wambles very long?

2   A.  Just coming through the facility, I've known him.

3   Q.  Does he strike you as somebody that is well educated?

4   A.  My opinion on that?

5   Q.  Yes.

6   A.  I would assume so.  He seemed as normal as other people.

7   Q.  He doesn't seem -- he's not any kind of scientist that

8   you know about?

9   A.  No, not that I know of.

10  Q.  Not a biologist?

11  A.  Not that I'm aware of.

12  Q.  At least, if you talk to him and you're around him, it

13  doesn't really seem like he probably even has a college

14  education, does it?

15  A.  I won't comment on that.

16  Q.  But you don't have any information about him being

17  especially well educated?

18  A.  Not that I know of.  I don't know what his education is.

19  Q.  Just like anybody else there at the jail?

20  A.  Right.

21          MR. MURRELL:  Thank you.

22          THE COURT:  Redirect?

23          MR. USTYNOSKI:  Nothing, Your Honor.

24          THE COURT:  Thank you, Mr. Jeter.  You may step down.

25          Please call your next witness.

1          MR. USTYNOSKI:  Tommy Harkrider.

2          DEPUTY CLERK:  Please raise your right hand.

3      **TOMMY GENE HARKRIDER, JR., GOVERNMENT WITNESS, DULY SWORN**

4          DEPUTY CLERK:  Be seated.

5          Please, state your full name and spell your last

6   name for the record.

7          THE WITNESS:  Tommy Gene Harkrider, Jr.;

8   H-a-r-k-r-i-d e-r.

9                        DIRECT EXAMINATION

10  BY MR. USTYNOSKI:

11  Q.  Mr. Harkrider, good afternoon.

12  A.  Good afternoon.

13  Q.  You're one of the few people out of uniform today.

14      Who do you work for?

15  A.  I work with the Florida Department of Health in Jackson

16  County.

17  Q.  And what's your job duties and description and title with

18  the Florida Department of Health?

19  A.  I am the environmental health director.  There we oversee

20  different types of environment permitting, emergency

21  response, and that sort of thing, to environmental issues.

22  Q.  You say emergency response?

23  A.  We have a disaster preparedness planner that works in

24  coordination with the emergency management office.

25  Q.  And what's your role, and how do you become involved, if

 1   there is an environmental emergency?

 2   A.   We receive a call typically from the state warning point

 3   or from a local sheriff's office, and we are dispatched in

 4   that manner.

 5   Q.   In a given year, how many times would you say you receive

 6   such a call regarding a possible threat?

 7   A.   In a given year?  Not too terribly often.  Over the

 8   course of 20 years, maybe ten times, especially after the

 9   event that occurred down South with the Anthrax scare.

10   Q.   So prior to being involved in this matter, had you ever

11   been involved in any investigation involving possible

12   Anthrax?

13   A.   We have carried several samples over to the Jacksonville

14   laboratory as suspicious white powder.

15   Q.   How many times, approximately?

16   A.   Six, seven, eight.  Something like that.

17   Q.   Did any of those turn out to be positive for Anthrax?

18   A.   No, sir.

19          MR. USTYNOSKI:  May I approach, Your Honor?

20          THE COURT:  You may.

21          MR. USTYNOSKI:  Thank you.

22   BY MR. USTYNOSKI:

23   Q.   Please take a look at Government's Exhibits 7 and 8.

24   Before getting into those, can you tell the members of the

25   jury how you became involved in this investigation?

1   A.   I received a call from our environmental response

2   coordinator in Region I, which is in Pensacola.  He informed

3   me that we had a white powder incident in Jackson County, and

4   he asked if, rather than him make the trip from Pensacola to

5   Jackson County to carry it to Jacksonville to the laboratory,

6   he asked if I could pick up the sample and meet somebody in

7   Tallahassee to have the person in Tallahassee continue to

8   take it to Jacksonville.  So I ran that leg of the trip over

9   to Jacksonville.

10  Q.   And, again, who contacted you?  I'm sorry.

11  A.   Our regional environmental response coordinator.  Eric

12  Gilmore is his name.

13  Q.   He's your regional environmental response coordinator?

14  A.   Correct.

15  Q.   And do you know why he and the Florida Department of

16  Health got involved in this investigation?

17  A.   I'm not sure.  I would guess that they were contacted by

18  the state warning point.  Typically, when there is a unknown

19  substance, there's a single number that you can call in the

20  state of Florida that alerts all of the appropriate agencies

21  to investigate.  So I'm assuming that that's how he was

22  notified.

23  Q.   And do you know, based on what the allegations were, is

24  there any reason that you got involved or you were called to

25  be involved in the investigation?

*Tommy Harkrider - Direct*

1  A.  Other than I was local and just to save him a trip from

2  Pensacola to pick up the article and then carry it to

3  Tallahassee, and I was just closer than he was, and that's

4  how I got involved.

5  Q.  Okay.  And where did you turn -- whatever evidence you

6  picked up, where did you turn it over to?

7  A.  I met Mr. McDonald, who I believe is the Region II

8  environmental response coordinator, I met him in the parking

9  lot of a Flying J truck stop, and he carried it on to

10 Jacksonville.

11 Q.  Now, when you received the evidence that you got, and

12 then transported it and turned it over, what condition was it

13 in?  Was it in a container?  Could you see what it was?

14 A.  It was in an evidence package, I believe.  I picked it up

15 from the Marianna Police Department, and it was packaged.  I

16 just signed the chain of custody, started one of my own, and

17 carried it over to him.  But it was prepackaged.  I didn't

18 change the package.

19 Q.  And can you see what was in the package?

20 A.  No, sir, not that I remember.

21 Q.  Okay.  So, looking at Government's Exhibits 6, 7, and 8,

22 you wouldn't know if that was the evidence that you actually

23 transported over in that evidence bag?

24 A.  No, sir.

25 Q.  And once you transported the evidence, were you involved

1    in any way or notified of the results?

2    A.  No, sir.

3    Q.  Lastly, when you were involved in the emergency

4    environmental response, what's the typical things that the

5    Department of Health gets involved in, you know, what types

6    of cases?

7    A.  Biohazardous waste, untreated sewage, foodborne illness

8    type things, and then white powdery instances like this.

9            MR. USTYNOSKI:  That's all I have, Your Honor.  Thank

10   you.

11           THE COURT:  Cross-examine?

12           MR. MURRELL:  I have no questions.

13           THE COURT:  Thank you, Mr. Harkrider.  You may step

14   down.

15           Please call your next witness.

16           MR. USTYNOSKI:  Kevin Blackburn, please.

17           DEPUTY CLERK:  Please raise your right hand.

18   *KEVIN EDWARD BLACKBURN, GOVERNMENT WITNESS, DULY SWORN*

19           DEPUTY CLERK:  Be seated.

20           Please, state your full name and spell your last

21   name for the record.

22           THE WITNESS:  Kevin Edward Blackburn,

23   B-l-a-c-k-b-u-r-n.

24                        DIRECT EXAMINATION

25   BY MR. USTYNOSKI:

Kevin Blackburn - Direct

1   Q.  Good afternoon, Mr. Blackburn.

2       By whom are you employed?

3   A.  City of Jacksonville, Fire and Rescue Department.

4   Q.  In what capacity?

5   A.  Lieutenant on the hazardous materials team.

6   Q.  How did you become a lieutenant on hazardous material?

7   A.  My whole career with Jacksonville has been on the hazmat

8   team.

9   Q.  How many years is that?

10  A.  Ten.

11  Q.  Can you tell the members of the jury, how did you get

12  involved in this investigation?

13  A.  We were called by our chief to respond to the state lab

14  there in Jacksonville to prescreen a package that was being

15  brought in.  It's their protocol to have it screened for

16  certain hazards prior to taking them into the building.

17  Q.  And when you got that information, what did you do, if

18  anything?

19  A.  We responded to the lab and met the individual I believe

20  from the public health that was transporting the particular

21  package, and then we went through our normal protocol for

22  screening it for certain hazards.

23  Q.  Can you describe for the members of the jury your

24  protocol and what you did in this case?

25  A.  In this case we took -- the package was sealed already.

1   It had some kind of material in it.  What we would do in that

2   situation is check the exterior of the package for anything

3   that can be hazardous to the lab personnel.  So by that, we

4   use several different metering devices to check for different

5   hazards such as explosive limits, any volatile organic

6   compounds, any radiological material, and any other chemical

7   agents such as like sarin, VX, G and H type agents.

8   Q.  You're saying that was only to the exterior of the --

9   A.  Yes.  We just tested the exterior of the package.  We

10  never opened it or sampled or touched the product inside.

11  Q.  How did you -- can you explain to the members of the jury

12  how you tested for chemical, radiological --

13  A.  We have one gas meter made by RAE system.  It's a five

14  gas meter that measures carbon dioxide, volatile organic

15  compounds, hydrogen sulfide, lower explosive limits, and

16  oxygen levels.  We use that meter.  And then we have a

17  radiological meter that we test for any radiological agents.

18  And then we have a lightweight chemical detector that checks

19  for your G and H chemical agents such as sarin, VX gas,

20  things of that nature.

21  Q.  And did you perform those things yourself?

22  A.  Yes.

23  Q.  And were those tests -- can they give you any indication

24  of what's inside the envelope or --

25  A.  No.

1   Q.   -- strictly the exterior?

2   A.   Strictly the exterior.   In all of those tests, basically,

3   we're searching -- we pick up anything in the air that was

4   coming off of the product.   They don't come in contact with

5   the product.   None of them can identify what's in the

6   package.

7   Q.   And to test it, did you need to take it out of any type

8   of container that it may have been inside of?

9   A.   No.   We never physically touched the package.   We just

10  metered it from the exterior.

11  Q.   Do you recall what it may have been in?

12  A.   If I remember correctly, it was in a clear evidence bag.

13  Q.   So you were able to actually test it while it was still

14  inside the bag?

15  A.   Yes.   We didn't have to open anything.

16  Q.   And you -- is it true that you are basically certifying

17  that it's safe to then send to a lab to be tested?

18  A.   Correct.   All that does is it protects the lab personnel

19  in regards to nothing hazardous on the outside of the package

20  so that they can take it into their facility and then proceed

21  with whatever testing they need to do.

22  Q.   So, you know, there could be a harmful material inside

23  the envelope?

24  A.   Correct.

25  Q.   You're not certifying anything about the inside, only the

**Kevin Blackburn - Direct**

*159*

1   outside?

2   A.   Nothing about what's actually in the package, just the

3   exterior.

4   Q.   As you sit here today, lieutenant, you said you remember

5   maybe a clear plastic evidence bag is what you were kind of

6   testing.

7   A.   Uh-huh.

8   Q.   Do you recall what was inside it at all, if you do?

9   A.   Best recollection -- unfortunately, the report for this

10  wasn't written until recently, because this is something that

11  we don't normally get a call on.  So I'm going from memory

12  from several months ago, but --

13  Q.   What do you -- it's not something you normally get a call

14  on and --

15  A.   Well, like, if we get dispatched through our dispatch

16  system, we'll get a call and we do a report on it.  These

17  types situations, a lot of times the lab will call, and it's

18  a favor to them, and we'll go over and do it and a report is

19  normally not written.  So I had to go back and write a report

20  from recollection.

21      And the powder -- I believe it was a white-powder type

22  substance that I could see from the exterior of the bag.

23  Q.   You could see that there was some substance inside of --

24  A.   There was something inside.  Never opened it or looked

25  inside.

*Phillip Lee - Direct*

1  Q.  Prior to getting involved in the investigation and doing

2  the testing on the outside of the package, and as you sit

3  here today, do you know anybody by the name of Jamie Lee

4  Wambles?

5  A.  No, I do not.

6          MR. USTYNOSKI:  That's all I have, Your Honor.

7  Government pass.

8          THE COURT:  Cross-examine?

9          MR. MURRELL:  No questions.

10          THE COURT:  Thank you, Mr. Blackburn.  You may step

11  down.

12          Mr. Ustynoski, please call your next witness.

13          MR. USTYNOSKI:  Phil Lee, please.

14          DEPUTY CLERK:  Please raise your right hand.

15      **PHILLIP ANDREW LEE, GOVERNMENT WITNESS, DULY SWORN**

16          DEPUTY CLERK:  Be seated.

17          Please, state your full name and spell your last

18  name for the record.

19          THE WITNESS:  My full name is Phillip Andrew Lee, and

20  the last name is spelled L-e-e.

21                    DIRECT EXAMINATION

22  BY MR. USTYNOSKI:

23  Q.  Good afternoon, Mr. Lee.

24  A.  Good afternoon.

25  Q.  Please speak in a loud, clear voice this afternoon for us

1    all.

2         By whom are you employed?

3    A.   The state of Florida, Department of Health, Bureau of

4    Public Health Laboratories.

5    Q.   And what is your job title with the Department of Health

6    in the state of Florida?

7    A.   I'm the lead biological defense coordinator.

8    Q.   Lead biological defense coordinator?

9    A.   Yes.

10   Q.   And that means you do what?

11   A.   I'm a microbiologist.

12   Q.   Probably the best person for me to ask this.  What is

13   Anthrax?

14   A.   It's a bacterial agent.  It's commonly found in various

15   areas around the country.  It's also been developed

16   previously as a biological warfare agent.

17   Q.   When you say as a biological warfare agent, it's

18   developed, is it somehow changed or altered?

19   A.   If it developed as a weapon and weaponized, then, yes, it

20   can be altered.  But it can also be used in its natural state

21   as well.

22   Q.   And how does a group out there weaponize it?  How does

23   it -- how does it -- how do they make it -- how do they

24   change it in some way that it becomes more of a weapon?

25   A.   That is outside of my field.

*Phillip Lee - Direct*

1    Q.  Have you ever been certified as an expert before?

2    A.  I'm sorry?

3    Q.  Have you ever been certified as an expert before?

4    A.  No, I haven't.

5    Q.  Can you tell the members of the jury, how did you get

6    involved in this investigation?

7    A.  On December 21st we received a call from the FBI weapons

8    of mass destruction coordinator, Special Agent Bridgette

9    Frost; and our role in the laboratory, we are part of the

10   national-international network of laboratory -- of the

11   laboratory response network.  And this is a network that is

12   managed by the Center for Disease Control and Prevention, the

13   FBI, and the Association of Public Health Laboratories.

14       And since 1999, this network was established,

15   specifically, to prepare for and respond to acts of

16   biological terrorism.

17       And so I first became involved in this case, as I

18   mentioned, December 21st, and received the sample.  And at

19   that point then proceeded to test it for a whole panel.  We

20   don't just look for Anthrax.  We look for a whole panel of

21   agents.

22   Q.  And can you explain the procedure, how you test it?

23   A.  Yes.  There's several different methods that we use.  The

24   main one is called "preliminary chain reaction."  It's a

25   genetic method for amplifying DNA that has specific targets

1    for the biological agents of concern that we look for.

2        In addition to this method that we call PCR, the genetic

3    amplification method, we also have a method for looking for

4    ricin toxin as part of our panel as well; and that's a

5    different method.  That looks specifically for the protein of

6    the ricin toxin.

7    Q.  And are you somehow using other chemical agents on the

8    envelope or, you know, can you describe how you test it?

9    A.  Yeah.

10   Q.  Specifically, what you did in this case?

11   A.  In this case, there was powder present in the envelope

12   with the letter, and so we just take a dry swab, and so we

13   don't want to adulterate the evidence.  We take a dry swab of

14   the powder.  And at that point we make a suspension in a

15   solution, and we then move on for all of our subsequent

16   testing based on this solution that we use.

17   Q.  And how many different -- do you recall, in this

18   investigation, did you look at one or did you analyze

19   additional items of evidence?

20   A.  It was just this one.

21   Q.  In front of you is Government's Exhibits 7 and 8.  Do you

22   recall what the items were that you analyzed?

23   A.  Yes.  In this envelope, the one with the letter, Item

24   Number 8, there's also some white powder present, and that

25   was the powder that I tested.

1   Q.  And did your office also prepare a report?

2   A.  Yes, it did.

3          MR. USTYNOSKI:  May I approach, Your Honor?

4          THE COURT:  You may.

5   BY MR. USTYNOSKI:

6   Q.  I'm showing you Government's Exhibit 13 for

7   identification.  Do you recognize -- if you can, take a look

8   at that document.

9   A.  I do.

10  Q.  What is that document?

11  A.  This is our final report from the sample.

12  Q.  And did you have any involvement in creating that

13  document?

14  A.  Yes, I did.

15          MR. USTYNOSKI:  Your Honor, if there is no objection,

16  I ask that it be moved into evidence.

17          MR. MURRELL:  No objection.

18          THE COURT:  Give me the number, again.

19          MR. USTYNOSKI:  Thirteen, Your Honor.

20          THE COURT:  Government 13 is admitted.

21      (GOVERNMENT EXHIBIT NO. 13:  Received in evidence.)

22          MR. USTYNOSKI:  May it be published, Your Honor?

23          THE COURT:  It may.

24  BY MR. USTYNOSKI:

25  Q.  Can you summarize the findings and what is notated in the

1    report, sir?

2    A.   Yes.   The three lines on here, multi-agent culture

3    identification, in addition to the genetic testing and the

4    ricin toxin test that I mentioned, we also set up a culture

5    for bacterial agents, and we incubate this up to five days,

6    since some of the agents we look for actually takes that long

7    to grow.

8         So as to the multi-agent culture identification, which

9    was negative, we have none of these bio-threats agents

10   growing.

11        So the second line down, the multi-agent PCR, is this

12   preliminary chain reaction to the genetic test that we use

13   for detecting several agents.

14        And then the third line, TRF, it stands for "Time Result

15   Florescence."   It's a method that we use for looking for the

16   ricin toxin.

17   Q.   Now, in the upper-left-hand corner, Mr. Lee, you will

18   see, right underneath Department of Health, you'll see a LIMS

19   Report Number.   Tell us what does that refer to?

20   A.   LIMS is the laboratory information management system.

21   It's our database that we enter the results into.   And the

22   database itself assigns a number.   The sample number, which

23   is a little further down, starting with JBT, JBT12000131,

24   that's our operational sample number.   That's the number that

25   I know this case as.

*Phillip Lee - Direct*

1    Q.   And underneath sample it says "source."

2    A.   Yes.

3    Q.   And the notation says, "Letter with powder."

4    A.   That's correct.

5         MR. USTYNOSKI:   May I approach, Your Honor?

6         THE COURT:   You may.

7    BY MR. USTYNOSKI:

8    Q.   I'm going to show you a similar document marked

9    Government's Exhibit 6.   Take a look at that and compare it

10   to Exhibit 12.

11        Mr. Lee, can you tell us, is government's exhibit the

12   same type of form?

13   A.   It is, yes.

14   Q.   And looking at the LIMS number and the other numbers, can

15   you tell -- and what the indication is, whether it's a letter

16   or an envelope, can you tell the members of the jury what may

17   have been analyzed as well by your lab?

18   A.   This is an open envelope, letter.   I couldn't tell you

19   looking at this report whether there is any other substance

20   such as a powder present, but this is the second sample that

21   we received.   The JBT number, again, that's our operation

22   number in the laboratory.   JBT12000132 is the subsequent

23   sample that we tested following the previous sample, 131.

24   Q.   So they are just one number off from each other?

25   A.   Yes; that's correct.

*Phillip Lee - Direct*

1  Q.  And the first one that you discussed, the form says

2  actual powder or something referencing powder?

3  A.  Letter with powder, yes.

4  Q.  Okay.  Now, this exhibit, Government Exhibit 6, what does

5  it say was tested?

6  A.  At this point, when we have a letter or an envelope where

7  there is no visible substance, we can just swab the actual

8  letter or the envelope itself.

9  Q.  And can you tell the members of the jury the results as

10  indicated on Government's Exhibit Number 6 for the envelope

11  or letter that was tested?

12  A.  Yes.  The results we obtained here were identical to the

13  previous sample.  The culture was negative.  It was

14  non-reactive for all tested agent DNA, which means the

15  amplified method did not detect any bio-threat agents, and

16  the ricin toxin was also negative.  And, therefore, it means

17  that we didn't detect any ricin toxin in the sample.

18  Q.  Now, both things that you tested in your lab, can you

19  tell the members of the jury, are you testing to exclude it

20  as a biological possible weapon and -- or is there also any

21  indication to try to determine what it actually is?

22  A.  No.  Our role is just to rule out these high consequence

23  biological threat agents.  So we're not looking for

24  everything on the planet.  We're just ruling out the agents

25  that have previously been developed as biological warfare

1   agents and could be used as bio-terrorism agents.

2   Q.  So, can you tell the members of the jury, is it fair to

3   say whether that powder that you were involved in analyzing,

4   you wouldn't know whether it was baking soda, cocaine, or

5   crushed Tylenol or aspirin, is it?

6   A.  That's correct.

7          MR. USTYNOSKI:  Your Honor, at this time I would also

8   ask that Government's Exhibit 6 be moved into evidence.

9          THE COURT:  Government's 6 is admitted.

10         (GOVERNMENT EXHIBIT NO. 6:  Received in evidence.)

11  BY MR. USTYNOSKI:

12  Q.  Mr. Lee, why is it that you and your lab did all of these

13  different tests on these items?

14  A.  That's part of the responsibility of the lab response

15  network.  Whenever the FBI were to bring us a sample in cases

16  such as this, that we use the same consistent panel to test

17  every sample that comes into our laboratory.

18  Q.  At the time you were involved in this investigation and

19  testing of substances, did you ever know an individual by the

20  name of Jamie Lee Wambles?

21  A.  No, I did not.

22  Q.  Sitting here today, do you have any idea who Mr. Wambles

23  is?

24  A.  No.  I assume he's sitting on the front here in the white

25  shirt, but that's an assumption.

1              MR. USTYNOSKI:  Thank you, Your Honor.  The

2      government would pass the witness.

3              THE COURT:  Cross-examine?

4                          CROSS-EXAMINATION

5      BY MR. MURRELL:

6      Q.  Is it Dr. Lee?

7      A.  No, it's not.

8      Q.  Mr. Lee, I'm Randy Murrell.  I represent Mr. Wambles over

9      here.

10         I'll let Mr. Ustynoski wrap things up.

11         You are a microbiologist, though.

12     A.  Yes; that's correct.

13     Q.  And you work there at the lab?

14     A.  Yes.

15     Q.  Do you have any idea how many times your lab has tested

16     for Anthrax?

17     A.  I can tell you that, since 2001, that it's been probably

18     close to 5,000 samples.

19     Q.  So it's something that you often test for?

20     A.  Yes.

21     Q.  Have you ever come up with a positive?

22     A.  Yes.

23     Q.  How many times?

24     A.  Once.

25     Q.  Once?

1    A.   Yes.

2    Q.   You said that -- Mr. Ustynoski asked you what was

3    involved in weaponizing Anthrax, and you said that was

4    outside of your field.

5    A.   That's correct.

6    Q.   Is it safe to say that's a pretty sophisticated process?

7    A.   Yes, it is.

8    Q.   Not just anybody would know how to do that?

9    A.   No.

10   Q.   Are there consequences to somebody that handles Anthrax

11   without any sort of protection or without knowing what

12   they're doing?

13   A.   Yes.  If they didn't protect themselves, it's likely that

14   they would infect themselves.

15   Q.   And if they infected themselves, what would happen?

16   A.   They would develop Anthrax.  Depending how it's entered

17   the body, then there are different clinical forms.

18   Q.   At the very least, you would be pretty sick?

19   A.   Yes.

20   Q.   If you didn't die?

21   A.   If it was a cutaneous or gastrointestinal form, yes.  If

22   it was a -- I'm sorry.  A gastrointestinal inhalation, yes.

23   If it was cutaneous, there is less than one percent mortality

24   rate.  Most people survive even without treatment.

25   Q.   I gather from what you say, though, that this weaponized

 1  Anthrax is not something that's widely available?

 2  A.  Not weaponized, but it's fatal if it's -- or it can be

 3  fatal if it's mishandled even in its, what we call, wild

 4  type, naturally acquired.

 5  Q.  When you say it occurs in the wild, what does that amount

 6  to?

 7  A.  We have about 15 cases a year in the United States of

 8  Anthrax.  They tend to be in ranches out in Texas.  It tends

 9  to be the cutaneous form.  So it's the least harmful one.

10  But it's naturally occurring in the soil, and so it can be

11  obtained.

12  Q.  So, in theory, you could be digging around in the soil,

13  and you could contract -- you could be infected with Anthrax?

14  A.  If I disturb the soil enough and inhale the dust, then,

15  yes.  There is a recent case.

16  Q.  Again, that is pretty rare?

17  A.  It is rare.

18        MR. MURRELL:  Thank you very much.

19        THE COURT:  Redirect?

20        MR. USTYNOSKI:  Nothing, Your Honor.

21        THE COURT:  Thank you, Mr. Lee.  You may step down.

22        Please call your next witness.

23        MR. USTYNOSKI:  Bill Bryant, please.

24        THE COURT:  Members of the jury, as you've noticed,

25  witnesses who are not parties to a case aren't in the

*Billy Bryant - Direct*

1  courtroom while others testify.  The case agent is always

2  here, and the parties to a case are always present.  Other

3  witnesses are outside the courtroom, except when they testify

4  themselves, at least until they finish testifying.  That's a

5  normal part of the procedure in every case.  It is done in

6  every case.

7          DEPUTY CLERK:  Please raise your right hand.

8          **BILLY RAY BRYANT, GOVERNMENT WITNESS, DULY SWORN**

9          DEPUTY CLERK:  Be seated.

10         Please, state your full name and spell your last

11  name for the record.

12         THE WITNESS:  My name is Billy Ray Bryant,

13  B-r-y-a-n-t.

14                     DIRECT EXAMINATION

15  BY MR. USTYNOSKI:

16  Q.  Good afternoon, Mr. Bryant.

17  A.  Good afternoon.

18  Q.  Please speak in a loud and clear voice for us all this

19  afternoon.

20      By whom are you employed, sir?

21  A.  Marianna Police Department.

22  Q.  And what is your title?

23  A.  Captain.

24  Q.  And how long have you been a captain of the Marianna

25  Police Department?

*Billy Bryant - Direct*

1  A.  About ten years.

2  Q.  Can you tell us a little bit about your training or

3  background?

4  A.  I've been in law enforcement for 38 years.  I started out

5  in '74, and I've been with the Marianna Police Department 23

6  years.

7  Q.  The last 23 years?

8  A.  Right.

9  Q.  Prior to that what -- what made up the 38 years?  What

10  did you do in law enforcement before that?

11  A.  I started out in Panama City in 1974, spent a year there.

12  I got out of it for two years.  And then I went -- come back

13  to Washington County Sheriff's Department for four years.

14  Went to the Niceville Police Department for ten.  Then I've

15  been here for 23.

16  Q.  And can you tell the members of the jury, how did you get

17  involved in this investigation?

18  A.  We go over the files from the previous day.  Every day we

19  go over the files, whatever took place the previous day.  And

20  I noticed in one of the files that they had received a letter

21  from the jail that supposedly contained Anthrax, and I

22  questioned where was this letter, and it was in evidence.

23  They had put it into evidence.  So that's how I come across

24  that letter.

25  Q.  And when you say they put it in evidence, do you know who

*Billy Bryant - Direct*

1   put it in there?  Who put it into evidence?

2   A.   Yeah.   It was Officer Herndon with the police department.

3   And he's fairly new.  There's four of us that's on call for

4   one week out of the month, and usually on situations that

5   serious, they will call whoever is on call and -- but he's --

6   well, less than a year, probably.  But he's a new officer,

7   and he really didn't know what to do, I guess.  So he just

8   dumped it in the evidence drop box.  Because I think it was

9   around midnight when they discovered the letter, and he just

10  brought it back to the station, and we have a drop box that

11  they put evidence in for the next day for the evidence

12  custodian to collect.

13  Q.   Was this around the holidays, if you recall?

14  A.   That one, it was around the 18th on that one.  I think it

15  was, because I received a -- I think it was on the 19th, is

16  when I took it into my custody and questioned --

17  Q.   And can you tell the members of the jury, once the

18  evidence was left in the evidence box and then discovered

19  what was contained in there, what did you do next, if

20  anything?

21  A.   I called the emergency operations center and talked to

22  Rodney Andreasen, who is over it, and told him what we had.

23  And he told me to hold on and he would get back with me.  And

24  he called me back a short while later and told me that

25  Mr. Harkrider was passing through our city, anyway.  He said

1    he'll stop by and pick it up and take it on to Jacksonville

2    to the lab.

3    Q.  What was his name?

4    A.  Harkrider, I think.

5    Q.  Do you know who he works for, if you know?

6    A.  I did a little while ago.  I forgot now.  But it was

7    Mr. Harkrider that picked it up.  He picked it up from the

8    evidence custodian.

9    Q.  Captain Bryant, in your 30 years of law enforcement, have

10   you ever had a case of -- an allegation of a threat of

11   weapons of mass destruction?

12   A.  Not within the city there, no.

13   Q.  Not within your city?

14   A.  Right.

15   Q.  Have you ever had to deal with this type of potential

16   threat before?

17   A.  Many years ago, they had one at the courthouse, but the

18   sheriff's department handled that one.  That's the only other

19   one that I can recall ever been involved in.

20   Q.  And Marianna Police Department didn't get involved in

21   that earlier incident?

22   A.  No.

23   Q.  So this was the first time that you and the Marianna

24   Police Department was handling it, to your knowledge?

25   A.  Correct.

*Billy Bryant - Direct*

1   Q.  Did you do anything with the evidence while it was in

2   your custody?

3   A.  No.

4   Q.  Was there any testing done or --

5   A.  No, we did no testing.  Once we talked to Mr. Andreasen,

6   we waited on Mr. Harkrider to pick it up.

7   Q.  In fact, captain, does your -- are you aware of any type

8   of testing kits at your police department for any type of

9   biological --

10  A.  No, we have none.

11  Q.  -- agents?

12  A.  We have none.

13          MR. USTYNOSKI:  Court's indulgence.

14  BY MR. USTYNOSKI:

15  Q.  Captain, after you turned over the evidence to the

16  Florida Department of Health --

17  A.  That would -- the evidence custodian did that.

18  Q.  The evidence custodian?

19  A.  Right.

20  Q.  Did you further the investigation in any way?

21  A.  Yes.  I notified FDLE Agent Travis Lawson and told him

22  what had took place, and we went to the Jackson County

23  Correctional Facility and spoke with Mr. Wambles about it.

24  Q.  You went and spoke with Mr. Wambles?

25  A.  Right.  We took a statement from him.

*Billy Bryant - Direct*

1   Q.  Okay.  Did you read Mr. Wambles his rights?

2   A.  Yes, I did.

3   Q.  And who all was present there, sir?

4   A.  Myself and FDLE Agent Travis Lawson.

5   Q.  And did you record the statement that you took with

6   Mr. Wambles?

7   A.  Yes, I did.

8   Q.  And in that recording were you and Mr. Lawson asking

9   Mr. Wambles questions?

10  A.  Yes.

11  Q.  Did he answer your questions?

12  A.  Yes, he did.

13  Q.  And at some point did the interview end?

14  A.  Yes.

15  Q.  And as soon as it ended, can you tell the members of the

16  jury, did Mr. Wambles tell you something that wasn't recorded

17  that caused you to then restart the recording again?

18  A.  Right.  We had finished the recording, and we started to

19  get up to leave, and he said that he had already mailed out a

20  threatening letter on the 18th.  So we went back on tape to

21  get the statement about that letter.

22  Q.  Can you tell the members of the jury, you went and you

23  were interviewing him about one letter; and after the

24  interview concluded, Mr. Wambles, is it fair to say, then

25  told you that he had already sent out an earlier letter?

*Billy Bryant - Direct*

178

1   A.   Right.   One that we didn't know about, and then we went

2   and took the statement about that one.

3   Q.   And in both statements, did Mr. Wambles admit to you his

4   participation in both letters?

5   A.   Yes, he did.

6   Q.   Can you tell the members of the jury, did Mr. Wambles

7   give you a -- first of all, did Mr. Wambles admit to writing

8   both letters?

9   A.   Yes.

10  Q.   And did Mr. Wambles tell you and Mr. Lawson why he wrote

11  these threatening letters?

12  A.   Yes, he did.

13        MR. USTYNOSKI:   At this time, Your Honor, I'd ask

14  that Government's Exhibit 14(a), that has already been moved

15  into evidence, be played to the jury.

16        THE COURT:   All right.   You can do that.

17        MR. USTYNOSKI:   I'm sorry.   Your Honor, before we do

18  that, I also have 14(b), which is the transcript, I would ask

19  that it be published to the jury members.

20        THE COURT:   And how do you plan to do that?   You just

21  want to scroll it on the screen or --

22        MR. USTYNOSKI:   It's on the screen, also.

23        THE COURT:   All right.   Good.   You can do that.

24      (*Government's Exhibit 14(a) published to the jury*.)

25  BY MR. USTYNOSKI:

1  Q.  Mr. Bryant, is that your voice?

2  A.  Yes, it is.

3        MR. MURRELL:  Is there a way to turn that up a little

4  bit?

5        MR. USTYNOSKI:  It's as loud as --

6        THE COURT:  I think I can turn it up, and whether

7  that will help, I'm not sure.

8     (*Government's Exhibit 14(a) resumed publication*.)

9  BY MR. USTYNOSKI:

10 Q.  After that, Mr. Bryant, then you had the conversation

11 with Mr. Wambles where he notified you of an earlier letter

12 that he wrote?

13 A.  Correct.

14       MR. USTYNOSKI:  Okay.  Please play the second one.

15    (*Government's Exhibit 14(a) published to the jury*.)

16       Thank you.  The government would pass the witness.

17       THE COURT:  Cross-examine?

18       MR. MURRELL:  I don't have any questions.

19       THE COURT:  Thank you, Mr. Bryant.  You may step

20 down.

21       Please call your next witness.

22       MR. USTYNOSKI:  Wayne Lipford, please.

23       DEPUTY CLERK:  Please raise your right hand.

24     *JIMMY WAYNE LIPFORD, GOVERNMENT WITNESS, DULY SWORN*

25       DEPUTY CLERK:  Be seated.

1      Please, state your full name and spell your last

2  name for the record.

3      THE WITNESS:  Jimmy Wayne Lipford, L-i-p-f-o-r-d.

4                   DIRECT EXAMINATION

5  BY MR. USTYNOSKI:

6  Q.  Good afternoon, Mr. Lipford.  Please speak loud and clear

7  for everyone this afternoon, and lean into that microphone.

8  We would appreciate it.

9      By whom are you employed?

10  A.  Jackson County Board of County Commissioners.

11  Q.  And what is your title?

12  A.  Jail administrator.

13  Q.  And as the administrator, are you in charge of any

14  facility?

15  A.  Yes, sir.

16  Q.  What are you in charge of?

17  A.  Jackson County Jail.

18  Q.  The JCCF, the Jackson County Correctional Facility?

19  A.  Yes, sir.

20  Q.  Are you the headman in charge there, so to speak?

21  A.  Yes, sir.

22  Q.  And being in charge, is part of your responsibilities

23  security, safety --

24  A.  Yes, sir.

25  Q.  -- of the prison, both the inmates and staff?

*Jimmy Lipford - Direct*

1  A.  Yes, sir.

2  Q.  Can you just briefly tell us your background, educational

3  background?

4  A.  Graduated from high school, went to correctional school,

5  and been at the county jail, or JCCF, for 22 years.

6  Q.  You have been at the JCCF for 22 years?

7  A.  Yes, sir.

8  Q.  How long have you been the chief at the jail?

9  A.  Almost three and a half years.

10  Q.  Being a -- obviously, you've served in other capacities

11  at the prison prior to becoming chief?

12  A.  Yes, sir.

13  Q.  So is it fair to say that you are well versed in things

14  being smuggled into prisons?

15  A.  Yes, sir.

16  Q.  Can you tell the members of the jury how frequently or

17  infrequent it happens?

18  A.  Well, frequently.  We just had one Friday that tried to

19  bring some cigarettes in.  It's not a real, I would say,

20  frequent, but they do try.  Cigarettes, marijuana -- when

21  they come into the sally port, they may have lighters on

22  them, which we don't allow, because we don't allow smoking --

23  cigarettes, like I said, dope, razor blades, knives,

24  whatever.

25  Q.  At some point were you informed of a suspicious letter or

1   letters at your prison?

2   A.  Yes, sir.

3   Q.  And did they involve Jamie Lee Wambles?

4   A.  Yes, sir.

5   Q.  And can you tell the members of the jury how were you

6   notified about this?

7   A.  I don't know exactly what day it was, but Sergeant Jeter

8   called me around 10:30, 11:00 one night, when they were going

9   through the mail, advised me that they had found a substance

10  in a letter, but they wasn't sure what it was.  And they told

11  me what the letter had stated, or what the letter had said,

12  and I told Sergeant Jeter to contact the Marianna Police

13  Department to let them take control of the -- since we was in

14  the city limits, Marianna P.D. always investigates our issues

15  we have.

16  Q.  Being there as long as you have and being the chief, do

17  you know -- in your experience there, has there ever been a

18  threat at your prison of a substance, being Anthrax or any

19  other weapons of mass destruction?

20  A.  No, sir.

21  Q.  Did you have any policies or procedures in place to deal

22  with something of this nature?

23  A.  No, sir, not at the time.

24  Q.  So is it fair to say there is no type of testing kit at

25  your facility to determine what a powder may be, if you find

1   one?

2   A.  No, sir.

3   Q.  Is it fair to say if -- strike that.

4       In this case are you aware that a letter was -- with a

5   suspicious powder material?

6   A.  Yes, sir.  The night that Sergeant Jeter called me, he

7   told me what the letter had said or supposedly claiming what

8   was in the letter.

9   Q.  And do you know what was claimed to be in the envelope at

10  your prison?

11  A.  Anthrax.

12  Q.  Not having any type of kit to test it and as the chief,

13  you handled it as if it could potentially be Anthrax?

14  A.  Yes, sir.

15  Q.  Do you have any idea who Jamie Lee Wambles may know

16  outside of the prison --

17  A.  No, sir.

18  Q.  -- or who he communicates with?

19      When this -- when you received this information, did you

20  take it as a serious matter?

21  A.  Yes.

22          MR. USTYNOSKI:  That's all I have, Your Honor.

23          THE COURT:  Cross-examine?

24                      CROSS-EXAMINATION

25  BY MR. MURRELL:

1  Q.  I'm Randy Murrell.  I represent Mr. Wambles.

2      So you have a lot of drugs and weapons inside the jail?

3  A.  Not currently, no, sir, but we have seen some come in.

4  Q.  Well, you talk about people trying to bring things in.

5  Are people successful in getting them into the jail?

6  A.  Yes, sir, once in a while.

7  Q.  Once in a while, does that mean once a week or once every

8  few months or -- I'm just trying to get some idea.

9  A.  It's kind of hit and miss.  Like I said, Friday we had

10  one.  It could be --

11  Q.  Friday, did you actually catch somebody in the jail with

12  it, or somebody was trying to bring it in?

13  A.  No.  We got the guy with it when he come in the sally

14  port.

15  Q.  That's my question.  How often is it that you actually

16  catch somebody in the jail with something that has been

17  successfully smuggled in -- marijuana, cocaine, weapons?

18  A.  I'd say maybe once or twice a month.

19  Q.  Once or twice a month.  And what are those things

20  typically?

21  A.  Drugs or cigarettes.

22  Q.  Or cigarettes, sometimes cigarettes.  All right.

23      No weapons of mass destruction?

24  A.  Not that we found, no, sir, not yet.

25  Q.  And Mr. Ustynoski asked you if you had any special

1    protocol or procedure for handling weapons of mass

2    destruction, and you said no.

3    A.   Right.

4    Q.   But if you, as the administrator of the jail, thought

5    that there was some thought of deadly poison that could

6    infect the staff and prisoners alike, wouldn't you take some

7    action?

8    A.   Yes, sir, and I did.  I contacted the Marianna Police

9    Department, because I wasn't sure what it was, and I wasn't

10   going to take a chance on the inmates' life, the public's

11   life, and my officers' life.

12   Q.   Other than contacting the police department, did you take

13   any other steps?

14   A.   No, sir.

15   Q.   I mean, you didn't shut down the jail?

16   A.   No, sir.

17   Q.   Didn't evacuate the jail?

18   A.   No, sir.

19   Q.   Didn't call in any kind of hazardous material groups to

20   test the jail?

21   A.   No, sir.

22   Q.   Any steps that you took other than calling the police

23   department and giving them that envelope?

24   A.   No, sir.

25            MR. MURRELL:  Thank you.

```
 1              THE COURT:  Redirect?

 2              MR. USTYNOSKI:  Nothing, Your Honor.

 3              THE COURT:  Thank you, Mr. Lipford.  You may step

 4    down.

 5              THE WITNESS:  Yes, sir.

 6              THE COURT:  Please call your next witness.

 7              MR. USTYNOSKI:  Charles Obert.

 8              DEPUTY CLERK:  Please raise your right hand.

 9       CHARLES OBERT, GOVERNMENT WITNESS, DULY SWORN

10              DEPUTY CLERK:  Be seated.

11         Please, state your full name and spell your last

12    name for the record.

13              THE WITNESS:  Charles Obert, O-b-e-r-t.

14                        DIRECT EXAMINATION

15    BY MR. USTYNOSKI:

16    Q.  Good afternoon, Mr. Obert.  I notice you are a tad soft

17    spoken.  I'm going to ask you to really exaggerate and speak

18    loud for us into that microphone so everybody can hear you

19    today.  Okay, sir?

20    A.  Yes, sir.

21    Q.  Mr. Obert, by whom are you employed?

22    A.  The Jackson County Correctional Facility.

23    Q.  And what's your job there?

24    A.  Just a guard, CO, corrections officer.

25    Q.  How long have you worked with Jackson County Correctional
```

1    Facility?

2    A.   Approximately five and a half years.

3    Q.   Five and a half?

4    A.   Yes, sir.

5    Q.   And what are your current job duties?  What do you do

6    there?

7    A.   It's different.  Sometimes I work in the control room.

8    Sometimes I work at the main housing.  And I have worked in

9    the booking desk, Post 1 booking desk, and sometimes Post 3,

10   main housing.  Different.

11   Q.   Are you involved in any way in security measures at the

12   facility?

13   A.   Well, we just, you know, we, you know, make sure we do

14   our walk-throughs and counts and all, you know, keep

15   everything secure.

16   Q.   And keeping things secure, can you tell the members of

17   the jury, does that involve in any way screening visitors for

18   potential contraband?

19   A.   Well, I'm usually not the one that gets the visitors in

20   the door.  Sometimes I go to the lobby to pick them up; but,

21   you know, usually we don't -- I don't usually do that, except

22   just sometimes I could go to the lobby to escort them to the

23   main housing after they've been signed in, you know.

24   Q.   Let me ask you this, specifically what you do then.  You

25   get involved in any way in screening mail at your facility?

1  A.  When I'm on the night shift, I do.  The mail is picked up

2  after lockdown at night, and then we go through the mail,

3  and, you know, we have to screen the letters that's sealed --

4  not sealed up, the personal mail, and then seal them, and

5  then the -- turn the mail over to the booking desk.

6  Q.  Is it always the same routine, the mail is always picked

7  up after midnight every day?

8  A.  It is Sunday night through Thursday night.  The mail is

9  not picked up on Friday night and Saturday night, but Sunday

10  night through Thursday night.

11  Q.  And what are you looking for when you're doing that?

12  A.  The mail that's left open, personal mail, we scan through

13  the mail, you know, to see if there's any threats in there

14  against an officer or any kind of threat at all.  The legal

15  mail is sealed up.

16  Q.  I'm going to show you --

17       MR. USTYNOSKI:  May I approach, Your Honor?

18       THE COURT:  You may.

19  BY MR. USTYNOSKI:

20  Q.  Sir, I'm going to show you what is marked as Government's

21  Exhibit 15 for identification.  Take a look at that.

22     Mr. Obert, do you recognize Government's Exhibit 15?

23  A.  Yes, sir.

24  Q.  And can you tell the members of the jury, is that a

25  letter that you had found at your facility?

1    A.  Yes, sir.

2    Q.  Can you tell the members why that particular -- strike

3    that.

4         MR. USTYNOSKI:  Your Honor, at this point I ask the

5    government to be able to move Government's Exhibit 15 into

6    evidence.

7         MR. MURRELL:  No objection.

8         THE COURT:  Government's 15 is admitted.

9    (GOVERNMENT EXHIBIT NO. 15:  Received in evidence.)

10        MR. USTYNOSKI:  May I publish it?

11        THE COURT:  You may.

12   BY MR. USTYNOSKI:

13   Q.  Mr. Obert, looking at that envelope in front of you and

14   the screen in front of you, can you tell the members of the

15   jury what was it about that letter that caught your

16   attention, if anything?

17   A.  Well, I was working on the booking desk during that time,

18   and I was on night shift, and I picked up the mail.  When I

19   got back to my desk and was going through the mail, and I

20   seen -- I didn't recognize that name on the outside, the

21   return address, as being, you know, in the maximum security

22   cell.  So I looked it up on the alpha roster and seen that

23   William Ulmer's name -- he was in A Pod, which is Post 3,

24   main housing.  He was in A Pod, and I knew he didn't -- I

25   knew there wasn't any way he could be up there, could get a

1  letter up there to Post 1.  So I called main housing to make

2  sure he was still down there, and they said, yeah, he's still

3  in A Pod.

4  Q.  Explain to us what you mean that William Ulmer couldn't

5  have --

6  A.  Sir?

7  Q.  Can you explain to the members of the jury what you mean,

8  why William Ulmer couldn't have been the author of that

9  letter?

10 A.  Well, it came from a different part of the jail.  It came

11 from I Pod, which is part of the maximum security cells, and

12 it's in a different part of the jail facility.  It's in a

13 different area.  And there's no way it could've got up there.

14 Q.  So is that what caught your attention to the letter, the

15 individual that is mentioned in the upper-left-hand corner?

16 A.  Yes, sir.

17 Q.  The sender was somebody you felt couldn't have

18 logistically wrote that letter?

19 A.  Right; yes, sir.

20 Q.  And what did you do when you found that letter?  Can you

21 tell the members of the jury?

22 A.  Well, I called main housing to make sure that he was

23 still down in main housing in A Pod, because the alpha roster

24 said -- you know, we have alpha roster that has the inmates'

25 names in alphabetical order, and we call them alpha roster.

1    And I looked in there and see he was still in A Pod, main

2    housing.  Then I notified Sergeant Jeter, my OIC.

3    Q.  When you say you wanted to make sure -- so the record is

4    clear, when you say you wanted to make sure he was still in A

5    Pod, who are you referring to?

6    A.  William Ulmer.

7    Q.  William Ulmer?

8    A.  Yes, sir.

9    Q.  And what were you able to confirm?

10   A.  I was told that he was still in A Pod at main housing.

11   Q.  So, if he was in A Pod, could he have written that

12   letter?

13   A.  No, sir, he couldn't have gotten that letter up there.

14   Q.  And once you confirmed that, what did you do next with

15   the letter?

16   A.  I called Sergeant Jeter, my OIC, and turned the letter

17   over to him, and that was it.

18   Q.  Did you -- before you called Sergeant Jeter, did you open

19   the letter, sir?

20   A.  No, sir.

21   Q.  No?

22   A.  No, sir.

23   Q.  You didn't open it to see what the contents may have been

24   in --

25   A.  No, I didn't open it.

1  Q.  When Sergeant Jeter came, did he open the letter in front

2  of you?

3  A.  Yes, sir.  I went on -- after I gave him the letter, I

4  went about my business, to doing my job, you know, because

5  it's a busy place on the booking desk; and after lockdown, it

6  really gets busy, and you got a lot of paperwork to do.

7  Q.  So after you --

8  A.  So I gave him the letter, and I went on about my

9  business.

10  Q.  After you turned that letter over to Sergeant Jeter, you

11  went back to doing whatever you were doing, you were busy?

12  A.  Yes, sir.

13  Q.  Okay.

14       MR. USTYNOSKI:  Court's indulgence.

15       Your Honor, that's all.  The government would pass

16  the witness.

17       THE COURT:  Cross-examine?

18                        CROSS-EXAMINATION

19  BY MR. MURRELL:

20  Q.  Mr. Obert, I'm Randy Murrell.  I represent Mr. Wambles.

21     Mr. Ustynoski started to ask you about visitation.  You

22  said you didn't have a lot to do with getting visitors into

23  the jail?

24  A.  Well, sometimes when the sergeant gets them signed in, he

25  calls me to come escort them into the main housing.

*Charles Obert - Cross*

1  Q.  I just want to ask you about visitation.  When somebody

2  comes to visit a prisoner there at the jail, is it a contact

3  visit?  Do they talk to them through a glass and use a phone?

4  How does that work?

5  A.  They visit through a glass.  Phones on each side of the

6  glass.

7  Q.  So the idea is, if a visitor is on the other side of the

8  glass, they can't pass anything through to the inmate that

9  they are visiting?

10  A.  They shouldn't be able to.  I've heard that it has

11  happened, where there's a part of the glass that they can

12  slide something under the bottom of it.  But that --

13  there's -- I don't think there is any way they can do that.

14  But there has been I know of -- I know of ways that stuff has

15  got in there.

16  Q.  Oh, I see.  But at least --

17  A.  I can give you an example, if you want me to.

18  Q.  Sure.  What's that?

19  A.  Ten, twelve, visitors came to visit a boy one Sunday, and

20  she -- the boy's sister took a $20 bill, stuck a piece of

21  tape on the bottom of it, and when she started out the slider

22  door, she dropped her keys on the floor.  And while she

23  reached down to pick up her keys, she stuck the $20 bill

24  under bottom of the slider door.  And the inmate, when he

25  came out of visitation, he went down there and got it.

*Charles Obert - Cross*

1   Q.  So, if you are clever enough --

2   A.  If you're clever enough, you can figure -- you can figure

3   out ways to do stuff, if you're clever enough.

4   Q.  But, again, a typical visitor, they come and they talk

5   over the phone, and there is a piece of glass that separates

6   the visitor from the inmates?

7   A.  Yes, sir.

8           MR. MURRELL:  Thank you.

9           THE COURT:  Redirect?

10          MR. USTYNOSKI:  Nothing further, Your Honor.  Thank

11  you.

12          THE COURT:  Thank you, Mr. Obert.  You may step down.

13          Members of the jury, this makes this a convenience

14  point to break for the afternoon.  Leave your pad right there

15  on your chair.  We will lock them up overnight and have them

16  out in the morning.  We'll start at 9:00 in the morning, not

17  the same time you arrived this morning, but by 9:00.  If you

18  can make sure you get here early enough to get through

19  security and up in that jury room by 9:00, I'll try to have

20  you in the courtroom right at 9:00.

21          Recall my instructions.  Don't talk about the case

22  with anybody.  Don't let anybody talk about in your presence.

23  If you didn't check in at the office or home over the lunch

24  hour, then, if you do that between now and 9:00 tomorrow

25  morning, you're going to get that question, what kind of case

1    is it.  Again, don't respond even to that question.  Don't go

2    on the internet.  Don't get any information from any source.

3            We will see you back here at 9:00 with the same state

4    of knowledge that you have right now.  Have a safe and

5    pleasant trip home and back in the morning.

6            Jury out, please.

7       (*The jury exited the courtroom at 4:55 p.m.*)

8            All right.  You may be seated.

9            Where do we stand?

10           MR. USTYNOSKI:  I have six witnesses left, Your

11   Honor.

12           THE COURT:  Are they going to say anything different

13   than what the witnesses have already said?  You look at them

14   tonight.  If they have any new information, you can call as

15   many as you want.  But if it's all information that we've

16   already proved sometimes two or three times, then we don't

17   need to prove it again, but -- and if it's the crucial

18   contested information, then you can prove it again.  But if

19   it's just stuff that Mr. Murrell admitted in opening, let's

20   don't prove it more times than we need to.

21           None of these are long witnesses, I take it.

22           MR. USTYNOSKI:  No, Your Honor.

23           THE COURT:  So you are -- at the first break in the

24   morning, you may be finished.  Sometime along in there.

25           And, Mr. Murrell, you said you didn't have any

1   witnesses on the list.  So if anybody testifies, it will just

2   be Mr. Wambles.

3          MR. MURRELL:  Yes, sir.

4          THE COURT:  Mr. Wambles, whether to testify or not is

5   your decision.  You have an absolute right to testify in the

6   case, if you want to testify.  You have an absolute right not

7   to testify, if you don't want to testify.  If you testify,

8   I'll tell the jury they should evaluate your testimony, just

9   like they evaluate the testimony of every witness.  If you

10  choose not to testify, then I will tell the jury that they

11  can't draw any inference against you; that you had a right not

12  to testify, and they can't hold it against you.

13          You should talk with Mr. Murrell and consider his

14  advice on that subject.  That's just his advice.  It's your

15  decision.  So you get to decide whether to testify or not.

16          After the government closes, if Mr. Murrell announces

17  that the defense rests and he hasn't called you as a witness,

18  I will know that you have decided not to testify.  If you want

19  to testify, you make sure you get my attention, and I'll make

20  sure that you get to testify.

21          What else, if anything, do we need to do this

22  afternoon?

23          You need a set of jury instructions from me.  I'll

24  get those done this evening.  I haven't gotten them done.  I

25  have a draft working, but I need to do some work on it.  With

1    this one, with the on again off again situation with the case,

2    I didn't do the instructions last week.  So I'll be doing them

3    tonight.  I'll get them to you as soon as I can, maybe after

4    dinner.

5              MR. MURRELL:  So are they likely to be posted

6    tonight?

7              THE COURT:  I'll post them tonight.  That's the best

8    way for you to get them, isn't it?

9              MR. MURRELL:  Oh, yes, sir.

10             THE COURT:  As soon as I've got something that's in

11   good enough form to talk about, I will post it.  But as I say,

12   it's likely to be after dinner.  But we're not starting until

13   9:00, so that will give you some time with them in the

14   morning.  I will come in in the morning before we start and

15   just ask at least for heads-up at that point of any issues you

16   have with the instructions.  So if you can read them tonight

17   or in the morning, that will help.

18             What else do we need to do this evening?

19             MR. MURRELL:  You want us here at 8:30 tomorrow

20   morning?

21             THE COURT:  Just make sure you are here by a quarter

22   of nine.  So, if there is any issue on either side, I can come

23   in and resolve the issue; and, if we need to talk about the

24   instructions, we can talk about them at least briefly before

25   we start in the morning.  But you don't need to be here before

1    quarter of nine.

2              Anything else?

3              Thank you all.  We'll be in recess.

4         (*A recess was taken at 4:59 p.m.*)

5         (*The proceedings adjourned at 4:59 p.m.*)

6                    *   *   *   *   *   *   *   *

7

8

9

10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
11   redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
12   transcript.

13

14

15   *Judy A. Gagnon*                    11/7/2013
     Judy A. Gagnon, RMR, FCRR           Date
16   Official U.S. Court Reporter

17

18

19

20

21

22

23

24

25

<pre>
 1                            INDEX

 2                                                     PAGE

 3    ATTORNEY CONFERENCE                               2
      JURY DULY SWORN                                  16
 4    OPENING STATEMENT BY MR. USTYNOSKI               22
      OPENING STATEMENT BY MR. MURRELL                 37
 5


 6
    WITNESSES FOR THE GOVERNMENT:                      PAGE
 7

 8    WILLIAM JASON McALPIN
           DIRECT EXAMINATION BY MR. USTYNOSKI.............. 45
 9
      JAMES W. LANGLEY
10         DIRECT EXAMINATION BY MR. USTYNOSKI.............. 51
           CROSS-EXAMINATION BY MR. MURRELL................. 58
11
      GLEN ADCOCK
12         DIRECT EXAMINATION BY MR. USTYNOSKI.............. 60
           CROSS-EXAMINATION BY MR. MURRELL................. 67
13
      ANDREW KILGORE
14         DIRECT EXAMINATION BY MR. USTYNOSKI.............. 68
           CROSS-EXAMINATION BY MR. MURRELL................. 80
15
      SCOTT MICHAEL SIMMONS
16         DIRECT EXAMINATION BY MR. USTYNOSKI.............. 84
           CROSS-EXAMINATION BY MR. MURRELL................. 94
17
      MARK LEON
18         DIRECT EXAMINATION BY MR. USTYNOSKI.............. 95
           CROSS-EXAMINATION BY MR. MURRELL................. 108
19         REDIRECT EXAMINATION BY MR. USTYNOSKI............ 110

20    BRIDGETTE FROST
           DIRECT EXAMINATION BY MR. USTYNOSKI.............. 113
21         CROSS-EXAMINATION BY MR. MURRELL................. 123
           REDIRECT EXAMINATION BY MR. USTYNOSKI............ 125
22
      DANNY MOREHEAD
23         DIRECT EXAMINATION BY MR. USTYNOSKI.............. 128
           CROSS-EXAMINATION BY MR. MURRELL................. 138
24

25
</pre>

*JAMIE JETER*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 140
    CROSS-EXAMINATION BY MR. MURRELL................. 148

*TOMMY GENE HARKRIDER, JR.*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 151

*KEVIN EDWARD BLACKBURN*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 155

*PHILLIP ANDREW LEE*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 160
    CROSS-EXAMINATION BY MR. MURRELL................. 169

*BILLY RAY BRYANT*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 172

*JIMMY WAYNE LIPFORD*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 180
    CROSS-EXAMINATION BY MR. MURRELL................. 183

*CHARLES OBERT*
    DIRECT EXAMINATION BY MR. USTYNOSKI.............. 186
    CROSS-EXAMINATION BY MR. MURRELL................. 192

\* \* \* \* \* \* \* \*

GOVERNMENT'S EXHIBITS

| NO.: | DESCRIPTION | PAGE |
|------|-------------|------|
| 1 | Envelope addressed to Clerks Office, 111 N. Adams Street, Tallahassee, Fl, 32301, postmarked 12/20/12, from Jackson County Correctional Facility | 64 |
| 2 | One-page handwritten letter by Jamie Wambles, first letter | 76 |
| 3 | One-page document entitled, "Criminal Punishment Code Supplemental Scoresheet" for Jamie Wambles | 78 |
| 4 | One-page document entitled "Florida State Emergency Response Commission, Appendix E" dated 12/26/12 | 92 |

| 5 | Florida Bureau of Public Health Laboratories Chain of Custody form | 121 |
| 6 | One-page document entitled, Department of Health, Bureau of Laboratories," LIMS Report No. 4581772 | 168 |
| 7 | Envelope addressed to US District Court, Northern District, Clerk Office, 111 N Adams St., Tallahassee, Florida 32301, marked "Legal Mail" | 133 |
| 8 | One-page handwritten letter addressed to, "To Who's Reading This!" | 133 |
| 9 | Plastic Property Envelope | 142 |
| 10 | One-page document entitled, "Marianna Police Department, Property Receipt" | 144 |
| 11 | Biohazard evidence bag | 144 |
| 12 | One-page document entitled, Marianna Police Department, Property Receipt | 145 |
| 13 | One-page document entitled, "Department of Health, Bureau of Laboratories," LIMS Report No. 4581771 | 164 |
| 14(a) | CD of Mr. Wambles' interview conducted on 12/20/12 | 105 |
| 14(b) | Transcript of Government Exhibit 14(a) | 107 |
| 15 | Envelope addressed to Northern District Courts, 111 North Adams Street, Tallahassee, Florida 32301, handwritten notation "Legal Mail" | 189 |

*  *  *  *  *  *  *  *