**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


*UNITED STATES OF AMERICA,*          )
                                     )
                 *Plaintiff,*        ) *Case No:  4:13-cr-25/RH*
                                     )
*vs.*                                ) *Tallahassee, Florida*
                                     ) *June 11, 2013*
*JAMIE LEE WAMBLES,*                 ) *8:51 A.M.*
                                     )
                 *Defendant.*        )
_____     )


**VOLUME II**
**(Pages 202 through 366)**

**TRANSCRIPT OF SECOND DAY OF TRIAL**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE, and a jury**



APPEARANCES:


  For the Plaintiff:        Pamela C. Marsh
                            United States Attorney
                            By:  JAMES M. USTYNOSKI
                                 Assistant U.S. Attorney
                                 *james.ustynoski@usdoj.gov*
                            111 North Adams Street
                            4th Floor
                            Tallahassee, Florida   32301


  For the Defendant:        Randolph P. Murrell
                            Federal Public Defender
                            By:  RANDOLPH P. MURRELL
                                 Federal Public Defender
                                 *randolph_murrell@fd.org*
                            227 North Bronough Street
                            Suite 4200
                            Tallahassee, Florida   32301



1                    P R O C E E D I N G S

2          (Call to Order of the Court.)

3          (Defendant present; jury not present.)

4               THE COURT:  Good morning.  Please be seated.

5               You got a set of instructions last night that I

6     posted on CM/ECF, and then I put on your desk this morning a

7     version that showed one minor change, changing the word

8     "blowing up" to "bombing" twice.  I thought it was a little

9     less colloquial, a better description.  Other than that, tell

10    me what issues you have.

11              MR. MURRELL:  My issue goes to the elements of the

12    offenses, pages 6 and 7 of the proposed instructions.  With

13    regard to 1038, 18 U.S.C. 1038 charges, the fourth element

14    you've stated that the assertion could reasonably have been

15    believed, my position is it should read, "Under the

16    circumstances, the assertion could reasonably have been

17    believed."  It's not in the abstract.  I think it's in the

18    context.

19              THE COURT:  That's okay with me.

20              MR. MURRELL:  And that would be true in the next

21    page, in the 876 offense, the fourth element reads exactly the

22    same; and, here again, I think it should be "under the

23    circumstances."

24              THE COURT:  Mr. Ustynoski, do you disagree?

25              MR. USTYNOSKI:  Your Honor, I know "under the

```
 1   circumstances" is used with the pattern jury instructions only
 2   one -- that exact language under one of the statutes.
 3            THE COURT:  I don't know that there is a standard
 4   instruction under this statute.
 5            MR. MURRELL:  Not in 1038.
 6            MR. USTYNOSKI:  Well, there wasn't one in the
 7   Eleventh Circuit, clearly.  I pulled one out of the U.S.A.
 8   book, but it didn't have that in it, but --
 9            THE COURT:  Well --
10            MR. USTYNOSKI:  I don't know that -- I don't know
11   that I have necessarily a big objection on that, anyway.  It's
12   just that it's clearly written into the one statute, and then
13   I didn't see it in the other one.
14            THE COURT:  Well, the statute says, "Under
15   circumstances where such information may reasonably be
16   believed."
17            MR. USTYNOSKI:  Right.
18            MR. MURRELL:  That's what 1038 says.
19            THE COURT:  Candidly, I think it means the same thing
20   with or without the language.  I mean, if you evaluate whether
21   something can be believed, you have to know the circumstances.
22   So I don't think it makes any substantive difference one way
23   or the other.  But unless the government can suggest some
24   reason why that isn't accurate, and it does seem to me that it
25   comes right out of the statute.
```

1          MR. MURRELL:  I agree, Your Honor.

2          THE COURT:  All right.  The reason it wasn't in the

3    first draft, frankly, is that my usual approach is fewer words

4    are better, and words that don't change the meaning aren't

5    needed.  But Congress doesn't always draft things with quite

6    the same principle in mind, and here it did refer to

7    circumstances, so I'll add that language.  That's true on both

8    6 and 7.

9          Anything else from the defense?

10         MR. MURRELL:  No, sir.

11         THE COURT:  Anything from the government?

12         MR. USTYNOSKI:  Yes.  Your Honor, on page 7, all of

13   the Eleventh Circuit instructions and stuff I saw in the

14   U.S.A. book, I didn't see the fifth element that you added

15   there about affecting interstate commerce, and I couldn't find

16   where you got that.

17         THE COURT:  All right.  Here's where I got it.  1038

18   says that the defendant has to convey false information where

19   the -- under circumstances where the information may

20   reasonably be believed and where such information indicates

21   that an activity has taken, is taken, or will take place that

22   would constitute a violation of, and it lists a lot of

23   chapters.  The indictment limits it to Chapters 10 and 113(b).

24         MR. USTYNOSKI:  Right.

25         THE COURT:  In Count Three, it can't be Chapter 10,

1  because that deals with biological toxin substances, and here

2  in three, you're only talking about a bomb.  So it's just

3  113(b).  So it has to be circumstances where it would be a

4  violation of 113(b).

5          The provision in 113(b) that seems to apply says it

6  applies if the mail is used or it affects interstate commerce.

7  Well, in setting off the bomb, I couldn't see how you could

8  claim that the mail would be used.  There is no indication --

9  I'll be able to talk here in a moment.  There's no

10 indication that the bomb was going to be mailed.

11         Now, the communication was mailed, but that's not

12 what we're talking about.  The communication has to falsely

13 indicate that a crime is going to be committed of a specific

14 kind, and the specific kind includes either mailing or

15 interstate commerce.

16         So, when you're talking about that underlying crime,

17 the bombing, I couldn't see any way to say that the mail was

18 going to be used in the bombing.  He didn't say, "I'm going to

19 mail you a bomb."

20         So the only way I could see the government could make

21 out its case is if the bomb was going to affect interstate

22 commerce.

23         Now, he didn't say anything about interstate

24 commerce.  But on the most favorable reading to the

25 government, he doesn't have to say anything about interstate

1   commerce.  It just has to be reasonable that the crime would

2   affect interstate commerce.  But you have to have that peg

3   under 113(b).

4           So it seemed to me that the peg had to be there, and

5   the only peg I could find was interstate commerce.  So that's

6   how I got to it.

7           Now, if you can find me something in 113(b) where

8   there is not a requirement to affect interstate commerce, I'm

9   all ears; or, if you can explain to me how it could be

10  inferred that the mail would be used, I'll add the mail.

11          MR. USTYNOSKI:  Well, Your Honor, my response would

12  be this:

13          First, if Mr. Wambles -- I don't know how

14  Mr. Wambles, if he wanted to send a bomb, I don't know that I

15  necessarily limited him to personally dropping off a package

16  or pulling up in a truck.  Maybe he just does -- maybe mail a

17  small bomb; maybe, you know, as he said in own words, it only

18  takes 2 grams to blow up a mailbox.  Maybe he just wants to

19  blow up one -- I mean, there's a lot of possibilities.  I

20  can't -- I don't wanna -- I don't think we should be limited

21  to it has to be 110 gallons of nitrate.  He said, you know, it

22  only takes a certain amount to blow up a car.  Two grams you

23  can put on the tip of your finger, so he could very well mail

24  it.  He's not limiting himself in his letter saying, "I'm only

25  going to do a big one," or, you know, he's not -- I don't --

1  it could -- it could very well be that he mailed a bomb, and

2  that happens.

3          THE COURT:  Sure.  One could speculate that the bomb

4  could have been mailed.  Do you really want to go on proof

5  beyond a reasonable doubt of mail being used?

6          MR. USTYNOSKI:  I don't want to be limited to one

7  thing.  I want -- if he's going to do it, I don't think we

8  should be limited in proving that he has to do it in a certain

9  manner.

10         THE COURT:  All right.  So you're arguing for this,

11 so I assume you think it matters that the jury might well find

12 mail and not interstate commerce, and here's the peg.

13         When you -- if you get a conviction, when you write

14 the red brief, the only thing you're going to be saying, or

15 the primary thing you're going to be saying is, oh, they could

16 have found interstate commerce, so instructing on the mail was

17 harmless error.

18         Well, I try not to make errors harmless or not.  So,

19 if there is no evidence to suggest -- to support a claim that

20 the underlying crime was going to use the mail, then I'm not

21 inclined to instruct on it, and I don't think you ought to be

22 arguing for something that you can only defend as harmless

23 error.  You ought to be arguing only if you say a jury could

24 find beyond a reasonable doubt that his false threat, false

25 communication involved using the mail.

1    MR. USTYNOSKI:  Your Honor, I think it could be

2    either one.  I think a reasonable jury -- first of all, he

3    mailed powder.  So using the mail is something that he likes

4    to do or would do.  It's a lot easier to mail a small amount

5    of -- you know, I don't know much about letter bombs.  I

6    just --

7    THE COURT:  They're real.  I understand.  Bombs get

8    mailed.  There is no question about it.

9    MR. USTYNOSKI:  So I don't -- I just think the

10   government should be able to argue he could either do

11   something that's going to affect interstate commerce, or he

12   could mail it.  I don't know that I have to -- I don't know

13   that I should have to argue either one, and I don't know why

14   it would be error.

15   THE COURT:  Mr. Murrell, do you care if I instruct on

16   mail?

17   MR. MURRELL:  Frankly, no.

18   THE COURT:  All right.

19   MR. USTYNOSKI:  Judge, and if possible, when we're

20   done with the witnesses' testimony this morning, maybe the

21   government will change its mind and make things less

22   complicated.

23   THE COURT:  Either way, I just --

24   MR. USTYNOSKI:  I mean, obviously, I just --

25   THE COURT:  Here's my statement for the Eleventh

1  Circuit, which the Eleventh Circuit can regard or not, and, of

2  course, part of their job is figuring out when district judges

3  are wrong.  So they may think I'm wrong.  But the government

4  has argued with some force for inclusion of the mail in this,

5  and that it seems to me that that indicates that the

6  government thinks this might well make a difference, and so

7  the government ought to be heard only with some skepticism, if

8  the government asserts on appeal, that if this was an error,

9  it was harmless, because the government seems to think it will

10  make a difference.  But that's my dictum that the Eleventh

11  Circuit may well ignore.  We can talk about this some more.

12          Are we ready for the jury?

13          MR. USTYNOSKI:  The only thing I would ask, Your

14  Honor, after we are done with the witnesses' testimony, can we

15  possibly have 15-minute break, so I can -- whatever the final

16  instructions are, I can have my IT person have them ready in

17  Sanctions for the closings?

18          THE COURT:  Absolutely.  We'll have some time to do

19  that.  You can also use the hard copy.  We'll get you a clean

20  hard copy as well that you can put on the presenter; but, if

21  you want to load it through the computer, you can do that.

22          Jury in, please.

23          The instructions, by the way, are set up both ways.

24  So that, if Mr. Wambles testifies, one of the references has

25  to come out; if he doesn't testify, the other reference has to

1    come out.

2          Were there issues with the verdict form?

3          MR. MURRELL:  No, sir.

4          MR. USTYNOSKI:  No, Your Honor.

5          THE COURT:  I'll let you announce your witness.

6      (*The jury entered the courtroom at 9:04 a.m.*)

7          All right.  You may be seated.

8          Good morning, ladies and gentlemen.  Welcome back.

9          Mr. Ustynoski, please call your next witness

10         MR. USTYNOSKI:  Thank you, Your Honor.

11         The government would next call Sergeant Jamie Jeter.

12         THE COURT:  And, Mr. Jeter, you are still under oath.

13         Mr. Ustynoski, you may proceed.

14      (**JAMIE JETER**, having been previously duly sworn, was

15    recalled by the government.)

16                    DIRECT EXAMINATION

17    BY MR. USTYNOSKI:

18    Q.  Good morning, sergeant.

19    A.  Good morning.

20    Q.  I'm just going to ask you some brief questions in

21    furtherance of some of the testimony you did yesterday.

22       You testified yesterday that you had been involved in the

23    first letter that was confiscated at your facility.  Do you

24    recall that testimony?

25    A.  Yes, sir, I do.

1   Q.  And did there come a time where at the -- at your

2   corrections facility you became involved in the investigation

3   or the confiscation of a second letter?

4   A.  Yes, sir.  Mr. Obert, he was my booking officer at the

5   time, retrieved a letter out of I Pod, I believe it was, that

6   Mr. Wambles was housed in.

7   Q.  I'm sorry.  Can you speak louder so everybody can hear

8   you?

9   A.  Mr. Obert retrieved a letter out of the mailbox of I Pod,

10  which is maximum security.  Mr. Obert was the booking officer

11  at the time, and brought the letter to me.  And it had

12  another inmate's name on it.  And being that the other inmate

13  was housed across the facility at another housing unit, we

14  opened up the letter, and inside contained the letter to the

15  courthouse over here in Tallahassee, and also had a detention

16  report, which is the booking sheet for the facility of

17  Mr. Wambles inside, and it was signed by Mr. Wambles.

18          MR. USTYNOSKI:  May I approach, Your Honor?

19          THE COURT:  You may.

20          MR. USTYNOSKI:  Thank you.

21  BY MR. USTYNOSKI:

22  Q.  Sergeant, I'm going to show you Government's Exhibit

23  Number 15.  Can you tell the members of the jury, do you

24  recognize Government's Exhibit 15?

25  A.  Yes, sir, I do.

1          MR. USTYNOSKI:  Actually, can we please publish that?

2    BY MR. USTYNOSKI:

3    Q.  Now, just so it's clear, can you explain what you mean by

4    somebody was in a certain I Pod, and what is unusual about

5    this mail or letter?

6    A.  The inmate's name on it, William Ulmer, was in main

7    housing, which is a separate housing unit.  It's probably

8    approximately 40, 50 yards from this housing unit, and you've

9    got to go out the side on one part of the facility to an open

10   breezeway, chain-linked breezeway, to the other facility to

11   get to it.  So he had no way of putting the letter in the

12   mailbox up in I Pod.

13   Q.  And because of that, did you yourself and Corrections

14   Officer Obert open this letter?

15   A.  We did.  Being that it had another inmate's name on it,

16   and being that Mr. Wambles is in there, where we had the

17   other incident with the letter when he was housed in main

18   housing.

19   Q.  And did it mean anything to you when it was addressed to

20   the Northern District Courts?

21   A.  Yes, sir, it did.

22   Q.  And did yourself open the letter?

23   A.  I'm not sure if me or Mr. Obert opened it, but we were

24   both present.

25          MR. USTYNOSKI:  May I approach, Your Honor?

*Jamie Jeter - Direct*

1           THE COURT:  You may.

2  BY MR. USTYNOSKI:

3  Q.  Sergeant, I'm going to show you what's been marked for

4  identification as Government's Exhibit 16.  Take a brief

5  moment to take a look at that document.

6      Do you recognize that document?

7  A.  Yes, sir, I do.

8  Q.  Can you tell the members of the jury, is that the letter

9  that was inside the envelope in Government's Exhibit 15 that

10 you just looked at?

11 A.  Yes, sir, it is.

12          MR. USTYNOSKI:  At this time, Your Honor, the

13 government would move into evidence Government's Exhibit 16,

14 if there is no objection.

15          THE COURT:  Government's 16 is admitted.

16     (GOVERNMENT EXHIBIT NO. 16:  Received in evidence.)

17          MR. USTYNOSKI:  May I publish, Your Honor?

18          THE COURT:  You may.

19 BY MR. USTYNOSKI:

20 Q.  Sergeant, could you please take your time and read aloud

21 the letter to the jury?

22 A.  Yes, sir.  "To the FBI/Marshal's:

23     "Now I can't -- now I want to -- I won't play no more.

24 Y'all set around and let the state of Florida/Jackson County,

25 Florida, do what they want to and send people to prison for

*Jamie Jeter - Direct*

215

```
 1  20 to 40 years for nothing.  I was made by a drug task force
 2  to do several meth buys, and at the time I was clean and been
 3  clean for two months.  After I done what they told me to,
 4  they wanted me to keep going so I started using meth again,
 5  and started using the needle and shooting meth.  Now I'm in a
 6  lot of trouble with charges that they said I done.  I was so
 7  far strung out, I don't recall doing any of it, if I even
 8  done any.  I told ATF James Langley that I knew where an
 9  AK-47 was, that the people I set up on the meth buys had
10  stole and sold.  Then they charged me with the gun and not
11  them.  Burt McAlpin, Sneads PD officer, shot my dog for no
12  reason and lied and said the dog was mean.  I told them to
13  let me get my dog, and they would not, instead they killed
14  him.  I've got a video of the whole shooting, but I'm in
15  Jackson County Jail now, but I got the boys on the outside to
16  get ready to pay 111 North Adams Street a visit on the week
17  after Christmas.  Ammonium nitrate and fuel and a battery
18  makes a big, big boom.  So get ready, the building will go
19  up.  So hope now I got your eyes open, but it's too late now.
20  If I get moved out of this jail and y'all look into my dog's
21  death, it will not happen.  But if I stay you will see boom,
22  boom."  Signed Jamie Wambles.
23  Q.  When you opened it up, did you read the letter?
24  A.  Yes, sir, I did.
25  Q.  Can you tell the members of the jury, what actions, if
```

*Jamie Jeter - Direct*

1   any, did you take from there?

2   A.   I had Mr. Obert write Mr. Wambles a DR.

3   Q.   What is that?

4   A.   A disciplinary report for the facility for submitting

5   mail, using another inmate's name, trying to send a letter

6   out.

7        I also contacted Chief Lipford and advised him of this

8   letter, in which I contacted the Marianna Police Department,

9   Sergeant Todder and Officer Herndon, and they come took

10  custody of the letter.

11  Q.   I'm sorry.  What was the name of the person that came and

12  took --

13  A.   Sergeant Todder and Officer Herndon from the Marianna

14  Police Department.

15  Q.   Marianna Police Department?

16  A.   Yes, sir.

17  Q.   Do you know if you -- was there any type of evidence or

18  property receipt that you guys --

19  A.   No, sir.  We didn't seal this up.  We just handed the

20  letter over to him with a copy of the report.

21  Q.   Okay.  You read a reference in there to boys on the

22  outside.  Do you have any idea who Mr. Wambles knows on the

23  outside?

24  A.   No, sir, I don't.

25  Q.   Who his boys are?

1   A.   No, sir.

2   Q.   When you read that letter, did you take it seriously?

3   A.   Yes, sir.  I took it as a threat to the courthouse.

4        MR. USTYNOSKI:  Your Honor, thank you.  No further

5   questions.

6        THE COURT:  Cross-examine?

7                    CROSS-EXAMINATION

8   BY MR. MURRELL:

9   Q.   Sergeant Jeter, I suppose you did take it seriously, you

10  gave him what you call a DR?

11  A.   Yes, sir.

12  Q.   And what is a DR again?

13  A.   A disciplinary report.

14  Q.   And what happens when you issue a disciplinary report?

15  A.   There is a disciplinary committee that will come around

16  and decide whether he's guilty or not of the offense.

17  Q.   And what sort of penalties are imposed?

18  A.   It can be anything from loss of privileges up to 30 days

19  in confinement.

20  Q.   You might not be able to go to the canteen or might not

21  get to exercise out in the yard, something like that?

22  A.   Right.

23  Q.   Or you might be stuck there in that maximum security

24  section for 30 days?

25  A.   Right.

*Jamie Jeter - Cross*

1    Q.   What was the date that this happened?

2    A.   Let me look at my notes.

3    Q.   Sure, you can check your notes.

4    A.   It would've been on 12/24.

5    Q.   Christmas Eve?

6    A.   Right.

7    Q.   So this would have been after he already told you that

8    there was Tylenol in that one letter?

9    A.   Right.

10   Q.   And did you know that he had at that point talked to

11   Captain Bryant from the Marianna Police Department?

12   A.   No, sir, I did not.  Captain Bryant would have come on

13   day shift, and I was on night shift.

14   Q.   Did you know at that point that there had been two

15   letters sent, or did you just know about the one?

16   A.   I just knew about the one that Corporal Morehead had

17   caught.

18   Q.   And the one, though, was the one where he told you that

19   it contained Tylenol?

20   A.   Right.

21   Q.   And that would have been back on the 18th, I suppose?

22   A.   Right.

23   Q.   So six days earlier?

24   A.   Yes, sir.

25           MR. MURRELL:  Thank you.

1          THE COURT:  Redirect?

2          MR. USTYNOSKI:  No questions, Your Honor.  Thank you.

3          THE COURT:  Thank you, Mr. Jeter.  You may step down.

4      Please call your next witness.

5          MR. USTYNOSKI:  William Ulmer, please.

6          DEPUTY CLERK:  Please raise your right hand.

7          **WILLIAM ULMER, GOVERNMENT WITNESS, DULY SWORN**

8          DEPUTY CLERK:  Be seated.

9      Please, state your full name and spell your last

10  name for the record.

11          THE WITNESS:  William Ulmer, U-l-m-e-r.

12                      DIRECT EXAMINATION

13  BY MR. USTYNOSKI:

14  Q.  Good morning, Mr. Ulmer.

15  A.  Good morning.

16  Q.  I'm only going to ask you very few questions this

17  morning.  I'd ask that you please speak loud and clear so

18  that all of the jury members can hear you, as well as the

19  defendant and defense counsel, please.

20  A.  Yes, sir.

21  Q.  And kind of exaggerate.  That's a microphone in front of

22  you; and, if you can speak into that microphone, I would

23  appreciate it.

24      Sir, where are you currently housed?

25  A.  I'm currently housed at Holmes CI.

1    Q.   And where is that?

2    A.   That's in Bonifay, Florida.  It's a state facility.

3    Q.   Okay.  Last year in December, in 2012, and maybe early

4    January -- let me ask you, when did you move to that

5    facility?

6    A.   I moved to Holmes CI, let's see, I got there

7    February 11th of this year.

8    Q.   And where were you before that?

9    A.   I was at Washington Reception Center for like 11 days,

10   but before that I was at Jackson County Correctional

11   Facility.

12   Q.   And can you tell us approximately how long you were

13   there?

14   A.   I got there November 15th, and I left January 30th.

15   Q.   And would that be November of 2012?

16   A.   Yes.

17   Q.   And you left January of 2013?

18   A.   Yes, sir.

19   Q.   Okay.  And during that time, did you meet an individual

20   by the name of Jamie Lee Wambles or Jamie Wambles?

21   A.   Yes, sir.

22        MR. USTYNOSKI:  May I approach, Your Honor?

23        THE COURT:  You may.

24   BY MR. USTYNOSKI:

25   Q.   Sir, I'm going to show you Government's Exhibit 1, which

*William Ulmer - Direct*

221

```
1   is a letter.  Take a brief moment to look at that.  Tell me,

2   is that -- can you tell the members of the jury, is that a

3   letter that you wrote?

4   A.  No, sir.

5   Q.  Do you see the sender up in the left-hand box, there is a

6   name.  What's the name?

7   A.  James Ulmer, yes, sir.

8        MR. USTYNOSKI:  Can we publish this?  If you can blow

9   up the left?

10  BY MR. USTYNOSKI:

11  Q.  Mr. Ulmer, do you see the name on the center of the

12  address there?

13  A.  Yes, sir.

14  Q.  Do you see that it reads James Ulmer?

15  A.  Yes, sir.

16  Q.  Is James your middle name?

17  A.  No, sir.

18  Q.  Do you know of any other Ulmers at the facility?

19  A.  No, sir.

20  Q.  Is that your handwriting?

21  A.  No, sir.

22  Q.  Did you ever write any letters threatening Anthrax to

23  that address on that letter?

24  A.  No, sir.

25  Q.  How about to bomb the federal courthouse at that address?
```

1  A.  No, sir.

2           MR. USTYNOSKI:  Government 15, please.

3  BY MR. USTYNOSKI:

4  Q.  Sir, next I'm going to show you Government's Exhibit 15.

5  Again, on that letter, who is it addressed to?

6  A.  The return address or the --

7  Q.  Where it sent mail to?

8  A.  Northern District Courts.

9  Q.  And up in the left-hand corner, can you tell the members

10  of the jury what name you see?

11  A.  I see William Ulmer on that, sir.

12  Q.  Can you tell the members of the jury, is that your

13  handwriting?

14  A.  No, sir, that's not my handwriting.

15  Q.  Did you have any involvement in that letter?

16  A.  No, sir.

17  Q.  While you were at that facility, did Mr. Ulmer ever tell

18  you that he wrote any type of letters or made threats?

19  A.  He wrote one while he was in the cell with us.

20  Q.  And how did you come to know about it?

21  A.  He told everybody about it.

22           MR. USTYNOSKI:  That's all I have, Your Honor.  Pass

23  the witness.

24           THE COURT:  Cross-examine?

25                     CROSS-EXAMINATION

1    BY MR. MURRELL:

2    Q.  Mr. Ulmer, there's no chance you crushed those Tylenol

3    pills for him, is there?

4    A.  No, sir.

5    Q.  No chance that you egged him on?

6    A.  No, sir.

7    Q.  No chance that you gave him the paper to write it on?

8    A.  No, sir.  He bummed the envelope from me.

9    Q.  You were there at the Jackson County Jail?

10   A.  Yes, sir.

11   Q.  And it wouldn't be a good thing to be involved in

12   something like this, would it?

13   A.  No, sir.  I was already sentenced.

14   Q.  And if you had been involved in something like this, you

15   could have been right there where Mr. Wambles is?

16   A.  Yes, sir.

17   Q.  And you've been in some trouble before?

18   A.  Yes, sir.

19   Q.  By my count, let's see, you were convicted back in 2007

20   of possession of a controlled substance, possession of a

21   controlled substance, two more counts of possession of a

22   controlled substance, that's four counts.  That would have

23   been methamphetamine?

24   A.  One count was methamphetamine.

25   Q.  What were the other counts?

1   A.  Marijuana, Schedule III narcotics -- that's Lortabs --

2   and cocaine.

3   Q.  So four counts of possession of a controlled substance.

4   You were convicted at the same time of fleeing or attempting

5   to elude a police officer?

6   A.  Yes, sir.

7   Q.  And you were convicted of being a habitual traffic

8   offender, driving with a license suspended?

9   A.  Yes.

10  Q.  So back in 2007, there were -- one, two, three, four,

11  five -- actually there are two counts of that driving charge.

12  So -- one, two, three, four five -- seven felonies back in

13  2007?

14  A.  Yes, sir.

15  Q.  And then in 2012 you were convicted of burglary of a

16  structure?

17  A.  Yes, sir.

18  Q.  That gets us up to eight.  And then recently you had a

19  couple of cases in Gadsden County?

20  A.  Yes, sir.

21  Q.  Looks like in 2012, in one case you were convicted of

22  manufacturing methamphetamine, possession of chemical used to

23  manufacture a controlled substance.  Pseudoephedrine,

24  probably?

25  A.  No, there was no pseudoephedrine found at my house.

1    Q.  But it was some kind of substance used to manufacture a

2    controlled substance.

3    A.  Yes.  They found alcohol and lighter fuel in my grill.

4    Q.  Possession of a firearm by a convicted felon?

5    A.  Yes, sir.

6    Q.  Tampering with physical evidence.  So that's four more

7    convictions.

8    A.  Yes, sir.

9    Q.  And then there was another Gadsden County case as well,

10   correct?

11   A.  Yes, sir.

12   Q.  Possession of methamphetamine?

13   A.  Yes, sir.

14   Q.  Here, again, possession of a listed chemical with intent

15   to manufacture a controlled substance?

16   A.  Yes, sir.

17   Q.  And another count of manufacturing methamphetamine?

18   A.  Yes, sir.

19   Q.  So that would be a total of -- one, two, three, four,

20   five, six -- seven in those Gadsden County cases; going back

21   to 2007 -- eight, nine, 10, 11, 12, 13 -- 14, and if you

22   count the burglary of a structure charge, that would be 15

23   prior felony convictions?

24   A.  Yes, sir.

25   Q.  It wouldn't be good if you egged on Mr. Wambles, would

*Mark Leon - Direct*

 1   it?

 2   A.  Nah, I didn't have no reason to egg him on.

 3           MR. MURRELL:  I don't have any further questions.

 4           THE COURT:  Redirect?

 5           MR. USTYNOSKI:  Nothing, Your Honor.  Thank you,

 6   Mr. Ulmer.

 7           THE COURT:  Thank you, Mr. Ulmer.  You may step down.

 8           Please call your next witness.

 9           MR. USTYNOSKI:  Your Honor, the government would call

10   Mark Leon.

11     (**MARK LEON**, having been previously duly sworn, was

12   recalled by the government.)

13           THE COURT:  Mr. Leon, you may be seated.  You are

14   still under oath.

15           Mr. Ustynoski, you may proceed.

16           MR. USTYNOSKI:  Thank you, Your Honor.

17                         DIRECT EXAMINATION

18   BY MR. USTYNOSKI:

19   Q.  Good morning, Agent Leon.

20   A.  Good morning.

21   Q.  I would like to follow up on some of the testimony

22   yesterday.

23           MR. USTYNOSKI:  May I approach, Your Honor?

24           THE COURT:  You may.

25   BY MR. USTYNOSKI:

1    Q.  Agent Leon, I'm going to show you Government's Exhibit 8

2    and Government's Exhibit 16.  Do you recognize those

3    exhibits?

4    A.  Yes, I do.

5    Q.  Now, yesterday the testimony and questions I asked you

6    about had to do with the first letter that you were involved

7    in investigating.

8        Now, Government's Exhibit 8, was that the second letter

9    allegedly that the defendant wrote?

10   A.  Yes, we believed that to be the second letter based upon

11   what he told us, and this was the letter that was intercepted

12   at the Jackson County Correctional Facility.

13           MR. USTYNOSKI:  Could we publish Exhibit 8?

14   BY MR. USTYNOSKI:

15   Q.  Yesterday we just covered the first letter.  Now this is

16   allegedly the second letter that you say was confiscated or

17   that the defendant wrote, rather?

18   A.  Yes, sir.

19   Q.  Can you tell the members of the jury, when you got this

20   letter during your investigation, did you take this

21   particular second letter seriously?

22   A.  Yes, we did.

23   Q.  And why?

24   A.  Well, in a WMD investigation -- WMD investigations are a

25   little different than your normal criminal-type

1   investigations.  They are investigations in which we are not

2   permitted to make a mistake.  You may be able to make a

3   mistake in a healthcare fraud matter or a bank robbery matter

4   where, if we're unable to prove our case, then, you know,

5   there may be a loss of money.  If we don't take this

6   seriously and investigate it and prove this case, then it

7   could result in the loss of a number of lives.

8       So, in this instance, you know, I do not know

9   Mr. Wambles, do not know who he knows on the outside or his

10  abilities; but initially, yes, we took this very seriously

11  and followed through with our protocols in sending it to the

12  lab.

13  Q.  Okay.  And --

14          MR. USTYNOSKI:  If we can show Government's

15  Exhibit 16.

16  BY MR. USTYNOSKI:

17  Q.  Agent Leon, looking at allegedly the third letter in your

18  investigation that was written, can you tell the members of

19  the jury when the FBI got this letter, which is addressed to

20  the FBI; although, where was this mailed to or attempted to

21  be mailed to when it was confiscated?

22  A.  Well, this one was intercepted at the Jackson County

23  Correctional Facility and intended for the courthouse here.

24  Q.  And, eventually, you got word and you got this letter

25  during your investigation?

1   A.   Yes.  I believe I was notified on January 2nd.

2   Q.   And --

3   A.   And immediately the next day, I, along with Deputy Andrew

4   Kilgore, went out and interviewed Mr. Wambles at the Jackson

5   County Correctional Facility.

6   Q.   And was that soon after this letter?

7   A.   Immediately, yes.

8   Q.   Can you tell the members of the jury, when you got notice

9   and were aware of this letter, did you take it seriously?

10  A.   Yes.  I think my actions speak for that, and given the

11  fact that it's a threat against a federal courthouse, which

12  is a high-value target, we, you know, initially took that

13  seriously and took the initial investigative steps that we

14  needed to in order to see, you know, if further investigation

15  was deemed necessary.

16  Q.   And you said you went to interview the defendant after

17  getting notice of this letter?

18  A.   Yes, sir.

19  Q.   And who did you go with, if anyone?

20  A.   Deputy United States Marshal Andy Kilgore.

21  Q.   And where did you go to speak with the defendant?

22  A.   At the Jackson County Correctional Facility where he was

23  incarcerated.

24  Q.   And did you, in fact, meet with Mr. Wambles?

25  A.   Yes, we did.

*Mark Leon - Direct*

1   Q.  And when you met with him, can you tell the members of

2   the jury, did he admit to writing any of the letters?

3   A.  Yes.  He was read his *Miranda* rights, and he agreed to

4   talk with us, and he admitted -- we showed him copies of each

5   of the three letters that we had at that point in time, and

6   he admitted to, you know, writing them all, to making the

7   threats that were contained in them.

8   Q.  Did he blame anybody else for egging him on, or did he

9   tell you whether anybody else had any involvement in the

10  letters?

11  A.  No.  He said it was strictly him.

12  Q.  Did he mention a William Ulmer during your interview?

13  A.  I do not believe that he did, no.

14  Q.  Did Mr. Wambles tell you he was upset in any way?

15  A.  Yes, he did.

16  Q.  And can you tell the members of the jury what did he tell

17  you, why he was upset?

18  A.  Much like we've heard, you know, yesterday and today that

19  he was upset about, you know, the gun charges he was facing

20  as well as the fact that during his arrest his dog was shot.

21  Q.  Now, for that interview, you earlier heard the playing

22  back of an audio recording where the Marianna Police

23  Department had a recording.  Do you remember that testimony?

24  A.  Yes, I did.

25  Q.  Did you and Mr. Kilgore in any way record the statement?

*Mark Leon - Direct*

1    A.  We did not.

2    Q.  Did you prepare a report, though?

3    A.  Yes, I do.

4    Q.  Did you summarize everything that was stated in the --

5    A.  Yes, I did.

6         MR. USTYNOSKI:  Approach, Your Honor?

7         THE COURT:  You may.

8    BY MR. USTYNOSKI:

9    Q.  Agent Leon, I'm going to show you what has been marked

10   for identification as Government's Exhibit 19.  Please take a

11   brief moment to look at that.

12   A.  Yes, sir.

13   Q.  Do you recognize what that item is?

14   A.  Yes, I do.

15   Q.  And tell the members of the jury, what is that item?

16   A.  That was an envelope that I received on or about

17   January 10th of this year at my office.

18   Q.  Do you recall the exact date that you and Mr. Kilgore

19   went and interviewed the defendant?

20   A.  We interviewed Mr. Wambles on January 3rd this year.

21   Q.  January 3rd.  And when do you believe that you might have

22   received that letter?

23   A.  January the 10th.

24        MR. USTYNOSKI:  At this time the government would ask

25   to move Government's Exhibit 19 into evidence.

1          THE COURT:  Government 19 is admitted.

2          (GOVERNMENT EXHIBIT NO. 19:  Received in evidence.)

3          MR. USTYNOSKI:  Thank you.  Publish the item, Your

4    Honor?

5          THE COURT:  You may.

6    BY MR. USTYNOSKI:

7    Q.  For the record, Mr. Leon, can you tell the members of the

8    jury who the Government's Exhibit 19 is addressed to?

9    A.  It's addressed to me, and that's the address of my office

10   here in town.

11   Q.  When you say your office, it is a personal office or is

12   it a governmental office?

13   A.  The FBI office here in Tallahassee.

14   Q.  When you went and interviewed Mr. Wambles, did you give

15   him your business card and said --

16   A.  Yes, I did.

17   Q.  Okay.

18   A.  I will note on here that the zip code is incorrect, but

19   other than that it did make it to my office.

20   Q.  What is the correct zip code?

21   A.  It should be 0-1.

22   Q.  Zero-one, okay.  And in the upper-left-hand corner who

23   does it appear that the letter -- at least the envelope was

24   written by?

25   A.  Jamie Wambles.

 1          MR. USTYNOSKI:  May I approach, Your Honor?

 2          THE COURT:  You may.

 3    BY MR. USTYNOSKI:

 4    Q.  Mr. Leon, I'm going to show you what is marked for

 5    identification as Government's Exhibit 20.  Do you recognize

 6    Government's Exhibit 20?

 7    A.  Yes, I do.

 8    Q.  What is that?

 9    A.  That is the letter that was contained in the envelope

10    from the prior exhibit.

11          MR. USTYNOSKI:  Your Honor, the government would ask

12    that Government's Exhibit 20 be moved into evidence.

13          THE COURT:  Government 20 is admitted.

14      (GOVERNMENT EXHIBIT NO. 20:  Received in evidence.)

15          MR. USTYNOSKI:  Permission to publish?

16          THE COURT:  You may.

17    BY MR. USTYNOSKI:

18    Q.  Agent Leon, for the jury and the record, please, first of

19    all, can you tell the members of the jury who is it addressed

20    to, this letter?

21    A.  It is addressed to me.

22    Q.  And the date?

23    A.  January 3, 2013.

24    Q.  Again, the date that you actually interviewed the

25    defendant?

1  A.  Was January 3, 2013.

2  Q.  Could you please read aloud the letter?

3  A.  "I'm sorry for everything I caused by writing these

4  letters.  You know that I'm a convict and no matter what I

5  say you should not have believed what I said to you.  I'm

6  still pissed about my dog and these cops around here.  I've

7  played around with y'all today during this interview.  I do

8  have --" I take that to be "-- ammonium nitrate, but for

9  y'all to get it, I would want something in return, like a

10  deal with my charges and my dog.  Other than that, you won't

11  get 110 gallons of it, nitrate.  Tell you what, check with

12  Jennifer Eliss in Jacksonville, which is my ex-wife, other

13  than that I'm not say where it's at.  It don't take much of

14  nitrate, hell, it takes 14 grams to blow a mailbox up and 2

15  gallons to blow a car up.  So know, does that tell you I know

16  what I'm talking about?  So, if you would let me know what's

17  going on if we got a deal or what.  Jamie."

18    And then it says, "P.S., I'm going to be truthful with

19  you.  I got nitrate, pure, I can get anything you want, guns,

20  ice, meth, bombs."

21  Q.  You just said pure.  Could it be possible that that could

22  be "plus"?  And if not, if you believe it says "pure," that's

23  fine.

24  A.  It could be "plus."

25  Q.  When you -- in reading that letter, can you tell the

1  members of the jury, does it appear that Mr. Wambles wants

2  something from you or from the FBI?

3  A.   Well, he would like our assistance, you know, in handling

4  apparently the state charges that he's facing in return for

5  him turning over the ammonium nitrate that he claims to have.

6  Q.   And, according to his P.S., what else does he claim that

7  he has the ability to possess?

8  A.   He also has the ability to possess guns, ice, meth, and

9  bombs.

10  Q.   Did you know one way or the other whether he has the

11  ability to possess nitrate or guns or bombs or any of those

12  items?

13  A.   I do not know.  I will take him at his word.

14  Q.   Can you tell the members of the jury, do you know what

15  the defendant would do if you didn't agree to try to help him

16  out in this letter?

17  A.   Well, given I had read the prior letter in which it

18  seemed as though he wanted a deal as well, and stated that,

19  if he didn't, then he would -- I believe the item was boom,

20  boom, boom, I took this letter in the same vein as the prior

21  letter.

22  Q.   Let's get specific.  Which letter are you referring to

23  that you used in your consideration?

24  A.   The prior exhibit.

25  Q.   What did you -- what are you referring to?

1   A.   I'm referring to the letter that was intercepted at the

2   Jackson County Correctional Facility in which he threatened

3   to bomb this courthouse.

4           MR. USTYNOSKI:  May I approach, Your Honor?

5           THE COURT:  You may.

6   BY MR. USTYNOSKI:

7   Q.   I show you Government's Exhibit 16.

8   A.   Yes, that's the letter I was referring to.

9   Q.   Is that the third letter written?

10      Can you take your time and look at that and be specific,

11  and tell the jury what, if anything, you used in your

12  consideration as to whether this fourth letter you received

13  was some type of threat?

14  A.   Well, in Exhibit 16 he refers to having boys on the

15  outside making a visit to the courthouse the week after

16  Christmas, ammonium nitrate and fuel oil and a battery makes

17  a big, big boom.  And then the last sentence in the letter

18  says, "Now, if I get moved out of this jail, and you will

19  look into my dog's death, it will not happen; but, if I stay,

20  you will see, boom, boom, boom."

21  Q.   Now, the letter that was written to you, Government's

22  Exhibit 20, can you tell the members of the jury if, in fact,

23  you took that as serious?

24  A.   Yes, I did.

25  Q.   Did you take that as some sort of type of possible

*Mark Leon - Direct*

237

1   threat?

2   A.   Yes.

3   Q.   Can you tell the members of the jury why?

4   A.   Well, again --

5        MR. MURRELL:   I'm going to object.   It seems to me

6   that the witness's opinion here is not relevant.

7        THE COURT:   Sustained.

8   BY MR. USTYNOSKI:

9   Q.   Well, after reading that letter, what actions did you

10  take, if any?

11  A.   I immediately contacted Mr. Kilgore, who is over security

12  for the courthouse here, and advised him that another letter

13  had been received.   And he took the necessary steps to put,

14  you know, to continue his people on alert for suspicious

15  people, activity around the courthouse, or something that may

16  be in the vein of, you know, of individuals involved with

17  explosives.

18  Q.   Do you know at any point if anybody during the

19  investigation gone to Mr. Wambles' residence at all?

20  A.   Well, after we interviewed Mr. Wambles on January 3rd,

21  and we were returning to -- got back to Tallahassee, we

22  contacted FDLE Agent Travis Lawson to advise him of the

23  results of our interview and to request that he do a drive-by

24  of Mr. Wambles' house to see if there were any indications of

25  any of this material whatsoever.

1   Q.  Why did you have him do that?

2   A.  Because that was the next logical step in the

3   investigation.

4   Q.  Why was that?  Why would you send somebody to his house?

5   What were you looking for?

6   A.  We were looking for ammonium nitrate that he referred to,

7   fuel oil, any other sorts of items that could be used, you

8   know, to make bombs or explosives or cause harm to the

9   courthouse.

10  Q.  When you read the reference to boys on the outside, do

11  you have any idea who Mr. Wambles means by that?

12  A.  No, sir.

13          MR. USTYNOSKI:  The court's indulgence.

14          That's all of the questions I have, Your Honor.  Pass

15  the witness.

16          THE COURT:  Cross-examine?

17          MR. MURRELL:  Yes, sir.

18                      CROSS-EXAMINATION

19  BY MR. MURRELL:

20  Q.  Mr. Leon, on January 2nd you got that letter that we

21  assume was the third letter written that was intercepted

22  there at the jail, or you found out about it?

23  A.  That's correct.

24  Q.  And you said you took it seriously.  When did you ask

25  that the officer do the drive-by?

*Mark Leon - Cross*

1    A.   After we had interviewed Mr. Wambles.

2    Q.   So that would have been maybe January 3rd?

3    A.   Yes, sir.

4    Q.   Did anybody try to search his house?

5    A.   No, we did not.

6    Q.   I mean, drive by, is that just what it sounds like, drive

7    by his house?

8    A.   He drove -- what was relayed to me is he drove by, went

9    up to the property, looked around and --

10   Q.   Did you ask anybody to talk to his relatives?

11   A.   No, sir.

12   Q.   Did you ask anybody to find out who his friends were?

13   A.   Not at that point; no, sir.

14   Q.   Well, did you ever ask anybody to find out who his

15   friends were?

16   A.   No, sir.

17   Q.   Okay.  Did you find out when that letter was actually

18   intercepted by the people at the jail?

19   A.   Yes, I did.

20   Q.   When was that?

21   A.   It was before Christmas.  I believe the testimony, it's

22   the 24th.

23   Q.   So eight or nine days passed before you got there to talk

24   to him?

25   A.   Yes.  I was not happy about that.

1   Q.  And then when you talked to him, he told you that it was

2   all -- there was nothing to it?

3   A.  Yes, he did.

4   Q.  And he told you that the letters, there was nothing to

5   the letters?

6   A.  Yes, he did.

7   Q.  And, in fact, there was another letter sent on the 5th to

8   FDLE Agent Travis Lawson.  Were you aware of that letter?

9   A.  I became aware of that letter, and I'm unclear as to when

10  I became aware.

11  Q.  Okay.  And in that letter -- did you ever see that

12  letter?

13  A.  Yes, I have.

14  Q.  In that letter he apologized for what he did and asked if

15  they could help him go about it the right way to address

16  these problems he was talking about?

17  A.  That is correct.

18  Q.  When he talked to you on the 3rd, did he apologize for

19  the letters?

20  A.  I don't know if he specifically apologized.  He admitted

21  to them.  I can't say for sure if he apologized.

22  Q.  Now, the fourth letter is the one that you got on

23  January 10th, correct?

24  A.  Yes, sir.

25  Q.  And I heard you say that there's a postmark on that or a

1   P.S., and he said something about, "I can get you bombs, I

2   can get you meth, I can get you ice," and you said you took

3   him at his word?

4   A.   I left -- the statement is what the statement is.

5   Q.   I mean, did you ask anybody to conduct an investigation

6   about bombs or meth or ice that he might have had?

7   A.   No.  I mean, he was at the prison and none had been

8   discovered at that point.  So at that point there was no need

9   to continue with that sort of an investigation.

10  Q.   I mean, if you had information that somebody out there

11  had a bomb or explosives, you wouldn't just let that go,

12  would you?

13  A.   No, sir.

14  Q.   And in that last letter, what he was trying to do was get

15  you to help him on those other charges?

16  A.   To some degree, yes, sir, I would agree with that.

17  Q.   And the business about the dog?

18  A.   Yes.

19  Q.   And he said, if you just do that, he'd let you know where

20  that ammonium nitrate was located?

21  A.   That is correct.

22  Q.   And this business about getting you bombs and meth and

23  ice, and so on, that's sort of the way these -- some of these

24  investigations go, isn't it?  I mean, some of these people

25  that have information, if they can tell you about somebody

1    that has guns or bombs or meth, sometimes that can work to

2    their benefit.

3    A.  Definitely.  That's a fair statement.

4    Q.  And it seems like what he was doing here, he was saying,

5    "Look, I can help you out and tell you about these things, if

6    you can help me"?

7    A.  Well, that was part of the statement, I agree with that.

8    I don't think it's the whole --

9    Q.  That's what the P.S. was about, anyway?

10   A.  I think that's accurate.

11           MR. MURRELL:  Thank you very much.

12           THE COURT:  Redirect?

13                      REDIRECT EXAMINATION

14   BY MR. USTYNOSKI:

15   Q.  Well, other than the P.S., what was the other part you

16   were alluding to?

17   A.  Well, the other part, as I spoke to before, is the, you

18   know, the threat that, if he did not get this assistance,

19   then, read in conjunction with the prior letter, that, you

20   know, I believe that his course would have, you know, been to

21   blow up the courthouse.

22   Q.  And how about the prior two letters to that letter?  Did

23   that in any way come into play in your thought process?

24   A.  Yes.  The whole series of all of the letters that had

25   been received in this matter.

1    Q.  Now, Mr. Murrell asked did you go and try to investigate

2    or talk to any of his friends, and you said no.  Do you know

3    who his friends are?

4    A.  I do not, no.

5    Q.  Did he give you any names or addresses or phone numbers

6    of any of his friends?

7    A.  He did not.

8    Q.  He didn't tell you who the boys on the outside were?

9    A.  He did not.

10   Q.  If he did, would you then have tried to interview them?

11   A.  There is a distinct possibility that we would have.

12   Q.  Mr. Murrell asked you, if you had helped Mr. Wambles with

13   his charges, he implied that he would tell you where this

14   nitrate was, correct?

15   A.  Yes.

16   Q.  Did you know what Mr. Wambles would do if you didn't help

17   him with his charges?

18   A.  Just as I explained before, having read the letter, you

19   know, he seemed -- he was very upset about the charges, and

20   there was the possibility that he may have followed through

21   on his threat against the courthouse.

22        MR. USTYNOSKI:  Okay.  Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Leon.  You may step down

24   and return to counsel table.

25        Mr. Ustynoski, please call your next witness.

1    MR. USTYNOSKI:  The government next would call Andy

2  Kilgore.

3    (**ANDREW KILGORE**, having been previously duly sworn, was

4  recalled by the government.)

5    THE COURT:  Mr. Kilgore, you may be seated.  You are

6  still oath.

7    Mr. Ustynoski, you may proceed.

8    MR. USTYNOSKI:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10  BY MR. USTYNOSKI:

11  Q.  Good morning, Mr. Kilgore.

12  A.  Good morning, sir.

13  Q.  Just a few questions in furtherance of your testimony

14  yesterday.

15    Yesterday you testified concerning the letter that was

16  received here at this courthouse.  Do you remember your

17  testimony?

18  A.  Yes, sir, I do.

19  Q.  Okay.  And subsequent to letter that was actually

20  received here, did you then learn of any subsequent letters

21  that were then confiscated or received?

22  A.  I heard that there were two letters that were confiscated

23  by the jail.  There was a third letter that never was

24  confiscated nor received here at the courthouse but mailed to

25  Special Agent Leon.

1    Q.  After the first letter was received here, were you

2    notified -- you said you were notified that there was another

3    letter confiscated at the prison?

4    A.  Yes, sir, there was, at the jail.

5    Q.  And do you know why you were notified of that?

6    A.  Well, the letter itself contained a -- the letter was --

7              MR. MURRELL:  I object to hearsay.

8              THE COURT:  Sustained.

9    BY MR. USTYNOSKI:

10   Q.  Well, after you received that, whatever information you

11   received, was that something important to you?

12   A.  Yes, sir, it was.  I was provided a copy of the letter

13   through the FBI with regard to an explosive threat against

14   the courthouse.

15   Q.  And did you take any type of measures as far as security

16   or higher alert at the courthouse?

17             MR. MURRELL:  Objection, relevancy.

18             THE COURT:  Overruled.

19             THE WITNESS:  Yes, sir, we did.  What we ended up

20   doing with the nature of the bomb threat that was made against

21   the facility, per protocol, my seniors were notified, the

22   chief deputy and the United States Marshal, as well as the

23   court security officers were notified with regard to the

24   nature of the threat.  The intent being, the threat, the

25   letter itself explained that the use of ammonium nitrate with

*Andrew Kilgore - Direct*

1   diesel fuel to be delivered by some means to the facility.

2           With that, notifying the lead court security officer,

3   notified the court security officers here in the building --

4   or I should say "buildings," both this one and the bankruptcy

5   courthouse -- to be more vigilant of unusual driving, drivers,

6   driving habits around the facility itself.  Also, through the

7   court security officers and the lead court security officer,

8   we notified the local contact in the downtown area with the

9   Tallahassee Police Department to step up patrols in the area,

10  to be looking after hours, over the weekends or before hours,

11  before the building opened, of any unusual vehicular activity

12  around the buildings or the facilities, sir.

13  BY MR. USTYNOSKI:

14  Q.  And is the reason you took all of those measures because

15  you took the information you received seriously?

16  A.  I took it seriously that there was a threat against the

17  building, that steps -- measures needed to be in place and

18  executed to maintain the security of the facility and the

19  safety of the occupants of the facility.

20  Q.  You mentioned that you contacted somebody in Washington,

21  D.C.?

22  A.  We contacted -- I ended up contacting our threat

23  management division with regard to the threat.  What I ended

24  up having to do was, when there is an inappropriate

25  communication or a threat against a member of the judiciary,

1  member or the facility such as this courthouse, what I have

2  to do is prepare a report.  A report is then generated and

3  submitted to our threat management division in Washington.

4  Q.  And did you actually prepare a report and send it to

5  Washington?  Do you recall?

6  A.  Yes, sir, I -- yes, sir.

7  Q.  After that letter, did you receive any further

8  information, a telephone call from Mr. Leon?

9  A.  After the -- after receiving the information about the

10 mailing of the suspected devise against the courthouse, the

11 bomb, the ammonium nitrate with the diesel fuel, I had

12 received information that there was a fourth letter, if

13 that's what you're referencing, that was mailed to Special

14 Agent Leon.

15 Q.  Yes.  That fourth letter that you became aware of, based

16 on information that Agent Leon informed you of, did you do

17 anything in regards to the information he provided you?

18 A.  Well, essentially, the letter itself basically reiterated

19 the fact that there was suspected the possibility of a mobile

20 device or an explosive device being used and utilized against

21 the facility or against the building.

22 Q.  And, again, did you, based on what Mr. Leon informed you

23 of, did you take any measures here at the courthouse?

24 A.  Well, again, the notification process went through the

25 court security officers to maintain vigilance in doing

1  their -- as court security officers do their perimeter

2  patrol, as well as the observation of vehicular activity

3  around -- in and around the courthouse and the building, sir.

4  Q.  Can you explain to the members of the jury, when you say

5  court security, who are all of the different members of the

6  team that make up the security of this courthouse?

7  A.  Well, the security of the courthouse falls upon the

8  jurisdiction and responsibility of the United States Marshal.

9  The marshal, with the assistance of the chief deputy, the

10 deputies, the United States marshals are utilized for the

11 security here in the courthouse as well as the facility.  The

12 Marshal's Service will also contract to, in this case, in

13 this district, American Paragon Protective Services, who is

14 the contractor that hires and employs court security officers

15 that are here in this building, in the bankruptcy, and

16 throughout the facilities here in the Northern District.

17 Q.  What is the name of that company, sir?

18 A.  It's American Paragon Protective Services.

19 Q.  Now, you work for the United States Marshal's Service?

20 A.  Yes, sir; that is correct.

21 Q.  Now, this American Paragon Protective Services, they

22 employ, am I correct, all of the court security officers?

23 A.  Yes, sir.  They are the contractor that the Marshal's

24 Service awarded the contract to for the security -- that the

25 personnel that are utilized for the security of these

*Andrew Kilgore - Direct*

1    buildings.  It's a national contract that was awarded -- that

2    is awarded, not only to say for the Northern District, but

3    for the districts throughout all 94 districts throughout the

4    nation.

5    Q.  For instance, the gentleman sitting to your right, is he

6    employed by this American Paragon Company?

7    A.  Yes, sir, he is.

8    Q.  And where is the American Paragon headquartered?

9    A.  They have headquarters in Virginia as well as in Texas.

10   We receive -- we are actually billed by the contractor out of

11   Austin, Texas.

12   Q.  Now, when you say "we're billed," who do you mean?

13   A.  Well, every month, for the services provided by American

14   Paragon, we receive an invoice or bill for the contractural

15   services for the security by the court security officers.

16   Q.  Now, you say "we received," who are you implying that --

17           MR. MURRELL:  I have to object to relevancy.

18           THE COURT:  Overruled.

19           THE WITNESS:  When I say "we," the United States

20   Marshal's Service.

21   BY MR. USTYNOSKI:

22   Q.  And where do those bills come from?

23   A.  They come from American Paragon, but physically located,

24   the billing process is out of Austin, Texas.

25   Q.  And when the U.S. Marshal's Service pays American

1    Paragon -- strike that.

2        Does the Marshal's Service then pay, like the gentleman

3    sitting to your right, or any other officers, do they pay

4    them directly, or do you pay American Paragon?

5    A.  We will pay American Paragon, then Paragon will pay their

6    employees.

7    Q.  So the money is sent to the headquarters in Austin,

8    Texas -- the payment?

9    A.  The payment is made to an existing account provided to

10   the Marshal's Service by Paragon.  It's all done through an

11   electronic funds transfer by our contracting officer or by

12   our financial management division.

13   Q.  Now, the individual that testified, the first letter --

14   the only letter that was only received at this courthouse,

15   who was the individual that intercepted that letter?

16   A.  That intercepted by Court Security Officer Glen Adcock.

17   Q.  And anybody assist him in that?

18   A.  Well, upon the receipt of the letter by CSO Adcock, the

19   lead court security officer, Don Porter, was notified, where

20   he came out and assisted with the -- with the arrival of the

21   letter, bagging the letter, and then sealing it.

22   Q.  And is it true that both Mr. Porter and Mr. Adcock are

23   both employed by this Paragon company, headquartered out of

24   Austin?

25   A.  Yes, sir; that is correct.

1  Q.  Can you tell the members of the jury, is it fair to say,

2  if an explosive device had gone off in the courthouse, that

3  obviously -- well, would the CSOs still have to come to the

4  courthouse, or would they be laid off or suspended?

5  A.  Based on what the extent of the damage is, obviously, and

6  the impact that it had upon the operation of the facility

7  itself, it would drive the number of CSOs that we would have

8  in the facility.  Because if the building were closed, then

9  our responsibility would be that there wouldn't be the need

10  for the CSOs to be in the building.

11  Q.  Is the Marshal's Service also responsible for

12  transporting prisoners?

13  A.  Yes, sir, we are.

14  Q.  And can you tell the members of the jury, do you often

15  get prisoners from out of state?

16  A.  Quite often, yes, sir.

17  Q.  And are you responsible -- is the Marshal's Service

18  responsible for transporting those prisoners?

19  A.  We are, with the assistance of several agencies,

20  organizations, based on whether it's a state inmate or a

21  federal inmate.  But we do transport a large number of both

22  state and federal inmates.

23  Q.  And can you tell the members of the jury when -- in

24  moving individuals, sometimes does it happen from state to

25  state, from Florida to other states?

1    A.  Yes, sir, it does.

2    Q.  Inmates coming here and also going to other states?

3    A.  Yes, sir.

4    Q.  And is it always -- are there different companies or

5    contractors that move prisoners, or who typically is involved

6    in that?

7    A.  Well, predominantly, the inmate is requested by the

8    courts or by the district court.  There are a number of

9    methods that are available.  But predominantly, the

10   transportation here locally as well as with the other local

11   courthouses throughout the nation, is done by the United

12   States Marshal's Service.

13          MR. USTYNOSKI:  Thank you, Your Honor.  That's all I

14   have.  I pass the witness.

15          THE COURT:  Cross-examine?

16                        CROSS-EXAMINATION

17   BY MR. MURRELL:

18   Q.  Good morning, Mr. Kilgore.

19   A.  Good morning, sir.  How are you?

20   Q.  Good.  How are you?

21   A.  Good.  Thank you.

22   Q.  You testified about the third letter that was apparently

23   one that was intercepted at the jail here in Jackson County?

24   A.  I know there were two letters intercepted at Jackson

25   County.  The third letter, yes, sir, I believe so.

1   Q.  Somebody told you about it, and the testimony was that

2   you alerted the security officers and advised them to keep

3   their eyes open?

4   A.  To be vigilant, yes, sir.

5   Q.  And did you say that you reported that information to

6   somebody else up the chain?

7   A.  Yes, sir, I did.

8   Q.  And in doing that, you were following protocol?

9   A.  Procedures, yes, sir.

10  Q.  And do you know when it was you got the information about

11  what we're calling the third letter?

12  A.  It was before the end of the calendar year.  It was after

13  Christmas but before the end of the calendar year; yes, sir.

14  Q.  So at that point, though, you knew that there had been

15  two letters, the two letters talking about Anthrax, one that

16  was actually received here and one that was intercepted at

17  the Jackson County Jail?

18  A.  Yes, sir.

19  Q.  And you knew then at that point that everyone understood

20  those to be false threats?

21  A.  Well, we understood that the threat was made.  The

22  ability or the validity of the threat itself --

23  Q.  I mean, did anybody tell you that it had been tested and

24  there was no Anthrax?

25  A.  We were told -- well, I knew the letters were submitted

*Andrew Kilgore - Cross*

1   for testing.  At that time I don't recall what -- I knew the

2   letters had been submitted for testing; yes, sir.

3   Q.  Did you know that he had -- Mr. Wambles had told the

4   officials that it was Tylenol?

5   A.  When we went and interviewed, basically, his explanation,

6   yes, sir.

7   Q.  So, again, by the time you got that, you were told about

8   the third letter, you knew that he had already said it was

9   Tylenol?

10  A.  Well, we knew what he had stated.

11  Q.  Pardon?

12  A.  What basically he had stated to us; yes, sir.

13  Q.  But, still, it was incumbent upon you to follow protocol?

14  A.  Well, we had to.  We had to verify it.  Because if I took

15  everything at face value that somebody, especially, based on

16  the nature of the threat, had told me, the number of times I

17  have been lied to --

18  Q.  Sure.  Do you have any idea how many threatening letters

19  have been received at the courthouse?

20  A.  At the courthouse itself?

21  Q.  Yes.

22  A.  There have been a few.  To say it's excessive, I wouldn't

23  say -- well, based on your definition of what you consider

24  excessive, I mean if we get one letter, I personally

25  prefer -- I consider that --

1   Q.   I'm not talking about the time.

2   A.   -- excessive.

3            MR. USTYNOSKI:   I would ask that he be able to finish

4   the response.

5            THE COURT:   I think he's answered the question.   Ask

6   him another one.

7   BY MR. MURRELL:

8   Q.   Over the last two years, do you have any idea how many

9   have been received?

10  A.   At this facility or throughout the district?

11  Q.   Well, say throughout the district.

12  A.   Throughout the district, I would say we have received

13  close to two-dozen threatening or inappropriate

14  communications to the various facilities here in the

15  district.

16  Q.   And in every instance, did you follow protocol?

17  A.   As well as we could, yes, sir.

18  Q.   I mean, you didn't get any of those letters and say, "Oh,

19  this is just a joke, I'm not going to report it or follow

20  protocol"?

21  A.   No, sir.

22           MR. MURRELL:   Thank you.

23           THE COURT:   Redirect?

24                       REDIRECT EXAMINATION

25  BY MR. USTYNOSKI:

*Andrew Kilgore - Redirect*

1   Q.  Why do you take every letter seriously and -- strike

2   that.

3       Why do you follow protocol in every threatening letter or

4   general threat over the phone that you would get?

5   A.  In today's environment, quite often it's been

6   demonstrated that what seems like it's just -- what some

7   people may consider a joke, I don't have or within the

8   Marshal's Service, we don't have the luxury of considering it

9   a joke.  For example, if somebody were to call in a bomb

10  threat to the building, I don't have the luxury to sit back

11  and say he's kidding, he's joking, let's forget it.  I've got

12  to exercise protocols.

13      If somebody mails in a letter containing a powdery

14  substance claiming that it's Anthrax, I've got to treat it as

15  if it is Anthrax.

16      The same thing goes just as, not only what occurs here in

17  the district, but throughout the nation, for example, if

18  someone makes a comment that there is a risk or a threat

19  where ricin has shipped, where this could be the nature of

20  the job or the work that goes in this facility or within the

21  building, that it has to be treated as a real threat.  Until

22  the unknown element is eliminated, we have to treat it as if

23  it is true and accurate.

24  Q.  And that's even if it's in an anonymous threat?

25  A.  Even if it's an anonymous threat; yes, sir.

*Andrew Kilgore - Recross*

1  Q.  Sitting here today, can you tell the members of the jury

2  if you know for sure whether Mr. Wambles has the ability to

3  obtain materials for a bomb?

4  A.  Knowing from where he -- where he lived in rural areas,

5  that the material necessary that -- materials necessary to

6  create an explosive device are readily available, are easily

7  manufactured, just by the source of the information that is

8  available on the internet, I have to treat it with a

9  reasonably high degree of certainty that, yes, it does pose a

10  threat, it is a risk to the facility and the occupants and

11  the tenants of this building.

12      MR. USTYNOSKI:  Thank you.  I have nothing further.

13      MR. MURRELL:  May I ask for redirect?

14      THE COURT:  You may.

15                    RECROSS-EXAMINATION

16  BY MR. MURRELL:

17  Q.  So that would be true of anybody that lives in Jackson

18  County?

19  A.  Well, anybody living within the district itself who

20  called and made a threat against any of the facilities in the

21  district.

22  Q.  Well, I mean, you talked about the fact that he lives in

23  a rural county.

24  A.  Well, I say a rural county, maybe anyone living within --

25  it could be rural, it could be very easy in a high density

1  population -- I mean a higher density in the city of

2  Tallahassee, or wherever.

3  Q.  Anybody in the Northern District of Florida?

4  A.  Yes, sir.

5           MR. MURRELL:  Thank you.

6           THE COURT:  Anything further?

7           MR. USTYNOSKI:  Just one question, Your Honor.

8                      REDIRECT EXAMINATION

9  BY MR. USTYNOSKI:

10 Q.  In this case, when you got information of the threat, did

11 you also know that Mr. Wambles was upset?

12 A.  I knew he was upset, yes, sir.

13 Q.  As opposed to an anonymous threat that you still take

14 seriously?

15 A.  Oh, yes, sir.

16           MR. USTYNOSKI:  Nothing further.

17           THE COURT:  Thank you, Mr. Kilgore.  You may step

18 down.

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Mr. Ustynoski, please call your next

21 witness.

22           MR. USTYNOSKI:  The government would call Greg

23 Armstrong, Your Honor.

24           DEPUTY CLERK:  Please raise your right hand.

25      *GREGORY ARMSTRONG, GOVERNMENT WITNESS, DULY SWORN*

*Gregory Armstrong - Direct*

259

```
 1              DEPUTY CLERK:  Be seated.

 2              Please, state your full name and spell your last

 3    name for the record.

 4              THE WITNESS:  Gregory Armstrong, A-r-m-s-t-r-o-n-g.

 5                      DIRECT EXAMINATION

 6    BY MR. USTYNOSKI:

 7    Q.  Good morning, Mr. Armstrong.  Tell us who you are

 8    employed by.

 9    A.  I work for the Tallahassee Police Department.  I've

10    worked for them for 25 years.

11    Q.  I'm sorry.  How long?

12    A.  Twenty-five years.  And I'm also the bomb squad commander

13    for our bomb squad, which I have been on for 19 years.

14    Q.  How long have you been the bomb squad commander?

15    A.  Two.

16    Q.  Just briefly, can you give us a summary of your training

17    and experience that got you to become the commander of the

18    bomb squad?

19    A.  Initially, there's a FBI military school that all of the

20    bomb technicians in the United States go to at Redstone

21    Arsenal in Huntsville, Alabama.  When I went through, it was

22    a four-week school.  It's now a six-week school.  I have been

23    to post blast classes.  I've been to improvised explosive

24    classes.  We train twice a month and several conferences.  I

25    can't list them all.
```

1   Q.  Are there different types of -- when somebody says a bomb

2   or an explosive device, in your line of work, are there

3   different types?

4   A.  Yes.  There's -- if we're talking -- there's

5   commercially-manufactured explosives and military explosives,

6   and then there's what we call improvised explosives that are

7   used generally in improvised explosive devices.

8   Q.  Can you give us examples of -- is it called improvised

9   explosives?

10  A.  Improvised explosives.

11  Q.  What do you mean by that?

12  A.  Improvised explosives are explosives that are not

13  commercially-manufactured.  You can go from an improvised

14  explosives using, you know, gun powders, smokeless or black

15  powders; or you can get into -- which are low explosives --

16  or you can improvise high explosives.  Those formulas are

17  readily available on the internet.  Videos show you how to do

18  it.  And those improvised explosives are quasi equivalent

19  with military and commercially-manufactured explosives.

20  Q.  Now, when you say there's actually a video, can you tell

21  the members of the jury, when you say there's a video, are

22  these things that are law enforcement videos or are these

23  things that are actually out on the internet?  What do you

24  mean by videos for improvised explosives?

25  A.  They are not law enforcement videos.  They are people,

*Gregory Armstrong - Direct*

1    anyone posting videos on how to manufacture and/or use

2    improvised explosive devices.  You can do a YouTube search

3    for specific explosives, and you can find how to make them,

4    how to use them, on the internet.

5    Q.  Can you tell the members of this jury, what you're

6    calling improvised explosives, is ammonium nitrate something

7    that is a common type of ingredient that might be used?

8    A.  Yes, it is.  Ammonium nitrate, in and of itself, you can

9    get it in various grades, fertilizer, which, if you -- I

10   don't know if you are familiar with fertilizers, but -- if

11   you buy fertilizers, there's usually three numbers on the

12   bag.  The first number is ammonium nitrate content, and then

13   you can buy it, you know, 33 or 34, 00, meaning that 34

14   percent of that or 33 percent of that bag is ammonium

15   nitrate.  There is also what's call blaster's grade

16   explosives, which is regulated by ATF, that is used in the

17   mining industry.  But the fertilizer will explode when mixed

18   with diesel fuel.

19   Q.  When mixed with what?

20   A.  Diesel fuel.

21   Q.  Explain that.  Why is diesel fuel important?

22   A.  Diesel fuel is the fuel in the explosion.  The ammonium

23   nitrate is the oxidizer.  Explosions are just really rapid

24   burning.  And so when you mix that fuel with an oxidizer, you

25   are providing the oxygen in the explosion.  It doesn't have

*Gregory Armstrong - Direct*

1   to pull oxygen from the atmosphere, which allows it to burn

2   rapidly or detonate.

3   Q.  How about battery, car battery acid?  Is that important

4   when you're talking about improvised explosives?

5   A.  Battery acid is generally sulfuric acid, which is a

6   strong acid.  One of the explosives that we're always on the

7   watch for, because it's extremely dangerous, is TATP.  It's a

8   peroxide-based explosive.  With sulfuric acid, acetone, which

9   you can get anywhere, and hydrogen peroxide, you can make

10  TATP.  TATP is extremely sensitive to heat, shock, and

11  friction, and the terrorists use it to manufacture initiators

12  for their explosives, explosive devices, their IEDs.

13  Q.  When you spoke of the readily availability of knowledge

14  on the internet and these videos that people are posting,

15  between what's out there on the internet, and if you had

16  ammonium nitrate, fuel oil, and a car battery or car acid or

17  hydrogen peroxide, are those some of the main ingredients

18  that could be used to make an improvised explosive device?

19  A.  Absolutely.

20  Q.  If you had the ability to acquire those materials, can

21  you tell the members of the jury, is it your opinion that,

22  based on what information that's available on the internet,

23  that you would be able to -- somebody could make an explosive

24  device using those materials?

25  A.  With those materials, you could manufacture an explosive

1   device.

2           MR. USTYNOSKI:  Thank you, Your Honor.  The

3   government would pass.

4           THE COURT:  Cross-examine?

5                       CROSS-EXAMINATION

6   BY MR. MURRELL:

7   Q.  Good morning.  I'm Randy Murrell.  I represent

8   Mr. Wambles.

9       So this information is widely available on the internet?

10  A.  Yes, sir.

11          MR. MURRELL:  Thank you.  That's all I have.

12          THE COURT:  Redirect?

13                      REDIRECT EXAMINATION

14  BY MR. USTYNOSKI:

15  Q.  Do you know Mr. Jamie Wambles?

16  A.  I do not.

17          THE COURT:  Further questions?

18          MR. USTYNOSKI:  Nothing further.

19          THE COURT:  Thank you, Mr. Armstrong.  You may step

20  down.

21          Please call your next witness.

22          MR. USTYNOSKI:  The government would next call Travis

23  Lawson.

24          DEPUTY CLERK:  Please raise your right hand.

25          ***TRAVIS LAWSON, GOVERNMENT WITNESS, DULY SWORN***

```
1              DEPUTY CLERK:  Be seated.

2              Please, state your full name and spell your last

3    name for the record.

4              THE WITNESS:  My name is Travis Lawson.  My last name

5    is spelled L-a-w-s-o-n.

6                        DIRECT EXAMINATION

7    BY MR. USTYNOSKI:

8    Q.  Good morning, Mr. Lawson.

9    A.  Good morning.

10   Q.  I'm going to ask you some questions.  If I ask anything

11   that you don't understand, please let me know, and I'll

12   rephrase it for you.  And please speak loud and clear in that

13   microphone so everybody can hear you this morning.

14   A.  Okay.

15   Q.  Thank you.

16       Mr. Lawson, by whom are you employed?

17   A.  I'm employed with the Florida Department of Law

18   Enforcement.

19   Q.  And in what capacity?

20   A.  As a special agent.

21   Q.  And how long have you been a special agent?

22   A.  I have been a special agent for 13 years.

23   Q.  Have you been with the Florida Department of Law

24   Enforcement for 13 years as well?

25   A.  I've been with FDLE for 16 years total.
```

1    Q.  And what are your current responsibilities as a special

2    agent?

3    A.  I'm assigned to our Panama City field office, but

4    specifically I'm out of the Marianna office.  There's a

5    two-man office there.

6    Q.  Are you in charge of investigations?  What are your

7    responsibilities?

8    A.  General investigations.  We primarily assist the local

9    agencies in Jackson, Washington, and Calhoun Counties; and we

10   also have our own investigations that we develop.

11   Q.  Did you at some point become involve in the investigation

12   of an individual by the name of Jamie Wambles?

13   A.  Yes, sir; that's correct.

14   Q.  Can you tell the members of the jury how it is that you

15   became involved in the investigation?

16   A.  Yes.  I was contacted by Captain Bill Bryant with the

17   Marianna Police Department.  I believe it was December 20th,

18   2012.  He advised that the Marianna Police Department had

19   received a letter from the Jackson County Correctional

20   Facility from an inmate there, and that the letter contained

21   an unknown white-powdery substance, and the letter stated

22   something to the effect that it was possibly Anthrax.

23   Q.  What did you do, if anything, in your investigation?

24   A.  Sure.  I went to the jail the next day with Captain Bill

25   Bryant from the Marianna Police Department.  The inmate who

1  had written the letter was Inmate Jamie Wambles, and we

2  interviewed him that day.

3  Q.  And did Mr. Wambles admit to you to writing a letter or

4  letters?

5  A.  Yes, sir, he did.

6  Q.  How many did he admit to you that he wrote?

7  A.  That day he admitted to -- well, one was intercepted by

8  the jail staff, and we took his statement from him, wherein

9  we talked about that.  Then after we went off tape, he

10  indicated that he had mailed another letter that he believed

11  had gotten through.  So it would be two letters that day.

12  Q.  From your meeting with Mr. Wambles, tell the members of

13  the jury, did it appear that he was upset over something?

14  A.  Yes.  Mr. Wambles indicated he was upset with the federal

15  government and also the local authorities.  At the time that

16  he was arrested, his dog had been shot by law enforcement,

17  and he was primarily upset about that.

18  Q.  And after you inquired -- the interview with Mr. Wambles,

19  after those two letters, can you tell the members of the

20  jury, did you get involved with any investigation after that?

21  A.  After that time I was notified, I believe it was

22  January 2nd, that the Marianna Police Department had picked

23  up a third letter from the jail -- I believe that was on

24  December 24th -- wherein Mr. Wambles had written a letter

25  addressed to the federal courthouse in Tallahassee, stating

1    something to the effect that, if he was not transferred from

2    the correctional facility in Jackson County, and also if the

3    matter involving where his dog was shot by law enforcement,

4    that he would send some friends to blow up the courthouse

5    with -- I believe it was ammonium nitrate and fuel oil.

6    Q.  And what did you do after receiving that information, if

7    anything?

8    A.  I contacted SA Mark Leon with the FBI in Tallahassee to

9    advise him about the third letter.

10   Q.  And did you at some point then see the third letter?

11   A.  Yes.  We opened up that letter at the Marianna Police

12   Department.  I was in Captain Bryant's office at the time

13   that he opened up the letter.

14   Q.  And after reviewing the letter, did you and law

15   enforcement -- did you put letters or evidence on what's

16   called a property receipt?

17   A.  Yes.  At that point in time, it was the Marianna Police

18   Department's case, and they maintained the evidence.  So they

19   would have maintained any property receipts with it.

20   Q.  Okay.  And do you know if it was also maybe put in a

21   property evidence bag?

22   A.  It was in an evidence bag.  When Captain Bryant retrieved

23   it, he actually opened it up in his office in my presence,

24   and that's when we read the letter.

25           MR. USTYNOSKI:  May I approach, Your Honor?

 1          THE COURT:  You may.

 2   BY MR. USTYNOSKI:

 3   Q.  Agent Lawson, I'm going to show you what is marked as

 4   Government's 17 and 18 for identification.  In reference to

 5   the third letter, can you tell the members of the jury, do

 6   you recognize what those items are?

 7   A.  Yes.  One is going to be a property receipt from the

 8   Marianna Police Department, identifying the third letter that

 9   was received on January 24th -- I'm sorry -- December 24th.

10   Q.  For the record, which --

11   A.  I'm sorry.  I'm referring to Exhibit Number 18.

12   Q.  And that's the property receipt?

13   A.  That's the property receipt.

14   Q.  Okay.  And Government's Exhibit 18, do you recognize

15   that?

16   A.  I was referring to 18.  Let me I guess back up.

17        Number 17 is going to be the Marianna Police Department

18   evidence bag that contained the letter.

19   Q.  Okay.  And then Government's Exhibit 18, what is that?

20   A.  Exhibit 18 is going to be a property receipt identifying

21   receipt of the letter that they had received on

22   December 24th.  The chain of custody, Lieutenant Owens, who

23   is a lieutenant at the Marianna Police Department, turned the

24   letter to me, and I subsequently turned it over to Mark Leon

25   with the FBI.

1      MR. USTYNOSKI:  At this time, Your Honor, the

2    government would introduce Government's Exhibits 17 and 18

3    into evidence.

4      THE COURT:  Government's 17 and 18 are admitted.

5      (GOVERNMENT EXHIBIT NOS. 17 AND 18:  Received in

6    evidence.)

7    BY MR. USTYNOSKI:

8    Q.  Agent Lawson, after that third letter, were you part of a

9    subsequent interview of Mr. Wambles at any point, or not?

10   A.  No, sir.  The only interview I recall doing with

11   Mr. Wambles was that first time there at the jail.

12   Q.  Okay.  Did you -- after that third letter, did you

13   receive any information from Mr. Leon about a letter that he

14   had received?

15   A.  Mr. Leon had -- or Agent Leon had indicated that the

16   other letter that Mr. Wambles had referred to as being mailed

17   out, he thought, or had been mailed out and gotten through

18   the correctional facility.  Agent Leon advised that that

19   letter had been intercepted here in Tallahassee.

20   Q.  Can you tell the members of the jury, when you

21   interviewed or were part of the interview with Mr. Wambles,

22   who else was with you that day?

23   A.  Captain Bill Bryant with the Marianna Police Department.

24   Q.  And you -- were you both asking Mr. Wambles questions?

25   A.  Correct.

*Travis Lawson - Direct*

1   Q.  At the end of that, did you give -- do you remember if

2   you gave Mr. Wambles a business card?

3   A.  I believe I did, correct.

4   Q.  At some point during this investigation, did you yourself

5   receive a letter from Mr. Wambles?

6   A.  Yes, sir, I did.

7           MR. USTYNOSKI:  May I approach, Your Honor?

8           THE COURT:  You may.

9   BY MR. USTYNOSKI:

10  Q.  Agent Lawson, I'm going to show you what has been marked

11  as Government's Exhibit 21 for identification.  Please take a

12  brief moment to look at that.

13      Do you recognize that item?

14  A.  Yes, sir, I do.

15  Q.  Can you tell the members of the jury, what is that item?

16  A.  Exhibit Number 21 is an envelope that contained -- or

17  that the letter that Mr. Wambles had written to me was

18  contained in this envelope.  It's from the Jackson County

19  Correctional Facility, and it's addressed to me at our P.O.

20  Box or our work P.O. Box.

21  Q.  You received that envelope?

22  A.  Yes, sir, I did.

23          MR. USTYNOSKI:  Your Honor, the government would move

24  Exhibit 21 into evidence.

25          THE COURT:  Exhibit 21 is admitted.

1          (GOVERNMENT EXHIBIT NO. 21:  Received in evidence.)

2                MR. USTYNOSKI:  Thank you.  Permission to publish?

3                THE COURT:  You may.

4                MR. USTYNOSKI:  Twenty-one.

5     BY MR. USTYNOSKI:

6     Q.  Mr. Lawson, P.O. Box 1506, Marianna, Florida, 32447,

7     where is that?

8     A.  That is the P.O. Box to our FDLE office in Marianna.

9     Q.  Would that be on your business card?

10    A.  Yes, sir.

11    Q.  Looking in the left-hand corner, where does it appear

12    that the letter was mailed from?

13    A.  The Jackson County Correctional Facility.

14    Q.  And the name of the alleged sender?

15    A.  Jamie Wambles.

16    Q.  And did you, in fact, receive that envelope at your place

17    of employment?

18    A.  Yes, sir, I did.

19                MR. USTYNOSKI:  May I approach, Your Honor?

20                THE COURT:  You may.

21    BY MR. USTYNOSKI:

22    Q.  Showing you Government's Exhibit 22 for identification,

23    take a brief moment to look at that item.

24        Do you recognize Government's Exhibit 22?

25    A.  Yes, sir, I do.

1    Q.  Is Government's Exhibit 22 a letter that was contained in

2    Exhibit 21 that you received?

3    A.  Yes, sir; that's correct.

4         MR. USTYNOSKI:  Your Honor, at this time I'd ask that

5    it be moved -- that Government's Exhibit 22 be moved into

6    evidence.

7         THE COURT:  Government 22 is admitted.

8         (GOVERNMENT EXHIBIT NO. 22:  Received in evidence.)

9         MR. USTYNOSKI:  Thank you.  Permission to publish?

10        THE COURT:  You may.

11   BY MR. USTYNOSKI:

12   Q.  Agent Lawson, can you please, for the record and for the

13   members of the jury, slowly and loudly please read

14   Government's Exhibit 22?

15   A.  Sure.  It starts, "Mr. Lawson:  I'm sorry for writing the

16   letters I wrote.  I know it's not the way you go about doing

17   things.  I would like to know how I go about pressing charges

18   on Chief Burt McAlpin for murdering my dog.  I told him over

19   and over to let me get my dog, but he would not.  So when my

20   dog came out to me, Sergeant Bowen pulled his gun, and my dog

21   looked up at him, that's when he fired two shots in his

22   chest.  And then he was screaming, and Burt McAlpin shot him

23   four more times.  I'm asking you, please, could you help me

24   or lead me in the right way of what to do?  If you can find

25   it in your heart to help me, please do.  And did you find

1   that letter that got sent out to courthouse?  If you would, I

2   would like to speak with you.  Thanks, Jamie Wambles.  P.S.,

3   I have witnesses to state what they do to -- did to my dog."

4           MR. USTYNOSKI:  That's all I have, Your Honor.  The

5   government would pass the witness.

6           THE COURT:  Cross-examine?

7                        CROSS-EXAMINATION

8   BY MR. MURRELL:

9   Q.  Mr. Lawson, I'm Randy Murrell.  I represent Mr. Wambles.

10      The letter you just read to us, when did you receive

11  that?

12  A.  I believe it was January 4th.

13  Q.  January the 4th.  And did you let anybody know about

14  having received that letter?

15  A.  Mark Leon with the FBI.

16  Q.  So would you have told him -- when would you have told

17  Mr. Leon about it?

18  A.  I don't know specifically.  Can I refer to my report?  I

19  might have it indicated in there.

20  Q.  Please do.

21  A.  I didn't write the specific date down, but in

22  Investigative Report Number 5 I indicated I contacted FBI

23  Special Agent Mark Leon in Tallahassee to advise him of the

24  letter and forwarded him a copy of that letter.

25  Q.  When you say you forwarded it, would you have mailed it,

1   emailed it?  How would you have sent it to him?

2   A.  I don't specifically recall how I forwarded it to him.

3   Q.  Would you have waited days before doing all of this, or

4   would you have done it pretty promptly?

5   A.  I would have done it promptly, I would imagine.

6   Q.  If you had to guess, would you say it was either the day

7   or the day after you received the letter?

8           MR. USTYNOSKI:  Objection.  Speculation, Your Honor.

9           THE COURT:  Overruled.

10  BY MR. MURRELL:

11  Q.  What would your best guess be?

12  A.  I would think within a matter of days.

13          MR. MURRELL:  Thank you very much.

14          THE COURT:  Redirect?

15          MR. USTYNOSKI:  Nothing, Your Honor.

16          THE COURT:  Thank you, Mr. Lawson.  You may step

17  down.

18          THE WITNESS:  Thank you, sir.

19          THE COURT:  Please call your next witness.

20          MR. USTYNOSKI:  Court's indulgence?

21          THE COURT:  Sure.

22          MR. USTYNOSKI:  Thank you.

23          Your Honor, the government rests its case.

24          THE COURT:  All right.  Members of the jury, that

25  means that you have received all of the government's evidence

1    in the case.  As I told you at the beginning of the trial, a

2    defendant is not required to present any evidence at all; but,

3    if the defendant chooses to do so, this is the time in the

4    trial when that would happen.  But before that, this is also a

5    convenient time to take the morning break.

6         Even though you've gotten all of the government's

7    evidence in the case, it's still not time to start talking

8    about the case.  Wait until you've gotten all of the evidence

9    and the closing arguments and my instructions.

10        So we'll take a break, and we'll be back with you in

11   a few minutes.

12        Jury out, please.

13      (*The jury exited the courtroom at 10:35 a.m.*)

14        You may be seated.

15        A couple of notes about rulings.  I overruled the

16   objection about best guess.  I understand the question was

17   sort of a guess, and that's ordinarily speculative.  But in

18   context, I understood it as a question about the standard

19   procedures, what would you do in the circumstances, and I

20   thought that was a proper question.  Ultimately, that's how

21   the witness answered it.  That was for Mr. Lawson.

22        There was one instance where there was a question to

23   Mr. Kilgore, and I didn't explain it very well, but it looked

24   to me like he was headed off the track from the question, and

25   I sustained the objection, and we got back to the meat of what

1   was actually being asked.

2        Does either side want the expert instruction?  There

3   is an instruction, I kind have abbreviated it from the

4   standard instruction.  It says the same thing.  It says

5   sometimes a witness can give an opinion; you don't have to

6   accept it; it's up to you to evaluate it.  Mr. Armstrong's

7   testimony was kind of up near the edge of that.  Frankly I

8   don't think the instruction will add anything, but it won't do

9   any harm.  If either side wants it, I will give it

10       MR. MURRELL:  I'd ask that you give it.

11       THE COURT:  So I'll add the expert instruction.

12       Mr. Murrell, I need to see if there is anything from

13  the defense, and then whether a decision has been made about

14  whether Mr. Wambles will testify.

15       MR. MURRELL:  I would move for judgment of acquittal

16  at this time.  I'm prepared to argue it, if you're ready to

17  hear it.

18       THE COURT:  This is the time.  As you do that, I'm

19  going to hand down a third draft of the jury instructions.

20  The one that I put on the table this morning is actually the

21  second draft; although, I didn't label it that way.  I've

22  edited the interstate commerce provision to add the mails, and

23  actually to expand it a little bit, going back over the

24  statute.  I added the language the defense asked for, "under

25  the circumstances."

 1          MR. USTYNOSKI:  And, Your Honor, I'm sorry, the

 2   blowing up was changed to bombing?

 3          THE COURT:  Right.  That was made in the second

 4   draft.  So that should be that way in the third draft.  That

 5   will not be highlighted in the third draft, but the third

 6   draft will have the tracked changes since this morning's

 7   draft.

 8          MR. USTYNOSKI:  And then the only difference now

 9   would be the addition of the expert testimony that

10   Mr. Murrell --

11          THE COURT:  Right.  That is not in the draft I just

12   gave you, but we will add that.  And we will correct the

13   answer, depending on whether Mr. Wambles decides to testify or

14   not.

15          MR. MURRELL:  As for the judgment of acquittal, I

16   would ask for a judgment of acquittal on Count Two, because in

17   my view no reasonable juror could find that, under the

18   circumstances, these threats could reasonably be believed.

19   The agent from -- or the lab microbiologist from Jacksonville

20   says that he's gotten five -- he's tested for Anthrax 5,000

21   times, one turned out to be true.  The testimony is that

22   Mr. Wambles was in jail.  And I would suggest the likelihood

23   that anybody could successfully send Anthrax from the jail is

24   just about zero.  And so, in my view, the evidence has not

25   shown that these threats could reasonably be believed.

```
1            As for the third letter, the fertilizer, at that
2   point Mr. Wambles had admitted to sending two false threats;
3   and it seems to me it would not be reasonable to believe that
4   was a threat, a true threat.
5            And, finally, the fourth one suffers from those
6   problems as well.  In the interim we've got an apology.  In
7   the interim he said the third letter is false.  So we now have
8   three false threats.  And, additionally, if you read the
9   letter, it's simply not a threat.  That fourth letter says
10  that, look, I do have some ammonium nitrate; and, if you'll
11  help me, I'll tell you where it is.  It is a fellow that is
12  negotiating, he says he will turn over this material, if
13  they'll just help him.  There is no threat in the letter.
14           THE COURT:  And that's Government's -- what's the
15  number of that one, 19?
16           MR. MURRELL:  I can tell you.
17           THE COURT:  It may be 20.  Nineteen may be the
18  envelope.
19           MR. MURRELL:  I think that's correct.
20           MR. USTYNOSKI:  The fourth letter, it's Number 20,
21  Your Honor.
22           THE COURT:  All right.  I have it.
23           MR. USTYNOSKI:  Your Honor, I would like to respond,
24  but I will wait until Your Honor is done.
25           THE COURT:  All right.  I've read it.  Do you think
```

1    this is a threat?

2            MR. USTYNOSKI:  Absolutely, Your Honor.

3            THE COURT:  What does it say that's a threat?

4            MR. USTYNOSKI:  He's pissed off and as --

5            THE COURT:  I hear that on a regular basis.  Should I

6    take it as a threat?

7            MR. USTYNOSKI:  Not unless they're going to send

8    Anthrax, Your Honor, and two letters, and say I have nitrate

9    and a battery, and it only takes 16 grams to blow up a

10   mailbox, then I absolutely would take it as a threat.  And if

11   he's mad at you, Your Honor, absolutely.

12            I mean, the whole charge is going to read under the

13   circumstances.  Under these circumstances, if you take that

14   letter solely without anything else, maybe not.  But, if you

15   take it under the circumstances of this case, with all of the

16   prior letters saying he's still mad, absolutely that is still

17   a threat.

18            THE COURT:  All right.  On a Rule 29 motion, my job

19   is not to decide which side is right, but to decide whether

20   there is evidence from which a jury reasonably could find

21   beyond a reasonable doubt that the defendant is guilty.

22            I deny the motion on Counts Two and Three.  I'll take

23   it under advisement on Count Four.

24            MR. MURRELL:  Because I was moving for Count One as

25   well.

1          THE COURT:  Count One is the same argument as

2    Count Two?

3          MR. MURRELL:  Yes, sir.

4          THE COURT:  And Count Three.  So, One, Two, and

5    Three, the argument is essentially the same?  It gets better

6    as time goes on because he's admitted that the first one

7    was --

8          MR. MURRELL:  One and Two is Anthrax.  I'm just

9    saying that it's not a plausible threat that somebody could

10   send Anthrax.

11         THE COURT:  Got it.

12         MR. MURRELL:  Count Three was the ammonium nitrate,

13   and I'm saying he's already twice --

14         THE COURT:  Already admitted they were false.  I

15   understand.  I deny the motion for Counts One, Two and Three.

16   I understand the argument, but that's a jury argument.

17         On Count Four, it's less clear that it's a jury

18   argument.  But I do understand the government's theory, and

19   maybe somebody can think this is a threat; although, it's

20   certainly not an explicit threat.  Every word of it is

21   completely consistent with the defense theory that it's an

22   offer to tell the government where material is as part of a

23   plea deal, not that it's a threat to blow the building up.

24         But I understand the government's theory that it's an

25   implied threat to blow the building up, and I'm at least going

1    to get a verdict on that count.

2            Anything else from the defense?

3            MR. MURRELL:  Actually, I was going to call Mr. Leon

4    as a witness.

5            THE COURT:  You can do that.

6            MR. MURRELL:  I understand.  But what I was going to

7    say, did you say that you would give us some time between the

8    end of the case and the closing arguments?

9            MR. USTYNOSKI:  I would ask, Your Honor, please, if

10   you could, because the jury instructions have changed, and I

11   would like to try to get it in our computer.

12           THE COURT:  To get the jury instructions in the

13   computer, that takes about 30 seconds, and you don't have to

14   do it yourself.  Now, I'll give you some time.  I understand

15   it's better for lawyers to have time.  Let me tell you what

16   the jury does.

17           I mean, I give them these instructions, and I like to

18   think they abide by them.  But if you think there are jurors

19   sitting back in that room not thinking about how to decide the

20   case while you're thinking about what to say in closing

21   argument, I think you're not being realistic.

22           So, if I give two hours for you to prepare your

23   closing, they're back there thinking about what the answer is

24   before they've heard your closing and my instructions.  So I'm

25   not going to give them a long time.  I also don't want them to

1    feel like we are wasting their time.

2            MR. MURRELL:  I'm only asking for ten minutes.

3            MR. USTYNOSKI:  I'm asking for 20, Your Honor.

4            THE COURT:  Well, you can get 10 minutes.  I don't

5    know that you're going to get 20.

6            MR. USTYNOSKI:  Okay.

7            THE COURT:  I hear you, and I know how difficult it

8    is to prepare closings.  I know it's better for you if you

9    have more time.  But I'm really trying to run a good trial

10   with engaged jurors who feel like their time is being well

11   spent, so -- but I hear you, I'll get you some time.

12           You may call Mr. Leon as a witness in your case, and

13   that obviously won't be very long.

14           Will Mr. Wambles testify?

15           MR. MURRELL:  No, Mr. Wambles is not going to

16   testify.

17           THE COURT:  All right.  Mr. Wambles, I told you

18   yesterday it's your decision, and that's what you've decided,

19   is not to testify?

20           THE DEFENDANT:  Yes, Your Honor.

21           THE COURT:  All right.  I will treat the defense

22   Rule 29 motion as renewed at the end of all of the evidence,

23   based on all of the evidence, rather than just the evidence

24   that's been presented so far.  And if there is additional

25   information that you would like to say at the time, I will

```
1   give you a chance to do it the next time that the jury is out.
2   So we don't need to take -- we don't need to go into your 20
3   minutes doing that.  We can hold that back.  I'm not going to
4   keep the case from going to the jury.
5           MR. MURRELL:  I mean, I have exactly one or two
6   questions for Mr. Leon, so I don't know if you want to take
7   the break now, and then come back, and I can call him, and we
8   can go right into things.  Whatever the court's preference,
9   but I'm not going to have Mr. Leon up there but for a minute
10  or two.
11          THE COURT:  All right.  How long do you want for
12  closing argument?
13          MR. USTYNOSKI:  An hour, Your Honor.
14          THE COURT:  You can have an hour.  If you talk for an
15  hour, the chances that you will be doing yourself any good in
16  the second half hour is pretty remote, I think.  You may have
17  heard my story before.
18          When they dedicated the battlefield at Gettysburg,
19  the Harvard professor who was the main speaker spoke for two
20  hours.  That other guy spoke for about two and half or three
21  minutes.  What he said is on wall in the Memorial.  Nobody
22  much remembers who the Harvard professor was or what he said.
23  The guy that spoke for only two and a half minutes, he was a
24  lot better.
25          They've sat through this trial.  So I really think,
```

1    if you really talk for an hour, you're not going to be helping

2    yourself.  But I won't cut you off, but you need to focus on

3    the case.

4              Here's what we will do.  We will go ahead and take a

5    little longer break.  I'll let the jurors order lunch.  We

6    will get lunch brought in.  So I'll put them to work ordering

7    their lunch now.  We will take another 15 minutes or so, and

8    then we will come back, put on Mr. Leon, and go right into

9    closings.

10             MR. USTYNOSKI:  One question, Your Honor.  You said

11   there would be a chance to argue -- renew the 29.  You still

12   didn't rule on the fourth count, and I just want to be clear.

13             THE COURT:  I'm going to take that under advisement.

14             MR. USTYNOSKI:  Okay.  Can I just add then before --

15   can I add something to the argument on that?

16             THE COURT:  Do it later.

17             MR. USTYNOSKI:  Oh, later?

18             THE COURT:  Let's do it after the jury goes out.  You

19   can talk as long as you want.  It's not on the jury's time,

20   and you're not interfering with your closing argument.

21             MR. USTYNOSKI:  Okay.

22             THE COURT:  What's the best way to get you the

23   electronic copy of the instructions that are finalized?

24             MR. USTYNOSKI:  Just email or post on the computer.

25             THE COURT:  I'll post it, if that is --

1          MR. USTYNOSKI:  Yes, I'll get notice of that right

2     away.

3          THE COURT:  If you want a Word Perfect version, we

4     can email it to you.

5          MR. USTYNOSKI:  Yes, yeah, that would be great, Your

6     Honor.

7          MR. MURRELL:  I'm going to be right here in the

8     courtroom.  I'm not going to go anyplace, but --

9          THE COURT:  You don't want it electronically.  You

10    want a hard copy.

11         MR. MURRELL:  Yes.

12         THE COURT:  I will bring you a hard copy.  Now, that

13    one you've got on your desk has a change in it.  So, if you

14    want to be heard on that, I mean, take a minute to read that.

15    I'm going to come back at five minutes after 11, that's 20

16    more minutes, and we'll go from there.

17         (*A recess was taken at 10:47 a.m.*)

18         (*The proceedings resumed at 11:06 a.m.*)

19         (*Defendant present; Mr. Ustynoski not present; jury not*

20    *present.*)

21         THE COURT:  Please be seated.  We're missing

22    Mr. Ustynoski.  We'll be at ease.

23         (*Pause.*)

24         AGENT LEON:  Judge, do you want me to --

25         THE COURT:  He's coming in now.

1     (*Mr. Ustynoski entered the courtroom at 11:07 a.m.*)

2          Mr. Ustynoski, that's twice in one trial.  The next

3     time it happens, you will not be pleased with the outcome.

4          MR. USTYNOSKI:  Sorry, Your Honor.

5          THE COURT:  Are we ready for the jury?

6          Jury in, please.

7     (*The jury entered the courtroom at 11:08 a.m.*)

8          All right.  You may be seated.

9          Mr. Murrell, what says the defense?

10         MR. MURRELL:  Judge, I would like to call one

11    witness.  I would like to call Agent Leon.

12        (**MARK LEON**, having been previously duly sworn, was called

13    by the defense.)

14         THE COURT:  All right.  Mr. Leon, you may be seated.

15    You are still under oath.

16         Mr. Murrell, you may proceed.

17                        DIRECT EXAMINATION

18    BY MR. MURRELL:

19    Q.  Mr. Leon, I meant to ask you one question earlier.

20        You told us about the letter you received on January the

21    10th.

22    A.  That's correct.

23    Q.  And that was a letter where you said he wanted to try and

24    work out something; and, if you helped him, he would tell you

25    where the ammonium nitrate was?

1   A.  Yes, sir.

2   Q.  After you got the letter on the 10th, did you go back and

3   talk to him?

4   A.  I did not.

5           MR. MURRELL:  Thank you.  That's all I have.

6           THE COURT:  Cross-examine?

7           MR. USTYNOSKI:  Nothing, Your Honor.

8           THE COURT:  Thank you, Mr. Leon.  You may step down

9   and return to counsel table.

10          Mr. Murrell?

11          MR. MURRELL:  At this time the defense would rest.

12          THE COURT:  All right.  Members of the jury, as I

13  told you, the government goes first, then the defense is not

14  required to present any evidence, but if it does, as the

15  defense did here, then the government again has an opportunity

16  to present evidence just responding to the defense case, so a

17  very narrow scope that the government can call -- can

18  introduce evidence.  The government is not required to

19  introduce any evidence at this phase of the trial.

20          Mr. Ustynoski, is there a rebuttal case for the

21  government?

22          MR. USTYNOSKI:  There is no rebuttal case, Your

23  Honor.

24          THE COURT:  All right.  Members of the jury, that

25  means you've gotten all of the evidence on both sides of the

1    case.  It's now time for the lawyers to make their closing

2    arguments.

3         What I told you about opening statements is true

4    about closing arguments.  What the lawyers say is not evidence

5    in the case.  You've already received all of the evidence.

6    What they say does not constitute your instruction on the law.

7    I will instruct you on the law when they have finished.  I

8    have told them exactly the instructions that I will give you.

9    In fact, I have written them down and they have copies of the

10   instructions.  So they are free to comment on the

11   instructions.

12        Even though the arguments are not evidence and are

13   not your instructions on the law, the arguments are important.

14   They're designed to help you as you go about analyzing the

15   evidence that has come in and as you go about applying the law

16   as set out in my instructions to the facts of the case.  So I

17   ask that you give the lawyers your close attention as I

18   recognize them for their closing arguments.

19        The sequence of arguments is the same as for the

20   presentation of evidence.  The government goes first, followed

21   by the defense.  The government then may respond to the

22   defense argument.  The government gets to go first and last

23   because the law places the burden of proof on the government,

24   as I will explain to you in more detail as part of my

25   instructions.  So I do ask that you give the lawyers your

1    close attention.

2            Mr. Ustynoski?

3            MR. USTYNOSKI:  "Read this letter slow.  You are

4    about to go.  Anthrax is all over this letter.  Take it to the

5    bank because it's true."

6            Are you kidding me?  Take it to the bank because it's

7    true, nobody should believe that?  A reasonable person getting

8    that, without even knowing Mr. Wambles, what he's capable of,

9    takes it to the bank because it's true.

10            Mr. Murrell, Your Honor, members of the jury, good

11   morning.

12            Thank you all for paying close attention during this

13   case.  It's tough asking questions, trying to stay on track,

14   to make sure I get every exhibit in, and watch y'all.  But it

15   seemed like you were all paying attention, taking notes.  I'm

16   sure I speak on behalf of Mr. Murrell, but you were a very

17   attentive jury, and we really appreciate it.

18            You know, you all are sitting here now with 12 robes

19   on.  You're not getting Judge Hinkle's salary today.  I don't

20   know if it pays for your parking, but -- what you all say are

21   the facts as they apply to the law, it doesn't matter what I

22   think, it doesn't matter what Mr. Murrell thinks, it doesn't

23   even matter what His Honor thinks about the facts of this.

24   It's what you come back and tell us what it could be and what

25   they show.  So you all are wearing 12 robes.  You know, it's

1    an extremely important duty.  And, again, I really appreciate

2    how seriously you've taking it by watching you all take notes.

3          Let me just say.  If at any time I offend anybody

4    during this closing, or I -- you know, this is an adversarial

5    process.  So Mr. Murrell objects, I object.  You know, it's

6    not, you know, to the common person, it's not necessarily

7    polite to, you know, to interject or stop people from

8    speaking, but that's just the adversarial process.  So I

9    apologize if during this I said or did anything in my actions

10   or during this closing that I offended anybody.  Write to my

11   boss, Ms. Marsh, but please don't hold it against the

12   government.  And I know that you won't.

13         The court is the boss on the law, and he's going to

14   instruct you on the law; and, if I say anything during this

15   closing that differs, absolutely disregard it, and follow the

16   instructions that the court gives you to a tee.  But there's

17   some things that I think that the government wants to point

18   out to you that I think are very important instructions for

19   you all to consider.  And, again, I'm going to apologize.  I'm

20   probably going to have to speak very fast, because these -- we

21   only have a certain limited time for these closing arguments,

22   and I've never finished one in time in my entire 20 -- 17-year

23   career, I've never had a time where a judge didn't say sit

24   down, you're done.  So I'm going to talk very fast, and I

25   apologize to you and the court reporter.

```
 1              In the jury instructions you're going to see that --
 2   and we all hear the term "reasonable doubt."  You know, what
 3   is a reasonable doubt?  It's an abstract term.  Although, it's
 4   probably the keystone or cornerstone to trying to decide, you
 5   know, if the government has proven its case.  And, again, the
 6   defendant doesn't have to say anything.  The defense -- the
 7   government, I brought these charges.  It only stands to reason
 8   I should have to prove this case, and I submit, after all of
 9   the evidence you've heard, we've done that.  I know some of it
10   was repetitive.  But I wanted to let you know, you know, this
11   argument is going to be made that this was a joke, it was just
12   policy and procedure.  And that's Mr. Murrell's job.  But I
13   wanted to show you how every witness in this not only took it
14   seriously, but they all followed certain steps, and all of
15   these people, different agencies and people within those
16   agencies, all got involved.
17              But you're gonna, you know, when you hear the
18   instruction reasonable doubt, I just want to point out to you,
19   because I submit to you at the end of this it's all really
20   going to come down to, you know, whether you believe it was
21   reasonable how the government took the threat, as we submit to
22   you, was serious and reasonable to believe that it could
23   happen.
24              The government has a heavy burden.  We have to prove
25   it beyond a reasonable doubt, and it stands to reason, and we
```

```
 1   should have to.  But it's not beyond all possible doubt.  The
 2   judge is going to instruct you that it is not necessary that
 3   the defendant's guilt be proved beyond all possible doubt.
 4   It's only required that the government's proof exclude any
 5   reasonable doubt of the defendant's guilt.  A reasonable doubt
 6   is a real doubt based upon reason and common sense after
 7   careful and impartial consideration of the evidence.
 8           I submit to you that's what you're going to hear from
 9   Judge Hinkle at the end of the closings.
10           And, remember, I asked y'all in the beginning, I
11   asked you two things, you know, we listened to you for three
12   minutes, and we look at a piece of paper.  I asked you to be
13   fair to both sides and use your common sense.  That's it.
14   It's really that simple.
15           And the reason I say to use your common sense is
16   because that's the -- the instruction on reasonable doubt is
17   basically saying to you, well, use your common sense.  If you
18   use your common sense, do you really have a reasonable doubt?
19           The government doesn't have to prove it beyond all
20   possible doubt, beyond every shadow of a doubt, to a
21   mathematical certainty.  It's just a reasonable doubt.
22           There's basically four counts in the indictment, and
23   there's four separate letters.  There was a fifth letter that
24   I showed you, and I'll explain to you why, basically, Travis
25   Lawson testified at the end, and the reason I put that on
```

1    there is because, sure, the defendant is apologetic, and he's

2    saying, "I shouldn't have wrote those letters, that's not the

3    way about going -- about doing things."  I mean, don't take my

4    word for it that the defendant wrote the letters, that he knew

5    it was wrong, and that he should have went about it another

6    way, if he's really upset with the federal government.

7              I showed you Mr. Wambles' own words.  There's better

8    ways about going doing things, but how did he go about doing

9    things?  He sent the first -- other four letters.

10             I'm going to analyze quickly each letter as it

11   relates to each count.

12             Count One is the first letter that we believe he

13   wrote.  And, mind you, ladies and gentlemen, you also will be

14   instructed by Judge Hinkle, the government puts on or about a

15   certain date in these things.  Obviously, it's kind of hard to

16   know.  I mean, he's writing it from a prison.  He could've --

17   he could've have wrote it the date before or the date after.

18   We're going by what he writes on the letter and by how they're

19   postmarked.  But the judge is going to instruct you, the

20   government doesn't have to prove it to an exact date, as long

21   as the date we have is reasonable.  We have to prove beyond a

22   reasonable doubt that the date on there is reasonably close in

23   time to the date that we alleged.

24             And we submit to you, by Mr. Wambles's interviews, he

25   said what date he wrote them, when he wrote them, one day

1   after the other.  And then one of the letters to

2   Mr. Wambles -- to Mr. Leon is dated the same day of the

3   interview, and you can tell.  He said, you know, "I fooled

4   with y'all during the interview."

5           So the dates we put on there, I submit to you, are

6   very close to being accurate, if not completely accurate,

7   based on Mr. Wambles' own statements and the postmarks on the

8   envelope.  So I submit to you that I wouldn't get hung up on

9   the dates on the letters.

10          But if we can show the first letter, Exhibit 2,

11  please.  If you can, blow up the bottom part, the bottom

12  portion of it.

13          If you can read the second line, kind of going

14  across, horizontally, ladies and gentlemen, it says, "I need

15  you to read this letter slow, because you are about to go.

16  Anthrax is all over this letter.  So I'm sorry for this day.

17  God bless you all.  Take to it the bank because it's true."

18          Ladies and gentlemen, that letter was mailed to the

19  clerk's office at 111 North Adams Street.  That letter made it

20  to this courthouse.  Can you imagine the clerk, somebody

21  receiving that letter?

22          Mr. Murrell is going to get up here and say, well, he

23  was in prison, and those guards should know, you know, what

24  comes in and comes out, he never had Anthrax there.

25          Ladies and gentlemen, it comes -- that letter got to

1    this courthouse.  When the judge instructs you, is it

2    reasonable to believe, do you think Mr. Wambles wrote that

3    letter with the hopes that the CSO was just going to get it

4    and stop it?  What were the circumstances under which he wrote

5    that letter?

6             That letter was written to get here, make it to the

7    clerk's office and be opened by somebody in the clerk's

8    office.  You don't think somebody in the clerk's office, it's

9    reasonable for them to think that this is a real threat?

10   "Take it to the bank because it's true"?  Do you think

11   somebody is going to open it up, oh, another dissatisfied

12   customer with the government, throw it out.  There can't be

13   any Anthrax in this letter.  Do you think that's what would

14   happen in the clerk's office under these circumstances?

15            I specifically asked every witness, do you know

16   Mr. Wambles or what he is capable of.  You heard their

17   answers.  They don't know him.  They don't what he's capable

18   of.  They don't know who he knows on the outside, what they're

19   capable of.  They don't know what he's learned over the

20   internet.  Why would it be -- we're going to go each letter by

21   each letter, but why would it be unreasonable for anybody who

22   received this at the courthouse in the clerk's office, which

23   is what this defendant intended, why would they ever say this

24   is a hoax, or it can't be?  Why say take to it the bank

25   because it's true?

1          None of these letters are dated April 1st.  It's not

2    April Fools Day, ladies and gentlemen.  It was December before

3    Christmas.  That's the time you want to send it to the clerk's

4    office.  Merry Christmas to the feds.

5          Can you imagine if somebody here in this building,

6    which Mr. Wambles intended it to get through -- first of all,

7    I submit, anybody would take that serious, they don't know,

8    but what if they found out, once they read the letter, oh, by

9    the way, he also hates the government because they shot his

10   pit bull, and he's mad because he's in prison, and he thinks

11   he is wrongfully in prison.  Don't you think that makes it

12   reasonable to believe that threat?

13         If would you, please go to the first jury

14   instruction.

15         Ladies and gentlemen, if anything is different than

16   what I argue to you, listen to the court.  I'm just going to

17   show you what I believe you are going to be instructed on as

18   it pertains to this first letter that we're now talking about.

19         The defendant can be found guilty on Counts One and

20   Two -- which One is the first letter we just spoke about and I

21   showed you on the projector -- first, that the defendant wrote

22   or sent the letter on or about the date alleged in the count

23   under consideration.

24         Well, we're going to go through this real quickly and

25   make it real easy for you.

1           The defendant wrote it.  He admitted he wrote it.

2    It's signed Jamie Wambles.  He told agents both -- he's never

3    admitted -- he never told anybody else that it was anybody

4    else.  He sent the letter on or about the day alleged, which I

5    again I submit to you we went by with what Mr. Wambles said

6    and by the postmarking.

7           The second element that the government has to prove

8    to you beyond a reasonable doubt:

9           The defendant intended to convey through the letter

10   false information.

11          Well, obviously, he didn't have Anthrax.  He's

12   conveying something false.  That's a pretty easy one, I would

13   submit, for your consideration.

14          Third, the false information included, in substance,

15   an assertion that Anthrax had been, was being, or would be

16   used, transferred, or used as a weapon.

17          Well, he put in the letter Anthrax was all over the

18   letter.  Take to it the bank.  Easy enough.

19          And this is going to be the argument for every count.

20          Fourth, under the circumstances, the assertion could

21   reasonably have been believed.

22          Ladies and gentlemen, the Court Security Officer Glen

23   Adcock, he was quarantined for 45 minutes.  Why did they do

24   that?  They had to find out if he touched anything that could

25   be poisonous.  They had to send it to get tested.  Do you

1    think -- hey, do you think, when Mr. Kilgore, the head of the

2    Marshal's Service, said, hey, you know what?  Let's have a

3    good one on Glen.  Let's tell him -- let's put him in there,

4    and let him know that, even though we know that it's a

5    complete hoax and we can't possibly, it's not reasonable to

6    believe this, let's scare the living Jesus out of him and tell

7    him, hey, that could be real, you better get quarantined and

8    we've got to get this checked.  Do you think they decided to

9    play a little joke on Mr. Adcock?  Or do you think the

10   marshals were worried about his safety and the safety of

11   everybody in the courthouse if he's contaminated?  What's

12   reasonable?  Does Mr. Adcock, who received the letter, does he

13   know Mr. Wambles?  I asked him.  Do you think Mr. Adcock knows

14   what he's capable of, what he can get on the internet?  Is

15   that what Mr. Murrell is going to tell you, that Mr. Adcock

16   should have known that this was a bunch of BS?  Think about

17   it.

18           Mr. Adcock gets the letter.  He doesn't know

19   Mr. Wambles.  And then he said he gave it to CSO Porter and

20   tells Andy Kilgore who isn't working.  And, first of all, if

21   it was a big joke, why would Andy Kilgore, who was off, why

22   would he want to ruin his vacation and say, nah, you know

23   what?  Somebody is in prison, who cares.  I'm not coming in

24   for that.  It's a joke.  Why did he come in?  Why did they

25   call the Tallahassee Police Department hazmat team?

1           Do you think they just wanted to bother him and say,

2    hey, let's go through this fire drill; it's not -- you know,

3    it can't be possible, it's not reasonable, but let's call the

4    hazmat employee and get him down here and see if he wants to

5    have a little fun with this one?  Do you think that's what

6    happened?

7           Or do you think they were really worried that there

8    was real Anthrax in that letter?

9           And Mr. Murrell is going to bring out points about at

10   the lab they tested, they've only had one in 5,000.  One in

11   5,000?  Do you think that's -- can you imagine how many people

12   would play the Power Ball if you win one in 5,000?  One in

13   5,000 -- well, look, there is only one in 5,000 chances that

14   you're in trouble, so go home and sleep it off.  Really?  They

15   quarantined him.

16          So they call the hazmat team.  He goes through all

17   the testing procedures for all of the biochemical

18   possibilities.  He said nothing is on the outside of the

19   envelope, and they sent it to Jacksonville to the lab.  Why

20   would they send it to the lab?  Again, they just didn't have

21   nothing better to do?  This is a good fire drill.  Let's send

22   it to Jacksonville and have them go through all the testing

23   procedures.

24          Do you think Mr. Leon -- and it's up to you, ladies

25   and gentlemen.  If you come back and say it's unreasonable,

1    the jury has spoken.  At the end of day, you all can put your

2    head down on the pillows and come back, and Mr. Murrell and I

3    will be agreeable with whatever you say.  But I submit to you,

4    common sense here, common sense.  I mean, and I agree, go back

5    and think, well, what if, what if, what if.  But at the end of

6    day, again, even if you try to come up with some minutia of a

7    possibility, it's only beyond a reasonable doubt.  You have to

8    have a reasonable doubt.

9         Do you think Mr. Leon and the FBI and Mr. Kilgore

10   calling Washington, D.C., do you think he called the threat

11   management center in D.C. because it was a joke, and he knew

12   it?  Do you think he called them and said, hey, look, I know

13   you're in D.C., and, you know, I don't know what you're doing,

14   but we've got this thing, it's just a joke?  I mean, did

15   Mr. Leon and the FBI, everybody in this case, act reasonably?

16   And did they believe reasonably that this was a threat?

17   That's what this case comes down to.

18        Now the second letter, please.

19        Ladies and gentlemen, this was the letter that

20   actually was confiscated first.  If you recall from the

21   testimony, the corrections officers at the Jackson County

22   Correctional Facility confiscated this letter, because they

23   felt in the envelope some suspicious powder or material.  They

24   didn't say powder, but something was in the envelope.  He

25   said -- remember how the agent -- the CO testified, he shook

1    it, it sounded like powder, sand, he felt it.  And his initial

2    impression was, it's probably drugs, maybe cocaine.  Maybe the

3    inmate was trying to send it out and make some money for his

4    commissary.  That was his original knee-jerk reaction.

5           So then he called Sergeant Jeter, and says, we've got

6    this suspicious thing.  And ask yourself, if this is a hoax,

7    and Mr. Wambles -- this is common sense, think about this.

8    Step outside, you know, the facts are the facts, but, you

9    know, the government and what we argue as lawyers is the facts

10   and reasonable inferences therefrom, again reasonableness,

11   common sense.

12          When you read this letter, "To whose reading this.

13   Please read slow.  You're about to go.  This is Anthrax.

14   Merry Christmas to the feds."  And then he decides to write in

15   big letters, "Anthrax."

16          If he really didn't want to threaten or terrorize

17   anybody and this was really a joke, and he really didn't want

18   to be taken seriously, why did he write "legal mail" on the

19   envelope?  He didn't want it to be opened.  We're going to go

20   through the recording, but remember you heard him say, they

21   can't open that unless I'm there.  You know, other mail can't

22   be sealed.  Legal mail they can seal.  Prisoners, inmates can

23   seal them.  And it's ostensibly a letter to a lawyer; and, of

24   course, you can't, you know, law enforcement in any branch

25   cannot come between the purview of a client and his lawyer.

 1    And the policy is, the only -- the only way is if it's a

 2    safety concern.  You know, they're not going to let an inmate

 3    write legal mail just to avoid something, you know, something

 4    illegal contraband to go in or out.  But if he just really

 5    wanted to make this a hoax, why say legal mail?  He wanted to

 6    increase his chances to get it through, which the first letter

 7    I just showed you got through.

 8           Now, in there was a white powder.  Do you see a joke?

 9    "Please read slow.  You're about to go.  This is Anthrax."  He

10    took the time to keep going to the infirmary, by his own

11    admission, to get pills, crush them up into a fine powder, put

12    them in the envelope with that.  Common sense.  Do you think

13    he went through all of that and said, I hope I'm not going to

14    be taken seriously; I hope it gets there; or I hope they find

15    it in the prison and rip it up and throw it in the garbage?

16    Do you think that's what he wanted?

17           Ladies and gentlemen, and we're going to get to

18    Mr. Langley a little bit later, but he told Mr. Langley,

19    indict me federally.  You think this is a joke?

20           He was in state custody.  He wanted to be indicted

21    federally.  This isn't a joke.  He's basically screaming

22    through these letters, indict me federally.  That's what he's

23    doing.  He didn't send these letters for everyone to go, hey,

24    that was a good one, that Jamie Wambles, boy, what a

25    character.  I don't know him, but he's got one helluva sense

1    of humor.  We know what he wanted, because he asked

2    Mr. Langley.

3         Imagine if that letter got to its intended

4    destination.  Again, U.S. District Court -- this is the

5    envelope for that letter -- U.S. District Court, Northern

6    District Clerk Office, 111 North Adams Street, Tallahassee,

7    Florida.

8         When he wrote that letter and put that address and

9    put "legal mail" so it hopefully wouldn't get caught, and he

10   sent it to the clerk of this building, do you think he

11   expected the clerk to see that powder and say, good one,

12   another good one?  Or do you think he reasonably wanted to

13   cause terror?

14        I mean, you know he's upset.  And, look, I had a dog

15   once in my life, I know.  They are like family members.  No

16   question about it.  But nowhere in the instructions that the

17   court is going to read to you today are you going to hear that

18   this is a justification.  And I know you all know it's

19   common -- you can't threaten Anthrax, you can't send Anthrax,

20   you can't even make a threat of it, even if this pit bull, and

21   it doesn't matter whether it was right or wrong, the pit bull

22   attacked the officers, I didn't ask the officers, it doesn't

23   matter, because whether it was right or wrong, you can't send

24   those letters.  You know that.  Guess who even knows that?

25   Mr. Wambles.  I put the fifth letter on there with Mr. Lawson,

```
 1   I know it's not the right way to do things, I know that now.
 2           So he knows there's no justification.  And the court
 3   is not going to read you any justification.  There is none.
 4           But when I ask you to use your common sense to say,
 5   well, did he -- you know, was it reasonable for everybody to
 6   believe him?  Well, he puts right in there why he's mad.  You
 7   know, people do some stupid things.  I do all the time.
 8           Again, can we go back to the elements, the prior
 9   slide?
10           We know the first, he wrote it, he admitted it.
11           Intended to convey through the letter false
12   information.  We know the powder was false.  It was crushed
13   Tylenol.  Easy enough.
14           False information included an assertion Anthrax had
15   been used, was being used.  Was being used, he said in the
16   letter that there was Anthrax in there.  Easy enough.
17           Again, come to this fourth thing, under the --
18   reasonably have been believed.  That's what this whole case is
19   about.
20           And, by the way, you may be instructed that,
21   regardless of what found in Count One, Count Two, Count Three,
22   each one, obviously, you have to independently and separately
23   decide.  If you say guilty on Count One, that doesn't mean he
24   is guilty of Count Two.  You know, you have to go through each
25   one and go through this analysis.  That's why I'm showing you.
```

```
 1          And, again, I submit to you, on the first three
 2   letters, you're going to go first, second, and third, check,
 3   check, check.  And I don't suspect Mr. Murrell is going to get
 4   up here and tell you it's not check, check, check.  In his
 5   opening he said it all comes down to reasonableness.  It all
 6   comes down to the fourth element.
 7          And this is what I'm trying to explain to you.  You
 8   have to think, under the circumstances, what are the
 9   circumstances?  Is this an anonymous letter, you know, sent
10   anonymously?  Law enforcement knows, and he puts in the letter
11   that he's angry.  So each letter that is sent -- Mr. Murrell
12   is going to argue that, after you knew the first one was a
13   hoax, then, come on, government, come on, everybody, you
14   should know it's a hoax.  No.  I submit to you, actually, it
15   gets worse, because he's always telling you what his mind
16   process is.  And if you want to know, scratch a little bit
17   beneath the surface of the facts.
18          He sends two letters threatening Anthrax.  Why does
19   he change to an explosive device and bomb and nitrate and car
20   battery, why?  Ask yourselves that.
21          He wants to be believed.  He wants it to be
22   reasonable.  If you send 20 letters threatening Anthrax, you
23   know, at a certain point, even then you have to take it
24   serious, he could be bluffing all of the time and say, hey,
25   their guard is down now.  They think it's crushed Tylenol.
```

1    You could send 20 letters of Tylenol.  Do you think the 21st

2    letter we should just say, oh, it's just Tylenol?  Really?

3              You heard Mr. Leon's testimony.  There is no little

4    boom, boom, booms here.  There is no little ticker of your

5    respiratory system, if this is real.

6              So I submit to you, even he sent 20 letters, you

7    still have to take the 21st, and it's not -- and it would be

8    unreasonable not to accept every one is a true threat.

9              This is beyond argument.  This is much worse.

10   Because he says to himself, well, I told them the first two

11   were a hoax and it's crushed Tylenol.  So, if I send the third

12   one, in his own mind, he says, well, they probably won't

13   believe it.  What does he do?  I've got nitrate, 110 gallons

14   of ammonium nitrate, car battery, and fuel oil.  He changed

15   that so it's reasonable for us to believe the threat.  He's

16   not going to get what he wants -- listen, he wants somebody

17   prosecuted for his dog.  No?  He wants repercussions for being

18   charged, according to him, improperly for the gun.

19             Is he going to get that with an unreasonable,

20   unbelievable threat?  Hey, that boy, Jamie Wambles, he's got

21   such a sense of humor, let's let him out.  That was a real

22   funny one.  We really got Adcock good.  Call his wife, and

23   he's in a room for 45 minutes, quarantined, but it was all a

24   joke.  Even though he did that, he scared everybody, let's

25   help him out.  Let's investigate his dog.

1          Do you think he really meant it to be a joke and

2   unbelievable?  No.  He wanted action taken.  You need a

3   legitimate threat, don't you?  That's what he was doing.

4   That's why he changed from Anthrax to a bomb.

5          And Mr. Murrell -- again, I would do it if I was in

6   his shoes -- he asked all of the prisoner guards, have you

7   seen ammonium nitrate.  Of course not.  They didn't even know

8   what to do with it.  They don't have test kits there; they

9   don't have suits that look like, you know, a man on the moon,

10  a martian.  They didn't know what to do.  They called the

11  police department.  This is not something they're used to.  So

12  why would they take that as a joke?

13         I mean, look, we all know drugs, you know, cell

14  phones, stuff is smuggled into prisons every day.  And do you

15  think there is no disgruntled people out there with the

16  government?  There is one sitting right there.  Shoot, I don't

17  like to pay taxes, but I'm not going to blow anybody up.  But

18  we all know there's a lot of unhappy people out there with the

19  U.S. Government.  We don't know who he knows.  And by his own

20  words, it only takes 14 grams to blow up a mailbox.

21  Fourteen grams, I could put on the tip of my finger.  You

22  know, this marijuana and drugs, more than 14 grams, there's

23  45 grams of sugar in a coke.  How much is 14 grams?  How hard

24  would that be to smuggle in?

25         Again, he wasn't going to get what he wanted, he

1    wasn't going to get the negotiation, as Mr. Murrell points

2    out, it was just a negotiation for a deal.  He wasn't going to

3    get his side of the bargain, unless his threats would be taken

4    seriously.  I submit, ladies and gentlemen, that's the only

5    thing your -- in good common sense, you could possibly come up

6    with.

7          If we can go to the third letter, please.  The bottom

8    part, please.  A little bit further up.  Right down from

9    there.  Thank you.

10         Third line down, ladies and gentlemen, "I got the

11   boys on the outside to get ready to pay 111 North Adams Street

12   a visit on the week after Christmas."

13         I got the boys?  Who says that?  Somebody that wants

14   to be taken seriously or not seriously?  That's a, you don't

15   know who I am, you don't know who I know, I got the boys.  It

16   doesn't matter that I'm in here.  It doesn't matter that I'm

17   in prison.  I've got the boys on the outside to do my dirty

18   work.

19         Why does he send that letter?  Because he wants

20   repercussions for his dog and his charge.  And if it's a joke

21   and it's not believed, he's not going to get what he wants.

22   So he wants to let everybody know, it doesn't matter that I'm

23   locked up, I got power on the outside.

24         Ammonium nitrate, fuel, and a battery makes a big,

25   big boom.  Well, who knows that?  I mean, ladies and

```
 1   gentlemen, I'll be the first to say, I am not the most
 2   intelligent lawyer, and, if it comes down to intelligence,
 3   Mr. Murrell is going win every time.  But I'm fairly educated,
 4   and I don't remember in grade school, I don't remember at Holy
 5   Trinity, I don't remember at Bishop Hafey High School, I don't
 6   remember at the academy, where my dad shipped me to get me out
 7   of trouble, which was a horrible place, it was like a military
 8   academy, I don't remember learning about nitrates and fuel oil
 9   and a battery, okay?  So I didn't learn it in high school.
10   Then I went to Penn State, where I turned to boxing and had
11   what little bit of brains I had knocked out, and decided to
12   try to become a lawyer -- bad decision, should have went to
13   med school -- but I don't remember Penn State for four years
14   learning how to make a bomb.  I wouldn't know that those three
15   make a big boom, boom, boom.  And then I finally went to law
16   school, somehow I got in and passed and got my JD degree, and
17   I don't remember learning it in law school.  That wasn't part
18   of my JD degree.
19        Why does he put that in a letter?  To let you know he
20   knows, he researched it.  Is that to be taken un-seriously or
21   seriously?  I mean, I wouldn't know what to do with those
22   three.  I wouldn't know if they are important.  That's why I
23   called the bomb expert.  I wanted to hear it from him.  I
24   wanted y'all to hear it.  I'm sorry if some of your members
25   know.  I mean, I did hear that fertilizers could be used, but
```

1    other than that, I mean, I just -- you know, he wasn't

2    involved in the case, he didn't analyze anything, but I wanted

3    to know what those three would do.

4         Do you know who apparently knows?  Him.  Oh, but it

5    was a joke.  Let me actually put three things together with

6    maybe an ignite and it would go boom, boom, boom.  Why didn't

7    he use baking soda or something that doesn't matter, if it's

8    not going to be taken seriously?  Why did he use those three?

9    Well, you heard why.

10        The Tallahassee Police Department, the commander of

11   the bomb squad, told you, and there's videos all over the

12   place, all over the internet.  If you have those three and the

13   instructions, there's a video that tells you how to do it.  He

14   wants to be believed.  That's why he used those three.  That's

15   why he switched from Anthrax.  All right.  They know I'm

16   pulling BS on the Anthrax.  Let me go to something else that I

17   know about.

18        So get ready, that building will go.  Another funny

19   joke.  So hope now I got your eyes open, but it's too late.

20   Now if I get moved out of this jail and y'all look into my

21   dog's death, it will not happen.

22        There it is, in his own words, that he has to be

23   taken seriously.  That threat has to be reasonably believed.

24   He wants it to be, and it was, and you can tell by the actions

25   of everybody.  That's why we are in court today.

1    And he says, if you look into those things, it won't

2  happen.  So he wants his own form of justice.  But, if I stay,

3  you will see, boom, boom, boom.  Jamie Wambles.

4    I mean, on the government's worse day, ladies and

5  gentlemen, common sense.  How could that possibly be seen as a

6  pale threat?

7    Please go to the instructions for three, please.

8    You will be instructed from the court something to

9  this effect:

10    When you get to the third later, because it says

11  Count Three, and I can tell you the substance of Count Three

12  is the third letter that we just went over.

13    First, the defendant wrote or sent a letter on or

14  about the date alleged in Count Three.

15    Again, I already discussed -- I submit to you that,

16  you know, that the date is very, very close, if not identical,

17  and I don't think that Mr. Murrell will submit otherwise.  His

18  own client admitted when he wrote these letters, and the

19  postmarkings.

20    Second, the defendant intended to convey through the

21  letter false information.

22    Well, he intended to convey that he would blow up the

23  building, which, of course, Mr. Murrell is going to get up

24  here and say it wasn't true.  Look, to this day, who knows --

25  who knows what Mr. Wambles could possess on the outside or his

1   friends could possess.  Who are the boys on the outside

2   possess?  Who knows?

3        But because he intended to convey through the letter

4   false information that he's going to blow up the building,

5   check.

6        Third, the false information included, in substance,

7   an assertion that a destructive device had been, was being, or

8   would be used against a person or property in the United

9   States.

10       Well, where was that letter sent, the third letter?

11  Northern District Courts, 111 North Adams Street.  Again, it's

12  against a person, people in the building, property of the

13  United States -- the courthouse.

14       An assertion that a destructive device had been, was

15  being, or would be used.  Would be used.  I don't get what I

16  want, you don't look into my dog, it will not happen; but, if

17  I stay, you will see, boom, boom, boom -- would be used.

18       Game, set, and match on that one, ladies and

19  gentlemen.

20       Now, the fourth one that's probably, I would even

21  submit to you, the most -- would take the most -- well, the

22  most.  It requires a little bit more thought process than the

23  other three.  I submit to you the first three, are really --

24  if you use your common sense, there is not much argument to

25  say that there -- that -- that those things could not

1    reasonably be -- be believed.

2          The fourth one, the fourth letter is the one that I

3    want to spend the most time on.  I think Mr. Murrell will as

4    well, because it's the only one that is even possibly

5    debatable.

6          The fourth letter in the fourth count of indictment

7    is a letter written to Mr. Leon here.  And it's the same day

8    he went and interviewed him where Mr. Wambles admits to

9    writing the letters.  Doesn't bring up anybody else being

10   involved.

11         Can I please have the fourth letter?  From the third

12   line down, if you blow up that section, third line down to

13   maybe ten.

14         Ladies and gentlemen, if you look at the end of the

15   second line, I'm -- third line -- still pissed about my dog,

16   and these cops around here.

17         Mr. Murrell is going to say this is a negotiation to

18   get what he wants.  And I submit, you're absolutely right.

19   But the judge is going to read to you in the instructions to

20   Count Four, under the circumstances, reasonable under the

21   circumstances, was this letter a threat?

22         Mr. Leon told you he took it as a threat, and you all

23   can decide if he was reasonable in believing that or not.  It

24   doesn't matter what Mr. Leon believes.  At this point it

25   matters what you all believe a reasonable person would believe

1     under the circumstances of reading the letter.

2          But, again, I submit to you, you can't take this

3     letter out of context and just read one letter.  When Mr. Leon

4     gets this letter -- and, if it wasn't Mr. Leon, consider any

5     reasonable person in his shoes.  You know about the first

6     three letters we just went over, and you heard that he

7     threatened Anthrax, and then he was threatening a bomb, if he

8     didn't get what he wanted.  So now the same person who knows

9     all of that, whatever fictitious reasonable person you want to

10    use, forget Mr. Leon, would a reasonable person who now gets

11    this letter, knowing that he's already threatened what he has

12    and he's mad, he doesn't say, you know what, I tell you, let's

13    let bygones be bygones here.  You know what he says.  I'm

14    still pissed about my dog, who he considers like a family

15    member -- and, again, I get that.  I mean, killing somebody's

16    dog is like pretty much killing a family member.  But, of

17    course, if you kill a family member, you can't go bomb the

18    government.

19         First of all, the Sneads Police Department shot his

20    dog.  Why is he sending -- threatening Anthrax to the clerk of

21    court?  Maybe the police chief of the Sneads Police

22    Department, if he got this mail, he's just mad about his dog,

23    there is no Anthrax in there.  But he didn't send it to the

24    chief, to Burt McAlpin of the Sneads Police Department.  He

25    sent it to unsuspecting people here.  But he doesn't -- but

1    it's not reasonable to believe, ladies and gentlemen?  Really?

2         After he says I'm still pissed about my dog and the

3    cops around here, I've played around with y'all today during

4    the interview.  Really?  This gentleman here plays around with

5    him during the interview.  Is that what you do?  Is that what

6    a -- when you're trying to determine reasonableness here and

7    common sense, after you send three letters, two threatening

8    Anthrax and one a bomb, and the FBI comes and interviews you,

9    if it was all a joke, wouldn't he just say, okay, look, I just

10   wanted what I wanted.  He tells them he wrote them all.  He

11   says, well, you shouldn't believe me, I'm a convict.  That's

12   what he tells them in the interview, you shouldn't believe me,

13   I'm a convict.  And he says that right above it in this

14   letter.  You know that I'm a convict, and no matter what I say

15   you should not have believed what I said to you.  But then he

16   says I'm still pissed about my dog and the cops around here,

17   and then he says, I played around with y'all today during the

18   interview.  I do have ammonium nitrate.

19        So what is reasonable?  Should Mr. Leon -- any

20   reasonable person under those circumstances as existed at that

21   time -- the prior three letters and knowing he's upset and

22   basically said, I played around with you today, I played

23   around with you, Mr. FBI agent, but I still have ammonium

24   nitrate, and then he goes through the letter saying, I want

25   what I want.  And if you do, I'll give you the ammonium

1   nitrate, 110 gallons of it, I'll give you that.  Oh, yes,

2   P.S., I'm going to be truthful -- that would be nice -- with

3   you.  I got nitrate, plus I can get anything you want, guns,

4   ice, meth, bombs.

5          Wouldn't it be unreasonable for Mr. Leon to take that

6   thing, rip it up, and say, it's the fourth one, he's, you

7   know, he's just full of himself, he just wants attention?  Do

8   you think he just wanted attention?  No.  He wanted his dog's

9   death looked into, and he wanted to be moved for the gun

10  charges out of state custody.

11         Mr. Langley said 27 or 29 years on the job, and he's

12  never had an individual tell him, indict me, I want to go fed.

13  Who does that?  I'll tell you.  Somebody who might do

14  something crazy like this.  Somebody who might send Anthrax.

15  Somebody who might have nitrate and put together a bomb and

16  look at the internet.  Obviously, he did.  How did he know to

17  put that in the letter unless he researched it online?

18         Actions.  We have the words.  We all know actions

19  speak louder than words.  Well, where are the actions?  He

20  says it.  He had to go on the internet, he had to get this

21  information.  Again, unless I just went to all of those

22  schools that this, you know, there was no Bomb 101, you know,

23  I didn't take that as an elective.  He researched it.

24         So what's Mr. Leon going to do?  Well, I don't know.

25  By this point, you know, he's saying he wants me to help him

 1   out.  And Mr. Murrell is going to say, look, all he wanted was

 2   a negotiation.  You're darn right, it was a negotiation,

 3   ladies and gentlemen.  But Mr. Leon already knew -- again,

 4   under the circumstances, that's what the count is going to

 5   read.  So Mr. Leon gets this letter and reads it, and he knows

 6   under the circumstances he is a very disgruntled individual,

 7   who may or may not have access to all of the things that he

 8   apparently has knowledge about; and most importantly, knowing

 9   that Mr. Leon is not going to do anything for him, everything

10   he's asking for in this letter, nothing is going to happen.

11        So knowing that, under the circumstances, should

12   Mr. Leon assume that's it?  He's going to say, well, you know

13   what?  I tried four letters, I give up.  Or is it reasonable

14   to assume that he might do something?  What's reasonable?

15        He's already said he's got boys on the outside.  I

16   mean, you could read the Bible literally or contextually.  If

17   you want to just -- Mr. Murrell is going to come up and read

18   the fourth letter, and just read the exact words.  But I want

19   to tell you, when the judge instructs you, under the

20   circumstances, what would a reasonable person believe, and if

21   is it reasonable to believe that this fourth letter is to be

22   considered a threat -- it's not under the circumstance, it's

23   under the circumstances, and in the totality of the letters,

24   his actions, his words.

25        Can we go to the instruction of the fourth count?

1              Count Four, as it relates to this letter, ladies and

2    gentlemen, again, whatever the judge instructs you controls,

3    but I submit you are going to hear this.  There are two

4    elements that the government has to prove beyond a reasonable

5    doubt.  It's that fourth letter.

6              The defendant knowingly caused a written

7    communication addressed to an FBI agent to be delivered

8    through the United States Postal Service as charged in the

9    indictment.

10             Well, first count -- the first element, he mailed a

11   letter to FBI Agent Mark Leon at his FBI office, went through

12   the postal mark -- postal service, and it got to Mr. Leon at

13   the FBI building.  Count one -- element one.

14             Element two, the communication included a true threat

15   to injure a person by bombing the United States Courthouse in

16   Tallahassee, Florida.

17             Now, Mr. Murrell is going to say -- I don't see

18   where -- where, ladies and gentlemen, in this letter does it

19   say he's going to bomb the United States Courthouse in

20   Tallahassee, Florida?

21             Ladies and gentlemen, words have meanings.  When he

22   says he's still pissed about his dog and the cops, and he

23   really does have ammonium nitrate, and he really can get a

24   bomb, and he's not going to get what he wants, what's

25   reasonable to believe?  What would he do with it?  Bomb the

1    United States Courthouse.  Where did every letter go?  Where

2    did all of the letters threatening bombs and Anthrax, where

3    did they go?

4            The third letter was addressed to the District Court

5    here.  He basically said in that third letter what he would do

6    if he doesn't get what he wants.  And now this fourth letter,

7    he still wants the same thing and still says he has access to

8    ammonium nitrate and still has access to bombs.

9            So I submit to you, sure, the words aren't there, but

10   if I don't get what I want, boom, boom, boom, Jamie Wambles.

11   He didn't end it that way again.  But is it the only

12   reasonable way to read his words and his thoughts into this

13   letter?  If it was -- ladies and gentlemen, if it was as

14   simple as, the words, I am going to bomb the courthouse, boom,

15   boom, if it was that simple, if the words aren't in there

16   themselves, then I submit to you, sure, find him not guilty of

17   Count Four; or if this letter could be read in the abstract,

18   and it was just one letter.

19           But, again, you're going to hear the words, under the

20   circumstances, in these instructions.  And, again, that's why

21   I said use your common sense.  Words have meanings, and I

22   submit to you, when you look at the fourth letter, and you

23   take it into the context of all of the other letters, and what

24   is his mind process, when he's asking Mr. Leon what he wants

25   in here?  I'll turn it over.  Sure, if he gets what he wants,

1   he's saying to Mr. Leon, I'll turn over the nitrate; I'll turn

2   over the ice; I'll turn over meth; I'll turn over bombs.  But

3   ask yourself, what if he doesn't get it?

4          There is only a negotiation here, right?  It could go

5   one or two ways.  So Mr. Murrell is going to get up here and

6   argue, if it turns out the good way for Mr. Wambles, he gets

7   what he wants, he turns over the nitrate.

8          There has to be something read into this letter, if

9   he doesn't get what he wants.  Hey, ladies and gentlemen, did

10  he put, oh, if I don't get what I want, nothing is going to

11  happen?  Where's that in the fourth letter?  Sure, he says, if

12  I get what I want, I'll turn it over, but he leaves out the

13  part of what he will do if he doesn't get what he wants.

14         So sometimes, ladies and gentlemen, it's what you

15  say, but you also need to know, it's what you don't say.  So

16  in this letter he's saying, I want this, and I'll turn over

17  all of this stuff, bombs and nitrate, but what does this

18  letter also read, without putting the exact words?  What are

19  the thoughts, combined with everything else you've heard in

20  this case?  Again, he doesn't say, if I don't get it,

21  everything will be fine.

22         Mr. Leon, I submit to you, and the FBI, and it's all

23  for you to think about when you go back, but I submit to you

24  when they got this letter and they knew they weren't going to

25  give him what he wanted, is this no longer a threat, this

```
 1   letter, saying what he has, under all of the circumstances?

 2   Or was it still something they should be worried about?

 3         Mr. Leon called Andy Kilgore -- you heard the

 4   testimony -- and told him, I got this, be on the lookout.

 5   They go to his house looking for suspicious activity.  Sure, I

 6   would love for them to hit the house with a search warrant.

 7   That would be great.  I mean, I wished they took a lot of

 8   measures on every single case.  But I ask you to use your

 9   reasonable, common sense when you look at the fourth letter

10   and read what it says.  But I also ask you to put yourself and

11   try to figure out why he wrote it, what his mindset was, what

12   he wanted; and, if he didn't get it, if he was just going to

13   go away quietly into the night.

14         Ladies and gentlemen, I have about five minutes left

15   in my rebuttal, and I'll come back and talk to you all for

16   about five or seven minutes after Mr. Murrell speaks.  I

17   appreciate your attention, and I ask you to give Mr. Murrell

18   the same attention.

19         THE COURT:  Mr. Murrell?

20         MR. MURRELL:  Thank you, Judge.

21         Good afternoon, ladies and gentlemen.  The question

22   before you now is:  Has the government proven these charges

23   beyond a reasonable doubt?

24         If you think carefully -- I mean, carefully -- about

25   the evidence you've heard, if you pay close attention to the
```

1    instructions the judge is about to give you, and if you use

2    your common sense -- yes, your common sense -- you will see

3    the answer to that question is, no, they simply have not

4    proven these charges beyond a reasonable doubt.

5         Now, did Mr. Wambles do something that was wrong?

6    Yes, he did.  No question about it.  Did he do something that

7    caused a number of people to waste their time and go to

8    expenses that were unnecessary?  Yes, he did that, too.

9    Should he be punished in some way for what he did?  Sure.

10        Is this a joke?  Did he intend it to be joke?  No, he

11   didn't intend it to be a joke.  And did what he do, was that

12   enough to cause the people here at the courthouse to follow

13   certain protocols?  Yes, that's true.

14        But you'll see none of that proves this case beyond a

15   reasonable doubt, and those really aren't the questions you're

16   being asked.  The question you're being asked is -- the

17   question you're being asked is this:  Has the government

18   proven these four particular crimes?

19        Well, there are four crimes really.  They arise --

20   there are two kinds of crimes.  There's four charges alleged,

21   there are two kinds of crime.  The one -- and you've seen the

22   instructions, and you will get a lot of information about it.

23   I would describe the first kind of crime that is charged is

24   essentially making or trying to make a false threat that under

25   the circumstances could reasonably be believed.  Okay?

1      Again, you're going to get a lot more information

2   about it, but I think a shorthand way of looking at it is,

3   one, it's trying to or making a threat that's false under the

4   circumstances that could reasonably be believed, and those are

5   the first three counts you have to deal with.  The first two

6   have to do with Anthrax.

7      Now, what about Anthrax?  Now, forget for a moment

8   what Mr. Wambles said, or when he told them it was Tylenol, or

9   the fact -- well, forget all of that for a moment, but think

10  about Anthrax.

11     You know, we had Mr. Lee, he was the microbiologist

12  from Jacksonville to testify.  He said, in our lab we have

13  gotten about 5,000 -- 5,000 samples to test.  He didn't say

14  all of those were the result of threats.  I suppose somebody

15  could have stumbled across something and thought they should

16  submit it to the lab.  But my guess is that almost all of

17  those 5,000 samples they examined were based on threats.  And

18  how many -- how many of those 5,000 turned out to be Anthrax?

19  One.  One out of 5,000.  Well, think of it in this way.

20     If I were to go buy a car, and I was buying it from a

21  fellow who had sold 5,000 cars in the past, and every time he

22  sold one of those cars, he said it's a good, reliable car.

23  And before I meet up with him, I find out that 4,999 of those

24  cars were not reliable.  In fact, out of 5,000 claims he made

25  about reliable cars, only one was good.  So would I believe

1    that fellow when he told me that he had a reliable car for me?

2    No.

3           Now, this is different.  This is not cars.  And

4    Mr. Lee probably has more information than most of us have

5    about Anthrax.  But I think it's safe to say that all of us

6    know that Anthrax is not an everyday substance.  I think --

7    and a lot of this has been on the news.  People know the word

8    Anthrax.  I think they have some idea what it is.  But use

9    your common sense.  How many real Anthrax incidents have there

10   been in this country?

11          You could probably name them -- probably less than

12   five.  I don't know.  You have to use your own knowledge and

13   think about it.  But the fact of the matter is, Anthrax is a

14   very, very rare substance.

15          So what is the likelihood of any given letter that

16   claims to have Anthrax in it, what is the chances of that

17   claim being true?  One in 5,000?  One in a hundred?  I mean,

18   odds are any given letter that makes that claim is going to be

19   false.  All of us know that.

20          So, if anybody gets a letter that says, this has

21   Anthrax in it, should you be concerned?  Yes, you should be

22   concerned.  Should you take precautions?  Yes.  But can it be

23   said you should reasonably believe that threat?  One in 5,000?

24   No.  It's a hoax.  I think, if you use your common sense,

25   anybody that gets a letter like that, the odds are that it's a

1  hoax.

2          And there's another level to this here.  The letter

3  comes from somebody that's in the jail.  Now, apparently, they

4  do have a problem there at the Jackson County Jail.  A couple

5  of times a month somebody manages to get cigarettes in or some

6  marijuana.  What do you think the odds are of somebody

7  successfully getting Anthrax into the Jackson County Jail?  I

8  would suggest it's about zero.  But there's more to it than

9  that.

10         What are the chances of a prisoner in the Jackson

11  County Jail being able to handle Anthrax and get it in the

12  letter without killing himself and everybody else in the jail?

13  I would say about zero.

14         So, before we even get into the particulars of this

15  case, what is the likelihood of a claim that this letter

16  contains Anthrax?  One in 100, one in 5,000, one in 10,000?

17  Just like that guy who's trying to sell me a car that he makes

18  that claim that it's reliable, it's not something that, given

19  all of the circumstances, can be said to be reasonably

20  believed.  Again, it's something to be concerned about, not

21  something to take lightly, but what are the odds it's true?

22  One in 100, one in 5,000.

23         So we're starting right there without any real

24  details about the case.  But I do think it's important to

25  think about the chronology, and I've got that here.  I would

 1    like to put it up on the board for you.  This is what I made

 2    from my notes, but I think you'll see it's accurate.

 3           How much concern did this all really generate?  I'm

 4    going to talk about all of the letters at this point.  But

 5    these are the dates:

 6           December the 18th, jail officials discovered what we

 7    have been talking about as the second letter.  That's the one

 8    that had the white powder in it.  Well, that same night, they

 9    get Mr. Wambles out of the cell, and he says, yeah, it was a

10    fake, it had Tylenol.  So within hours of finding it, he tells

11    them it's fake, it's Tylenol.

12           Well, nobody is that concerned about it that they go

13    see him for a couple of days.  But then Captain Bryant from

14    the Marianna Police Department, they go to see him.  And at

15    that point, Mr. Wambles says, yes, that's Tylenol, it was a

16    fake.  And then Mr. Wambles volunteers it, yes, by the way,

17    there's another letter that I sent out.  He volunteers that

18    information.  And he says, yes, that's a fake, there's nothing

19    to it.

20           Now, the day before Christmas, Christmas Eve, the

21    third letter arrives at the jail -- or I'm sorry -- at the

22    courthouse.  Let me back up.  Actually, that didn't come until

23    February 26th.

24           December 24th, Christmas Eve, that's when they

25    discover the third letter at the jail.  That's the one that

1    talks about ammonium nitrate.  All right?

2            After they get that third letter on Christmas Eve,

3    does anybody go see Mr. Wambles at any time, the next time or

4    the days that follow?  Mind you, everybody is concerned about

5    this, supposedly.  But nobody goes to see him after they get

6    that third letter, not until Agent Leon goes to see him on --

7    if I have it right -- January the 3rd.  So at least people at

8    the jail weren't too concerned about that.

9            Anyways, December 26th, the first letter arrives at

10   the courthouse.  Well, by then Mr. Wambles has told them that

11   the first two letters are fakes; that there's nothing to them.

12           The next event is January the 3rd.  That's when Agent

13   Leon goes out and talks with Mr. Wambles about what was the

14   third letter, about the ammonium nitrate letter.  And he says,

15   look, all three claims were false; I'm upset about my dog; I'm

16   just trying to get some attention.

17           So, again, if you count the days from that third

18   letter, it's seven -- a good ten days before anybody goes to

19   talk to him about it.

20           And then on January the 4th, that's when Agent Lawson

21   gets that letter that's an apology.  Mr. Wambles says, I'm

22   sorry about writing these letters; I just -- I'm upset about

23   my dog.  And can you please tell me the right way to go about

24   drawing some attention to this?

25           And then January the 10th, Agent Leon gets that

1    fourth letter, and there's no subsequent interview.  Nobody

2    even goes to see Mr. Wambles after that fourth letter.

3          And somewhere in there somebody drives by

4    Mr. Wambles' house, but no search, nobody finds out who his

5    friends are.  I guess Mr. Wambles didn't volunteer to Agent

6    Leon who his friends were, but I don't know that Agent Leon

7    asked him.  And I think if the FBI wanted to, they could find

8    out who his friends were; and if they were really concerned

9    about it, could go see them.

10         Anyway, that's the chronology.  Let me get back to

11   the specific charges.

12         So we've got these two letters with Anthrax.  The

13   likelihood of anybody sending a letter with Anthrax in it is

14   extremely slim.  One in 100, one in 1,000.  What I'm saying to

15   you is, given those odds, you might want to take precautions,

16   you might want to be concern about it, but there is no reason

17   to be.

18         Then we get this third letter, and that was

19   discovered Christmas Eve.  That's the one that talks about

20   ammonium nitrate.  Well, at this point Mr. Wambles has already

21   told them, already told Captain Bryant, yeah, I sent two

22   letters, and they were fakes; and, yes, I said there was

23   Anthrax in them, but I was just making that up.  So then we

24   get this third letter that talks about -- it gets

25   intercepted -- it talks about ammonium nitrate.

1           Well, could anybody reasonably believe that was true

2    under the circumstances?

3           Well, you know, I already made up these things twice.

4    You know, going back to that car salesman, if he sold me two

5    bad cars, if he told me the first time he sold it to me that

6    it was reliable, and it wasn't; he sold me a second car, said

7    it was reliable, and it wasn't, do you think when I went back

8    the third time and he told me, yeah, this is a reliable car, I

9    would believe him?  Of course not.  Again, that's cars, this

10   is something different.

11          But the fact of the matter is, once somebody has told

12   you, hey, this was a hoax the first two times, how reasonable

13   is it to believe that the third letter is true?  It's not.

14   Take it seriously, yes, but that's not the same issue.

15          By the way, I did want to talk a little bit more

16   about that.  The marshals and the court security, they did the

17   right thing, and they do a fine job here.  They have a lot of

18   responsibility; and, yes, they should follow protocol.

19          Now, remember, Mr. Adcock, he's the one that

20   Mr. Ustynoski mentioned was quarantined.  And was all of that

21   a joke?  Why would they do that?  Well, they did it because

22   they were following the protocol.  Mind you, Mr. Adcock never

23   even read the letter.  But, at any rate, they were following

24   protocol.  Of course, when a threat comes to the courthouse,

25   and there is a claim of a biological or chemical agent, there

```
 1   are certain things they do.

 2          Now, do they have to send them all to Jacksonville?

 3   I suppose you could debate that.  But they followed protocol,

 4   and it makes perfect sense.  You know, the questions that were

 5   directed to the officers were not, did you believe the threat

 6   to be true?  The questions that were directed was, well, were

 7   you concerned?  Did you follow protocol?  Well, yes, they did.

 8          You know, the best example of this is Captain

 9   Simmons.  He was the fellow from the fire department.  He got

10   that letter, and he took it to the health department here in

11   Leon County.  He talked about some testing that they did.

12   Well, what was part of that testing?  They tested it to see if

13   it was radioactive.  Well, where in the world did that come

14   from?  Did somebody reasonably believe that this letter was

15   radioactive?  No.  They were following protocol, and that's

16   what that was all about.

17          Yes, the marshals took some steps.  The FBI sent

18   somebody out to see him.  They reported up the chain.  They

19   put Mr. Adcock in quarantine.  They sent it to the lab.  They

20   were following protocol.  And the question, again, is not, by

21   the way, what any individual officer may have thought or

22   believed, it's more of a general question.  Under all of the

23   circumstances, are these the kind of threats that reasonably

24   could have been believed?  That's the overall question.

25          All right.  We've got the two Anthrax claims.  Well,
```

1    one in 5,000 times, every threat turns out to be Anthrax.  All

2    of us I think know that Anthrax is a very, very rare

3    commodity, and the likelihood of somebody managing to get it

4    into jail and get it out is just pretty much nonsense.

5           The ammonium nitrate, well, he's already twice told

6    us he's been involved in hoaxes.  How many times are you going

7    to believe him?  How many times is it reasonable to assume

8    that this could be believed, if he's already sent out two

9    hoaxes?

10          And then the fourth count has to do with this letter

11   that was sent to Mr. Leon on the 10th, or he got it on the

12   10th.

13          Now, read that letter any way you want, and you'll

14   see there is no threat.  You can read all of the letters in

15   combination.  What he said -- he's already apologized.  And,

16   by the way, you know what happened between January the 10th

17   and January the 4th?  That's when Agent Lawson got that

18   letter, and we didn't see it up on the screen during

19   Mr. Ustynoski's closing argument, but you saw it earlier

20   during the case.  He says, I'm sorry.  And this information is

21   passed on to Mr. Leon, by the way.

22          But, anyways, Mr. Leon gets this fourth letter, and

23   by then we know that three of the claims are hoaxes, three

24   times he's cried wolf, and there is no wolf.  So, is it

25   reasonable to believe it?  No.  But even beyond that, even

1   beyond that, if you read the letter, there's no threat.  He's

2   saying, look, I'll turn over the nitrate to you, if you just

3   tell me how to fix this problem with my dog and these charges

4   here.  You can read it backwards, forwards.  There is no

5   threat.

6          So that's what this case is all about.  You've got

7   two threats involving ammonium nitrate.  That is extremely,

8   extremely unlikely, almost impossible.  You've got one count

9   involving ammonium nitrate, where he's already twice pulled a

10  hoax, and then you've got the fourth one that is not a threat,

11  where three times already he's admitted that, look, this is

12  all a hoax.

13         And, by the way, of course, the test, as I said, it's

14  not whether it's a joke.  He was trying to get attention.  No

15  question about that.  But the question is:  Can it be said

16  that these claims under the circumstances could reasonably be

17  believed?

18         Now, what makes this test a little sharper for you is

19  this:

20         It's not, is there a good chance that these could

21  have reasonably been believed; is it likely; is it more likely

22  than not?  No.  It's a test, it's a very tough test.  And it's

23  proof beyond a reasonable doubt.  And what does that mean?

24  Well, the judge is going to tell you.

25         Proof beyond a reasonable doubt is evidence that is

 1   so convincing that you would, in the most important of your

 2   own affairs, rely upon it without reservation, not just rely

 3   upon it, but rely upon it without reservation.  Well, what are

 4   the most important of our daily affairs?  Well, maybe spending

 5   thousands of dollars buying a house, maybe deciding whether or

 6   not to have surgery, or maybe deciding whether or not a child

 7   should have surgery.  Those are the most important affairs in

 8   our lives.

 9          Think about this case and put it in that context.

10   The likelihood that the letter contains Anthrax when one out

11   of 5,000 threats really has Anthrax in it, when we all know

12   that Anthrax is a very scarce commodity, with the likelihood

13   of somebody getting Anthrax into the jail and out is just

14   about zero, when that threat about the ammonium nitrate had

15   been made, he already twice told them that, I sent false

16   threats; and when this fourth letter doesn't even contain a

17   threat -- and here, again, it's after repeated false claims --

18   there is a reasonable doubt, and I would suggest there is only

19   one right verdict to return in this case, and that's the one I

20   urge you to return.  That's a verdict of not guilty on all

21   four counts.

22          Thank you.

23          THE COURT:  Mr. Ustynoski?

24          MR. USTYNOSKI:  Thank you, Your Honor.

25          Ladies and gentlemen, I apologize.  I'm trying to get

1  through everything, and there were two more elements of that

2  third letter that I forgot to put on the screen that I submit

3  that you're going to hear from the court, which was the third

4  letter that was confiscated that threatened to bomb this

5  courthouse.  It was addressed to this courthouse.  I read

6  three elements, and I want to apologize, there's two more

7  elements that I believe you're going the hear.

8         Fourth, that under the circumstances the assertion

9  could reasonably have been believed.  And, again, that's the

10  prong that I think all of the counts, and what I -- I surmised

11  Mr. Murrell is going to talk about, and I submit to you is the

12  crux of the matter.

13         And then fifth -- and I went through a lot of

14  questioning.  You probably was wondering why I put Andy

15  Kilgore to explain who hires the COs, who pays that gentleman

16  right there.  Because one of the elements is that, the fifth

17  element, and the court is going to read it to you, but in

18  essence, if the bomb -- if there had been a bomb and it was --

19  you know, if it had gone off or the threat of it and the place

20  was closed down for some time because of a bomb scare, or

21  there was actually an explosion here and part of the building

22  or the whole building was closed down, would it affect

23  interstate commerce?  And I asked -- the reason I went through

24  all of the questions with who pays -- it's an outside

25  contracting company, all of the court security officers, that

1   is headquartered in Austin, Texas.  They have headquarters in

2   Virginia.  The bills are generated from Austin, Texas, and

3   come to the U.S. Marshal's Service to pay the company back in

4   Austin, Texas, and then that company ends up paying the

5   individuals here, and the court security officers that you

6   heard at the front desk and the one that checked you all in

7   today downstairs, those guys are all -- it's a private entity.

8   It's not a government entity.  And, obviously, I submit to

9   you, that the fifth element is also a no brainer.  When you're

10  instructed on it, you're going to hear that, obviously, if

11  there was -- if a bomb had been used at this building, and the

12  bomb was closed -- if this building was closed down for a

13  couple of days, a week, a month, or year, whatever the case

14  may be, the court security officers aren't working, okay?

15  It's affecting interstate commerce.  So that's a nutshell, you

16  know, just a little bit on the fifth count.

17          But again I submit to you, as in all of the counts,

18  when you go through them, and you go through them back there,

19  it all comes down -- and also the fifth element there, ladies

20  and gentlemen, it could be through -- affecting interstate

21  commerce or it's affecting the postal system.  I don't know

22  how Mr. Wambles, I submit to you, if -- you know, of course,

23  he bragged about having 110 gallons of nitrate, but he said it

24  only takes a couple of grams to blow up things.  I don't know

25  if he was going to mail -- potentially mail the bomb, or if it

 1   was going to be boom, boom, boom, a huge explosion.  I mean, I

 2   don't know.  I don't know what is in Mr. Wambles' mind, other

 3   than what he says on paper.  But I submit it's definitely

 4   reasonable within, you know, it's within the realm of

 5   possibility that it could have been a letter bomb, which we

 6   all know happens, or it could have been something much worse

 7   than a letter bomb, in which case it would affect interstate

 8   commerce, because the court security officers and that company

 9   wouldn't be working.

10           All right.  I just wanted to touch on those few

11   housekeeping things.

12           Again, it comes down to reasonableness, all of the

13   counts, and I don't want to keep going over and over.  I think

14   it's painfully obvious on the first three.  This isn't a car

15   salesman.  And it's what's reasonable to believe.  Well, he

16   keeps -- Mr. Murrell keeps mentioning one in 5,000 or one in a

17   hundred, whatever it is.

18           The letter wasn't mailed to Phil Lee, an expert.  It

19   was mailed to the clerk of court.  So when he says you

20   shouldn't believe it, when he wrote that letter, and he put it

21   into the stream of -- and it got to Glen Adcock, luckily,

22   we're on the lookout for it; but, if it got -- it got to Glen

23   Adcock, or it went to somebody in the clerk's office, do you

24   think they know one in 5,000?  That's the number Mr. Murrell

25   wants to submit to you is unreasonable.

1          First of all, I submit one in 5,000, it's not -- with

2    that being the case, every threat of Anthrax, it would be

3    unreasonable to not take seriously.  I admit -- I submit to

4    you that you should find that's, you know, incredibly a low

5    number.  But even if you want to say one in 5,000, that's not

6    bad; one and 5,000 chance that I'm going to go out, I don't

7    need to wear my seatbelt, I'm not going to get in an accident.

8    I submit, one in 5,000 is a very high number of probability.

9    But even if you want to say it isn't, how does Glen Adcock or

10   anybody in the clerk's office know those numbers?  Did any of

11   y'all know that before the expert?  Do you think Mr. Murrell

12   knew that number before the guy testified?

13         All of the sudden it's not reasonable, ladies and

14   gentlemen, if you believe the defense argument, it's not

15   reasonable because Phil Lee in the lab knows the number.  Do

16   you think Glen Adcock knew who got the letter the number?

17         We hope y'all go back, you can ask the judge -- and

18   all of the evidence will be back there for you.  I'm not going

19   to play his whole confession, the tape that I played during

20   the trial.  Basically, he admits to everything on there.

21   There's no question about it.  He says why he did it and why

22   he's mad.  But I do want to point out to you something very

23   important.

24         And it's the transcript, Exhibit 14(b), and you can

25   listen to the recording yourself.  And, actually, you know, I

1   submit that you should listen to his own words, what you want

2   to know whether it's reasonable when we hear these things what

3   Mr. Leon and all of the agents would think.

4          In part he says, tell you right, if I get out right

5   now -- first of all, he's talking about Burt McAlpin shot his

6   dog.  To him, somebody who was like a family member who he

7   slept with and spent about $6,000 on.  And Burt, oh, well, the

8   dog was aggressive and tried to -- no, he didn't.  Tell you

9   right.  If I get out right now, I'd blow his house up.  It's

10  a -- that's like a -- that's my kid.  You know what I mean?

11  But like when y'all got a kid, that's my kid.  That's the way

12  I feel about him.  That's -- that's bad thing to say 'bout he,

13  Burt McAlpin, hate his guts.

14         Knowing when he got out he would blow up his house,

15  ladies and gentlemen, he's basically saying that somebody

16  killed a family member of his.  You don't think we should take

17  any of his threats seriously?  Are you kidding me?

18         How does this even come close to a car salesman?  I

19  know Mr. Murrell had to come up with something last night, but

20  there's nothing he can come up with.  I mean, it's a tough

21  situation.  What other -- other than the situation like this,

22  what can he come up with that's even close?

23         The government, it doesn't matter whether it was a

24  hoax.  Mr. Murrell keeps saying, well, they found out that the

25  first two were a hoax.  Well, the charge is a hoax.  It's

1    threatening communication.  It doesn't matter if there was no

2    Anthrax in there.  It doesn't matter that it was Tylenol.  If

3    it's reasonable to believe that it's Anthrax, he would be

4    guilty.  So who cares if he told them the first two were not

5    Anthrax, it doesn't matter.  It's a hoax.  And is it

6    reasonable to believe?  And after he sent the first two, sure,

7    he told some people, and some people know it was; but, if that

8    third letter got through, it was confiscated, but when

9    Mr. Wambles wrote it and put "legal mail" on there, knowing

10   one of them got through, do you think he really wanted to get

11   caught in the third one?  That was going to come to the clerk

12   of court threatening a bomb.  This is a guy who believes his

13   kid was murdered.  We should just sweep this under the carpet

14   and say it's not a reasonable threat?  Really?

15          THE COURT:  Mr. Ustynoski, you're in your last

16   minute.

17          MR. USTYNOSKI:  Okay.  Thank you, Your Honor.

18          Mr. Murrell says he wanted attention.  No question.

19   Those were his words just now.  Well, how do you get

20   attention?  How is he going to get attention?  By a threat

21   that is not reasonable?  Come on.  Come on.

22          The bell of truth.  This letter has to ring the bell

23   of truth, or he wasn't going to get what he wanted.

24          Ladies and gentlemen, the word "verdict" comes from a

25   Latin phrase, *veredictum.*  It means to speak the truth, to say

1    the truth.  Ladies and gentlemen, this is not a search for

2    doubt, and it's not a search for a conviction.  It's a search

3    for the truth, and the truth is Mr. Wambles is painfully

4    guilty of every single count, and you can take that to the

5    bank.

6              Thank you.

7              THE COURT:  All right.  Members of the jury, it's now

8    my duty to instruct you on the law that you must follow in

9    deciding the case.  When I have finished, you'll go to the

10   jury room and begin your deliberations.  I have written my

11   instructions, and I'll give you copies for reference during

12   your deliberations.  You, therefore, don't need to take notes.

13   Please just pay close attention as I go through the

14   instructions with you.

15             I'm going to start with general instructions that

16   apply in all criminal cases.  Then I'll address the specific

17   charges in this case.  Then I'll conclude with general

18   instructions on things like how you will return your verdict.

19             It will be your duty to decide whether the government

20   has proved beyond a reasonable doubt that the defendant is

21   guilty of the crimes charged in the indictment.  You must make

22   your decision based only on the evidence introduced during the

23   trial, and you must not be influenced in any way by either

24   sympathy or prejudice for or against the defendant or the

25   government.

1          You must follow the law as I explain it to you,

2     whether you agree with the law or not.  And you must follow

3     all of the instructions as a whole.  You may not single out or

4     disregard any instruction.

5          The indictment is not evidence of guilt.  Indeed,

6     every defendant is presumed by the law to be innocent.  The

7     law does not require a defendant to prove his innocence or to

8     produce any evidence at all.  And if a defendant chooses not

9     to testify, you must not consider that in any way in reaching

10    your decision.  The government has the burden of proving a

11    defendant guilty beyond a reasonable doubt, and if it fails to

12    do so, you must find the defendant not guilty.

13         Thus, the government's burden of proof is a strict or

14    heavy burden, it is not necessary, however, that the

15    defendant's guilt be proved beyond all possible doubt.  It is

16    only required that the government's proof exclude any

17    reasonable doubt of the defendant's guilty.  A reasonable

18    doubt is a real doubt based on reason and common sense after

19    careful and impartial consideration of all of the evidence.

20    Proof beyond a reasonable doubt is proof of such a convincing

21    character that you would be willing to rely and act on it

22    without reservation in the most important of your own affairs.

23    If you are convinced that the defendant has been proved guilty

24    beyond a reasonable doubt, say so.  If you are not convinced,

25    say so.

1          As I've said you must decide the case based only on

2    the evidence presented during the trial.  The evidence

3    consists of the testimony and the exhibits.  What the lawyers

4    say is not evidence.  It is your own recollection and

5    interpretation of the evidence that controls, not theirs.

6    Also, you should not infer from anything I have said or done

7    that I have any opinion on the merits of the case favoring one

8    side or the other.

9          As you consider the evidence, you may make deductions

10   and reach conclusions that reason and common sense lead you to

11   make; and you should not be concerned about whether the

12   evidence is direct or circumstantial.  Direct evidence is the

13   testimony of a person who asserts actual knowledge of a fact,

14   such as an eyewitness.  Circumstantial evidence is proof of a

15   chain of facts and circumstances tending to prove or disprove

16   a fact in dispute.  The law makes no distinction between the

17   weight you may give to either direct or circumstantial

18   evidence.

19         Now, in saying that you must consider all of the

20   evidence, I do not mean that you must accept all of the

21   evidence as true or accurate.  You should decide whether you

22   believe what a witness said and how important the testimony

23   was.  You may believe or disbelieve a witness in whole or in

24   part.  Also, the number of witnesses testifying on each side

25   of the dispute is not controlling.

1            In determining the believability of a witness and the

2    weight to be given the testimony, you may properly consider

3    how the witness acted as well as what the witness said.  Some

4    things you should consider are:

5            1.  Did the witness have an adequate opportunity to

6    see and know the things the witness testified about?

7            2.  Did the witness have a good memory?

8            3.  Was the witness honest and straightforward in

9    answering the question?

10           4.  Did the witness have an interest in the outcome

11   of the case?

12           5.  Did the witness's testimony seem reasonable

13   considered in the light of all of the evidence and in the

14   light of your own experience and common sense?  And,

15           6.  Did the witness do or say something at some other

16   time inconsistent with the testimony the witness gave before

17   you during the trial?

18           When knowledge on a technical subject might help the

19   jury, a person having special training or experience is

20   permitted to state an opinion on the subject, but that does

21   not mean that you must accept the opinion.  The same as with

22   any other witness, it is up to you to decide whether to rely

23   on the testimony.

24           If a witness has been convicted of a felony, that is

25   another factor you may consider in deciding whether you

344

1  believe the witness's testimony.

2          Now let me turn to the charges in this case.

3          The indictment charges the defendant, Jamie Lee

4  Wambles, with four crimes called "counts."

5          Counts One and Two charge the defendant with false

6  claims relating to Anthrax.  The separate counts arise from

7  separate letters.

8          Count Three charges the defendant with a false claim

9  relating to a destructive device.

10          Count Four charges the defendant with threatening to

11  injure a person by bombing the United States Courthouse.

12          Now I'm going to explain these counts in more detail

13  starting with Counts One and Two, the counts charging false

14  claims relating to Anthrax.

15          The defendant can be found guilty on Count One or Two

16  only if all of these facts have been proved beyond a

17  reasonable doubt:

18          First, the defendant wrote or sent a letter on or

19  about the date alleged in the count under consideration;

20          Second, the defendant intended to convey, through the

21  letter, false information;

22          Third, the false information included, in substance,

23  an assertion that Anthrax had been, was being, or would be

24  possessed, transferred, or used as a weapon; and,

25          Fourth, under the circumstances, the assertion could

1    reasonably have been believed.

2           Anthrax is possessed, transferred, or used as a

3    weapon if it is possessed, transferred, or used to injure or

4    intimidate a person or for anything other than peaceful

5    purposes.

6           Count Three charges a false claim relating to a

7    destructive device.  The defendant can be found guilty on

8    Count Three only if all of these facts have been proved beyond

9    a reasonable doubt:

10          First, the defendant wrote or sent a letter on or

11   about the date alleged in Count Three;

12          Second, the defendant intended to convey, through the

13   letter, false information;

14          Third, the false information included, in substance,

15   an assertion that a destructive device had been, was being, or

16   would be used against a person or property in the United

17   States;

18          Fourth, under the circumstances, the assertion could

19   reasonably have been believed; and,

20          Fifth, if a destructive device had actually been used

21   as asserted, at least one of these would have been true:

22          (A)  The mail would have been used to deliver the

23   destructive device or to arrange its detonation; or,

24          (B)  The destructive device would have been used

25   against property used in an activity that affects interstate

1  commerce; or,

2          (C)  Detonation of the destructive device would have

3  affected interstate commerce.

4          A destructive device is an explosive -- a bomb,

5  grenade, or similar device -- or any material that can be used

6  to convert any other device into an explosive.

7          An activity affects interstate commerce if it delays,

8  interrupts, or changes the flow of business activities between

9  a state and any other state or foreign country.

10         Count Four charges the defendant with threatening to

11 injure a person by bombing the United States Courthouse.  The

12 defendant can be guilty on Count Four only if all of these

13 facts have been proved beyond a reasonable doubt:

14         First, the defendant knowingly caused a written

15 communication addressed to an FBI agent to be delivered

16 through the United States Postal Service, as charged in the

17 indictment; and,

18         Second, the communication included a true threat to

19 injure a person by bombing the United States Courthouse in

20 Tallahassee, Florida.

21         A threat is a true threat only if is serious in tone

22 and only if, under the circumstances, a reasonable person

23 would believe the defendant intended to carry it out.  A

24 threat can be a true threat even if the defendant did not

25 actually intend to carry it out.  But these are not true

1  threats:  idle talk, something said jokingly, or a threat that

2  is obviously removed from reality.

3        Now some definitions that apply to all counts and

4  some concluding general instructions.

5        An act is done "knowingly" if it is done voluntarily

6  and intentionally and not because of mistake or accident.

7        The indictment charges that the crimes were committed

8  on or about specified dates or, for Count Three, during a

9  period beginning and ending on or about specified dates.

10        The government does not have to prove the exact date

11  of a crime.  It is sufficient if the government proves beyond

12  a reasonable doubt that the crime was committed on a date

13  reasonably near the date or period alleged.

14        You should consider each count separately.  Your

15  verdict on any one count will not determine your verdict on

16  any other count.

17        As I've told you before, you must make your decision

18  based only on the evidence presented during the trial.  And I

19  emphasize that you are here to determine whether the

20  government has proved beyond a reasonable doubt that the

21  defendant is guilty of each specific crime charged in the

22  indictment.  You are not here to determine any other issue.

23        You should not consider the question of punishment in

24  any way.  If the defendant is convicted, the punishment is for

25  me alone to determine later.

1      Any verdict, whether guilty or not guilty, must be

2  unanimous.  In other words, to return a verdict, you must all

3  agree.

4      Your deliberations will be secret.  You will never

5  have to explain your verdict to anyone.

6      It is your duty as jurors to discuss the case with

7  one another in an effort to reach agreement, if you can do so.

8  Each of you must decide the case for yourself, but only after

9  full consideration of the evidence with the other jurors.

10      While you are discussing the case, do not hesitate to

11  reexamine your own opinion and to change your mind, if you

12  become convinced that you were wrong.  But do not give up your

13  honest beliefs just because the others think differently or

14  merely to get the case over with.  Remember, that in a very

15  real way, you are judges -- judges of the facts.  Your only

16  interest is to seek the truth from the evidence.

17      When you go to the jury room, you should first select

18  a foreperson.  The foreperson will preside over your

19  deliberations and will speak for you here in the courtroom.

20      A verdict form has been prepared for your use.  It

21  starts with the name of the court, the name of the case, and

22  the case number.  Then it says, "We, the jury, unanimously

23  return the following verdict," because, as I told you, your

24  verdict must be unanimous.  Then it has one question for each

25  count, so there are four questions corresponding exactly to

1    the counts in the indictment that I just described for you.

2    So it says, for example, "On Count One, a false claim relating

3    to Anthrax on or about December 17, 2012 --" that's the date

4    in the indictment "-- we find the defendant, Jamie Lee

5    Wambles --" there's a blank for guilty or not guilty.

6            The second question is exactly the same, except the

7    date is December 18, 2012, the date in Count Two of the

8    indictment.

9            The third reads, "On Count Three, a false claim

10   relating to a destructive device, we find the defendant, Jamie

11   Lee Wambles --" again, guilty or not guilty.

12           And then, "On Count Four, threatening to injure a

13   person by bombing the United States Courthouse, we find the

14   defendant, Jamie Lee Wambles --" again, guilty or not guilty.

15           And then it ends, "So say we all on, blank, 2013, in

16   Tallahassee, Florida."  There is a signature line for the

17   foreperson.

18           You will have in the jury room this verdict form, the

19   indictment, the exhibits, and 12 copies of these instructions.

20           When you reach unanimous agreement, your foreperson

21   will fill in the verdict form, date, and sign it, and tell the

22   court security officer that you have reached a verdict.  Do

23   not give the verdict form to the court security officer.  Your

24   foreperson will carry the verdict form when you're brought

25   back into the courtroom, and the verdict will be announced

1    here in open court.

2           If you wish to communicate with me at any time,

3    please write down your message or question and give it to the

4    court security officer.  The officer will bring it to me.  I

5    will respond as promptly as possible, either in writing or by

6    having you brought back into the courtroom so I may address

7    you orally.  In any message or question you send, you should

8    not tell me your numerical division at the time.

9           Then, finally, if you counted, you notice that there

10   are 13 of you.  Twelve actually constitute the jury.

11          Ms. ███████, you are the alternate in the case.

12   So, if you would, wait right there for me.

13          For the rest of you, you, of course, can take your

14   pads with you.  Ladies and gentlemen, you may retire to

15   deliberate your verdict.

16      (*The jury exited the courtroom at 12:46 p.m.*)

17          All right.  You may be seated.  While I talk to

18   Ms. ███████, I would ask the lawyers to view the exhibits as

19   compiled by the clerk.  Make sure that everything is there

20   that should be and nothing is there that should not.

21          I need to ask this.  Are there any objections to the

22   instructions as read?

23          MR. USTYNOSKI:  None, Your Honor.

24          MR. MURRELL:  No, sir.

25          THE COURT:  And I think that means there are no

```
 1    objections to the instructions at all.  I think we got

 2    everything worked out ahead.

 3              MR. MURRELL:  That's correct.

 4              THE COURT:  Ms. ███████, I always find myself

 5    apologizing to the alternate.  I do watch you as you watch the

 6    trial, and I know you paid very close attention.  You're a

 7    very good juror.  And then after you spend a couple of days in

 8    the trial, you wind up not going back to the jury room to

 9    participate in the deliberations and make the decision.  So

10    I'm sorry you had to do that.

11              I hope you understand why we have to have an

12    alternate.  Even in a short trial like this one, things do

13    come up.  Jurors get sick.  Sometimes family members get sick.

14    Sometimes a witness testifies, and the juror didn't recognize

15    the name when the name was read, but the witness gets on the

16    stand, and it turns out the juror knows the person, knows

17    something about the person.  It means that that juror

18    shouldn't serve.  When those kind of things happen, if we did

19    not have an alternate, we would have to start all over again.

20              We try cases close in time to the events, as close as

21    we can.  Trials are better if they take place close in time to

22    the events.  Memories are fresher.  It's just better for

23    everybody to get a case over with.  So this case started this

24    year, and here we are in early June getting the case tried,

25    and that's typical in this court.  We get cases tried pretty
```

1    quickly.  But we couldn't do that, if we had to start many of

2    them over.  And so we have an alternate when we have a trial

3    like this, and that's where you come in.  So thanks very much

4    for your service.

5         The instruction not to talk about the case continues

6    until a verdict has been returned.  The courtroom deputy clerk

7    is going to give you a phone number in just a minute where you

8    can call and find out whether a verdict has been returned.

9    They will tell you what the verdict is.  You may be interested

10   in that.  And once you find out that a verdict has been

11   returned, you can talk about the case, if you want.  You never

12   have to talk about the case.  It's entirely up to you.  But

13   please don't talk about it until you know a verdict has been

14   returned.

15        You won't be called again for federal jury duty

16   during this two-year period.  The two-year period ends

17   September 30th.  It's tied to the federal government fiscal

18   year, and we are almost through the two years.  So you could

19   be called again in a future two-year period.  The system has

20   no memory.  So the fact that you were on the jury this time

21   won't affect whether you get called in the future.  And that's

22   the federal system.  The state system is completely separate.

23   You could have a state jury summons in the mailbox when you

24   get home.

25        If you are called again here in federal court in a

1   future two-year period, or if you are called by the state

2   court down the street, I hope you again will respond as

3   conscientiously as you did this time.  You have rendered an

4   important public service.

5          Finally, if there is anything we could have done to

6   make the service less burdensome or better in any way, please

7   let me know.  I'd be happy to hear from you, and so would the

8   people in the clerk's office.  But feel free to call me, I

9   would be happy to hear from you.  I can't fix it for you, but

10  I can fix it for the next group, so --

11         Thanks very much for your service.

12         ALTERNATE JUROR:  Thank you.

13         THE COURT:  At this point you are excused with the

14  thanks of the court.

15         Have the lawyers reviewed the exhibits?  Do you agree

16  that everything is there that should be and nothing is there

17  that should not be?

18         MR. USTYNOSKI:  Yes, Your Honor, the government

19  agrees.

20         MR. MURRELL:  Yes, sir.

21         THE COURT:  And are you certain that the disc, or

22  whatever medium has the recording, has only the recording and

23  nothing else?

24         MR. USTYNOSKI:  Yes, Your Honor.

25         THE COURT:  All right.  Then we'll be in recess until

1    we hear back from the jury.  I would ask you to be within ten

2    minutes.  So you're welcome to go back to your offices.  Have

3    your cell phone with you.  You're welcome to go to lunch, but

4    if she calls and we've got a jury question or verdict and

5    you're at lunch, it means that you can snag it and bring it

6    with you, or leave it, but you can't stay there and finish it.

7    You need to be able to be back in the courtroom within ten

8    minutes.

9            Did anybody want to be heard any further on the

10   motions?  I do treat the defense motion as fully renewed at

11   the close of all of the evidence.  I've got Count Four under

12   advisement.  And the others, I deny the motion.  Anything else

13   that you want to be heard on any of that?

14           MR. MURRELL:  No, sir.

15           MR. USTYNOSKI:  Nothing by the government.

16           THE COURT:  We'll be in recess until we hear from the

17   jury.

18      (*A recess was taken at 12:51 p.m.*)

19      (*The proceedings resumed at 2:00 p.m.*)

20      (*Defendant present; jury not present.*)

21           THE COURT:  Please be seated.  I'm told we have a

22   verdict.  Are we ready for the jury?

23           Jury in, please.

24           While the jury is coming, let me make this statement

25   to everybody in the courtroom.  When the verdict is announced,

1    there should be no outward reaction -- no audible reaction, no

2    visible reaction.  If you don't think you can hear the verdict

3    with the decorum expected in the United States District Court,

4    the time to leave is now.  For anyone that stays, I will

5    expect you to comply with that instruction.

6            Jury in, please.

7        (*The jury entered the courtroom at 2:02 p.m.*)

8            All right.  You may be seated.

9            Would the foreperson please stand?  I understand you

10    have reached a verdict; is that correct?

11            THE FOREPERSON:  Yes, sir.

12            THE COURT:  Please provide it to the court security

13    officer, and you may be seated.  Thank you.

14            This is the verdict in United States versus Jamie Lee

15    Wambles.

16            "We, the jury, unanimously return the following

17    verdict:

18            "On Count One, a false claim relating to Anthrax on

19    or about December 17, 2012, we find the defendant, Jamie Lee

20    Wambles, guilty.

21            "On Count Two, a false claim relating to Anthrax on

22    or about December 18, 2012, we find the defendant, Jamie Lee

23    Wambles, guilty.

24            On Count Three, a false claim relating to a

25    destructive device, we find the defendant, Jamie Lee Wambles,

1    guilty.

2          On Count Four, threatening to injure a person by

3    bombing the United States Courthouse, we find the defendant,

4    Jamie Lee Wambles, guilty.

5          "So say we all on 6/11/2013 in Tallahassee, Florida."

6    The verdict is signed by the foreperson.

7          Members of the jury, now, in accordance with the

8    standard practice followed in this court in every case, the

9    clerk is going to poll the jury; that is, she is going to ask

10   each of you individually whether this is indeed your verdict.

11   You have had other numbers during the jury process.  For this

12   purpose, you're going to get a brand new number.  It's just 1

13   through 6 across the front row and 7 through 12 across the

14   back row.

15          The clerk will please poll the jury.

16          DEPUTY CLERK:  Juror Number 1, is this your verdict?

17          JUROR NUMBER 1:  Yes.

18          DEPUTY CLERK:  Juror Number 2, is this your verdict?

19          JUROR NUMBER 2:  Yes.

20          DEPUTY CLERK:  Juror Number 3, is this your verdict?

21          JUROR NUMBER 3:  Yes.

22          DEPUTY CLERK:  Juror Number 4, is this your verdict?

23          JUROR NUMBER 4:  Yes.

24          DEPUTY CLERK:  Juror Number 5, is this your verdict?

25          JUROR NUMBER 5:  Yes.

1              DEPUTY CLERK:  Juror Number 6, is this your verdict?

2              JUROR NUMBER 6:  Yes.

3              DEPUTY CLERK:  Juror Number 7, is this your verdict?

4              JUROR NUMBER 7:  Yes.

5              DEPUTY CLERK:  Juror Number 8, is this your verdict?

6              JUROR NUMBER 8:  Yes.

7              DEPUTY CLERK:  Juror Number 9, is this your verdict?

8              JUROR NUMBER 9:  Yes.

9              DEPUTY CLERK:  Juror Number 10, is this your verdict?

10             JUROR NUMBER 10:  Yes.

11             DEPUTY CLERK:  Juror Number 11, is this your verdict?

12             JUROR NUMBER 11:  Yes.

13             DEPUTY CLERK:  And Juror Number 12, is this your

14    verdict?

15             JUROR NUMBER 12:  Yes.

16             THE COURT:  Members of the jury, now I want to end

17    where I started yesterday morning, and that's by saying again,

18    thank you very much for your service in this court.  You heard

19    my comments at that time about the jury system.  I meant every

20    word of it.  I do have more confidence in your ability to

21    analyze this evidence and to make the appropriate decision

22    under the law and based on the evidence than I would have in

23    my own ability to do that.  I very much appreciate your taking

24    the time and paying close attention and serving in this court.

25    I do watch you as you watch the trial, and I know you paid

1   very close attention.  I appreciate your doing that.  A couple

2   more notes about the jury process.

3           We operate on a two-year cycle.  The two years is

4   tied to the federal government fiscal year, and we are almost

5   through the two years.  So this two-year cycle ends on

6   September 30, 2013.  In every future two-year period, we will

7   do the same thing we did during this two-year period.  At the

8   beginning of the two years, we estimate how many jurors we

9   might need in all of the cases that go to trial here in

10  federal court in Tallahassee, and then we select at random the

11  appropriate number of people.  You had exactly the same chance

12  as every other registered voter to get called for jury duty

13  during this two years, and you will have exactly the same

14  chance as every other registered voter in each future two-year

15  period.  The fact that you were on this jury won't have

16  anything to do with it.  The system has no memory.

17          The state system is completely separate, so you could

18  have a jury summons in your mailbox when you get home from

19  your home county for state court.  The fact that you were on

20  federal jury duty won't have anything to do with whether you

21  get picked in state court.

22          If you are called in a future two-year period here in

23  federal court, or if you are called in state court in your

24  home county, I hope you again will respond as conscientiously

25  as you did this time.  You have rendered an important public

```
 1   service.

 2          The instruction not to talk about the case ends at

 3   this point.  You can talk about the case if you wish.  You

 4   never have to talk about the case.  Whether to do that or not

 5   is entirely up to you.

 6          The lawyers will not call you.  Lawyers in Florida

 7   are not allowed to call jurors after you serve.  That's a rule

 8   that is put in place to keep you from having to spend more

 9   time if you don't want to.  You can call them, and they would

10   probably be happy to hear from you, but they won't be calling

11   you.

12          If you do decide to talk with anyone about the case,

13   a suggestion -- it's not an instruction or an order, it's just

14   a suggestion -- is that you talk about your own views of what

15   happened and not relate what you were told by other jurors in

16   the confidence in the jury room.  What you were told right

17   there was done in confidence among jurors, so you might choose

18   not to repeat what others said.  Again, that's not an order,

19   that's just a suggestion.

20          If there is anything we could have done to make your

21   jury service less burdensome or more pleasant in any way,

22   please let me know.  I'd be happy to hear from you.  I can't

23   fix it for you, but I can work on it for the next bunch, or

24   let the clerk's office know.  I think they send you a survey,

25   and feel free to put down anything that we could have done
```

1    better.  We would be happy to hear from you.

2           With that I won't keep you further.  You are excused

3    with the thanks of the court.

4       (*The jury exited the courtroom at 2:08 p.m.*)

5           You may be seated.

6           Sentencing is set for August 29, 2013, at 11:00 a.m.

7           Mr. Wambles, the procedure that is going to go

8    forward now is this:

9           The probation officer, who is here in the courtroom

10   today -- she's against that back wall back there behind you --

11   or somebody who works for her, is going to be preparing a

12   presentence report.  That report is the first way I get

13   information to consider on your sentencing.  If there is

14   information that you would like me to have, tell it to the

15   probation officer.  If there are people you would like her to

16   talk to, tell her who they are and how to get in touch with

17   them so she may consider doing that.

18          You should cooperate with her fully in the process.

19   She's not going to ask you about the facts of the case.

20   You've gone to trial.  You will have the right to appeal after

21   the sentence is imposed.  You had the right to remain silent

22   up to this point, and you still have the right to remain

23   silent.  You are not required to talk to the probation officer

24   about the case.  And if you want to talk with the probation

25   officer about the case, you should first talk with Mr. Murrell

1    about whether that's a good idea or not and get his advice

2    about that.  But on other subjects, things that don't have to

3    do with the case but that might have some impact on sentencing

4    and some information would just be useful to the Bureau of

5    Prisons, if you're sentenced to prison, so they need to know,

6    on things like that, you should cooperate fully with the

7    probation officer.

8         You have the right to have your lawyer present when

9    you talk to the probation officer.  You don't have to do that,

10   it's up to you, but it's a right that you do have.

11        When the presentence report comes out, you'll have

12   the right to read it.  You should do so very carefully.  If

13   anything about that report is not correct, or anything is left

14   out that you think should be in it, you need to let

15   Mr. Murrell know that right away.  The court's rules have

16   strict time limits within which any objections have to be

17   made.  So it's important for you to read that report as soon

18   as you get it and talk about with Mr. Murrell.

19        If there are objections, then the lawyers for the two

20   sides and the probation officer will try to sort it out.  If

21   everybody is not able to agree, then I will resolve the

22   dispute at the sentencing hearing.  In order to get that

23   process started, you've got to read that presentence report

24   very carefully and talk about it with Mr. Murrell.

25        Mr. Wambles is in custody, so there is not a release

1    issue.

2         I haven't announced an adjudication.  I still have

3    the motion on the fourth court under advisement, so I will

4    wait to announce an adjudication of guilt until I resolve

5    that.  I'll give it some thought, do some research.  I may

6    just enter a ruling.  It probably won't be a long, written

7    ruling, but I will address it briefly and enter a written

8    ruling.  If I decide it's something that it would be helpful

9    to have any more argument, I'll set that up.

10        What else, if anything, do we need to do in this case

11   this afternoon?

12        MR. MURRELL:  Nothing further from the defense.

13        MR. USTYNOSKI:  Nothing from the government, Your

14   Honor.

15        THE COURT:  I have two matters for the government.

16   I'm sorry.  Sit back down.

17        One, and this goes to cases in general, it just

18   happens that it occurred to me first in this case.  You had

19   all of the exhibits loaded into software so that you showed

20   them.  It would help me to have a courtesy copy.  I'm not sure

21   the extent to which I have the same software, how it works

22   back and forth; but, frankly, for any case, if there is an

23   electronic courtesy copy -- I stopped a long time ago telling

24   people to make me copies of all of the exhibits, because it's

25   just a lot of paper.  But if it's an electronic, it's very

```
 1    easy for me, so that would be helpful.

 2             And then the other thing I was going to tell you.

 3    Mr. Ustynoski, you tried a good case, and I don't mean this as

 4    a criticism in any way, but I need to mention it to you.

 5             Everybody in this courtroom is a profession.  We've

 6    all got different jobs, but we are all professionals.  And

 7    that includes Ms. Stubbs.  She is not your IT girl.  And when

 8    you refer to her that way, I don't think you help yourself

 9    with the jury, but you can't refer to somebody that way in

10    this court if you are older than about 12.  From about 12 to

11    18, they can be young women, and after that they can't be

12    girls at all.

13             MR. USTYNOSKI:  I said IT guru, Your Honor.  It might

14    have sounded like "girl."

15             THE COURT:  I'm sorry.

16             MR. USTYNOSKI:  Guru.

17             THE COURT:  You can speak like you're from

18    Philadelphia, and that's not a problem.  So, if I misheard

19    you, that's my fault.  I should have known you wouldn't say

20    such a thing.  All right.

21             MR. USTYNOSKI:  Not on purpose, Your Honor.

22             THE COURT:  Fair enough.

23             MR. USTYNOSKI:  I'm pretty sure I said guru.

24             THE COURT:  It may very well.  It makes sense at this

25    point.  I just wondered how you would say such a thing, but I
```

1    thought I ought to mention it, and it turns out I shouldn't

2    have.  I just had it wrong.  Fair enough.

3              We'll be in recess.

4         (The proceedings adjourned at 2:14 p.m.)

5                    *  *  *  *  *  *  *  *

6

7    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
8    redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
9    transcript.

10

11

12   *Judy A. Gagnon*                          11/7/2013
     Judy A. Gagnon, RMR, FCRR               Date
13   Official U.S. Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2                                                          PAGE

3     JURY CHARGE CONFERENCE                                203

4

5     WITNESSES FOR THE GOVERNMENT:                         PAGE

6

7         JAMIE JETER (Recalled)
              DIRECT EXAMINATION BY MR. USTYNOSKI.............. 211
              CROSS-EXAMINATION BY MR. MURRELL................. 217

8         WILLIAM ULMER
9             DIRECT EXAMINATION BY MR. USTYNOSKI.............. 219
              CROSS-EXAMINATION BY MR. MURRELL................. 222

10        MARK LEON (Recalled)
11            DIRECT EXAMINATION BY MR. USTYNOSKI.............. 226
              CROSS-EXAMINATION BY MR. MURRELL................. 238
12            REDIRECT EXAMINATION BY MR. USTYNOSKI........... 242

13        ANDREW KILGORE (Recalled)
              DIRECT EXAMINATION BY MR. USTYNOSKI.............. 244
14            CROSS-EXAMINATION BY MR. MURRELL................. 252
              REDIRECT EXAMINATION BY MR. USTYNOSKI........... 255
15            RECROSS-EXAMINATION BY MR. MURRELL............... 257
              REDIRECT EXAMINATION BY MR. USTYNOSKI........... 258

16        GREGORY ARMSTRONG
17            DIRECT EXAMINATION BY MR. USTYNOSKI.............. 259
              CROSS-EXAMINATION BY MR. MURRELL................. 263
18            REDIRECT EXAMINATION BY MR. USTYNOSKI........... 263

19        TRAVIS LAWSON
              DIRECT EXAMINATION BY MR. USTYNOSKI.............. 264
20            CROSS-EXAMINATION BY MR. MURRELL................. 273

21                     *   *   *   *   *   *   *   *

22

23    WITNESS FOR THE DEFENDANT:                            PAGE

24

25        MARK LEON
              DIRECT EXAMINATION BY MR. MURRELL................ 286

1                        *   *   *   *   *   *   *   *

2
                                                            PAGE
3
     GOVERNMENT RESTS                                        274
4    MOTION FOR JUDGMENT OF ACQUITTAL BY MR. MURRELL         276
     RULING                                                  279
5    DEFENSE RESTS                                           287
     CLOSING ARGUMENT BY MR. USTYNOSKI                       289
6    CLOSING ARGUMENT BY MR. MURRELL                         321
     REBUTTAL ARGUMENT BY MR. USTYNOSKI                      333
7    JURY INSTRUCTIONS BY THE COURT                          340
     VERDICT                                                 355
8

9
                        GOVERNMENT'S EXHIBITS
10

11     NO.:                DESCRIPTION                       PAGE

12   16     One-page handwritten letter signed by Jamie      214
            Wambles
13
     17     Evidence bag                                     269
14
     18     One-page document entitled, "Marianna Police     269
15          Department, Property Receipt," dated
            12/24/12
16
     19     Envelope addressed to Mark R. Leon, 227          232
17          North Bronough Street, Suite 6300,
            Tallahassee, FL 32311, postmarked 1/7/13
18
     20     One-page handwritten letter addressed to Mr.     233
19          Mark R. Leon, by Jamie Wambles, dated 1/3/13

20   21     Envelope addressed to FDLE Travis Lawson,        271
            P.O. Box, 1506, Marianna, FL 32447,
21          postmarked 1/3/13

22   22     One-page handwritten letter addressed to Mr.     272
            Lawson from Jamie Wambles
23

24                      *   *   *   *   *   *   *   *

25